**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| ASSOCIATION OF EQUIPMENT MANUFACTURERS, | ) ) ) |
| AGCO CORPORATION, | ) ) |
| CNH INDUSTRIAL AMERICA LLC, | ) ) |
| DEERE & COMPANY, and | ) ) |
| KUBOTA TRACTOR CORPORATION, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| THE HON. DOUG BURGUM, Governor of the State of North Dakota, in his Official Capacity, and | ) ) ) ) |
| THE HON. WAYNE STENEHJEM, Attorney General of the State of North Dakota, in his Official Capacity, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:17-cv-151

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, the Association of Equipment Manufacturers ("AEM"), together with AEM members AGCO Corporation ("AGCO"), CNH Industrial America LLC ("CNH"), Deere & Company ("John Deere"), and Kubota Tractor Corporation ("Kubota") (collectively, the "Manufacturers"), by counsel, respectfully state as follows for their Complaint against Defendants The Honorable Doug Burgum, in his official capacity as Governor of the State of North Dakota ("Governor Burgum"), and the Honorable Wayne Stenehjem, in his official capacity as Attorney General of the State of North Dakota (the "Attorney General") (collectively, the "State").

1

## NATURE OF ACTION

1.  By way of their Complaint, the Manufacturers seek preliminary and permanent injunctive relief, a declaratory judgment, costs, and attorneys' fees with respect to North Dakota Senate Bill 2289 ("Senate Bill 2289"), a copy of which is attached as **Exhibit A**.

2.  Senate Bill 2289 is entitled "AN ACT to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair." The pre-existing provisions of the North Dakota Century Code that Senate Bill 2289 amends and reenacts—Sections 51-07-01.2, 51-07-02.2, and 51-26-06—are referred to collectively as the "North Dakota Farm Equipment Dealership Statute."

3.  Unless its enforcement is enjoined by this Court, Senate Bill 2289 is slated to go into effect on August 1, 2017.

4.  Senate Bill 2289 creates arguably the most restrictive dealership law in the entire country. Both individually and in combination, the provisions of Senate Bill 2289 impose unprecedented restrictions on the ability of farm equipment manufacturers to enforce new and existing contracts with dealers, to maintain their federally protected trademark rights, to enforce dealership appearance and performance standards, and to monitor or prevent warranty and incentive payment fraud.

5.  The provisions of Senate Bill 2289 from which the Manufacturers seek relief (collectively, the "Offending Provisions") are preempted by federal law, unconstitutional, and otherwise unenforceable for the following reasons:

   a.  Senate Bill 2289 deprives the Manufacturers of their right under the federal trademark statute, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act"), to control the quality and uniformity associated with the federally registered trademarks that they

2

license to farm equipment dealers in North Dakota.  If Senate Bill 2289 becomes law, a North Dakota farm equipment dealer licensed to use and display a Manufacturer's trademark could not be required to actually maintain the Manufacturer's farm equipment in stock for sale.  Nor could the dealer be required to maintain any inventory of the Manufacturer's parts even though—as an authorized dealer—it is permitted and indeed required to provide authorized service (including warranty service) for the Manufacturer's farm equipment and to use genuine parts supplied by the Manufacturer for that purpose.  Senate Bill 2289 thus permits a North Dakota farm equipment dealer to use the Manufacturer's trademark identifying its dealership as "bait" to "switch" customers to competing products.  This adverse effect on the Manufacturers' brand integrity is magnified by other provisions of Senate Bill 2289 permitting North Dakota farm equipment dealers to commingle the facilities, personnel, and display space used to sell and service a Manufacturer's farm equipment with its competitors' products.  In this regard, Senate Bill 2289 is akin to a state law that would require McDonald's Corporation to permit franchisees to sell the Burger King Whopper® from facilities licensed to display McDonald's federally registered trademark and "golden arches" trade dress.  Each Manufacturer is permitted (and indeed required) by the Lanham Act to control the quality and uniformity of goods and services offered by the dealers licensed to use its federally registered trademarks.  Senate Bill 2289, however, would impair the ability of each Manufacturer to ensure that North Dakota farm equipment dealers licensed to use its trademarks comply with the appearance and performance standards to which dealers in other states are subject.  Finally, Senate Bill 2289 would deprive each Manufacturer of the right to decide whether to license its federally registered trademarks

3

to new dealers in North Dakota—instead permitting the courts of North Dakota to decide whether a prospective trademark licensee meets the Manufacturer's standards.

b.     Senate Bill 2289 violates the "Contracts Clause" of the United States Constitution, U.S. CONST. art. I, § 10, because it substantially impairs Manufacturers' rights and obligations under their existing agreements with dealers of farm equipment in North Dakota.   Unlike the pre-existing North Dakota Farm Equipment Dealership Statute—which applied only prospectively—Senate Bill 2289 by its terms applies retroactively to existing dealership agreements (and to the renewal of existing agreements with farm equipment dealers).   The provisions of Senate Bill 2289 that impair the Manufacturers' contracts include—in addition to those that interfere with their rights under the Lanham Act—*ex post facto* changes to the payments that Manufacturers must make to North Dakota dealers for performing warranty service and restrictions that make it more difficult for Manufacturers to detect fraudulent claims for warranty reimbursement and incentive payments submitted by North Dakota dealers.

c.     Senate Bill 2289 purports to invalidate arbitration provisions in agreements with North Dakota farm equipment dealers even though the enforceability of such provisions is expressly preserved by 9 U.S.C. § 1 *et seq.* (the "Federal Arbitration Act") as enacted by the U.S. Congress and interpreted by the U.S. Supreme Court.

d.     Senate Bill 2289 runs afoul of the "Commerce Clause" of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3—including the so-called "dormant" Commerce Clause, *i.e.*, "the negative implication of the Commerce Clause:   states may not enact laws that discriminate against or unduly burden interstate commerce." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003).   Senate Bill

4

2289 imposes an undue burden on interstate commerce by preventing a Manufacturer from requiring a farm equipment dealer licensed to use its trademarks from actually maintaining any inventory of the Manufacturer's equipment and parts; by obligating a Manufacturer to fill dealer orders, no matter how small; by impairing a Manufacturer's ability to determine the best locations for the retail sale of its farm equipment; by potentially preventing a Manufacturer from withdrawing entire product lines from the market; and by impairing the ability of a Manufacturer to charge similarly-situated dealers uniform prices for farm equipment "of like grade and quality" sold in interstate commerce as required by federal law.

   e.  Senate Bill 2289 purports to change the prohibition against price discrimination contained in federal law, 15 U.S.C. § 13 *et seq.* (the "Robinson-Patman Act"), so that pricing to North Dakota farm equipment dealers would be subject to a different standard. Because dealers in North Dakota compete with out-of-state dealers, this provision puts Manufacturers in the untenable position of potentially violating federal law if they comply with Senate Bill 2289 or potentially violating Senate Bill 2289 if they comply with federal law.

## PARTIES

### The Manufacturers

### (AEM)

  6.  Plaintiff Association of Equipment Manufacturers ("AEM") is a not-for-profit corporation organized under the laws of Illinois, with a principal place of business of 6737 West Washington Street, Suite 2400, Milwaukee, Wisconsin 53214. AEM is a trade association that, among other things, represents and promotes the legal and business interests of AEM's 900-plus members and of the equipment manufacturing industry in general.

7.     AEM has associational standing to bring this lawsuit on its members' behalf. One or more of AEM's members would have standing to bring this lawsuit in the member's own right, because this lawsuit reflects an actual, justiciable case and controversy that directly affects one or more of AEM's members. This lawsuit is germane to AEM's organizational purpose of promoting the legal and business interests of the equipment manufacturing industry. Moreover, none of the claims asserted or relief requested requires the participation of individual AEM members not already named as Plaintiffs. For purposes of this Complaint, the term "Manufacturer" includes any member of AEM that is not a Plaintiff but is a "manufacturer," as that term is defined by N.D. Cent. Code § 51-26-01(6), of "farm equipment" and "farm implements," as those terms are defined by Senate Bill 2289, N.D. Cent. Code § 51-07-01.2(2) (effective Aug. 1, 2017).

**(AGCO)**

8.     Plaintiff AGCO Corporation ("AGCO") is a corporation organized under the laws of Delaware, with a principal place of business of 4205 River Green Parkway, Duluth, Georgia 30096. AGCO is a "manufacturer," as that term is defined by N.D. Cent. Code § 51-26-01(6), of "farm equipment" and "farm implements," as those terms are defined by Senate Bill 2289, N.D. Cent. Code § 51-07-01.2(2) (effective Aug. 1, 2017). AGCO's agreements with farm equipment dealers in North Dakota are therefore subject to the existing North Dakota Farm Equipment Dealership Statute. These agreements will—effective August 1, 2017—be subject to Senate Bill 2289 unless its enforcement is enjoined by this Court. AGCO is an active member of AEM.

**(CNH)**

9.     Plaintiff CNH Industrial America LLC ("CNH") is a limited liability company organized under the laws of Delaware, with a principal place of business of 6900 Veterans Boulevard, Burr Ridge, Illinois 60527. CNH is a "manufacturer," as that term is defined by N.D.

6

Cent. Code § 51-26-01(6), of "farm equipment" and "farm implements," as those terms are defined by Senate Bill 2289, N.D. Cent. Code § 51-07-01.2(2) (effective Aug. 1, 2017). CNH's agreements with farm equipment dealers in North Dakota are therefore subject to the existing North Dakota Farm Equipment Dealership Statute. These agreements will—effective August 1, 2017—be subject to Senate Bill 2289 unless its enforcement is enjoined by this Court. CNH is an active member of AEM.

### (John Deere)

10.     Plaintiff Deere & Company ("John Deere") is a corporation organized under the laws of Delaware, with a principal place of business of One John Deere Place, Moline, Illinois 61265. John Deere is a "manufacturer," as that term is defined by N.D. Cent. Code § 51-26-01(6), of "farm equipment" and "farm implements," as those terms are defined by Senate Bill 2289, N.D. Cent. Code § 51-07-01.2(2) (effective Aug. 1, 2017). John Deere's agreements with farm equipment dealers in North Dakota are therefore subject to the existing North Dakota Farm Equipment Dealership Statute. These agreements will—effective August 1, 2017—be subject to Senate Bill 2289 unless its enforcement is enjoined by this Court. John Deere is an active member of AEM.

### (Kubota)

11.     Plaintiff Kubota Tractor Corporation ("Kubota") is a corporation organized under the laws of Delaware, with a principal place of business of 1000 Kubota Drive, Grapevine, Texas 76051. Kubota is a "manufacturer," as that term is defined by N.D. Cent. Code § 51-26-01(6), of "farm equipment" and "farm implements," as those terms are defined by Senate Bill 2289, N.D. Cent. Code § 51-07-01.2(2) (effective Aug. 1, 2017). Kubota's agreements with farm equipment dealers in North Dakota are therefore subject to the existing North Dakota Farm Equipment

Dealership Statute. These agreements will—effective August 1, 2017—be subject to Senate Bill 2289 unless its enforcement is enjoined by this Court. Kubota is an active member of AEM.

## The State

12.     Defendant the Honorable Doug Burgum ("Governor Burgum") is the Governor of the State of North Dakota. The Office of Governor Burgum is located at 600 East Boulevard Avenue, Bismarck, North Dakota 58505. The North Dakota Constitution obligates Governor Burgum to see that the laws of the State of North Dakota "are faithfully executed." N.D. CONST. art. V, § 7, cl. 1. Governor Burgum is named as a Defendant to this action solely in his official capacity.

13.     Defendant the Honorable Wayne Stenehjem (the "Attorney General") is the Attorney General of the State of North Dakota. The Office of the Attorney General is located at 600 East Boulevard Avenue, Department 125, Bismarck, North Dakota 58505. "The Attorney General is the principal law officer of the state with duties and authorities coextensive with the public legal affairs of the whole community." *North Dakota State Board of Higher Education v. Jaeger*, 815 N.W.2d 215, 221 (N.D. 2012). The North Dakota Century Code authorizes the Attorney General to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state which may be necessary in the execution of the duties of any state officer" and to "[a]ttend to and perform any other duties which from time to time may be required by law." N.D. Cent. Code §§ 54-12-01.1, 54-12-01.15. The North Dakota Century Code also authorizes the Attorney General and his assistants "to institute and prosecute all cases in which the state is a party, whenever in their judgment it would be for the best interests of the state to do so." N.D. Cent. Code §§ 54-12-02. Additionally, the Attorney General "has the right, independent of any statutory provision, to institute an action in the courts when it is required for the general welfare of the people." *State* ex rel. *Heitkamp v. Family Life Services, Inc.*, 616 N.W.2d 826, 832 (N.D.

8

2000).   The Attorney General is named as a Defendant to this action solely in his official capacity.

## JURISDICTION AND VENUE

14.     This action arises under the United States Constitution and under federal statutes, including 42 U.S.C. § 1983, 28 U.S.C. § 2201 *et seq.* (the "Declaratory Judgment Act"), the Federal Arbitration Act, the Lanham Act, and the Robinson-Patman Act.

15.     Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337(a) (statutes regulating commerce and antitrust).

16.     Venue is proper in the United States District Court for the District of North Dakota pursuant to 28 U.S.C. § 1391(b) because the State resides in the District of North Dakota and because a substantial part of the events giving rise to the Manufacturers' claims occurred in the District of North Dakota.

## FACTS COMMON TO ALL COUNTS

### The Enactment of Senate Bill 2289

17.     Senate Bill 2289 was introduced in the North Dakota Senate on January 19, 2017 at the behest of the North Dakota Implement Dealers Association ("NDIDA"), a trade association for North Dakota-based farm equipment dealers.

18.     The North Dakota Senate Sponsors of Senate Bill 2289 were Senators Kelly Armstrong and Dwight Cook and Assistant Majority Leader Jerry Klein.   The North Dakota House sponsors of Senate Bill 2289 were Representative Michael Howe, Assistant Majority Leader Don Vigesaa, and Representative Lois Delmore.

9

19.     In subsequent public announcements, however, NDIDA has claimed to have introduced Senate Bill 2289 itself.  For example, a March 24, 2017 NDIDA press release with the title "NDIDA Farm Equipment Dealer Protection Bill Becomes Law" (copy attached as **Exhibit B**) describes Senate Bill 2289 as "[a] major farm equipment dealer protection bill *introduced by the North Dakota Implement Dealers Association*." (emphasis added)  Similarly, a June 7, 2017 letter to NDIDA members from NDIDA's President and Chief Executive Officer (copy attached as **Exhibit C**) stated in no uncertain terms that "[t]his bill was *introduced by NDIDA*" and described Senate Bill 2289 as "one [of] the most comprehensive and impactful pieces of legislation that *the NDIDA has ever introduced* in our 117 year history." (emphasis added).

20.     Following its introduction, Senate Bill 2289 was passed with little legislative explanation or debate.  It was discussed for a total of approximately five minutes in the North Dakota Senate, where it was the subject of no questions.  It was discussed for a total of approximately six minutes in the North Dakota House, where it was the subject of only one question.

21.     Senate Bill 2289 was passed by a vote of 46−0 in the North Dakota Senate and 86−5 in the North Dakota House.

22.     On March 14, 2017, Senate Bill 2289 was signed by both the President of the North Dakota Senate and the Speaker of the North Dakota House.

23.     On March 16, 2017, Governor Burgum signed Senate Bill 2289 into law.

24.     The executed Senate Bill 2289 was filed with the North Dakota Secretary of State that same day.

4813-7634-9514.5

25.     Unless its enforcement is enjoined by this Court, Senate Bill 2289 is slated to go into effect on August 1, 2017.

## The Existing North Dakota Farm Equipment Dealership Statute

26.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute did not interfere with the federally registered trademarks that manufacturers of agricultural equipment license to their dealers in North Dakota.  Specifically, the North Dakota Farm Equipment Dealership Statute did not purport to permit a dealer to use a Manufacturer's trademark as "bait" to switch customers to products sold by a competitor of the Manufacturer.  To the contrary, the North Dakota statute permitted a manufacturer of agricultural equipment—consistent with its rights under the Lanham Act—to require dealerships identified with and otherwise licensed to use an agricultural equipment manufacturer's trademarks to maintain an inventory of the Manufacturer's equipment and parts, to actually have the Manufacturer's equipment available for sale, and to also have the genuine parts necessary to fulfill its obligations to perform authorized service (including warranty service) on the Manufacturer's equipment.

27.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute did not purport to excuse a North Dakota dealer from complying with the appearance and performance standards required by a farm equipment manufacturer as a condition for being licensed to use the Manufacturer's federally registered trademarks.

28.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute left Manufacturers free to choose the farm equipment dealers in North Dakota—if any—to which they license their federally registered trademarks.  The North Dakota Farm Equipment Dealership Statute did not purport to allow the legislature and courts, much less farm equipment dealers themselves, to decide which dealers should be licensed to use the

11

Manufacturers' trademarks and what criteria the Manufacturers should apply in making trademark licensing decisions.

29.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute did not substantially impair Manufacturers' rights under their agreements with North Dakota farm equipment dealers.   To the contrary, the North Dakota Farm Equipment Dealership Statute expressly permitted a Manufacturer to terminate, cancel, or fail to renew a farm equipment dealership agreement if the dealer did not "sustainably comply with . . . essential and reasonable requirements imposed by the contract between the parties if the requirements are not different from those requirements imposed on other similarly situated retailers." N.D. Cent. Code § 51-07-01.1(1) and (2) (before Aug. 1, 2017).  Nor did the North Dakota Farm Equipment Dealership Statute purport to apply retroactively to pre-existing farm equipment dealership agreements.

30.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute did not prohibit manufacturers of farm equipment from enforcing the exclusivity provisions of their dealership agreements.   To the contrary, the North Dakota statute prohibited only *coercion* or *attempted coercion* of "a farm equipment dealer into a refusal to purchase farm equipment manufacturer by another farm equipment manufacturer." N.D. Cent. Code § 51-07-01.2 (before Aug. 1, 2017).  The prohibited coercion and attempted coercion did *not* include the enforcement of exclusivity provisions in farm equipment dealership agreements. *Cf. Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 538 (8th Cir. 2006).   To the contrary, the North Dakota statute expressly defined the "good cause" required for termination, cancellation, and non-renewal (including attempted or threatened termination, cancellation, and

non-renewal) as failure to comply with the provisions of farm equipment dealership agreements. N.D. Cent. Code §§ 51-07-01.1(1) and (2), 51-07-01.2(5) (before Aug. 1, 2017).

31.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute did not purport to prohibit enforcement of agreements to arbitrate disputes between manufacturers and dealers of agricultural equipment.   The North Dakota statute was thus consistent with the Federal Arbitration Act, which expressly makes arbitration agreements enforceable notwithstanding the provisions of state law.

32.     Before its amendment by Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute's prohibition of price discrimination was consistent with federal law.   The North Dakota statute prohibited only "[d]iscriminat[ion] in the prices charged for farm equipment of *like grade and quality* sold by the farm equipment manufacturer to similarly situated farm equipment dealers."   N.D. Cent. Code § 51-07-01.2(4) (before Aug. 1, 2017) (emphasis added).   This was consistent with the federal Robinson-Patman Act, which prohibits price discrimination "in prices between different purchasers of commences of *like grade and quality*." 15 U.S.C. § 13(a) (emphasis added).

33.     Unless the enforcement of Senate Bill 2289 is enjoined, however, these and other provisions of the pre-existing North Dakota Farm Equipment Dealership Statute will change effective August 1, 2017.   These changes are unlawful and threaten the Manufacturers with harm—including irreparable injury and financial loss—for the reasons set forth in the paragraphs that follow.

### The "Offending Provisions" of Senate Bill 2289

34.     The provisions of Senate Bill 2289 challenged by the Manufacturers (collectively, the "Offending Provisions") consist of the following amendments to the North Dakota Farm Equipment Dealership Statute, as described in the paragraphs that follow:

13

a.      the "No Required Separation of Trademarks" Provision;

b.      the "No Enforcement of Appearance Standards" Provision;

c.      the "No Enforcement of Performance Standards" Provisions;

d.      the "No Minimum Inventory or Order Requirements" Provisions;

e.      the "No Exclusivity Requirements" Provisions;

f.      the "Forced Transfer of Trademark License" Provision;

g.      the "No Market Withdrawal" Provision;

h.      the "No Control Over Dealer Locations" Provisions;

i.      the "Enabling Warranty and Incentive Payment Fraud" Provision;

j.      the "Retroactive Impairment of Existing Warranties" Provision;

k.      the "Retroactive Impairment of Existing Contracts" Provision;

l.      the "No Arbitration" Provision; and

m.      the "Interstate Price Regulation" Provision.

An expanded description of each of these "Offending Provisions" follows.

**(No Required Separation of Trademarks)**

35.     Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to

provide that farm equipment manufacturers may not:

> Require a farm equipment dealer to separate the line-makes operating within the
> dealer's facility by requiring the separation of personnel, inventory, service areas,
> display space, or otherwise dictate the method, manner, number of units, or the
> location of farm equipment displays at the dealer's facility.  This subdivision does
> not prevent a farm equipment dealer and manufacturer from agreeing to those
> terms if the agreement was supported by separate and valuable consideration.
> The issuance, reissuance, or extension of a dealership contract alone is not
> separate and valuable consideration.

*See* N.D. Cent. Code § 51-07-01.2(1)(d) (effective Aug. 1, 2017) (the "No Required Separation

of Trademarks" Provision).

4813-7634-9514.5

36.     For purposes of the No Required Separation of Trademarks Provision, a "line-make" refers to a brand, trademark, or service mark of a farm equipment product.

37.     The No Required Separation of Trademarks Provision thus purports to allow farm equipment dealers to intermingle different brands of farm equipment products.

38.     The No Required Separation of Trademarks Provision applies "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

39.     As Representative Cindy Schreiber Deck explained Senate Bill 2289 to the *Daily News* (Wahpeton): "If there's a building and it says 'John Deere' on it, now they (could) sell anything out of that particular building." Frank Stanko, *SB 2289 relates to prohibited practices for ag dealerships*, Daily News (Mar. 3, 2017). *See* **Exhibit D**.

40.     Not only would Senate Bill 2289 allow a dealer to sell "anything" out of a building identified with a Manufacturer's trademark, it would—by virtue of other provisions of the statute, including the No Minimum Inventory or Order Requirements Provisions—allow a North Dakota farm equipment dealer whose dealership is identified with a Manufacturer's trademark to sell *nothing* supplied by that Manufacturer from the facility.

**(No Enforcement of Appearance Standards)**

41.     Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not:

> Require a farm equipment dealer to unreasonably remodel, renovate, or recondition the dealer's facilities, change the location of the facilities, or make unreasonable alterations to the dealership premises. A request for a dealer to remodel, renovate, or recondition the dealer's facilities, change the location of the facilities, or make alterations to the dealership premises must be considered in light of current and reasonably foreseeable projections of economic conditions, financial expectations, and the dealer's market for the sale of farm equipment. A facility modification request is unreasonable if the request is within seven years of a farm equipment dealer's most recent facility remodel, renovation, or reconditioning.

15

*See* N.D. Cent. Code § 51-07-01.2(1)(h) (effective Aug. 1, 2017) (the "No Enforcement of Appearance Standards Provision").

42.    The No Enforcement of Appearance Standards Provision applies "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

43.    The No Enforcement of Appearance Standards Provision thus purports to prohibit farm equipment manufacturers from holding dealers to performance standards to which the parties otherwise have agreed or would have agreed.

44.    Typically, farm equipment dealers that have been licensed to use and display a Manufacturer's trademarks, service marks, and trade dress to identify the dealership are required to comply with certain appearance standards.  These appearance standards can include duties to maintain the same building design and layout, signage, color, lighting, and cleanliness standards as authorized dealers around the country are required to maintain.   As enacted, the No Enforcement of Appearance Standards Provision would undermine these routine, contractual requirements.

45.    Besides interfering with  Manufacturers' contractual rights, the No Enforcement of Appearance Standards Provision deprives a Manufacturer that licenses its trademark to a North Dakota farm equipment dealer of the right under Section 45 of the Lanham Act, 15 U.S.C. § 1127, to control the appearance of facilities identified with their licensed trademarks.  This right includes the right to require changes in the appearance of the dealership.  *See, e.g., Johnson v Arby's, Inc*., Bus. Franchise Guide (CCH) ¶ 12,018 (E.D. Tenn. Mar. 15, 2000).  Section 45 states that among the purposes of the Lanham Act is "to protect registered marks used in interstate commerce from interference by state, or territorial legislation."  15 U.S.C. § 1127.  The

16

Lanham Act grants the trademark owner alone the right to determine what appearance standards are "reasonable." Senate Bill 2289, however, turns that decision over to the legislature and courts of North Dakota. It therefore represents the very "interference by state . . . legislation" that Section 45 of the Lanham Act prohibits.

46.     This impermissible interference with Manufacturers' trademark rights is magnified by Senate Bill 2289's condemnation of any "facility modification request" as *per se* unreasonable "if the request is within seven years of a farm equipment dealer's most recent facility remodel, renovation, or reconditioning." Market conditions can change more often than every seven years, as can the competitive strategies of manufacturers of farm equipment. Like the provisions of an Iowa franchise statute that were previously invalidated by another district court in the Eighth Circuit, the No Enforcement of Appearance Standards Provision is therefore among the many provisions of Senate Bill 2289 that interfere with dealer agreement provisions that "allow [Manufacturers] to change with current market conditions; and serve the consuming public by maintaining adequate control over the quality of services provided under their licensed trademarks." *McDonald's Corp. v. Nelson*, 822 F. Supp. 597, 606 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994).

**(No Enforcement of Performance Standards)**

47.     In its current form, the North Dakota Farm Equipment Dealership Statute permits termination, cancellation, or non-renewal for failure to "substantially comply with those essential and reasonable requirements imposed by the contract between the parties if the requirements are not different from those requirements imposed on other similarly situated retailers." N.D. Cent. Code § 51-07-01.1(2) (before Aug. 1, 2017). The current version of the statute also permits attempted and threatened termination, cancellation, or non-renewal—along with "substantially

changing the competitive circumstances of dealership contracts"—"where the manufacturer does so as a consequence of the farm equipment dealer's failure "to comply with the terms of the written contract between the parties." N.D. Cent. Code § 51-07-01.2(5) (before Aug. 1, 2017).

48.     Senate Bill 2289 makes performance standards contained in farm equipment dealership contracts unenforceable in two ways.   The first way is by the following new provisions of N.D. Cent. Code §§ 51-07-01.2(1)(k) and 51-07-01.2(1)(g) (effective Aug. 1, 2017) referred to collectively as the "No Enforcement of Performance Standards" Provisions:

  a.     One of the No Enforcement of Performance Standards Provisions permits the courts of North Dakota to simply declare that a Manufacturer's performance standard is "unreasonable, arbitrary, or unfair."  Specifically, Senate Bill 2289 provides that farm equipment manufacturers may not "[u]se an unreasonable, arbitrary, or unfair sales, service, or other performance standard in determining a farm equipment dealer's compliance with a contract or program." *See* N.D. Cent. Code § 51-07-01.2(1)(k) (effective Aug. 1, 2017).

  b.     Another of the No Enforcement of Performance Standards Provisions amends what is currently N.D. Cent. Code § 51-07-01.2(5) (before Aug. 1, 2017). Currently, the North Dakota Farm Equipment Dealership Statute permits attempts or threats to terminate, cancel, or fail to renew (along with actual substantial changes to the competitive circumstances of dealership contracts) if the farm equipment dealer fails "to comply with the terms of the written contract between the parties." *Id.*  As amended by Senate Bill 2289, the statute permits such attempts, threats, or substantial changes only if the farm equipment dealer fails "to ***substantially*** comply with the ***material*** terms of the

18

written contract between the parties." N.D. Cent. Code § 51-07-01.2(1)(g) (effective Aug. 1, 2017) (emphasis added).

       c.     Yet another of the No Enforcement of Performance Standards Provisions adds an additional sentence to the end of what is currently N.D. Cent. Code § 51-07-01.2(5) (before Aug. 1, 2017). This new sentence defines a "substantial change in the competitive circumstances" of the dealership contract to include "the removal of authorization to operate at a location from where the dealer is currently operating or the unreasonable removal of a product line or segment." N.D. Cent. Code § 51-07-01.2(1)(g) (effective Aug. 1, 2017). The foregoing verbiage impairs farm equipment manufacturers' rights to remove individual locations, product lines, or segments from a dealer to address situations where the dealer's performance is unsatisfactory only with respect to that individual location, product line, or segment.

       d.     All of the foregoing No Enforcement of Performance Standards Provisions apply "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

49.    The second way in which Senate Bill 2289 makes performance standards contained in farm equipment dealership contracts unenforceable is by deeming certain provisions of farm equipment dealership agreements to be *per se* unreasonable. These include contractual requirements invalidated by the No Required Separation of Trademarks, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, No Exclusivity Requirements, No Control Over Dealership Locations, and Retroactive Impairment of Manufacturers' Warranties Provisions of Senate Bill 2289.

4813-7634-9514.5

50.     In practice, farm equipment manufacturers often impose a number of routine contractual standards on farm equipment dealers as a condition for allowing those dealers to use the manufacturer's trademarks and other intellectual property.   These standards can include duties to provide knowledgeable staff, maintain adequate inventories, handle return services, and otherwise adhere to the same performance standards to which authorized dealers around the country are subject.   As enacted, the No Enforcement of Performance Standards Provisions would—in conjunction with other provisions of Senate Bill 2289—undermine these routine contractual requirements.

51.     This impairment of Manufacturers' farm equipment dealership contracts deprives them of their right (and indeed their affirmative duty) under Section 45 of the Lanham Act to control the quality and uniformity of the goods and services offered by farm equipment dealers that have been licensed to use their trademarks.   Such control is essential to the success of any branded distribution system, as federal courts have long recognized.   "[T]he cornerstone of a franchise system must be the trademark or trade name of a product." *Susser v. Carvel Corp.*, 206 F. Supp. 636, 640 (S.D.N.Y 1962), *aff'd*, 332 F.2d 505 (2d Cir. 1964).   "[U]niformity of product and control of its quality and distribution . . . causes the public to turn to franchise stores for the product." *Id.*   The Fourth Circuit has similarly recognized that the benefits of being part of a franchise or other branded distribution system include "the right to use a trademark" and "the right to become a part of a system whose business methods virtually guarantee . . . success." *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir. 1980).   "His business is identified with a network of stores whose very uniformity and predictability attracts customers." *Id.*   In *Principe*, the Fourth Circuit observed that a franchisee benefits from the uniformity and predictability that results from "pervasive franchisor supervision" over "all facets of the

20

business, from the design of the menu board to the amount of catsup on the hamburgers, nothing is left to chance." *Id.*

### (No Minimum Inventory or Order Requirements)

52.     Manufacturers and customers alike expect that a dealership that holds itself out to the public as an authorized dealer of a particular brand of farm equipment will in fact have the Manufacturer's equipment on display and maintain a specified level of parts and accessories.

53.     Senate Bill 2289 provides that farm equipment manufacturers may not "require the farm equipment dealer to maintain or stock a level of equipment, parts, or accessories except as provided in subdivision b." *See* N.D. Cent. Code § 51-07-01.2(1)(a) (effective Aug. 1, 2017). That "subdivision b," in turn, amends the pre-existing North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not:

> Condition or attempt to condition the sale of farm equipment, parts, or accessories on a requirement that the farm equipment dealer also purchase other goods or services, or purchase a minimum quantity of farm equipment as a condition of filling an order for farm equipment.

*See* N.D. Cent. Code § 51-07-01.2(1)(b) (effective Aug. 1, 2017) (with § 51-07-01.2(1)(a), the "No Minimum Inventory or Order Requirements" Provisions).

54.     The No Minimum Inventory or Order Requirements Provisions apply "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

55.     In practice, farm equipment manufacturers often impose a number of routine inventory maintenance standards on farm equipment dealers as a condition for allowing those dealers to use the Manufacturer's trademarks and other intellectual property.  These standards can include duties to maintain the same minimum quantities or varieties of product models as

21

dealers around the country are required to maintain. As enacted, the No Minimum Inventory or Order Requirements Provisions would undermine these routine contractual requirements.

56.     In fact, the No Minimum Inventory or Order Requirements Provisions would allow farm equipment dealers to avoid carrying *any* inventory of farm equipment supplied by the Manufacturer whose trademark identifies the dealership.

57.     The No Minimum Inventory or Order Requirements Provisions would also obligate Manufacturers to fill dealer orders, no matter how small. For example, the No Minimum Inventory or Order Requirements Provisions would obligate a Manufacturer to fill a dealer's order for a single replacement part—such as an individual spark plug—even if it was not economical or practical for the Manufacturer to ship a single replacement part one at a time. To the extent that the Manufacturer could recoup the associated freight and other costs associated with such a shipment, the dealer would likely pass them on to the customer.

**(No Exclusivity Requirements)**

58.     Before the effective date of Senate Bill 2289, the North Dakota Farm Equipment Dealership only prohibited Manufacturers from "*[c]oerc[ing]* or attempt[ing] to *coerce* a farm equipment dealer into a refusal to purchase farm equipment manufactured by another farm equipment manufacturer." N.D. Cent. Code § 51-07-01.2(3) (before Aug. 1, 2017) (emphasis added).

59.     As a matter of law, "coercion" does not include the mere enforcement of an existing contractual provision. *See, e.g.*, *Minnesota Supply*, 472 F.3d at 538.

60.     Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to prohibit a Manufacturer from "*[r]equir[ing]* or attempt[ing] to *require* a farm equipment dealer into a refusal to purchase farm equipment manufactured by another farm equipment

22

manufacturer." *See* N.D. Cent. Code § 51-07-01.2(1)(c) (emphasis added) (effective Aug. 1, 2017).

61.    Thus, as enacted, Senate Bill 2289 purports to prohibit exclusive dealership agreements, even if freely negotiated and supported by consideration.

62.    Senate Bill 2289 also amends the North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not:

> Require a farm equipment dealer to either establish or maintain exclusive facilities, personnel, or display space or to abandon an existing relationship with another manufacturer in order to continue, renew, reinstate, or enter a dealer agreement or to participate in any program discount, credit, rebate, or sales incentive. This subdivision does not prevent a farm equipment dealer and manufacturer from agreeing to establish or maintain exclusive facilities for separate and valuable consideration. The issuance, reissuance, or extension of a dealership contract alone is not separate and valuable consideration.

*See* N.D. Cent. Code § 51-07-01.2(1)(e) (effective Aug. 1, 2017) (with § 51-07-01.2(1)(c), the "No Exclusivity Requirements" Provisions).

63.    The No Exclusivity Requirements Provisions apply "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

64.    The No Exclusivity Requirements Provisions purport to allow farm equipment dealers to carry multiple makes of farm equipment products, even if those multiple makes compete with one another. The No Exclusivity Requirements Provisions also purport to allow farm equipment dealers to sell competing makes of products in the same facilities or display spaces using the same personnel.

65.    The No Exclusivity Requirements Provisions have both the purpose and the effect of impairing Manufacturers' existing contract rights. They also ignore the Supreme Court's recognition that vertical non-price restraints such as exclusivity requirements may benefit consumers and may otherwise be pro-competitive:

Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. . . . Economists have identified a number of ways in which manufacturers can use such restrictions to compete more effectively against other manufacturers. For example, new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did.

*Continental TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-55 (1977) (citation and footnote omitted).

66.     By permitting competing products to be sold under a Manufacturer's trademarks, the No Exclusivity Requirements Provisions are among the many provisions of Senate Bill 2289 that impair each Manufacturer's right to control the quality and uniformity of what is sold by dealers licensed to use its trademarks. This irreconcilable conflict with the Lanham Act is exacerbated by other provisions of Senate Bill 2289—including the No Required Separation of Trademarks, No Enforcement of Appearance Standards, No Enforcement of Performance Standards, No Minimum Inventory or Order, and Forced Transfer of Trademark License Provisions.

**(Forced Transfer of Trademark License)**

67.     No Manufacturer prohibits a farm equipment dealer from selling its own business to another dealer. Manufacturers do, however, prohibit their trademark licenses from being freely assignable. Trademark licenses are considered to be "personal." Under the Lanham Act, a Manufacturer has the absolute right to determine whether to license its trademark to a farm

24

equipment dealer and—if so—to which one.  Senate Bill 2289, however, purports to permit the courts of North Dakota rather than the trademark owner to decide which farm equipment dealer(s) in North Dakota should be licensed to use its trademarks and what criteria the trademark owner must apply when deciding whether to grant such a license.

68.    If a farm equipment dealership agreement prohibits transfer of the Manufacturer's trademark license, such a contractual provision is enforceable under the North Dakota Farm Equipment Dealership Statute.  Indeed, a dealer's violation of such a contractual provision is— until August 1, 2017—"good cause" for termination, cancellation, and non-renewal (including attempted or threatened termination, cancellation, and non-renewal).  *See* N.D. Cent. Code §§ 51-07-01.1(1) and (2), 51-07-01.2(5) (before Aug. 1, 2017).  Senate Bill 2289, however, provides that a farm equipment dealer can "transfer, assign, or sell a dealer agreement" to another person, so long as notice is provided to the manufacturer and the transferee meets the manufacturer's written, reasonable, and uniformly applied standards of qualification" and requires that such "standards of qualification" be limited to the proposed transferee's "financial qualifications and business experience."  N.D. Cent. Code § 51-07-02.2 (effective Aug. 1, 2017) (the "Forced Trademark License Transfer Provision").  If a Manufacturer denies a proposed transfer, Senate Bill 2289 permits a farm equipment dealer to file suit in North Dakota state court to force the manufacturer to accept the transfer, with the Manufacturer bearing "the burden of proof regarding all issues raised in the action."  *Id.*

69.    In effect, the Forced Trademark License Transfer Provision would give farm equipment dealers the power to compel a Manufacturer to license its trademarks and related intellectual property to a third party to which the Manufacturer has decided ought not be granted such a license.  Under the Lanham Act, the Manufacturer has the absolute right to determine

4813-7634-9514.5

*whether* to license its trademarks at all, much less on what basis. Senate Bill 2289, however, purports to require the trademark owner to have "written standards of qualification" to become a trademark licensee. Senate Bill 2289 also requires that such qualifications be limited to the proposed transferee's "financial qualifications and business experience"—thereby excluding other qualifications such as interpersonal skills, reputation in the community, criminal history, and other criteria that a Manufacturer might want to consider before allowing a farm equipment dealership to be identified with its trademarks. Besides dictating the criteria that a Manufacturer can consider, Senate Bill 2289 purports to allow North Dakota state courts to decide whether the Manufacturer's standards are "reasonable" and have been "uniformly applied." N.D. Cent. Code § 51-07-02.2 (effective Aug. 1, 2017).

70.   According to a document that NDIDA prepared for its members, the Forced Trademark License Transfer Provision "allows a dealer to sell their [sic] dealership provided that the proposed buyer meets the manufacturer's financial and business experience requirements." *See* **Exhibit E**.

71.   Contrary to NDIDA's statement, no provision of any farm equipment dealership agreement prohibits a dealer from selling any assets of the dealership that belong to the dealer. The Forced Transfer of Trademark License Provision, however, purports to allow a dealer to "sell" something that it does not own: the right to use a Manufacturer's trademark. That is why the Forced Trademark License Provision is preempted by the Lanham Act and—unless its enforcement is enjoined—would effect an unconstitutional taking of the Manufacturers' intellectual property.

**(No Control Over Dealer Locations)**

72.     Senate Bill 2289 defines a "substantial change" in competitive circumstances to include "the removal of authorization to operate at a location from where the dealer is currently operating." N.D. Cent. Code § 51-07-01.2(1)(g) (effective Aug. 1, 2017).

73.     Senate Bill 2289 also amends the North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not "[r]equire a farm equipment dealer to . . . change the location of the facilities." N.D. Cent. Code § 51-07-01.2(1)(h) (effective Aug. 1, 2017).

74.     Finally, Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not "[u]nreasonably prevent or refuse to approve the relocation of a dealership to another site within the dealer's relevant market area." N.D. Cent. Code § 51-07-01.2(1)(i) (effective Aug. 1, 2017) (with the provisions of § 51-07-01.2(1)(g) and § 51-07-01.2(1)(h) cited in this subsection, the "No Control Over Dealer Locations" Provisions).

75.     The No Control Over Dealer Locations Provisions apply "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

76.     The No Control Over Dealer Locations Provisions impair a farm equipment manufacturer's ability to determine the best locations for the sale of its products. In particular, they impairs the ability of a Manufacturer to respond to changing demographics or market conditions, while giving the dealer certain powers to relocate against the Manufacturer's wishes.

**(Enabling Warranty and Incentive Payment Fraud)**

77.     Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not:

> Conduct a warranty or incentive audit or seek a chargeback on a warranty or incentive payment more than one year after the date of the warranty or incentive

27

payment.   A manufacturer may not charge back a dealer for an incentive or
warranty payment unless the manufacturer can satisfy its burden of proof that the
dealer's claim was false, fraudulent, or the dealer did not substantially comply
with the reasonable written procedures of the manufacturer.

See N.D. Cent. Code § 51-07-01.2(1)(j) (effective Aug. 1, 2017) (the "Enabling Warranty and

Incentive Payment Fraud" Provision).

78.    The Enabling Warranty and Incentive Payment Fraud Provision applies

"[n]otwithstanding the terms of any contract." See N.D. Cent. Code § 51-07-01.2(1) (effective

Aug. 1, 2017).

79.    The Enabling Warranty and Incentive Payment Fraud Provision thus purports to

prohibit farm equipment manufacturers from detecting or rectifying false, fraudulent, or

improper warranty or incentive payments more than one year after they are made.   This

prohibition applies even if a farm equipment dealer has otherwise agreed to a longer audit or

chargeback period.

80.    The Enabling Warranty and Incentive Payment Fraud Provision also limits a

Manufacturer's ability to impose a chargeback to cases where a dealer did not "substantially"

comply with the "reasonable," "written" procedures of the Manufacturer.

### (Retroactive Impairment of Existing Warranties)

81.    Before the effective date of Senate Bill 2289, the North Dakota Farm Equipment

Dealership Statute imposed only a modest requirement that Manufacturers reimburse farm

equipment dealers for any warranty repair labor that the dealer performs at the dealer's typical

hourly rate,  Specifically; the statute provided:

This chapter applies to any new farm machinery sold after July 31, 2001, and does
not invalidate, impair, or otherwise infringe upon the specific requirements of any
contract between a dealer and a manufacturer entered before August 1, 2001.
However, if warranty repair work is performed for a consumer by a farm
equipment dealer under a manufacturer's express warranty, the manufacturer shall
reimburse the dealer at an hourly labor rate that is the same or greater than the

28

hourly labor rate the dealer currently charges consumers for nonwarranty repair work. The dealer may accept the manufacturer's or supplier's warranty labor reimbursement terms and conditions in lieu of the above.

N.D. Cent. Code § 51-07-01.2 (before Aug. 1, 2017).

82.     The foregoing provision was added to the statute in 2001. When it was added, the North Dakota Legislative Assembly stated explicitly that the statute would not apply retroactively either to warranties for pre-existing sales or to preexisting contracts between dealers and manufacturers.

83.     Senate Bill 2289 significantly expands the warranty requirements imposed on farm equipment manufacturers. Among other things, Senate Bill 2289 purports to require Manufacturers to compensate farm equipment dealers for diagnostic work, transportation services, and, if necessary, up to six hours of travel time. Senate Bill 2289 also requires Manufacturers to pay any labor, diagnostic, transportation, or travel claims within thirty days of approving a warranty claim. N.D. Cent. Code § 51-26-06 (effective Aug. 1, 2017).

84.     As amended, Section 51-26-06 does not include any provision limiting its application to prospective sales or contracts. Instead, on its face, Section 51-26-06 as amended purports to impose these requirements retroactively on warranties for pre-existing sales and on pre-existing contracts between dealers and manufacturers (the "Retroactive Impairment of Existing Warranties" Provision).

85.     Thus, as enacted, Senate Bill 2289 imposes significant new duties and obligations on Manufacturers that apply retroactively to *any* outstanding warranties, and to *any* pre-existing relationships between the Manufacturer and a farm equipment dealer.

**(Retroactive Impairment of Existing Contracts)**

86.     The retroactive application of Senate Bill 2289 is not limited to its warranty provisions. Rather, Senate Bill 2289 makes each of its provisions applicable "[n]otwithstanding

29

the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017) (the "Retroactive Impairment of Existing Contracts" Provision).

87.     As a result, each of the Offending Provisions—including the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, the Interstate Price Regulation, the No Arbitration, and the Enabling Warranty and Incentive Payment Fraud Provisions of Senate Bill 2289—purportedly applies to the relationship between a farm equipment manufacturer and a farm equipment dealer, even if a pre-existing contract between the manufacturer and dealer says otherwise.

88.     The Retroactive Impairment of Existing Contracts Provision was known and debated in the North Dakota House.  On March 13, 2017, the following colloquy took place between Representative Bernie Satrom, a member of the House Agriculture Committee, and Representative George Keiser:

> Rep. Keiser:  Mr. Speaker and Representative Satrom, did the Committee discuss at all the conflict in subsection 1 where you limit what a contract can say in terms of the contract law within our Century Code?
>
> Rep. Satrom:  Um, I'd like to refer that to my Chairman.  I'd, I think, or could you, could you ask that question maybe a different way?
>
> Rep. Keiser:  *Mr. Speaker and Assembly, the Century Code has a very lengthy, extensive, detailed section on contracts.  What we're saying with this bill is you can have a contract but we're interfering with you having a contract.  And that's inconsistent with our contract law section,* so I was just wondering if the Committee had any discussion about that and what the implications of that discussion were.

*See* Bill Videos for SB 2289, *available at* http://www.legis.nd.gov/assembly/65-2017/bill-video/bv2289.html [select 3/13 1:34 PM "View Video"].

89.     Representative Keiser was one of five Assembly members to vote against Senate Bill 2289.

**(No Arbitration)**

90.     Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to provide that farm equipment manufacturers may not:

> Require a farm equipment dealer in this state to enter an agreement with the manufacturer or any other party which requires: . . .  [t]he dealer to bring an action against the manufacturer in a venue outside of this state . . .; [r]educing, modifying, or eliminating the dealer's right to resolve a dispute in a state or federal court in this state; or [t]he dealer to agree to arbitration . . . .

*See* N.D. Cent. Code § 51-07-01.2(*l*)(2), (4)-(5) (effective Aug. 1, 2017) (the "No Arbitration" Provision).

91.     The No Arbitration Provision applies "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

92.     The No Arbitration Provision purports to prohibit farm equipment manufacturers and farm equipment dealers from agreeing to arbitrate their disputes.

93.     Additionally, the No Arbitration Provision purports to prohibit farm equipment manufacturers and farm equipment dealers from agreeing to hold arbitrations outside of North Dakota.

**(No Market Withdrawal)**

94.     Before the effective date of Senate Bill 2289, the North Dakota Equipment Dealership Statute simply defined the "good cause" required for farm equipment manufacturers to "substantially change the competitive circumstances of" dealership agreements as the farm equipment dealer's failure "to comply with the terms of the written contract between the parties." N.D. Cent. Code § 51-07-01.2(5) (before Aug. 1, 2017).

4813-7634-9514.5

95.     Senate Bill 2289, however, amends the North Dakota Farm Equipment Dealership Statute to define a "substantial change" in competitive circumstances to include "the unreasonable removal of a product line or segment."   N.D. Cent. Code § 51-07-01.2(1)(g) (effective Aug. 1, 2017) (the "No Market Withdrawal Provision").

96.     The No Market Withdrawal Provision applies "[n]otwithstanding the terms of any contract."  *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

97.     By prohibiting the removal of product lines under circumstances that the North Dakota courts deem "unreasonable," the No Market Withdrawal Provision potentially impedes farm equipment manufacturers from withdrawing entire product lines from the market.  It would violate the Commerce Clause for a state to prevent a manufacturer from withdrawing a product line from the market altogether.  *See, e.g., Central GMC, Inc. v. General Motors Corp.*, 946 F.2d 327, 334-35 (4th Cir. 1991), *cert. denied,* 503 U.S. 907 (1992).

98.     Additionally, the same statutory language comprising the No Market Withdrawal Provision impairs farm equipment manufacturers' rights to remove individual locations, product lines, or segments from a dealer to address situations where the dealer's performance is unsatisfactory only with respect to that individual location, product line, or segment, as previously discussed with respect to the No Enforcement of Performance Standards Provisions.

### (Interstate Price Regulation)

99.     Before the effective date of Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute prohibited Manufacturers from "[d]iscriminat[ing] in the prices charged for farm equipment of like grade and quality sold by the farm equipment manufacturer to similarly situated farm equipment dealers."  N.D. Cent. Code § 51-07-01.2(4).

32

100.    In this respect, the North Dakota Farm Equipment Dealership Statute was consistent with the federal Robinson-Patman Act, which prohibits price discrimination "in prices between different purchasers of commodities of like grade and quality." 15 U.S.C. § 13(a).

101.    Senate Bill 2289 amends the North Dakota Farm Equipment Dealership Statute to prohibit manufacturers from "[d]iscriminat[ing] in the prices charged for farm equipment of similar grade and quality sold by the farm equipment manufacturer to similarly situated farm equipment dealers.  See N.D. Cent. Code § 51-07-01.2(1)(f) (effective Aug. 1, 2017) (emphasis added) (the "Interstate Price Regulation" Provision).

102.    The Interstate Price Regulation Provision applies "[n]otwithstanding the terms of any contract." *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017).

103.    By replacing "like" with "similar," North Dakota has established a different test for price discrimination than that established by the Robinson-Patman Act.

104.    North Dakota dealers sell farm equipment across state lines, and out-of-state dealers sell equipment in North Dakota.  The Robinson-Patman Act requires uniform pricing to these competing dealers.

105.    Because the federal and state standards for unlawful price discrimination are now different ("like" vs. "similar"), compliance with the Robinson-Patman Act may violate North Dakota law, and compliance with North Dakota law may violate the Robinson-Patman Act.

### The Offending Provisions' Adverse Effects on Manufacturers

106.    If Senate Bill 2289 becomes effective, it will cause every Manufacturer subject to the Offending Provisions to suffer harm, including irreparable injury.  This harm will result from impairment of Manufacturers' ability to control the quality and uniformity of farm equipment sold under their trademarks in North Dakota, to ensure that farm equipment dealers licensed to

33

use their trademarks in North Dakota comply with the appearance and performance standards expected of authorized dealers, and to otherwise respond to changing market conditions by pursuing the competitive strategies that each Manufacturer—in its business judgment—deems most appropriate.  In addition to the irreparable injury that the Manufacturers face, Senate Bill 2289 will also cause the Manufacturers to suffer financial loss.  This financial loss includes diminution in the value of their brands and additional costs associated with warranty claims in North Dakota that were not factored in to the selling price of the products when they were originally sold.  The harm faced by farm equipment manufacturers generally is exemplified by the harm that each of the Manufacturers identified as a named Plaintiff will suffer if Senate Bill 2289 takes effect.

### **Impairment of Existing Dealership Agreements**

107.    If Senate Bill 2289 becomes effective, the rights and obligations of each Manufacturer under its agreements with farm equipment dealers in North Dakota (collectively, the "Existing Dealership Agreements") will be substantially impaired.   This impairment is summarized in the Fed. R. Evid. 1006 Summary of Manufacturers' Existing Dealership Agreements Impaired By Senate Bill 2289 attached as **Exhibit F**.

108.    Both retroactively and prospectively, the Offending Provisions will deprive each Manufacturer of its right under the Lanham Act to control the use of its trademarks by North Dakota farm equipment dealers.

### **LEGAL BASES FOR INVALIDATING SENATE BILL 2289**

### **Lanham Act Preemption**

109.    By enabling North Dakota farm equipment dealers to use Manufacturer trademarks in ways that are inconsistent with the brand standards established by the trademark

owner, Senate Bill 2289 deprives Manufacturers of their rights under the Lanham Act. As previously discussed, Senate Bill 2289 specifically contemplates that a dealership identified with a Manufacturer's trademark might not actually have the Manufacturer's equipment and genuine replacement parts in stock. The deceptive type of "bait and switch" that Senate Bill 2289 enables is one of the many ways that Senate Bill 2289 conflicts with the Lanham Act.

110.    Consistent with the Lanham Act, farm equipment manufacturers typically license their authorized dealers to use and display the Manufacturers' trademarks. "[A trademark] license [is] needed when the manufacturer of branded goods permits a dealer to hold itself out as an 'authorized' dealer, repair outlet, and the like." J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 18:41 (4th ed.).

111.    The Lanham Act prohibits any use of a federally registered trademark by anyone except the registrant and a related company. 15 U.S.C. §§ 1051 and 1055. The Lanham Act defines "related company" as "any person who legitimately *controls or is controlled by*" the trademark owner "in respect to the nature and quality of the goods or services in connection with which the mark is used." 15 U.S.C. § 1127 (emphasis added). "The Lanham Trademark Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark." *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006) (quotation omitted).

112.    The Lanham Act also gives trademark and service mark holders the right to control the quality of goods and services that are sold under their federally registered marks by any person or entity to which the holders license the right to use the marks. *See generally Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991) ("The use of [a

4813-7634-9514.5

manufacturer's] marks implies that the product has been delivered according to all quality control guidelines enforced by the manufacturer.").

113.    The Lanham Act not only affords trademark or service mark holders the **_right_** to control the quality of goods and services sold under their marks, it also imposes upon them an **_affirmative duty_** to control, supervise, and ensure the quality of goods and services sold under their marks by licensees. *See generally Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977) ("Courts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products."); *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959) ("Clearly, the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.").

114.    In fact, if a trademark or service mark holder fails to reasonably control and supervise its licensees' use of the holder's mark, then the holder may be deemed to "forfeit" the rights in the mark afforded to the holder by the Lanham Act. *See generally Kentucky Fried Chicken Corp.*, 549 F.2d at 387 ("If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device. A trademark owner who allows this to occur loses its right to use the mark.").

115.    The "Supremacy Clause" of the United States Constitution, U.S. CONST. art. VI, cl. 2, provides that "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land . . . ."

116.    The Lanham Act expressly preempts state law: "No State . . . may require alteration of a registered mark, or require that additional trademarks, service marks, trade names,

or corporate names that may be associated with or incorporated into the registered mark be displayed in the mark in a manner differing from the display of such additional trademarks, service marks, trade names, or corporate names contemplated by the registered mark . . . ." 15 U.S.C. § 1121(b).

117.   When it enacted the Lanham Act, Congress expressed its legislative intent "to protect registered marks used in such commerce [within the control of Congress] from interference by State, or territorial legislation." 15 U.S.C. § 1127.

118.   Where "it is impossible to comply with both the state and federal law," the state law is preempted by the federal law under the doctrine of conflict preemption. *Davidson & Associates v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

119.   Courts have long recognized that the Lanham Act can preempt conflicting state laws. *See Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975) ("If state law would permit confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders, then the state law would, under the Supremacy Clause, be invalid."); *Macia v. Microsoft Corp.*, 152 F. Supp. 2d 535, 540 (D. Vt. 2001) ("The Lanham Act may preempt state law by implication, however, if the state law is inconsistent with or frustrates the objectives of the federal law."); *American Automobile Association (Inc.) v. AAA Insurance Agency, Inc.*, 618 F. Supp. 787, 798 (W.D. Tex. 1985) ("In any event, it is settled that state law cannot defeat or limit in any way the protection given to federally registered marks under the Lanham Act.").

120.   Individually and collectively, the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark

37

License Transfer Provisions violate and conflict with the rights and duties of federally registered trademark owners under the Lanham Act.

121.    For example, the No Required Separation of Trademarks Provision purports to allow farm equipment dealers to intermingle different brands of farm equipment products, even if one or more of those brands is identified by a federally registered trademark.

122.    Similarly, the No Exclusivity Requirements Provisions purport to allow farm equipment dealers to carry multiple competing makes of farm equipment products, even if one or more of those makes is protected by a federally registered trademark.   The No Exclusivity Requirements Provisions also purport to allow farm equipment dealers to sell competing makes of products in the same facilities or display spaces and using the same personnel.

123.    Public statements by North Dakota legislators suggest that the impairment of Manufacturers' trademarks was intentional.   *See, e.g.,* **Exhibit D** ("If there's a building and it says 'John Deere' on it, now they (could) sell anything out of that particular building.") (statement of North Dakota Representative Cindy Schreiber Deck).

124.    The No Required Separation of Trademarks and No Exclusivity Requirements Provisions thus have both the purport and the effect of purporting to require farm equipment manufacturers to allow different or competing trademarks, service marks, trade names, or corporate names to be associated with products sold under the Manufacturer's federally registered trademarks or service marks, in violation of the Lanham Act's express preemption provision, 15 U.S.C. § 1121(b).

125.    Additionally, the No Enforcement of Performance Standards Provisions purport to prevent farm equipment manufacturers from controlling, supervising, or ensuring the quality of goods and services sold under their federally registered trademarks by licensees.   Among other

4813-7634-9514.5

things, the No Enforcement of Performance Standards Provisions will prevent farm equipment manufacturers from enforcing routine, contractual requirements that licensees provide knowledgeable staff, adequate inventories, and return services, and to adhere to the same performance standards to which other authorized dealers around the country are subject.

126.    Similarly, the No Enforcement of Appearance Standards Provision purports to prevent farm equipment manufacturers from controlling, supervising, or ensuring the quality of goods and services sold under their federally registered trademarks by licensees.  Among other things, the No Enforcement of Appearance Standards Provision will prevent farm equipment manufacturers from enforcing in North Dakota the appearance standards to which dealers around the country are subject.

127.    Similarly, the No Minimum Inventory or Order Requirements Provisions purport to prevent farm equipment manufacturers from controlling, supervising, or ensuring the quality of goods and services sold under their federally registered trademarks by licensees.  Among other things, the No Minimum Inventory or Order Requirements Provisions will prevent farm equipment manufacturers from enforcing routine, contractual requirements that licensees maintain the same minimum quantities or varieties of product models as dealers around the country are required to maintain.

128.    Finally, the Forced Trademark License Transfer Provision purports to give farm equipment dealers the power to compel a Manufacturer to license the Manufacturer's federally registered trademarks against the Manufacturer's wishes.

129.    If Senate Bill 2289 becomes effective, the No Required Separation of Trademarks, No Enforcement of Appearance Standards, No Enforcement of Performance Standards, No Minimum Inventory or Order Requirements, No Exclusivity Requirements, and

39

Forced Transfer of Trademark License Provisions (collectively, the "Trademark License Impairment" Provisions) will enable North Dakota farm equipment dealers to infringe the trademarks of Manufacturers (the "Impaired Trademarks") in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); to engage in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and to dilute the Impaired Trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

**(Senate Bill 2289 Enables Trademark Infringement)**

130.    Under the Lanham Act, "a [trademark] license [is] needed when the manufacturer of branded goods permits a dealer to hold itself out as an 'authorized' dealer, repair outlet, and the like." J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 18:41 (4th ed.).

131.    To be licensed to use the Impaired Trademarks, North Dakota farm equipment dealers must agree to comply with the quality control and other provisions of the Existing Dealer Agreements.  In other words, each dealer's right to use an Impaired Trademark is "defined by the valid terms of the trademark license." 3 McCarthy at § 25:30 (footnotes omitted).  "Any sales of goods or services under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark." *Id.*  Any use of an Impaired Trademark outside the scope of the license constitutes infringement as a matter of law. *See, e.g., Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 470–71 (8th Cir. 2011) (affirming jury verdict for service mark infringement and breach of contract where the licensee exceeded the scope of its license); *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir. 2004) ("With regard to licenses, the prevailing view is that one who exceeds the scope of the license is potentially liable not just for breach of the license agreement but also for trademark infringement."); *E.G.L. Gem*

40

*Lab Ltd v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 293 (S.D.N.Y. 2000) ("Just as the unauthorized use of a mark by a former licensee 'constitutes a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor,' the use of a licensed mark beyond the scope of the license may deceive the public into thinking that the licensee is authorized to provide the goods or services offered under the mark when in truth it is not.") (footnote and citation omitted); *Bunn-O-Matic Corp. v. Bunn Coffee Serv.*, 88 F. Supp. 2d 914, 923 (C.D. Ill. 2000) ("A trademark license is the limited grant of a right to use another's property interest and is limited to the grant in the license."); *Hard Rock Cafe Int'l (USA) Inc. v. Morton*, 1999 WL 717995 (S.D.N.Y. 1999) ("Also weighing in favor of a finding of likelihood of confusion is the fact that infringement occurred as a result of conduct by a Licensee beyond the scope of a license agreement.").

132.    Because the Trademark License Impairment Provisions permit a North Dakota farm equipment dealer to use a Manufacturer's trademark to sell competing goods and services "while depriving [the Manufacturer] of any revenue from its trademark," they "attack the core purpose of trademark and franchise as it exists in this country." *Amoco Oil Co. v. D. Z. Enters., Inc.*, 607 F. Supp. 595, 599 (E.D.N.Y. 1985). Preventing confusion and deception as to source, authorization, and sponsorship "is the very purpose of the Lanham Act." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333 (6th Cir. 1997). The Trademark License Impairment Provisions, however, help create the very confusion and deception that the Lanham Act was intended to prevent.

133.    By allowing North Dakota farm equipment dealers to use the Impaired Trademarks in commerce without the consent of the Manufacturers in connection with the sale, offering for sale, and advertising of services and products, the Trademark License Impairment

41

Provisions are likely to cause confusion or mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

### (Senate Bill 2289 Enables Unfair Competition)

134.    By allowing North Dakota farm equipment dealers to use the Impaired Trademarks in commerce without the consent of the Manufacturers in connection with the sale, offering for sale, and advertising of services and products, the Trademark License Impairment Provisions permit use in commerce, in connection with goods or services, of words, terms, names, and symbols and combinations thereof, and of false designations of origin, false and misleading descriptions of fact, and false and misleading representations of fact.

135.    Such use is likely to cause confusion, to cause mistake, or to deceive as to the origin, sponsorship, or approval of the goods and services offered by North Dakota farm equipment dealers in violation of Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1).

136.    The Trademark License Impairment Provisions therefore allow North Dakota farm equipment dealers to engage in unfair competition in violation of Section 43(a)(2) of the Lanham Act, 15 U.S.C. § 1125(a)(2).

### (Senate Bill 2289 Enables Trademark Dilution)

137.    The Impaired Trademarks are famous.

138.    The Trademark License Impairment Provisions allow North Dakota farm equipment dealers to dilute the distinctive quality of the Impaired Trademarks in violation of Section 43(c)(1)(2) of the Lanham Act, 15 U.S.C. § 1125(c)(1)(2).

### Takings Clause

139.    The "Takings Clause" of the United States Constitution, U.S. CONST. amend V, provides that "nor shall private property be taken for public use, without just compensation."

4813-7634-9514.5

140.     The Takings Clause of the United States Constitution applies to the State of North Dakota by virtue of the Fourteenth Amendment to the United States Constitution.  U.S. CONST. amend XIV, § 1; *see Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005).

141.     The Lanham Act gives the Manufacturers a constitutionally protected property interest in their federally registered trademarks, service marks, and trade dress.  *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 673 (1999).

142.     Additionally, North Dakota state common law gives the Manufacturers a constitutionally protected property interest in their federally registered trademarks, service marks, and trade dress.  *See, e.g.*, *KAT Video Productions, Inc. v. KKCT-FM Radio*, 560 N.W.2d 203, 207-08 (N.D. 1997).

143.     The Trademark License Impairment Provisions constitute state interference in the Manufacturers' federally protected intellectual property rights.  Unless enforcement of Senate Bill 2289 is enjoined, this interference will have a significant economic impact on the Manufacturers' reasonable expectations with respect to the investments they have made in the value and goodwill of their federally protected trademarks, service marks, and trade dress.

144.     For example, various iterations of John Deere's "leaping deer" trademark have been used continuously in commerce since the 1870s.  Today, John Deere's federally registered "leaping deer" trademark ranks as one of the most famous in the entire world.  In 2016, Interbrand, a global branding consultancy, ranked John Deere as having the 91st most valuable corporate brand in the entire world, estimating that John Deere's brand alone is worth approximately $4.8 billion.

145.     By interfering in the Manufacturers' reasonable expectations with respect to their federally registered trademarks, service marks, and trade dress, the Trademark License

43

Impairment Provisions—individually and collectively—will effect a regulatory "taking" of the Manufacturers' federally registered trademarks and service marks. *See generally Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004 (1984).

146.    Additionally, to the extent that one or more of the Trademark License Impairment Provisions of Senate Bill 2289 causes one or more Manufacturers to be deemed to "forfeit" rights in any federally registered trademark, service mark, or trade dress, Senate Bill 2289 will completely deprive the affected Manufacturers of all economically beneficial use of those marks, and thus will effect a *per se* taking. *See generally Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).

147.    No compensation—"just" or otherwise—has been made or promised to any Manufacturer for Senate Bill 2289's taking of its federally registered trademarks, service marks, and trade dress.

148.    Likewise, no funds have been allocated in the State of North Dakota's budget for providing just compensation for the taking of any Manufacturer's federally registered trademarks service marks, and trade dress.

## **Contracts Clause**

149.    Before the effective date of Senate Bill 2289, each of the Manufacturers entered into one or more contracts with farm equipment dealers located in North Dakota (the "Existing Dealership Agreements").

150.    The Existing Dealership Agreements will remain in effect after the effective date of Senate Bill 2289.

44

151.    The Existing Dealership Agreements set forth the terms and conditions that govern the relationships between the Manufacturers, on the one hand, and the local farm equipment dealers, on the other hand.

152.    Each of the Existing Dealership Agreements was valid and enforceable at the time that it was signed.

153.    The "Contracts Clause" of the United States Constitution, U.S. CONST. art. I, § 10, provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

154.    In determining whether Senate Bill 2289 violates the Contracts Clause, the Court determines, first, "whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." If the Court so finds, then it must determine, second, whether the State has "a significant and legitimate public purpose behind the regulation." The State carries the burden of proof on this second determination. If and only if the State meets this burden, then the Court determines "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002) (quotations and alterations omitted).

155.    The Retroactive Impairment of Existing Contracts and Retroactive Impairment of Existing Warranties Provisions would substantially impair a number of material terms in the vast majority, if not all, of the Existing Dealership Agreements.

156.    For example, the Existing Dealership Agreements do not permit dealers to use a Manufacturer's trademark to sell equipment made by competing manufacturers. After the effective date of Senate Bill 2289, however, these pre-existing and continuing contractual

4813-7634-9514.5

obligations will be invalidated by, *inter alia*, the No Minimum Inventory or Order Requirements and No Required Separation of Trademarks Provisions—which are made retroactive by the Retroactive Impairment of Existing Contracts Provision. To the extent that any Existing Dealership Agreements require exclusivity on the part of a North Dakota farm equipment dealer, such provisions are invalidated by Senate Bill 2289's No Exclusivity Requirements Provisions.

157. Many Existing Dealership Agreements contain detailed provisions about the circumstances and procedures under which the Manufacturer may terminate or change the terms of its relationship with the dealer. After the effective date of Senate Bill 2289, however, the No Market Withdrawal and No Control Over Dealer Locations Provisions—which are made retroactive by the Retroactive Impairment of Existing Contracts Provision—and the Forced Trademark License Transfer Provision will purport to outlaw these pre-existing and continuing contractual obligations.

158. Many Existing Dealership Agreements also contain detailed provisions about the performance and appearance standards required of farm equipment dealers. After the effective date of Senate Bill 2289, however, the No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Required Separation of Trademarks, and No Control Over Dealer Locations Provisions—which are made retroactive by the Retroactive Impairment of Existing Contracts Provision—will purport to outlaw these pre-existing and continuing contractual obligations.

159. Many Existing Dealership Agreements specify minimum inventory or order requirements. After the effective date of Senate Bill 2289, however, the No Minimum Inventory or Order Requirements Provisions—which are made retroactive by the Retroactive Impairment

4813-7634-9514.5

of Existing Contracts Provision—will purport to outlaw these pre-existing and continuing contractual obligations.

160.    Similarly, many Existing Dealership Agreements contain dispute resolution provisions.  After the effective date of Senate Bill 2289, however, the No Arbitration Provision and related requirements of Senate Bill 2289—which are made retroactive by the Retroactive Impairment of Existing Contracts Provision—will purport to outlaw these pre-existing and continuing contractual obligations.

161.    Finally, many Existing Dealership Agreements contain detailed requirements about warranty and incentive payment fulfillment and oversight.  After the effective date of Senate Bill 2289, however, the Enabling Warranty and Incentive Payment Fraud Provision— which is made retroactive by the Retroactive Impairment of Existing Contracts and the Retroactive Impairment of Existing Warranties Provisions—will purport to outlaw these pre-existing and continuing contractual obligations.

162.    At the time that the Existing Dealership Agreements were signed, the Manufacturers could not have reasonably foreseen the adoption of Senate Bill 2289.  Before 2017, the North Dakota Farm Equipment Dealership Statute contained only modest provisions governing the relationships between farm equipment manufacturers and farm equipment dealers. The Manufacturers did not foresee, and reasonably could not have foreseen, that the State of North Dakota would enact sweeping, retroactive legislation that so substantially impairs the Manufacturers' Existing Dealership Agreements.

163.    There are no significant or legitimate public purposes to justify the State's adoption of Senate Bill 2289.

47

164.    Under settled law, merely "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Equipment Manufacturers Institute*, 300 F.3d at 861. Rather, "such special interest legislation runs afoul of the Contract Clause when it impairs existing contracts." *Id.*

165.    The legislative history shows that Senate Bill 2289 was adopted for the improper purpose of leveling the playing field between Manufacturers and dealers. In fact, during the approximately five minutes that Senate Bill 2289 was discussed on the North Dakota Senate floor, a co-sponsor of the bill, Senator Jerry Klein, described the purpose of Senate Bill 2289 as giving a "level playing field to our implement dealers." *See* Bill Videos for SB 2289, *available at* http://www.legis.nd.gov/assembly/65-2017/bill-video/bv2289.html [select 2/15 1:44 PM "View Video"].

166.    Even if the State could articulate a significant and legitimate public interest behind Senate Bill 2289, the impairment of the Existing Dealership Agreements is not based on reasonable conditions and is not of a character appropriate to the public purpose justifying Senate Bill 2289's adoption.

## **Dormant Commerce Clause**

## **(Undue Burden on Interstate Commerce)**

167.    "[A] statute will run afoul of the Commerce Clause . . . if it imposes an undue burden on interstate commerce that outweighs its local benefits." *State of North Dakota v. Heydinger*, 825 F.3d 912, 919 (8th Cir. 2016).

168.    The No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions of Senate Bill 2289 impose an undue burden on interstate commerce.

48

169.   The No Minimum Inventory or Order Requirements Provisions would allow North Dakota farm equipment dealers to use a Manufacturer's trademark in interstate commerce without ordering or maintaining any inventory of the Manufacturer's farm equipment and replacement parts.  They also would obligate Manufacturers to fill interstate dealer orders, no matter how small.   A Manufacturer would thus be required to fill a North Dakota farm equipment dealer's order for a single replacement part, even if it was not economical or practical for the Manufacturer to ship a single replacement part, one at a time.

170.   The No Control Over Dealer Locations Provisions impair a farm equipment manufacturer's ability to determine the best locations for the interstate sale of its products.  In particular, they impair the ability of a Manufacturer to respond to changing demographics or market conditions in interstate commerce.  For example, the No Control Over Dealer Locations Provisions could force a farm equipment manufacturer to acquiesce to a dealer's relocation from an area near the North Dakota/Minnesota border to a location far within the State of North Dakota, thereby depriving the manufacturer of the ability to compete for Minnesota customers.

171.   The No Market Withdrawal Provision potentially prevents farm equipment manufacturers from withdrawing entire product lines from interstate commerce.  In effect, the No Market Withdrawal Provision gives farm equipment dealers a perpetual option to continue ordering and offering for sale particular models of products—even if the Manufacturer would otherwise have ended the manufacture and interstate sales of those models.

172.   Similarly, the Interstate Price Regulation Provision forces farm equipment manufacturers to adopt a single uniform price schedule for all "similar" products sold to dealers in the State of North Dakota, whereas the federal Robinson-Patman Act only requires price uniformity for "like" products sold in the course of interstate commerce.

49

173.    The No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions do not advance any legitimate local interests to justify these burdens on interstate commerce.

174.    "[L]eveling the playing field between contracting parties" is *not* considered a significant or legitimate state interest for legislation. *Equipment Manufacturers Institute*, 300 F.3d at 861.

175.    Individually and collectively, the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions impose burdens on interstate commerce that are not justified or outweighed by legitimate local benefits.

### Federal Arbitration Act Preemption

176.    The "Supremacy Clause" of the United States Constitution, U.S. CONST. art. VI, cl. 2, provides that "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land . . . ."

177.    The Federal Arbitration Act provides that:

> *A written provision* in . . . a contract evidencing a transaction involving commerce *to settle by arbitration a controversy* thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, *shall be valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

178.    Therefore, the Federal Arbitration Act makes enforceable *any* arbitration provision in *any* contract that involves commerce.

179.    As the Supreme Court has explained, the Federal Arbitration Act "declares a national policy favoring arbitration of claims that parties contract to settle in that matter. That

50

national policy . . . forecloses state legislative attempts to undercut the enforceability of arbitration agreements." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (alterations and citation omitted). The preemptive effect of the Federal Arbitration Act is "well-established." *Id.*

180.   The Manufacturers named as Plaintiffs do not have a primary place of business in North Dakota and are not incorporated in North Dakota. Similarly, the vast majority of the unnamed Manufacturers that belong to AEM do not have a primary place of business in North Dakota and are not incorporated in North Dakota. Rather, most such Manufacturers sell farm equipment to dealers in North Dakota from out-of-state. To the extent that such Manufacturers enter into agreements with farm equipment dealers for the sale or distribution of farm equipment in North Dakota, those agreements "involve[e] commerce" within the meaning of the Federal Arbitration Act.

181.   The No Arbitration Provision of Senate Bill 2289 purports to prohibit farm equipment manufacturers and farm equipment dealers from agreeing to arbitrate their disputes. It also purports to prohibit farm equipment manufacturers and farm equipment dealers from agreeing to hold arbitrations outside of North Dakota.

182.   The Federal Arbitration Act preempts state laws that purport to prohibit or burden contractual arbitration provisions. *See Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *Equipment Manufacturers Institute v. Janklow*, 136 F. Supp. 2d 991, 1000 (D.S.D. 2001).

183.   The Federal Arbitration Act also preempts state laws that purport to require arbitrations to be held within a particular state. *See, e.g., KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42 (1st Cir. 1999); *Cahill v. Alternative Wines, Inc.*, No. 12-CV-110-LRR, 2013 U.S. Dist. LEXIS 14588 (N.D. Iowa Feb. 4, 2013).

51

**Robinson-Patman Act Preemption**

184.    The Interstate Price Regulation Provision purports to prohibit Manufacturers from "[d]iscriminat[ing] in the prices charged for farm equipment of *similar* grade and quality sold by the farm equipment manufacturer to similarly situated farm equipment dealers." *See* N.D. Cent. Code § 51-07-01.2(1)(f) (effective Aug. 1, 2017) (emphasis added).

185.    Before the effective date of Senate Bill 2289, the North Dakota Farm Equipment Dealership Statute only prohibited Manufacturers from "[d]iscriminat[ing] in the prices charged for farm equipment of *like* grade and quality sold by the farm equipment manufacturer to similarly situated farm equipment dealers." N.D. Cent. Code § 51-07-01.2(4) (before Aug. 1, 2017) (emphasis added).

186.    Before its amendment by Senate Bill 2289, Section 51-07-01.2(4) of the North Dakota Century Code was consistent with the federal Robinson-Patman Act, which prohibits price discrimination "in prices between different purchasers of commodities of *like* grade and quality." 15 U.S.C. § 13(a) (emphasis added).

187.    The Interstate Price Regulation Provision's prohibition against price discrimination for "similar" products is a broader prohibition than the Robinson-Patman Act's prohibition against price discrimination for "like" products.

188.    The Robinson-Patman Act's prohibition against price discrimination for "like" products implies that price discrimination for "similar (but not like)" products is permissible under federal law.

189.    In passing the Robinson-Patman Act, Congress did not intend to set a single uniform price for all "similar" products. Rather, the Robinson-Patman Act reflects a legislative balance that Congress struck between the competing interests of consumers in having fair pricing

52

and of businesses in having flexibility and freedom from price regulation. "The '*like* grade and quality' concept was designed to serve as one of the necessary rough guides for separating out those commercial transactions insufficiently comparable for price regulation by the statute . . . ." *Moog Industries, Inc. v. FTC*, 238 F.2d 43, 49-50 (8th Cir. 1956) (quotation and alteration omitted) (emphasis added); *see also id.* at 50 ("leaf springs, coil action parts or piston rings for a Ford sedan of 1947 may be sufficiently different from those for a Chevrolet coach of 1950 that the former could lawfully be sold for uniform higher or lower prices than the latter").

190.    However, if Senate Bill 2289 requires farm equipment manufacturers to charge the same prices for all "similar" products in North Dakota, then under the Robinson-Patman Act the farm equipment manufacturers will also be required to charge the same prices for all products in the same geographic market that the courts of North Dakota deem to be "similar."

191.    For example, suppose that a farm equipment manufacturer makes two different models of tractors: "Model A," a high-end model that sells for $50,000, and "Model B," a mid-tier model that sells for $30,000. Under both the Robinson-Patman Act and the pre-existing North Dakota Farm Equipment Dealership Statute, Model A and Model B are different enough that they would not be considered to be of "like grade and quality." If a North Dakota court found Model A and Model B to be of "*similar* grade and quality," however, the Manufacturer would be required to charge the same wholesale price in North Dakota for Model A as it does for Model B. If the Manufacturer adopted the same price, $40,000, for both Model A and Model B in North Dakota, the Manufacturer would soon find itself compelled to charge the same $40,000 price for both Model A and Model B in neighboring states that are in the same competitive market as North Dakota. Eventually, the Manufacturer could become obligated to charge the

4813-7634-9514.5

same $40,000 price for Model A and Model B tractors all across the country, solely because of Senate Bill 2289 in North Dakota.

192.     By prohibiting price discrimination between "similar" products rather than between "like" products, the Interstate Price Regulation Provision creates an inescapable conflict with the Robinson-Patman Act.  Senate Bill 2289 thus puts farm equipment manufacturers in the untenable position either of violating the Robinson-Patman Act to comply with Senate Bill 2289, or of violating Senate Bill 2289 to comply with the Robinson-Patman Act.

193.     Accordingly, farm equipment manufacturers cannot reasonably comply with both Senate Bill 2289 and the Robinson-Patman Act.

194.     The "Supremacy Clause" of the United States Constitution, U.S. CONST. art. VI, cl. 2, provides that "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land . . . ."

195.     Where "it is impossible to comply with both the state and federal law," the state law is preempted by the federal law under the doctrine of conflict preemption.  *Davidson & Associates v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

196.     Accordingly, the Court should declare, adjudge, and decree that the Interstate Price Regulation Provision is conflict-preempted by the Robinson-Patman Act.

## COUNT ONE

### Federal Arbitration Act Preemption
### Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

197.     The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

198.    The Court should declare, adjudge, and decree that—insofar as the No Arbitration Provision purports to regulate interstate commerce—the No Arbitration Provision is expressly preempted by the Federal Arbitration Act.

199.    The Court should grant a preliminary and permanent injunction against the enforcement or implementation of the No Arbitration Provision.

## COUNT TWO

### Federal Arbitration Act Preemption
### 42 U.S.C. § 1983

200.    The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

201.    The No Arbitration Provision deprives Manufacturers of their rights, privileges, and immunities under the Federal Arbitration Act.

202.    Unless enjoined, Governor Burgum and the Attorney General, directly and indirectly, will enforce the No Arbitration Provision under color of the statutes, ordinances, regulations, customs, and usages of the State of North Dakota.

203.    The Court should grant a preliminary and permanent injunction enjoining Governor Burgum and the Attorney General from enforcing or implementing the No Arbitration Provision.

204.    Additionally, the Court should award the Manufacturers their reasonable attorneys' fees pursuant to 28 U.S.C. § 1988(b).

## COUNT THREE

### Lanham Act Preemption
### Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

205.    The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

206.     Each Manufacturer named as a Plaintiff owns or uses in commerce one or more federally registered trademarks or service marks for use in the sale of farm equipment and related activities and licenses such marks to farm equipment dealers in North Dakota.

207.     The Court should declare, adjudge, and decree that the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Transfer Provisions—individually and collectively—are both expressly and implicitly preempted insofar as they purport to apply to the license of federally registered trademarks and service marks in North Dakota.

208.     The Court should grant a preliminary and permanent injunction against the enforcement or implementation of the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Transfer Provisions with respect to the license of federally registered trademarks and service marks in North Dakota.

## COUNT FOUR

### Lanham Act Preemption
### 42 U.S.C. § 1983

209.     The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

210.     The No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Transfer Provisions,

individually and collectively, deprive the Manufacturers of their rights, privileges, and immunities under the Lanham Act.

211.   Unless enjoined, Governor Burgum and the Attorney General, directly and indirectly, will enforce the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Transfer Provisions under color of the statutes, ordinances, regulations, customs, and usages of the State of North Dakota.

212.   The Court should grant a preliminary and permanent injunction enjoining Governor Burgum and the Attorney General from enforcing or implementing the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Transfer Provisions with respect to the license of federally registered trademarks or service marks in North Dakota.

213.   The Court should award the Manufacturers their reasonable attorneys' fees pursuant to 28 U.S.C. § 1988(b).

## COUNT FIVE

### Alternative Claim Under the Takings Clause
### Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

214.   The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

215.   In the alternative to Counts Three and Four, if the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and

57

Forced Trademark License Transfer Provisions are not preempted by the Lanham Act, then their enforcement will violate the Takings Clause.

216.    The Court should declare, adjudge, and decree that the No Required Separation of Trademarks, No Exclusivity Requirements, No Enforcement of Performance Standards, No Enforcement of Appearance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Transfer Provisions, individually and collectively, constitute a "taking" for which just compensation is due under the United States Constitution.

## COUNT SIX

**Contracts Clause**
**Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.***

217.    The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

218.    The Court should declare, adjudge, and decree that, as applied to the Existing Dealership Agreements, the Offending Provisions violate the Contracts Clause of the United States Constitution.

219.    The Court should declare, adjudge, and decree that—on a prospective basis—the Manufacturers may, with or without cause, decline to renew any Existing Dealership Agreements that would be inconsistent with Senate Bill 2289 once renewed.

220.    The Court should grant a preliminary and permanent injunction against the enforcement or implementation of the Offending Provisions with respect to the Existing Dealership Agreements.

4813-7634-9514.5

## COUNT SEVEN

### Contracts Clause
### 42 U.S.C. § 1983

221.    The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

222.    The Offending Provisions deprive the Manufacturers of their rights, privileges, and immunities under the Contracts Clause.

223.    Unless enjoined, Governor Burgum and the Attorney General, directly and indirectly, will enforce the Offending Provisions under color of the statutes, ordinances, regulations, customs, and usages of the State of North Dakota.

224.    The Court should grant a preliminary and permanent injunction enjoining Governor Burgum and the Attorney General from enforcing or implementing the Offending Provisions.

225.    The Court should award the Manufacturers their reasonable attorneys' fees pursuant to 28 U.S.C. § 1988(b).

## COUNT EIGHT

### Dormant Commerce Clause
### Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

226.    The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

227.    Individually and collectively, the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions impose burdens on interstate commerce that are not justified or outweighed by legitimate local benefits.

4813-7634-9514.5

228.    Accordingly, the Court should declare, adjudge, and decree that the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions violate the dormant Commerce Clause.

229.    Additionally, the Court should grant a preliminary and permanent injunction against the enforcement or implementation of the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions.

## COUNT NINE

### Dormant Commerce Clause
### 42 U.S.C. § 1983

230.    The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

231.    Individually and collectively, the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions deprive the Manufacturers of their rights, privileges, and immunities under the dormant Commerce Clause.

232.    Unless enjoined, Governor Burgum and the Attorney General, directly and indirectly, will enforce the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions under color of the statutes, ordinances, regulations, customs, and usages of the State of North Dakota.

233.    The Court should grant a preliminary and permanent injunction enjoining Governor Burgum and the Attorney General from enforcing or implementing the No Minimum Inventory or Order Requirements, No Control Over Dealer Locations, No Market Withdrawal, and Interstate Price Regulation Provisions.

60

234.     Additionally, the Court should award the Manufacturers their reasonable attorneys' fees pursuant to 28 U.S.C. § 1988(b).

## COUNT TEN

**Robinson-Patman Act Preemption**
**Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.***

235.     The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

236.     The Court should declare, adjudge, and decree that the Interstate Price Regulation Provision is conflict-preempted by the Robinson-Patman Act.

## COUNT ELEVEN

**Robinson-Patman Act Preemption**
**42 U.S.C. § 1983**

237.     The Manufacturers hereby incorporate by reference the foregoing paragraphs as if fully set forth herein.

238.     The Interstate Price Regulation Provision deprives Manufacturers of their rights, privileges, and immunities under the Robinson-Patman Act.

239.     Unless enjoined, Governor Burgum and the Attorney General, directly and indirectly, will enforce the Interstate Price Regulation Provision under color of the statutes, ordinances, regulations, customs, and usages of the State of North Dakota.

240.     The Court should grant a preliminary and permanent injunction enjoining Governor Burgum and the Attorney General from enforcing or implementing the Interstate Price Regulation Provision.

241.     Additionally, the Court should award the Manufacturers their reasonable attorneys' fees pursuant to 28 U.S.C. § 1988(b).

4813-7634-9514.5

## PRAYER FOR RELIEF

WHEREFORE, the Manufacturers respectfully request that this Court:

A.      Enter preliminary and permanent injunctive relief enjoining the State from enforcing or implementing Senate Bill 2289;

B.      Vacate and set aside Senate Bill 2289;

C.      Declare, adjudge, and decree that Senate Bill 2289, in whole or in part, is preempted by the Federal Arbitration Act;

D.      Declare, adjudge, and decree that Senate Bill 2289, in whole or in part, is preempted by the Lanham Act; or, alternatively, that Senate Bill 2289, in whole or in part, constitutes a "taking" for which just compensation is due under the Takings Clause of the United States Constitution;

E.      Declare, adjudge, and decree that Senate Bill 2289, in whole or in part, violates the Contracts Clause of the United States Constitution with respect to the Existing Dealership Agreements;

F.      Declare, adjudge, and decree that Senate Bill 2289, in whole or in part, violates the dormant Commerce Clause of the United States Constitution;

G.      Declare, adjudge, and decree that Senate Bill 2289, in whole or in part, is preempted by the Robinson-Patman Act;

H.      Award the Manufacturers their reasonable attorneys' fees; and

I.      Grant the Manufacturers such other relief as may be necessary or appropriate or as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Manufacturers hereby demand a trial by jury with respect to all issues so triable.

62

Dated:  July 24, 2017

Respectfully submitted,

ASSOCIATION OF EQUIPMENT MANUFACTURERS,
AGCO CORPORATION,
CNH INDUSTRIAL AMERICA LLC,
DEERE & COMPANY, and
KUBOTA TRACTOR CORPORATION

By:     /s/ Timothy Q. Purdon

Timothy Q. Purdon (ND Bar #05392)
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, North Dakota 58503
(701) 255-3000

Katherine S. Barrett Wiik
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
(612) 349-8500

Counsel

Michael J. Lockerby*                    Roberta F. Howell*
Benjamin R. Dryden*                     Connor A. Sabatino*
Lauren A. Champaign*                    FOLEY & LARDNER LLP
Jarren N. Ginsburg*                     Verex Plaza, 150 East Gilman Street
FOLEY & LARDNER LLP                     Madison, Wisconsin 53703-1481
Washington Harbour                      (608) 258-4273
3000 K Street, NW, Sixth Floor
Washington, D.C. 20007
(202) 672-5300

*Counsel for Plaintiffs, Association of Equipment Manufacturers, AGCO Corporation,
CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation*

---------

*Pro hac vice* motion to be submitted

4813-7634-9514.5