**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| ASSOCIATION OF EQUIPMENT MANUFACTURERS, | ) ) ) |
| AGCO CORPORATION, | ) ) |
| CNH INDUSTRIAL AMERICA LLC, | ) ) |
| DEERE & COMPANY, and | ) ) |
| KUBOTA TRACTOR CORPORATION, | ) ) |
| Plaintiffs, | )     Case No. 1:17-cv-00151-CSM ) |
| v. | ) ) |
| THE HON. DOUG BURGUM, Governor of the State of North Dakota, in his Official Capacity, and | ) ) ) ) |
| THE HON. WAYNE STENEHJEM, Attorney General of the State of North Dakota, in his Official Capacity, | ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM IN SUPPORT OF
THE MANUFACTURERS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, the Association of Equipment Manufacturers ("AEM"), together with AEM members AGCO Corporation ("AGCO"), CNH Industrial America LLC ("CNH"), Deere & Company ("John Deere"), and Kubota Tractor Corporation ("Kubota") (collectively, the "Manufacturers"), by counsel, respectfully state as follows in support of their Motion for Preliminary Injunction seeking to enjoin the enforcement by Defendants Governor Doug Burgum and Attorney General Wayne Stenehjem (collectively, the "State") of the amendments to the North Dakota Farm Equipment Dealership Statute known as Senate Bill 2289.

4849-4958-9579.3

## I.     PRELIMINARY STATEMENT

When it goes into effect on August 1, 2017, Senate Bill 2289 will be the most restrictive farm equipment dealership law in the country.  It will be far more restrictive and burdensome than either the South Dakota farm equipment dealership law of 1999 or the Iowa Franchise Act of 1992—both of which the Eighth Circuit struck down as unconstitutional.  *See generally Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842 (8th Cir. 2002);[1] *Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994).

Like the South Dakota and Iowa statutes at issue in *Janklow* and *Branstad*, respectively, Senate Bill 2289 impairs existing contracts in violation of the Contracts Clause of the United States Constitution, U.S. CONST. art. I, § 10 (the "Contracts Clause").  Like the Iowa statute, Senate Bill 2289 interferes with dealer agreement provisions that "allow [Manufacturers] to change with current market conditions; and serve the consuming public by maintaining adequate control over the quality of services provided under their licensed trademarks."[2]  This impairment is not limited to the "Existing Dealership Agreements" referenced in the Complaint and identified in the accompanying affidavits of Alistair McLelland (AGCO),[3] James E. Walker (CNH),[4] John D. Lagemann (John Deere),[5] and Todd. H. Stucke (Kubota).[6]  Rather, Senate Bill 2289 will also impair *prospective* contracts when agreements with existing North Dakota farm equipment dealers expire or come up for renewal.  With respect to existing and prospective farm equipment dealership agreements alike, Senate Bill 2289 deprives the Manufacturers of the right

---

[1] Plaintiff AEM is the successor to the lead plaintiff in *Janklow*, the Equipment Manufacturers Institute.  Plaintiff CNH is the successor to two plaintiffs in that litigation, Case Corporation and New Holland North America, Inc.  Plaintiffs AGCO and John Deere were also plaintiffs in *Janklow*.

[2] *McDonald's Corp. v. Nelson*, 822 F. Supp. 597, 606 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994).

[3] The Affidavit of Alistair McLelland (the "McLelland Affid.") is attached as **Exhibit A**.

[4] The Affidavit of James E. Walker (the "Walker Affid.") is attached as **Exhibit B**.

[5] The Affidavit of John D. Lagemann (the "Lagemann Affid.") is attached as **Exhibit C**.

[6] The Affidavit of Todd H. Stucke (the "Stucke Affid.") is attached as **Exhibit D**.

2

to arbitrate disputes that is protected by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"). Both retroactively and prospectively, Senate Bill 2289 impairs the Manufacturers' ability to require that North Dakota farm equipment dealers licensed to use their federally registered trademarks in fact comply with the appearance, performance, and other quality control standards to which authorized dealers of their products nationwide are subject. This is one of many ways in which Senate Bill 2289 is inconsistent with, and is therefore preempted by, the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act"). Based on their Lanham Act, FAA preemption, and Contracts Clause claims alone, the Manufacturers are likely to succeed on the merits and are otherwise entitled to preliminary injunctive relief under the standard articulated by the Eighth Circuit.[7]

## II.  FACTUAL BACKGROUND

The "Offending Provisions" of Senate Bill 2289[8] impose unprecedented restrictions on the Manufacturers' rights to enforce the Existing Dealership Agreements, to renew or to negotiate new contracts with dealers that are consistent with national industry norms, to include and enforce arbitration clauses in their dealer agreements, and to enforce their federally protected

---

[7] In addition, Senate Bill 2289 will create onerous operational requirements for manufacturers doing business in North Dakota that unreasonably burden interstate commerce in violation of the Commerce Clause of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3 (the "Commerce Clause"). Senate Bill 2289 also imposes a standard for price discrimination that is different than that set forth in the Robinson-Patman Act 15 U.S.C. § 13 *et seq.*, and does so in a way that will affect pricing in other states in violation of the Commerce Clause. In the absence of the preliminary injunction that the Manufacturers seek, the Offending Provisions will also effect an unconstitutional taking of the Lanham Act rights in violation of "Takings Clause" of the United States Constitution, U.S. CONST. amend V. The Manufacturers' Commerce Clause, Robinson-Patman Act preemption, and Takings Clause claims are not addressed in the pending motion.

[8] As defined in the Complaint, the "Offending Provisions" are: the "No Required Separation of Trademarks" (¶ 35), "No Enforcement of Appearance Standards" (¶ 41), "No Enforcement of Performance Standards" (¶¶ 48), "No Minimum Inventory or Order Requirements" (¶ 53), "No Exclusivity Requirements" (¶¶ 60, 62), "Forced Transfer of Trademark License" (¶ 68), "No Control Over Dealer Locations" (¶¶ 72-74), "Enabling Warranty and Incentive Payment Fraud" (¶ 77), "Retroactive Impairment of Existing Warranties" (¶¶ 83, 84), "Retroactive Impairment of Existing Contracts" (¶ 86), "No Arbitration" (¶ 90), "No Market Withdrawal" (¶ 95), and "Interstate Price Regulation" (¶ 101) Provisions.

trademark rights.   For example, Senate Bill 2289's No Arbitration Provision purports to invalidate the arbitration clause of John Deere's Agricultural Dealer Agreement, which states that "any Dispute shall be finally resolved by binding arbitration . . . in accordance with the arbitration rules of the American Arbitration Association . . . ."   (Lagemann Affid. ¶ 5). AGCO's farm equipment dealer agreements similarly provide that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach of this Agreement shall be determined by arbitration in accordance with the rules of the American Arbitration Association . . . ." (McLelland Affid. ¶ 6).   Under the FAA, these provisions of the John Deere and AGCO contracts are "valid, irrevocable, and enforceable."   9 U.S.C. § 2.   Senate Bill 2289's No Arbitration Provision,[9] however, would make these contractual arbitration clauses unenforceable as a matter of North Dakota law.   It also would prevent any other Plaintiff Manufacturer or member of AEM from including such a clause in future dealership agreements with farm equipment dealers in North Dakota.

All of the Manufacturers license their federally registered trademarks to equipment dealers in North Dakota.   For example, CNH's standard farm dealer agreement for its Case IH brand of farm equipment grants the dealer "a nonexclusive right and license to use" three trademarks owned by CNH:   "Case IH," "Case Construction," and "CNH Industrial Parts" trademarks (Walker Affid. ¶ 16).   Similarly CNH's standard farm dealer agreement for its New Holland brand of farm equipment grants the dealer "a nonexclusive right and license to use" three trademarks owned by CNH:   "New Holland," "New Holland Construction," and "CNH Parts."   The trademarks to which the Case IH Agreement and the New Holland Agreement grant

---

[9] *See* N.D. Cent. Code § 51-07-01.2(*l*)(5) (effective Aug. 1, 2017) ("Notwithstanding the terms of any contract, a manufacturer . . . of farm implements . . . may not . . . [r]equire a farm equipment dealer in this state to enter an agreement . . . which requires . . . [t]he dealer to agree to arbitration . . . .").

rights are defined as the "Licensed Trademarks." (Walker Affid. ¶ 16). The terms of a dealer's license to use these trademarks include the following provisions of the New Holland Agreement:

- "Dealer shall not use or display the Licensed Trademarks in any way that might cause confusion with, or dilute the distinctive quality of, the Licensed Trademarks, or in any way that violates any New Holland trademark guidelines. In furtherance of this provision, if Dealer represents non-New Holland products, Dealer shall at any such location: (a) maintain internal and external display areas for new Products separate from non-New Holland products; (b) display new Products in the most visible and desirable position and in an area of greater size or space than the area used to display non-New Holland products." (Walker Affid. ¶ 18 citing § 8.3).

- "Dealer's use of Licensed Trademarks and its display of Products on Dealer's website shall be subject to New Holland's approval." (Walker Affid. ¶ 19 citing § 9.1(c)).

- "Any and all goodwill arising from Dealer's use of the Licensed Trademarks shall inure solely and exclusively to the benefit of New Holland." (Walker Affid. ¶ 25 citing § 24.7).

- "Dealer shall not . . . sublicense or assign its right to use the Licensed Trademarks to any other person or entity . . . ." (Walker Affid. ¶ 26 citing § 24.3(b)).

The Case IH Agreements contain substantively identical provisions, substituting the term "Case IH" for "New Holland" in certain provisions. (Walker Affid. ¶¶ 18, 19, and 25). The other Plaintiff Manufacturers' dealer agreements contain similar provisions that are impaired by Senate Bill 2289. (Compl., Ex. F). *See also* McLelland Affid. ¶ 8 (quoting AGCO trademark dealer agreement provisions requiring use of the licensed "Marks" to "be in the manner prescribed by AGCO"); Lagemann Affid. ¶¶ 7-13 (identifying John Deere's registered trademarks, trademark standards, and Agricultural Dealer Agreement provisions impaired by Senate Bill 2289); Stucke Affid. ¶¶ 7-16 (identifying Kubota's registered trademarks, trademark license provisions, brand standards, and other dealer agreement provisions impaired by Senate Bill 2289—including prohibitions on unauthorized assignments and dealership relocations and obligations to maintain minimum levels of inventory).

Under the Lanham Act, each of the Manufacturers has the right to ensure that its

5

trademarks are not (mis-) used to sell competing products. *See generally Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 162 (1995). When licensing its trademarks to dealers, each of the Manufacturers also has the right under the Lanham Act to control the quality of the goods and services provided by the dealer licensees. *See Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006).

Notwithstanding the trademark protections of federal law, at least six provisions of Senate Bill 2289—the No Required Separation of Trademarks,[10] No Exclusivity Requirements,[11] No Enforcement of Appearance Standards,[12] No Enforcement of Performance Standards,[13] and Forced Trademark License[14] Provisions (collectively, the "Trademark License Impairment Provisions")—purport to either nullify or restrict each Manufacturer's rights under both its Existing Dealership Agreements and the Lanham Act to ensure that competing products are not sold under its trademarks and to otherwise control the use and assignment of its trademarks by its North Dakota licensees.

Unless its enforcement is enjoined by this Court, Senate Bill 2289 will cause irreparable injury to the Manufacturers' rights under the Existing Dealership Agreements—which are

---

[10] *See* N.D. Cent. Code § 51-07-01.2(1)(d) (effective Aug. 1, 2017) ("Notwithstanding the terms of any contact, a manufacturer . . . of farm implements . . . may not . . . [r]equire a farm equipment dealer to separate the line-makes operating within the dealer's facility by requiring the separation of personnel, inventory, service areas, display space, or otherwise dictate the method, manner, number of units, or the location of farm equipment displays at the dealer's facility.").

[11] *See* N.D. Cent. Code § 51-07-01.2(1)(e) (effective Aug. 1, 2017) ("Notwithstanding the terms of any contract, a manufacturer . . . of farm implements . . . may not . . . [r]equire a farm equipment dealer to either establish or maintain exclusive facilities, personnel, or display space . . . .").

[12] *See* N.D. Cent. Code § 51-07-01.2(1)(h) (effective Aug. 1, 2017) ("Notwithstanding the terms of any contract, a manufacturer . . . of farm implements . . . may not . . . [r]equire a farm equipment dealer to unreasonably remodel, renovate, or recondition the dealer's facilities . . . or make unreasonable alterations to the dealership premises. . . .").

[13] *See* N.D. Cent. Code § 51-07-01.2(1)(k) (effective Aug. 1, 2017) (a farm equipment manufacturer may not "[u]se an unreasonable, arbitrary, or unfair sales, service, or other performance standard is determining a farm equipment dealer's compliance with a contract or program").

[14] *See* N.D. Cent. Code § 51-07-02.2 (effective Aug. 1, 2017) (a farm equipment dealer is presumptively free to "transfer, assign, or sell a dealer agreement" to another person, so long as notice is provided to the manufacturer and the transferee meets the manufacturer's written, reasonable, and uniformly applied standards of qualification relating to the financial qualifications of the transferee and business experience of the transferee").

protected from impairment by the Contracts Clause—and to other rights protected by federal law, including the FAA and Lanham Act. Additionally, without an injunction, the Manufacturers will be subject to substantial business uncertainty and pressure to comply with aspects of Senate Bill 2289 that they genuinely believe to be improper. Accordingly, the Manufacturers respectfully request that the Court preliminarily enjoin the implementation and enforcement of Senate Bill 2289 in its entirety pending resolution of the merits of the Manufacturers' Complaint.

### III.   **PROCEDURAL STANDARD**

The four factors governing the Manufacturers' Motion for Preliminary Injunction are: (1) the probability that the Manufacturers will succeed on the merits; (2) the threat of irreparable harm to the Manufacturers in the absence of injunctive relief; (3) the balance between the harm to the Manufacturers and any injury that granting the injunction will inflict on the State; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "[N]o single factor is determinative;" rather, the four-factor test is meant to be "flexible enough to encompass the particular circumstances of each case." *Id.* at 113.

Although all four of these "*Dataphase* factors" must be considered, "[s]uccess on the merits has been referred to as the most important of the four factors." *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). Because the Manufacturers seek to enjoin the enforcement of "legislation . . . developed through presumptively reasoned democratic processes," they must show *either* (1) that they are "likely to prevail on the merits" (*i.e.*, that they have a 51% or greater chance of success on the merits); or (2) a "fair chance of success" (*i.e.*, a "less than fifty percent" chance of success) *and* that the legislation was "not the product of a reasoned democratic process." *Planned Parenthood Minn., N.D., S.D. v. Rounds*,

7

530 F.3d 724, 731-32 (8th Cir. 2008); *North Dakota v. U.S. Environmental Protection Agency*, 127 F. Supp. 3d 1047, 1054-55 (D.N.D. 2015).

## IV.   ARGUMENT

### A.   Under Any Standard, the Manufacturers Are Likely to Succeed on the Merits of Their Constitutional and Statutory Challenge to Senate Bill 2289.

Because Senate Bill 2289 was not developed through a reasoned democratic process, the Manufacturers need only show a "fair chance of success" on the merits under the standard articulated by the Eighth Circuit in *Planned Parenthood*.  Senate Bill 2289 was drafted by the North Dakota Implement Dealers Association, which boasted of having "introduced" the bill to the North Dakota Legislative Assembly (the "Assembly").  (Compl., Ex. B and C).  Nothing in the legislative history suggests that the Assembly engaged in any serious debate before adopting this trade association's bill.[15]  To the contrary, according to publicly available video of the legislative process, the North Dakota Senate discussed Senate Bill 2289 for approximately five minutes, where it received no questions; the North Dakota House discussed Senate Bill 2289 for approximately six minutes, where it received only one question.[16]  Nevertheless, Senate Bill 2289 was passed by a margin of 46–0 in the North Dakota Senate and 86–5 in the North Dakota House.[17]

---

[15] The Senate and House Agriculture Committees received oral and written testimony on Senate Bill 2289. However, many of the key speakers who testified in support of Senate Bill 2289 were present or past officers of the North Dakota Implement Dealers Association, and the record shows that the Agriculture Committees made only slight changes to the bill that the North Dakota Implement Dealers Association had drafted.

[16] *See* Bill Videos for SB 2289, *available at* http://www.legis.nd.gov/assembly/65-2017/bill-video/bv2289.html. Because the videos and related documentation about Senate Bill 2289 are public records, the Court may take judicial notice of them.  *See generally Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005); Fed. R. Evid. 201.  The one question that Senate Bill 2289 received is illuminating.  Representative George Keiser observed that "the Century Code has a very lengthy, extensive, detailed section on contracts.  What we're saying with this bill is you can have a contract but we're interfering with you having a contract.  And that's inconsistent with our contract law section . . . ." *See id.*, 3/13/17 1:34 pm video.  Representative Keiser was one of the handful of Representatives who ultimately voted against Senate Bill 2289.

[17] *See* Bill Actions for SB 2289, *available at* http://www.legis.nd.gov/assembly/65-2017/bill-actions/ba2289.html.

8

As was the case with the statute at issue in *North Dakota v. EPA*, the enactment of Senate Bill 2289 was "inexplicable, arbitrary, and devoid of a reasoned process." 127 F. Supp. 3d at 1055 (D.N.D. 2015). Accordingly, the Manufacturers need only show a "fair chance" of succeeding on the merits to justify a preliminary injunction. Under either the "fair chance" standard or the stricter "likely to prevail on the merits" standard, the Manufacturers have a high likelihood of prevailing on their declaratory judgment[18] and Section 1983[19] claims under the Contracts Clause, FAA, and Lanham Act, among others.[20]

### 1.   Senate Bill 2289 impairs the Existing Dealership Agreements in violation of the Contracts Clause of the U.S. Constitution.

The Contracts Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10. To determine whether Senate Bill 2289 violates the Contracts Clause, the Court must first determine "whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." *Janklow*, 300 F.3d at 850. If the Court so finds, it must determine whether the State has "a significant and legitimate public purpose" for Senate Bill 2289. *Id.* The Eighth Circuit's precedent in *Janklow* is clear that "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Id.* at 859-61.[21]

---

[18] The elements of a claim under the Declaratory Judgment Act are (1) a substantial controversy; (2) between parties having adverse legal interests; (3) of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Ringo v. Lombardi*, 677 F.3d 793, 796 (8th Cir. 2012) (citation omitted).

[19] The elements of a claim under 42 U.S.C. § 1983 are (1) conduct by a person acting under color of state law; (2) that deprives a person of rights, privileges, or immunities secured by the Constitution or federal laws. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

[20] Upon development of the factual record, the Manufacturers intend to prove each of the counts alleged in their Complaint. For purposes of the pending motion, however, the Manufacturers ask the Court to hold only that the Manufacturers are likely to succeed on their claims under the Contracts Clause, FAA, and Lanham Act.

[21] If and only if the State proves that it has a significant and legitimate purpose for Senate Bill 2289, then as a last step the Court determines "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Janklow*, 300 F.3d. at 850 (quotations and alterations omitted). Because the State cannot meet its burden

9

Based on these demanding requirements, the Eighth Circuit has consistently invalidated state dealership and franchise laws that purport to impair existing dealership and franchise contracts. In *Janklow*, the Eighth Circuit held that "the case law makes clear" that "such special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts." 300 F.3d at 861. In *Branstad*, the Eighth Circuit held that "[w]e do not think that it can be seriously contended [*i.e.*, contested] that the retroactive feature of the relevant Iowa legislation substantially impaired the obligations previously owed." 29 F.3d at 384. In this case, the Court's determination whether the Manufacturers are likely to succeed on the merits of their Contracts Clause claim is therefore guided by well-established law holding such retroactive legislation to be unconstitutional.

Before the August 1, 2017 effective date of Senate Bill 2289, the Manufacturers had Existing Dealership Agreements in place with farm equipment dealers in North Dakota. These Existing Dealership Agreements set forth the terms and conditions of the relationships between the Manufacturers and the local farm equipment dealers. Each of the Existing Dealership Agreements was valid and enforceable at the time that it was signed. However, Senate Bill 2289 makes no exception for contracts that were adopted before the statute's effective date. To the contrary, Senate Bill 2289's Retroactive Impairment of Existing Contracts Provision states explicitly that the statute applies "[n]otwithstanding the terms of any contract."[22]

Senate Bill 2289's Offending Provisions would invalidate scores of important terms in dozens of Existing Dealership Agreements, as demonstrated by the Fed. R. Evid. 1006 Summary

---

of proving a significant and legitimate public purpose for Senate Bill 2289, the Manufacturers do not expect the Court to reach this last step.

[22] *See* N.D. Cent. Code § 51-07-01.2(1) (effective Aug. 1, 2017); *see also* the Retroactive Impairment of Existing Warranties Provision, N.D. Cent. Code § 51-26-06 (effective Aug. 1, 2017) (applying new requirements on farm equipment warranties and on farm equipment manufacturers, and striking provisions of the North Dakota Farm Equipment Dealership Statute that excluded preexisting contracts).

of Manufacturers' Existing Dealership Agreements Impaired By Senate Bill 2289 attached as Exhibit F to the Complaint. The Supreme Court's Contracts Clause jurisprudence is clear that "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). Under this standard, the Manufacturers are highly likely to show that the Offending Provisions substantially impair their Existing Dealership Agreements.

In addition to considering whether the Offending Provisions substantially impair existing contracts, Eighth Circuit precedent also directs this Court to consider whether the Manufacturers may have foreseen the impairment of their contract rights that Senate Bill 2289 imposes. *See Janklow*, 300 F.3d at 857-58.[23] Here, the impairments imposed by Senate Bill 2289 were not foreseeable. Before 2017, the North Dakota Farm Equipment Dealership Statute contained a limited number of modest prohibitions against arbitrary terminations, coercion, and certain practices forbidden by federal antitrust laws. *See* N.D. Cent. Code §§ 51-07-01.1 and 51-07-01.2 (before Aug. 1, 2017). Thus, the Manufacturers reasonably could not have foreseen that the State of North Dakota would enact sweeping, retroactive legislation that so substantially impairs their Existing Dealership Agreements.

Because the Manufacturers have presented a strong *prima facie* case that Senate Bill 2289 violates the Contracts Clause, the burden shifts to the State to prove that the statute advances "a significant and legitimate public purpose." *Janklow*, 300 F.3d at 850. This requires the State to show that it "is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412. Eighteen years ago, the State of South

---

[23] This doctrine is not without its disagreement. For example, Eighth Circuit Judge Morris Arnold has called the foreseeability issue "a very troublesome aspect of current Contract-Clause jurisprudence," based on its implicit (and dubious) assumption that businesses think to incorporate the risk of intervening state legislation into the terms of contracts when negotiating them. *See Branstad*, 29 F.3d at 384-85.

11

Dakota tried to enact a similar dealership law to protect a "narrow class of dealers of agricultural machinery." *Janklow*, 300 F.3d at 861. The Eighth Circuit invalidated the South Dakota farm equipment dealership statute at issue in *Janklow*, holding that South Dakota had not met the burden of justifying the legislation because "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Id.*

Here, the State of North Dakota cannot meet its burden either. The record is clear that Senate Bill 2289 was enacted for purposes that are improper under the Contracts Clause. The drafters of Senate Bill 2289, the North Dakota Implement Dealers Association, made clear that its purpose was to advance the interests of a narrow class of implement dealers, describing it as "[a] major farm equipment dealer protection bill." (Compl., Ex. B). More importantly, the level-the-playing-field nature of the legislation was openly recognized by the Assembly itself. During the short time that Senate Bill 2289 was discussed on the Senate floor, State Senator Jerry Klein (the Assistant Majority Leader, and a co-sponsor of the bill) candidly described the purpose of the bill as giving a "level playing field to our implement dealers." *See* Bill Videos for SB 2289, *supra* note 16, at 2/15/17 1:44 pm video.[24] In other words, the co-sponsor of Senate Bill 2289 has freely admitted that the purpose of the bill was to do precisely what the Contracts Clause forbids.

### 2. Senate Bill 2289 violates the Manufacturers' rights under the FAA to include arbitration provisions in their dealer agreements.

In addition to impairing the Existing Dealership Agreements generally, Senate Bill 2289 specifically impairs any farm equipment dealership agreements—existing or new—that require arbitration. Senate Bill 2289's No Arbitration Provision prohibits farm equipment manufacturers

---

[24] Additionally, during the short time that Senate Bill 2289 was discussed in the House, a Representative expressed his opinion that "What we're saying with this bill is you can have a contract but we're interfering with you having a contract. And that's inconsistent with our contract law section . . . ." *See supra* note 16.

4849-4958-9579.3

and dealers from agreeing to arbitrate their disputes and further prohibits agreements to arbitrate outside of North Dakota.[25]  This provision is preempted by the FAA, which provides:

> *A written provision* in . . . a contract evidencing a transaction involving commerce *to settle by arbitration a controversy* thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, *shall be valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).  Therefore, the FAA makes enforceable *any* arbitration provision in *any* contract that involves commerce.  As the Supreme Court has explained, the FAA "declares a national policy favoring arbitration of claims that parties contract to settle in that matter.  That national policy . . . forecloses state legislative attempts to undercut the enforceability of arbitration agreements."  *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (alterations and citation omitted).

Plaintiffs AGCO, CNH, John Deere, and Kubota do not have their primary places of business in North Dakota and are not incorporated in North Dakota.  Similarly, most of the other Manufacturers that are members of AEM do not have a primary place of business in North Dakota and are not incorporated in North Dakota.  To the extent that any of the Manufacturers enter into agreements with farm equipment dealers in North Dakota for the distribution of farm equipment, those agreements "involv[e] commerce" within the meaning of the FAA.

The FAA preempts state laws that purport to prohibit or burden contractual arbitration provisions.  *See Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *Equipment Manufacturers Institute v. Janklow*, 136 F. Supp. 2d 991, 1000 (D.S.D. 2001), *rev'd in part on*

---

[25] *See* N.D. Cent. Code § 51-07-01.2(*l*)(2), (4)-(5) (effective Aug. 1, 2017) (outlawing contracts that require "[t]he dealer to bring an action against the manufacturer in a venue outside of this state . . .; [r]educing, modifying, or eliminating the dealer's right to resolve a dispute in a state or federal court in this state; or [t]he dealer to agree to arbitration").

13

*other grounds* 300 F.3d 842 (8th Cir. 2002).   Additionally, the FAA preempts state laws that purport to require arbitrations to be held within a particular State.  *See, e.g., KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42 (1st Cir. 1999); *Cahill v. Alternative Wines, Inc.*, No. 12-CV-110-LRR, 2013 U.S. Dist. LEXIS 14588 (N.D. Iowa Feb. 4 2013).  Because Senate Bill 2289 purports to prohibit arbitration clauses altogether and to require that arbitrations be held in North Dakota, it is preempted by the FAA.

> ### 3.   Senate Bill 2289 violates each Manufacturer's rights under the Lanham Act to control the quality associated with its trademarks.

The Lanham Act gives each Manufacturer a federal right to ensure that its trademarks are not used to sell competing products.  *See generally Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 162 (1995).  At least two Offending Provisions of Senate Bill 2289, however—the No Required Separation of Trademarks and No Exclusivity Requirements Provisions—purport to give farm implement dealers the freedom to mix and match one Manufacturer's products under another Manufacturer's trademarks.  This was the actual, deliberate intent of Senate Bill 2289. In fact, as State Representative Cindy Schreiber Deck explained these provisions to the media shortly before the enactment of Senate Bill 2289:  "If there's a building and it says 'John Deere' on it, now they (could) sell anything out of that particular building."  (Compl., Ex. D).  Because these provisions would violate the Manufacturers' well-settled federal trademark rights, the Manufacturers are likely to prevail on their claim that Senate Bill 2289 is preempted by the Lanham Act.  In this regard, Senate Bill 2289 runs afoul of the very purpose of the Lanham Act, the intent of which is "to protect registered marks used in [interstate] commerce from interference by State, or territorial legislation."  15 U.S.C. § 1127.  Senate Bill 2289 is also expressly preempted by the Lanham Act, which provides:  "No State . . . may require alteration of a registered mark, or require that additional trademarks, service marks, trade names, or

14

corporate names that may be associated with or incorporated into the registered mark be displayed in the mark in a manner differing from the display of such additional trademarks, service marks, trade names, or corporate names contemplated by the registered mark . . . ."  15 U.S.C. § 1121(b).

Additionally, at least four other provisions of Senate Bill 2289—the No Enforcement of Appearance Standards, No Enforcement of Performance Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Provisions—irreconcilably conflict with the Manufacturers' Lanham Act rights to control how their products are sold by dealers in their capacity as trademark licensees.  The Lanham Act preempts conflicting state laws under the doctrine of conflict preemption.  *See, e.g., Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975); *Macia v. Microsoft Corp.*, 152 F. Supp. 2d 535, 540 (D. Vt. 2001); *American Automobile Association (Inc.) v. AAA Insurance Agency, Inc.*, 618 F. Supp. 787, 798 (W.D. Tex. 1985).  As the Eighth Circuit recognized in *Mid-State Aftermarket Body Parts*, the Lanham Act gives trademark licensors the "right to control the quality of the goods . . . sold under" the licensed trademarks.  466 F.3d at 634 (quotation omitted). *See also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991).  In fact, the Lanham Act not only gives licensors the ***right*** to control the quality of goods and services sold under their marks, it also imposes an affirmative ***duty*** on licensors to control, supervise, and ensure the quality of goods and services sold under their marks by licensees.  *See generally Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977); *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959).  A licensor that fails to discharge this duty forfeits its rights to the mark. *See generally Kentucky Fried Chicken Corp.*, 549 F.2d at 387.

The No Enforcement of Appearance Standards, No Enforcement of Performance

Standards, No Minimum Inventory or Order Requirements, and Forced Trademark License Provisions all constrain the Manufacturers' ability to control the quality of goods and services that dealers provide in their capacities as licensees of the Manufacturers' federally registered marks. For example, the No Enforcement of Appearance Standards Provision prevents the Manufacturers from enforcing routine requirements that dealers in North Dakota maintain the same signage, color, lighting, and cleanliness standards as dealers around the country are required to maintain. Likewise, the No Enforcement of Performance Standards Provisions prevent the Manufacturers from enforcing routine requirements that dealers in North Dakota provide knowledgeable staff, adequate inventories, and return services, or to ensure that these dealers perform to the same standards as dealers around the country are required to meet. The No Minimum Inventory or Order Requirements Provisions prevent the Manufacturers from enforcing routine requirements that dealers in North Dakota maintain the same minimum numbers or varieties of product models as dealers around the country are required to maintain. Finally, the Forced Trademark License Provision requires the Manufacturers to accept assignments of trademark licenses from established dealers to unknown, and potentially unpalatable, third parties. As the Eighth Circuit observed in *Janklow*, "Manufacturers conduct [an] extensive review of potential dealers because if the dealership becomes insolvent, the manufacturer's reputation in the community may suffer and its customers may be left without a local dealership for repairs and parts." 300 F.3d at 855. The Manufacturers are therefore likely to succeed on their claim that Senate Bill 2289 is either expressly preempted or conflict-preempted by the Lanham Act.

**B.     The Deprivation of Manufacturers' Rights Under the Contracts Clause, FAA, and Lanham Act Establishes the Likelihood of Irreparable Harm.**

The next *Dataphase* factor—the threat of irreparable harm—requires that there be "a

16

threat of irreparable harm if injunctive relief is not granted, and that such harm is not compensable by money damages." *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1141 (D.N.D. 2012). Here, Senate Bill 2289 will cause the Manufacturers to suffer irreparable harm for three independent reasons.

First, the various harms that Senate Bill 2289 will cause the Manufacturers are irreparable by their very nature. Because Senate Bill 2289 will substantially impair the Existing Dealership Agreements in violation of the Contracts Clause, it will cause the Manufacturers irreparable harm as a matter of law. *See generally Myers v. Gant*, 49 F. Supp. 3d 658, 668 (D.S.D. 2014) ("Once a constitutional injury has been demonstrated, the Court assumes that [the movant] has satisfied the irreparable harm prong."); *Allen v. Minnesota*, 867 F. Supp. 853 (D. Minn. 1994) ("the impairment of plaintiffs' constitutional [Contract Clause] rights constitutes irreparable harm"). Similarly, depriving the Manufacturers of their right under the FAA to compel arbitration of disputes with dealers would impose on the Manufacturers "the precise risk [they] bargained and contracted to avoid." *Northwest Airlines, Inc. v. R&S Company S.A.*, 176 F. Supp. 2d 935, 941 (D. Minn. 2001). Being forced to litigate a dealership dispute in North Dakota state court rather than before the arbitral panel specified in the dealership agreement is not an injury that can be remedied by an award of money damages. Finally, by impairing Manufacturers' rights under the Lanham Act, Senate Bill 2289 threatens harm to each Manufacturer's reputation and customer relationships—harms that cannot be remedied with money damages. *See generally Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir. 1980).

Second, Senate Bill 2289 creates substantial business uncertainty for the Manufacturers. Without a preliminary injunction, the Manufacturers will be forced either to follow a law that they genuinely believe to be improper or risk violating the law at their peril. *See McDonald's*

17

*Corp. v. Nelson*, 822 F. Supp. 597, 605 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1993) ("Plaintiffs (and for that matter their franchisees) should not be forced to act at their peril before a determination of these issues."). *See* McLelland Affid. ¶ 13; Walker Affid. ¶ 28; Lagemann Affid. ¶ 14; Stucke Affid. ¶ 18.

As a third, independent ground for finding irreparable harm, the State of North Dakota and its officers—including the two Defendants—enjoy sovereign immunity from damages actions. *See generally* U.S. CONST. amend. XI; *Ex parte Young*, 209 U.S. 123, 150 (1908). Thus, even if the Manufacturers' injuries might otherwise be remedied by an award of money damages, the Manufacturers cannot obtain money damages **against the State**. *See Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *see also North Dakota v. EPA*, 127 F. Supp. 3d at 1059; *Allen v. Minnesota*, 867 F. Supp. at 859.

### C.    The Balance of Hardships Weighs in Favor of the Manufacturers and Against the State, Thus Warranting Preliminary Injunctive Relief.

Because the Manufacturers are likely to prevail on their claims under the Contracts Clause and face irreparable injury, the next *Dataphase* factor—the relative balance of hardships that a preliminary injunction would impose—weighs in favor of granting a preliminary injunction. To the extent that Senate Bill 2289 is unconstitutional as applied to the Existing Dealership Agreements, the State does not have any legitimate interest in enforcing it. *See generally Emineth*, 901 F. Supp. 2d at 1142 ("no party has an interest in the enforcement of an unconstitutional law").

Moreover, the State will not be harmed by continuing the *status quo ante* pending a full resolution on the merits. Senate Bill 2289 is not emergency legislation, nor was it passed to prevent some particular impending harm. Rather, consistent with the laws of many other states, the **existing** North Dakota Farm Equipment Dealership Statute already protects farm equipment

18

dealers against arbitrary terminations and other manufacturer actions.[26]   These protections will remain in place if Senate Bill 2289 is enjoined.  On balance, then, issuing an injunction will prevent the Manufacturers from suffering significant, irreparable harm but will not impair the legitimate interests of the State.

### D.      The Public Interest in Protecting Constitutional Rights, Encouraging Arbitration, and Protecting Trademarks Warrants Injunctive Relief.

As this Court has previously observed, "it is always in the public interest to protect constitutional rights." *Emineth v. Jaeger*, 901 F. Supp. 2d at 1143.  *Accord Activision TV, Inc. v. Pinnacle Bancorp, Inc.*, 976 F. Supp. 2d 1157, 1168 (D. Neb. 2013) ("The public interest is served by enforcing the Constitution of the United States.").  Similarly, as the Eighth Circuit has recognized, it is appropriate for the Court in its discretion to consider "the public's interest in . . . protecting freedom to contract through enforcement of contractual rights and obligations." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007).

Senate Bill 2289's No Arbitration Provision also contradicts the "liberal federal policy favoring arbitration agreements" that Congress declared in adopting the FAA.  *See generally Moses M. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). Preliminary injunctive relief would therefore advance the public interest, as articulated by Congress, in resolving disputes by arbitration rather than in courts when the parties to the dispute have so agreed.  This, in turn, would benefit the public at large by lightening the load on local courts while also giving force to businesses' chosen dispute resolution procedures. *See generally Northwest Airlines*, 176 F. Supp. 2d at 942-43 ("The public interest is served by promoting stability in international contracts by enforcing bargained for arbitration clauses.").

Finally, a preliminary injunction would also serve the public interest by reducing the risks

---

[26] *See* N.D. Cent. Code § 51-07-01.1; N.D. Cent. Code § 51-07-01.2 (before Aug. 1, 2017).

19

for consumer confusion or deception caused by Senate Bill 2289's effects on federally registered trademarks. As a State Representative explained the effect of Senate Bill 2289: "If there's a building and it says 'John Deere' on it, now they (could) sell anything out of that particular building." (Compl., Ex. D). That result might be good for dealers hoping to free-ride on the Manufacturers' investments, but it is bad for members of the public who have come to know and rely upon a Manufacturer's trademarks as signs of quality, consistency, and value. *See generally Green Products Co. v. Independence Corn By-Products Co.*, 992 F. Supp. 1070, 1081 (N.D. Iowa 1997) ("the public interest is not well served when potential customers are lured onto a competitor's web site"). Therefore, the public interest would be well served by enjoining Senate Bill 2289.

## V.   CONCLUSION

Absent preliminary injunctive relief, the Manufacturers face irreparable harm to their rights under the Existing Dealership Agreements, the FAA, and the Lanham Act. The Manufacturers therefore respectfully request that the enforcement of Senate Bill 2289 be preliminarily enjoined, pending a final decision on the merits.

4849-4958-9579.3

Dated: July 25, 2017

Respectfully submitted,

ASSOCIATION OF EQUIPMENT MANUFACTURERS,
AGCO CORPORATION,
CNH INDUSTRIAL AMERICA LLC,
DEERE & COMPANY, and
KUBOTA TRACTOR CORPORATION

By:       /s/ Timothy Q. Purdon

Timothy Q. Purdon (ND Bar #05392)
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, North Dakota 58503
(701) 255-3000

Katherine S. Barrett Wiik
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
(612) 349-8500

Counsel

Michael J. Lockerby*
Benjamin R. Dryden*
Lauren A. Champaign*
Jarren N. Ginsburg*
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, NW, Sixth Floor
Washington, D.C. 20007
(202) 672-5300

Roberta F. Howell*
Connor A. Sabatino*
FOLEY & LARDNER LLP
Verex Plaza, 150 East Gilman Street
Madison, Wisconsin 53703-1481
(608) 258-4273

*Counsel for Plaintiffs, Association of Equipment Manufacturers, AGCO Corporation,
CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation*

---

*Pro hac vice* motion to be submitted

4849-4958-9579.3