**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| ASSOCIATION OF EQUIPMENT MANUFACTURERS, | ) ) ) |
| AGCO CORPORATION, | ) ) |
| CNH INDUSTRIAL AMERICA LLC, | ) ) |
| DEERE & COMPANY, and | ) ) |
| KUBOTA TRACTOR CORPORATION, | ) ) |
|     Plaintiffs, | ) ) |
| v. | ) ) ) |
| THE HON. DOUG BURGUM, Governor of the State of North Dakota, in his Official Capacity, and | ) ) ) ) |
| THE HON. WAYNE STENEHJEM, Attorney General of the State of North Dakota, in his Official Capacity, | ) ) ) ) ) |
|     Defendants. | ) ) |

Case No. 1:17-CV-151

**AFFIDAVIT OF JOHN D. LAGEMANN**

| | |
|---|---|
| STATE OF KANSAS | ) |
| | ) ss: |
| COUNTY OF JOHNSON | ) |

John D. Lagemann, having been first duly sworn, deposes and says as follows:

1.    I am the Senior Vice President, Sales & Marketing for the Agriculture & Turf Division of plaintiff Deere & Company ("John Deere"). I joined John Deere as a marketing representative in the Kansas City Sales Branch in 1982 and have held various positions with John Deere ever since, assuming my current position in September 2012.

1

2. I am competent to testify. I make this Affidavit, based on personal knowledge and certain business records of John Deere, to advise the Court of certain facts relevant to the motion for preliminary injunction filed by the plaintiffs seeking to enjoin enforcement of recently enacted amendments to the North Dakota Farm Equipment Dealership Statute known as "Senate Bill 2289."

3. Unless its enforcement is enjoined by this Court, Senate Bill 2289 will cause a number of hindrances and disruptions to John Deere's operations in North Dakota and elsewhere. Although the initial impact of Senate Bill 2289 will be on John Deere's contractual relationships with agricultural equipment dealers in North Dakota, the statute will also have adverse effects on consumers seeking to purchase agricultural equipment; dealers that seek to comply with the appearance, service, and other performance standards that John Deere expects of dealers licensed to use its federally registered trademarks; and on John Deere's trademarks themselves.

4. The ten contracts that John Deere has with agricultural equipment dealers in North Dakota support the 40 John Deere dealer locations in North Dakota and are among the "Existing Dealership Agreements" referenced in the Complaint and specifically identified in Exhibit F to the Complaint. These Existing Dealership Agreements are based on a standard template used for John Deere agricultural equipment dealers (the "Agricultural Dealer Agreements") in North Dakota and with most dealers around the country.

5. Section XVII of the Agricultural Dealer Agreement is an arbitration provision, which provides as follows:

> Although Dealer and Company are entering into this Agreement in a spirit of cooperation and mutual respect, it is possible that Disputes may arise. Dealer, (including without limitation guarantors of Dealer), Company [John Deere] and Deere Credit Services, Inc., agree that any Dispute shall be finally resolved by binding arbitration pursuant to the terms set forth in Exhibit 4. The duty to arbitrate shall extend to any officer, employee, shareholder, principal, agent,

4820-7947-0667.3

partner, trustee (in bankruptcy or otherwise), or subsidiary of Dealer as to any Dispute that is subject to this Section XVII.

A substantively identical arbitration provision is included in the great majority, if not all, of John Deere's agricultural dealer agreements in North Dakota and around the country. My understanding is that Senate Bill 2289 will outlaw or render unenforceable the arbitration provision in John Deere's Existing Dealership Agreements with North Dakota agricultural equipment dealers.

6.     This arbitration provision is one of many provisions of John Deere's standard Agricultural Dealer Agreement that John Deere believes will be impaired by Senate Bill 2289. Insofar as it relates to John Deere, the "Fed. R. Evid. 1006 Summary of Manufacturers' Existing Dealership Agreements Impaired by Senate Bill 2289" attached as Exhibit F to the Complaint correctly identifies the Existing Dealership Agreements that John Deere believes will be impaired, outlawed, or rendered unenforceable by Senate Bill 2289.

7.     Of particular concern is the fact that Senate Bill 2289 will impair John Deere's ability to enforce the appearance, service, and other performances standards that are the *quid pro quo* whenever John Deere licenses agricultural equipment dealers in North Dakota to use John Deere's federally registered trademarks, service marks, and trade dress. By way of background, John Deere and its affiliates have some 241 existing trademark registrations on file or pending with the United States Patent and Trademark Office. Many of John Deere's trademarks—including the famous "leaping deer" trademark that is used worldwide (which was most recently updated in the year 2000)—are federally registered for use in the sale of agricultural equipment and related services. These include the following "leaping deer" registrations: USPTO Trademark Registration Nos. 2,589,571 ("[o]perating repair and service facilities for tractors, agricultural machinery, industrial equipment, lawn and garden equipment"); 2,759,410

3

("[o]perating retail outlet services, specializing in tractors, agricultural machinery, industrial equipment, lawn and garden equipment, and parts and accessories therefor"); 2,729,763 (use with "[w]agons, wheel and crawler tractors and engines and parts therefor"); 2,729,766 (use with "[a]gricultural machines"); 2,820,151 (use with "[p]aints, paint thinners, and enamels for use in agricultural equipment and vehicles"); 3,833,851 (use with certain "pipes for agricultural, horticultural, nursery, green house and landscaping use").

8.    Trademarks are essential to John Deere's business.  John Deere's trademarks signal quality, consistency, and value to growers and users of agricultural equipment and related services.  John Deere thus has spent many hundreds of millions of dollars on its trademark strategy over the years, dating back to at least 1876, when John Deere first registered an early iteration of the "leaping deer" trademark for use in the sale of plows.  Today, John Deere has requirements that every dealer must meet to ensure that customers in North Dakota and elsewhere have a purchase and service experience—in terms of dealership appearance, sales and service by trained professionals, and stock of equipment and parts—that meets the requirements that John Deere seeks to have associated with its trademarks.  These requirements are set forth in the Existing Dealership Agreements themselves and in various documents, some of which are incorporated by reference.  These include the John Deere Brand Dealer usage Guidelines and Tools attached as **Exhibit A** and the John Deere Dealer/Distributor Sign Agreement attached as **Exhibit B**.  John Deere also needs the ability to vary these standards over time in response to changing market conditions and remain competitive.  Without the ability to enforce these requirements, John Deere would rather not license its trademarks to dealers at all.

4820-7947-0667.3

9.     John Deere's standard Agricultural Dealer Agreement grants dealers a non-exclusive license to use John Deere's federally registered trademarks, including the "leaping deer" mark. For example, Section VIII.A of the Agricultural Dealer Agreement provides:

> Company [John Deere] grants Dealer the non-exclusive right to use the Trademarks (including without limitation the JOHN DEERE trademark, and the trademark comprising the leaping deer design with JOHN DEERE), during the period of Dealer's appointment, in connection with the advertising and sale of Goods bearing one or more of the Trademarks, and in connection with the providing of services by Dealer relating to the sale or servicing of Goods identified and authorized under this Agreement. Such use of the Trademarks shall be in a manner and form approved by Company. Dealer agrees not the use any of the Trademarks as part of Dealer's corporate or business name and to cease all use of the Trademarks if Dealer ceases to be a dealer, including without limitation the removal from Dealer's premises and vehicles of all signs and distinctive identification that might associate Dealer with Company. Dealer also agrees not to sell or distribute any goods bearing any of the Trademarks, unless the goods originated from Company, entities affiliated with Company, or licensees authorized to use the Trademarks on the goods. Dealer also agrees not to use the Trademarks to promote goods not originating from Company, entities affiliated with Company, or their licensees.

A substantively similar provision is included in the great majority, if not all, of John Deere's agricultural equipment agreements around the country—including the Existing Dealership Agreements in North Dakota.

10.     My understanding is that Senate Bill 2289 will outlaw or render unenforceable certain terms in Section VIII.A of the Agricultural Dealer Agreement. For example, my understanding is that Senate Bill 2289 will, in certain circumstances, outlaw or render unenforceable the requirement that the dealer's "use of the Trademarks shall be in a manner and form approved by" John Deere. Senate Bill 2289 will also outlaw or render unenforceable the requirement that the "Dealer also agrees not to use the Trademarks to promote goods not originating from Company, entities affiliated with Company, or their licensees." It is my understanding that substantively identical license terms with other dealers across the State of

5

North Dakota will also be outlawed or rendered unenforceable, unless this Court grants an injunction.

      11.    In addition, Section I.B.2 of the Agricultural Dealer Agreement provides:

> One of the purposes of Dealer's obligations under this Agreement is to assure that the best efforts and adequate resources are being committed to the sale of Goods and to the performance of this Agreement. If Dealer undertakes to carry another major competitive line of equipment or engage in another major business activity, either of which involves an important commitment of effort and resources, Dealer agrees to make such separation of the personnel, facilities, capital and other resources devoted to that business as is satisfactory to Company.

Likewise, Section II.C.2.c of the Agricultural Dealer Agreement permits John Deere to terminate, "effective immediately," upon "any noncompliance with Section I.B." Provisions substantively identical to these are included in the great majority, if not all, of John Deere's agricultural equipment agreements around the country—including the Existing Dealership Agreements in North Dakota.

      12.    My understanding is that Senate Bill 2289 will outlaw or render unenforceable certain terms in Section I.B.2 and II.C.2.c of the Agricultural Dealer Agreement. For example, my understanding is that Senate Bill 2289 will outlaw or render unenforceable the requirement in Section I.B.2 that the dealer separate "the personnel, facilities, capital and other resources devoted" to any business activities by dealer that are unrelated to or that compete with John Deere. Similarly, my understanding is that Senate Bill 2289 will, at least in certain circumstances, outlaw or render unenforceable the provision in Section II.C.2.c that allows John Deere to terminate upon "any noncompliance with Section I.B." It is my understanding that substantively identical license terms in the Existing Dealership Agreements in North Dakota will also be outlawed or rendered unenforceable.

      13.    My understanding of the effects of Senate Bill 2289 is informed, among other things, by a March 3, 2017 article in the *Daily News* (Wahpeton), a true and accurate copy of

which was attached as Exhibit D to the Complaint.  According to that article, North Dakota State Representative Cindy Schreiber Beck explained the effect of Senate Bill 2289 as follows:  "If there's a building and it says 'John Deere' on it, now they (could) sell anything out of that particular building."

14.     In addition to the harms described above, Senate Bill 2289 will cause John Deere substantial business uncertainty by causing John Deere either to follow aspects of a law that John Deere genuinely believes to be improper or risk violating the law at its peril.  One example is as a result of the provision of Senate Bill 2289 that the Complaint calls the "Retroactive Impairment of Existing Warranties" Provision.  Effective August 1, 2017, this will require John Deere to use different procedures for dealer warranty reimbursement and to pay different levels for dealer warranty service in North Dakota than those set forth in the Warranty Administration Manual incorporated by reference in the Agricultural Dealer Agreement.   When John Deere sold agricultural equipment to dealers in North Dakota, its pricing was based on the assumption that dealer warranty reimbursement would be at the levels set forth in John Deere's Warranty Administration Manual, as published to its dealers and incorporated by reference in the Agricultural Dealer Agreement—not at the (presumably higher levels) set by the North Dakota legislature.

15.     It is John Deere's understanding that the passage of Senate Bill 2289 was driven by the North Dakota Implement Dealers Association ("NDIDA"), a local trade association that serves to advance the interests of North Dakota implement dealers.  A copy of NDIDA's publicly available March 24, 2017 press release about Senate Bill 2289 is attached as Exhibit B to the plaintiffs' Complaint.   That press release states that Senate Bill 2289 was "introduced" by NDIDA.

4820-7947-0667.3

FURTHER THE AFFIANT SAYETH NOT.

_____
( ) John D. Lagemann

Subscribed and sworn to me before me this 24 day of July, 2017

_____
Notary Public

> NOTARY PUBLIC - State of Kansas
> JENNIFER L. SCHREIER
> My Appt. Exp. 03/15/2021

My commission expires: March 15, 2021

4820-7947-0667 3