**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Association of Equipment | ) | |
| Manufacturers, | ) | |
| AGCO Corporation, | ) | **Case No. 1:17-cv-151** |
| CNH Industrial America LLC, | ) | |
| Deere & Company, and | ) | |
| Kubota Tractor Corporation | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The Hon. Doug Burgum, Governor | ) | |
| of the State of North Dakota, in his | ) | |
| Official Capacity, and | ) | |
| The Hon. Wayne Stenehjem, Attorney | ) | |
| General of the State of North Dakota, | ) | |
| in his Official Capacity | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| North Dakota Implement Dealers | ) | |
| Association | ) | |
| | ) | |
| Intervenor. | ) | |

**NORTH DAKOTA IMPLEMENT DEALERS ASSOCATION'S RESPONSE IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Intervenor, the North Dakota Implement Dealers Association (hereinafter, "NDIDA"), pursuant to this Court's Order Granting NDIDA's Motion to Intervene, hereby submits this Response In Opposition to the Plaintiffs' Motion for Preliminary Injunction. See Docket No. 41. In support thereof, NDIDA states as follows:

**BACKGROUND**

Plaintiffs' have a filed an action seeking declaratory and injunctive relief from legislation enacted by the North Dakota Legislature and signed by the Governor of North Dakota in March

2017 and that was set to take effect August 1, 2017.  Collectively, the legislation, known as SB 2289, adds greater regulation and protections in the franchisor/franchisee relationship between farm implement manufacturers and their franchised dealers.  Plaintiffs have moved a preliminary injunction based on three claims: 1) Violation of the Contract Clause; 2) Preemption by the Federal Arbitration Act; and, 3) Preemption by the Lanham Act.

<u>**ARGUMENT AND INCORPORATED MEMORANDUM OF LAW**</u>

**I.**      **Plaintiffs Have Not Carried Their Burden to Obtain a Preliminary Injunction.**

A preliminary injunction is an extraordinary remedy.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).  Courts must consider the measure of "competing claims for injury [as well as] the effect on each party of the granting or withholding of requested relief."  *Id.* (quoting, *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  Courts must proceed cautiously when a party seeks an injunction, and, importantly, the plaintiff seeking an injunction has the burden of proving his entitlement thereto. *E.g., Nat. Res. Def. Council*, 555 U.S. at 20.  Plaintiffs have not carried their burden.

In determining whether to issue a preliminary injunction, the Eighth Circuit follows a four-factor test: 1) the likelihood of Plaintiffs prevailing on the merits of their claims; 2) whether Plaintiffs will suffer irreparable harm absent injunctive relief; 3) the balance between the potential harm to Plaintiffs versus the injury suffered by Defendant and Intervenor in the event the injunction is granted; and 4) the public interest.  *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The four-factor test is to be applied flexibly to the particular circumstances of each case and no single factor is determinative.  *Id.* at 113.  But, the likelihood of success on the merits is usually considered the most important of the factors.  *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).

Plaintiffs argue they are not required to show a likelihood of prevailing on the merits, but only a fair chance of success. It is true that in certain situations the Eighth Circuit will only require a showing of a "fair chance" of prevailing on the merits in order to issue a preliminary injunction. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008). However, the current matter involves an attempt to enjoin the enforcement of a duly-enacted statute, passed by the Legislature and enacted by the Governor. See Docket No. 1, ¶21-24. In these situations, it is well-settled that the Court must make a "threshold finding that a party is likely to prevail on the merits" of its claims. *Planned Parenthood Minn.*, 530 F.3d at 732-33.

Plaintiffs cite *North Dakota v. U.S. Environmental Protection Agency*, 127 F. Supp. 3d 1047 (D.N.D. 2015), for the proposition that if enactment of a statute that is "inexplicable, arbitrary, and devoid of a reasoned process," then the Court should apply the lesser "fairly likely" standard. However, *North Dakota v. EPA* is not analogous to the current matter. It involved a review of an agency rule which the Court noted appeared to be "arbitrary and capricious." *North Dakota v. EPA,* 127 F. Supp. 3d at 1056-57. Additionally, agency rulemaking is inherently entitled to less deference than statutes enacted by the Legislature. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984) (some regulations receive "statutory-like deference even though a statute outranks them."). The legislative process is presumptively well-reasoned and thus entitled to deference. *1-800-411 Pain Referral Serv.,* 744 F.3d at 1054 (8th Cir. 2014). Courts do not inquire into the amount debate, the length of time the bill was discussed, or whether questions were asked before voting on a bill. *Richland/Wilkin Joint Powers Auth. V. United States Army Corp. of Engineers*, 826 F.3d 1030, 1040 (8th Cir. 2016). Rather, the inquiry is simply did the legislative body pass the bill and was it signed by the Governor, if so, then the

more deferential standard is applied.[1]  *MKB Mgmt. Corp. v. Burdick*, 954 F. Supp. 2d 900, 905 (D.N.D. 2013).  Therefore, Plaintiffs must prove that they are likely to prevail on the merits of their claims, and they cannot.

In addition to being unable to show a likelihood of success on the merits of their claims, which will be discussed in greater detail below, Plaintiffs cannot show that the other three factors support entry of the injunction either.  And, despite Plaintiffs' assertions, statements by outside organizations like Intervenor regarding legislation do not equate to legislative intent.  *Alliance of Automobile Mfrs. v. Gwadosky*, 304 F.Supp.2d 104 (D.Me. 2004).

### a.  Plaintiffs' Claim of Irreparable Harm is Dubious.

A preliminary injunction is an extraordinary remedy fashioned in equity by courts to prevent irreparable harm.  *Roudachevski,* 648 F.3d at 705 (citing, *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003)).  To demonstrate irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Id.* at 706. (quoting, *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir.1996)).  Notably, SB 2289 was signed into law in March 2017, but Plaintiffs waited four months to file the instant action.  This period of inaction hurts Plaintiffs' claims that harm to them from SB 2289 is "imminent."  *E.g.*, *Novus Franchising, Inc. v. Dawson*, 725 F.3rd 885, 895 (8th Cir. 2013).

Further, Plaintiffs' allege, without support, that SB 2289 impairs contractual obligations in its existing Dealer Agreements.  Plaintiffs have attached a "Fed. R. Evid. 1006 Summary" alleging impairment of various contractual obligations by various provisions of SB 2289.  See Docket No. 1, Ex. F.  But, summaries are only permitted by rule if the underlying information they depict is provided to the parties and court. Fed. R. Evid. 1006.  While Plaintiffs' contracts are likely to be

---

[1] Nevertheless, the uncontroverted record is that SB 2289 was subject to numerous committee hearings, question, answer and debate.

admissible, Plaintiffs have not provided them to the other parties or Court for review and evaluation. Without such documents, the Court must rely on the accuracy and authenticity of Plaintiffs' summary regarding their claim of irreparable harm. Similarly, the affidavits testifying to the contents of the contracts are also not sufficient because the affiants are testifying to hearsay (the Dealer Agreements) and the documents have not been provided to this Court for a determination regarding admissibility. Fed. R. Evid. 801, 802. More is required by Plaintiffs to meet their burden of demonstrating irreparable harm. *See Hypred S.A. v. Pochard*, No. CIV 04-2773 (JNE/JGL), 2004 WL 1386149, at *5 (D. Minn. June 18, 2004); *Goodman v. Illinois Dept. of Financial and Professional Reg.*, 430 F.3d 432, 439 (7th Cir. 2005) (refusing to find error in the exclusion of affidavits containing hearsay at the preliminary injunction hearing by the trial court).

### b. The Balance of the Harms Supports Denying Plaintiffs' Motion for Preliminary Injunction as Does the Public Interest.

Similarly, Plaintiffs allege that great harm will result should SB 2289 become enforceable. But, again, the harm arises out of impairment of contracts not provided to this Court. On the other hand, intervenors have shown a number of examples of situations involving the oppressive practices SB 2289 was enacted to prohibit. *See* (Ex. A, Laarsgard Affidavit).[2] Legislators and citizens alike testified to oppressive practices SB 2289 prevents as well as the benefits to the North Dakota economy, farm industry and consumers generally. *Id.* at ¶ 8, 12, 14, 16, 18, 25. The widespread support from all sectors of the agriculture industry evidences SB 2289 general benefits and the harms that will continue should SB 2289 not be enforced. *Id.* at ¶ 6.

---

[2] Ex. A, the Laarsgard Affidavit, contains quotations from testimony, both by legislators as well as constituents, presented during committee hearings on SB 2289. Audio and video recordings of this testimony are publicly available at http://www.legis.nd.gov/assembly/65-2017/bill -video/bv2289.html. These videos, audio recordings, and related documentation are public records, the Court may take judicial notice of them and they are not hearsay. *See generally, Stuzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005); Fed. R. Evid. 201; Fed. R. Evid. 803(8).

Further, as noted above and discussed in much more detail below, addressing the inequity in bargaining power between farm implement manufacturers and dealers benefits the State of North Dakota and its citizens as a whole.  (Ex. A).  When farm implement manufacturers are allowed to abuse and oppress their dealers, the customers of those dealers suffer and the economy of the State is less stable.  *Id.*  SB 2289 prevents oppressive and unfair conduct by farm implement manufacturers and ensures stability in this vital sector of the North Dakota economy.  *Id.*  This is a benefit to the both local and state tax coffers as well as those employees of the dealers. *Id.*

**II.    Plaintiffs Are Not Likely to Prevail on the Merits of Their Claims.**

   **a.  SB 2289 Does Not Substantially Impair Existing Agreements and is Supported by Broad and Generalized Public Purposes.**

Plaintiffs argue that retroactive application of SB 2289 will impair existing contracts (or Dealer Agreements) between the farm implement dealers and manufacturers and it is therefore unconstitutional under the Contract Clause of the United States Constitution.  U.S. CONST. art. I, § 10.  SB 2289 does remove unfair and prohibited provisions from existing dealer agreements. However, such a retroactive application is not unconstitutional because legislation and additional regulation like SB 2289 was foreseeable to farm implement dealers and manufacturers when they executed their existing contracts.  Regulating the commercial relationships between these parties prevents unfair and oppressive trade practices and the other consumer protections are legitimate legislative purposes that permit even substantial impairment of contracts.  (Ex. A, ¶13-14, 18, 30).

The U.S. Constitution prohibits state legislation from "impairing the Obligation of Contracts."  U.S. CONST. art. I, § 10.  However, this bar is not absolute and "is not to be read with literal exactness like a mathematical formula."  *Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 551 (8th Cir. 1997) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934)).  In fact, the Contract Clause is subordinate to the police power of a

state to protect the general welfare of its citizens.  *Allied Structural Steel Co. v. Spannaus*, 438

U.S. 234, 241 (1978) (noting that a state's police power is "paramount to any rights under contracts

between individuals.").  In other words, the Contract Clause does not completely usurp states'

broad power to fashion general regulatory schemes that may impair or even destroy private

contracts.  *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (citations omitted).  Therefore,

when confronted with a constitutional challenge based upon the Contract Clause, courts must

accommodate the Contract Clause with the inherent police power of a state "to safeguard the vital

interests of its people."  *Home Bldg. & Loan Ass'n*, 290 U.S. at 434; *see also Energy Reserves

Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983).  And, thus, state laws that

impair obligations under private contracts do not necessarily give rise to a viable Contract Clause

claim.  *See U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 16 (1977).

When confronted with an alleged violation of the Contracts Clause, courts examine

"whether the change in state law has 'operated as a substantial impairment of a contractual

relationship.'"  *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quoting *Allied

Structural Steel Co.*, 438 U.S. at 244).  If a court finds a substantial impairment of a contractual

relationship, only then does it examine the nature and purpose of the state legislation and, to a

lesser degree, the means and conditions the Legislature chose to accomplish that purpose.  *Allied

Structural Steel Co.*, 438 U.S. at 244.  More specifically, the Eighth Circuit Court of Appeals

considers the following in analyzing claims under the Contract Clause:

> (1)     The first inquiry is whether the state law has, in fact, operated as a
> substantial impairment on pre-existing contractual relationships.  If there is no
> substantial impairment of contractual relationships, the law does not violate the
> Contract Clause.  If, however, the law does constitute a substantial impairment, the
> second part of the test is addressed:
>
> (2)     The State must have a significant and legitimate public purpose
> behind the regulation.  If there is no significant and legitimate public purpose, the

state law is unconstitutional under the Contract Clause.   If a significant and legitimate public purpose has been identified, the third part of the test is applied:

> (3)      [A court] must determine whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

*Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002) (internal citations and quotations omitted); *see also In re Workers' Compensation Refund W. Nat'l Mut. Ins. Co.*, 46 F.3d 813, 817 (8th Cir. 1995) ("In practial terms, state legislation violates the Contract Clause if: (1) the state law operates a substantial impairment upon a contractual relationship, and (2) the state cannot demonstrate a significant and legitimate public purpose behind the regulation.")

The first inquiry evaluates three discrete aspects: 1) whether a contractual relationship exists; 2) whether the change in the law substantially impairs this contractual relationship; and, 3) whether the impairment is substantial.   *Id.*   The first step is not at issue in this matter.   In determining if the contractual relationship is impaired, the court "must first identify what contractual rights, if any, have been impaired."   *Janklow*, 300 F.3d at 851.   Importantly, as discussed *supra*, Plaintiffs have not attached the allegedly-impaired contracts to their Complaint or Motion for Preliminary Injunction.   Therefore, there is no admissible evidence before this Court to determine if and to what degree Plaintiffs contractual rights are impaired.

Assuming arguendo that Plaintiffs demonstrate impairment to the existing contractual relationships, they also must show that such an impairment is substantial.   *E.g.*, *Allied Structural Steel Co.*, 438 U.S. at 244.   In determining whether an impairment of an existing contractual relationship is substantial, courts examine the reasonable expectations of the parties at the time they entered into the impaired contracts.   *In re Workers' Compensation Refund*, 46 F.3d at 819.   Notably, reasonable expectations include existing regulation of an industry and the potential for additional regulation.   *Id.* (citing *Energy Reserves Group*, 459 U.S. at 411.).   And, reasonable

expectations are much lower where the industry is already subject to regulation because it is unreasonable not to expect additional legislation. *Id.* at 820; *see also, Honeywell*, 110 F.3d at 558 (citing *Energy Reserves*, 459 U.S. at 411). Therefore, "[i]mpairment is greatest where the challenged governmental legislation was wholly unexpected." *Sanitation and Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). If an industry was already regulated in the area in which the claimant now objects, that party normally cannot prevail on a Contract Clause challenge. *Allied Structural Steel Co.*, 438 U.S. at 242, n. 13 (citing *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 301 U.S. 32, 38 (1940)). Therefore, in situation like the matter at bar, where the industry has been previously regulated, the proper inquiry is whether the impairments effectuated by the allegedly-offending statute were foreseeable. *See Janklow*, 300 F.3d at 857.

Here, it was foreseeable that the North Dakota Legislature would undertake further regulation of the parties' contractual relationship. And, this foreseeability compels finding that SB 2289 is not a substantial impairment of existing contracts. Substantial impairment is a threshold inquiry in Contract Clause analysis and foreseeability alone is a sufficient basis to support a finding that SB 2289 does not violate the Contract Clause. *E.g., Energy Reserves*, 459 U.S. at 411; *Gwadosky*, 304 F.Supp.2d at 116.

First, North Dakota's Legislature has a long history of regulating the relationship between farm implement manufacturers and their franchised dealers. In 1937, the North Dakota Legislature required that farm implement manufacturers purchase any unsold inventory from any franchised dealer they terminated. S.L. 1937, ch. 125, §§ 1, 3. And, North Dakota law has required "good cause" for a manufacturer to terminate a dealer's agreement since 1975. *See Williston Farm Equipment, Inc. v. Steiger Tractor, Inc.*, 504 N.W.2d 545, 547 n. 2 (N.D. 1993) (quoting N.D.C.C.

§ 51-07-01.1).  Accordingly, regulation has been a foreseeable aspect of the parties' commercial relationship for over half a century.

Second, the scope of regulation in North Dakota has also grown broader over the years. Regulation in any form has existed since 1937.  Termination of dealers has been the subject of North Dakota Law since 1975.  And, greater regulation of other manufacturer practices has existed since 1991.  S.L. 1991, ch. 521, § 1 (regulating termination, forced ordering of equipment, and price discrimination).   And, since 1991, the scope of statutory guidance has grown steadily. *Compare e.g*,  N.D.C.C. § 51-07-01.2 A 3  (2012) (preventing the manufacturer from coercing a dealer into refusing to purchase equipment from a competing manufacturer); N.D.C.C. § 51-07- 01.2 1 d, e (2017) (preventing a manufacturer from requiring a dealer maintain exclusive of separate-competitor facilities).

SB 2289 makes amendments to three main areas of North Dakota law governing the commercial relationship between farm implement manufacturers and dealers: 1) adds to prohibited practices by manufacturers; 2) adds greater protection for dealers during transfers of their businesses; and, 3) further defines and regulates the arena of warranty reimbursement to dealers. Notably, each of these areas were the subject of previous regulation.  Prohibited practices were first touched by legislation in 1991.  *Compare* S.L. 1991, ch. 521, § 1; S.L. 2017, ch. 354, § 1. Warranty reimbursement has been the subject of regulation since 2001.  *Compare* S.L. 2001, ch. 447, § 6; S.L. 2017, ch. 354, § 3.   And, dealership transfers have been regulated since 2005. *Compare* S.L. 2005, ch. 439, § 3; S.L. 2017, ch. 354, § 2.   Additionally, North Dakota law previously regulated many aspects of the manufacturer-dealer commercial relationship that were not the subject of SB 2289's provisions, including cancelling dealer agreements, discontinuing line-makes, selling goods with a counterfeit trademark, altering serial numbers on products, repair

of nonconforming machinery, and replacement of farm machinery. *See* S.L. 2001, ch. 441, § 1-2, 4; S.L. 1975, § 549; S.L. 2001, ch. 447, § 1-5.  Thus, incremental amendment and expansion of statutory guidance has been foreseeable in most aspects of the farm implement industry for decades.

Third, the newly-enacted statutes are almost identical to the regulatory scheme already in place in North Dakota for motor vehicle dealers and tractor-trailer or truck dealers and their manufacturers.  N.D. Cent. Code §§ 51-07-00.1 - 55-07-29.  The dealer-manufacturer relationship and the inherent inequities are essentially identical.  *Deere & Company v. the State of New Hampshire*, 130 A.3d 1197, 1208-09 (N.H. 2015), *cert. denied,* 137 S.Ct. 38, U.S.N.H. (Oct. 3, 2016).  This progression of regulation from motor vehicle dealer relationships to those in the agricultural industry has played out across the country.  And, as the North Dakota Legislature recognized, statutory schemes similar to SB 2289 were not unique to its State.  *E.g.*, Testimony of Senator Kelly Armstrong, co-sponsor of SB 2289.[3]

Finally, Plaintiffs in the current matter have been litigating similar statutes throughout the country for years.  *E.g., Deere & Company*, 130 A.3d 1197; *Janklow*, 300 F.3d 842.  Their participation in prior litigation hurts the plausibility of their claim that statutory changes like those in SB 2289 were not foreseeable.  *See Alliance of Automobile Mfrs., Inc. v. Currey*, 984 F.Supp.2d 32, 56 (D. Ct. 2013).  For these reasons, SB 2289 and its additional regulation was foreseeable at the time the parties contracted; therefore, SB 2289 does not substantially impair existing contracts. *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892 (7th Cir. 1998).

Even if a statute affects a substantial impairment on reasonable expectations of contracting parties, it will not violate the Contract Clause if it has a "significant and legitimate public purpose."

---

[3] Audio and video recordings of this testimony are publicly available at http://www.legis.nd.gov/assembly/65-2017/bill -video/bv2289.html.

*Energy Reserves Group*, 459 U.S. at 411.  SB 2289 serves to further a number of significant and legitimate public purposes.  *See, generally* (Ex. A).  And, unlike *Janklow*, there is ample evidence showing SB 2289's wide-spread benefits, far beyond "leveling the playing field."

First, SB 2289 protects farm implement dealers from abusive and oppressive actions by farm implement manufacturers.  (Ex. A, ¶ 8, 15, 16, 21, 26, 28) (including quotations from Sen. Klein and Rep. Keifert).  Such protection is necessary because the negotiations between these parties is one-sided and autocratic.  *Deere & Company*, 130 A.3d at 1208-09.  Manufacturers foist adhesion contracts upon the dealers which harms North Dakota businesses and consumers alike. *Id.*  The United States Supreme Court explicitly held such protection to be a significant and legitimate public purpose.  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox, Co.,* 439 U.S. 96, 101 (1978) (finding the one-sided relationship between motor vehicle manufacturers and motor vehicle dealers necessitating regulation).  When confronted with similar legislation, courts across the country have found prohibition of oppressive acts of manufacturers to be a legitimate public purpose.  *Deere & Company*, 130 A.3d at 1209 (citing cases finding cessation of oppressive conduct in a franchisor-franchisee relationship a legislative aim a legitimate purpose).

Second, SB 2289 benefits North Dakota generally by promoting fair dealing and protecting small businesses. (Ex. A, ¶ 14, 16, 18, 19).  The United States Supreme Court have found these aims to be legitimate public purposes for legislative action.  *Orrin W. Fox.* 439 U.S. at 102, n. 7.

Finally, consumers and citizens of North Dakota benefit from the cessation of harmful manufacturer franchise practices, ensuring stability in the farm implement dealers market, fair pricing to consumers, and avoiding the harm to business and consumers alike that results from manufacturers abusing their power into the franchise relationships.  *Deere & Company*, 130 A.3d at 1208-11 (noting many benefits of legislation regulating the relationship between farm

implement manufacturers and dealers, including preventing harm to consumers from manufacturers' abuses of their power in the franchisee/franchisor relationship, ensuring fairness is pricing to consumers, and promoting a stable business climate benefiting the state economy and consumers); *Fireside Nissan, Inc. v. Fanning,* 30 F.3d 206, 218 (1st Cir. 1994) ("the state's desire to protect local dealers and consumers from harmful franchising practices is a lawful legislative goal"); *Am. Motor Sales v. Div. of Motor Vehicles, Etc.,* 592 F.2d 219, 222-23 (4th Cir. 1979) (finding a Virginia statute regulating motor vehicle franchisor/franchisee relationships served a legitimate local purpose because it fulfilled the same interests as *New Motor Vehicle Board of California*); *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 827-28 (D.Me. 1994) (finding Maine had legitimate purposes in rectifying the "disparity in bargaining power" between motor vehicle manufacturers and their dealers as well as protecting dealers from abusive and oppressive manufacturer practices), *affirmed in part and reversed in part on other grounds*, 44 F.3d 1050 (1st Cir. 1995); *General Motors v. Motor Vehicle Review Bd.*, 224 Ill.2d 1, 862 N.E.2d 209, 229 (Ill. 2007) (finding that a legitimate government purpose exists in rectifying the disparity in bargaining power between motor vehicle manufacturers and their dealers as well as protecting the public from the negative impact of manufacturers' harmful franchise practices); *Anderson's Vehicle Sales, Inc. v. OMC-Lincoln*, 287 N.W.2d 247, 250 (Mich. Ct. App. 1979) (finding that the Legislature possessed the power to regulate inequities in the relationship between motor vehicle manufacturers and dealers).

Contrary to Plaintiffs' assertions, protection of dealers and the public generally from abusive and oppressive manufacturer practices is a legitimate legislative purpose and does not only serve special interests. As one court stated best, "eliminating unfair methods of competition and unfair and deceptive practices can foster 'a salubrious and more stable business climate' for all

businesses, 'thus aiding the state economy' and providing a 'secondary benefit that insure to…consumers.'" *Deere & Company*, 130 A.3d at 1211 (quoting *N.A. Burkitt, Inc. v. J.I. Case Co.*, 597 F.Supp. 1086, 1092 (D.Me. 1984)).  Further, while SB 2289 clearly prevents abusive business and trade practices of manufacturers, it also has wide-ranging societal benefits to all North Dakota citizens.  This recognition by the North Dakota Legislature clearly distinguishes the current matter from *Janklow*.  For example, it prevents manufacturers from unfairly passing along excess costs to dealers and then consumers in the form of unfunded warranty repair work.  (Ex. A, ¶ 11).  It also prevents manufacturers from forcing dealers to close unfairly, thereby leaving a void in the market for the consumers and products that still remain.  *Id.* at ¶ 17.  Also, notably, SB 2289 received support from not just the NDIDA, but also the North Dakota Farm Bureau, North Dakota Farmers Union, the North Dakota Agriculture Association, the North Dakota Stockmen's Association, and the North Dakota Grain Growers Association.  *Id.* at ¶ 6.  Quite simply, SB 2289 was not special interest legislation, but rather aimed to deal with a broad, generalized economic and social problem.  *See generally* Ex. A.

Finally, in the event the Court reaches this step in its analysis, it evaluates whether the recalibration of rights and responsibilities of the contract parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.  *Janklow*, 300 F.3d at 850.  But, when the contracts at issue are purely private and there is no involvement by a governmental entity in the market, courts defer to the legislature's judgment that the legislation is of an appropriate character and based upon reasonable conditions.  *Energy Reserves Group*, 459 U.S. at 412-413.  Therefore, "unless the State is itself a contracting party, courts should properly defer to the legislative judgment as to the necessity and reasonableness of a particular measure."  *Keystone Bituminous Coal Ass'n. v. DeBenedictis*, 480 U.S. 470, 505

(1987).  After all, it is not for a court to "second-guess" the legislature's determination regarding the protections it believed were necessitated and enacted.  *Id.* at 506.

### b.   The Plain Language of SB 2289 Does Not Evidence Preemption by the Federal Arbitration Act.

Plaintiffs argue that SB 2289 is unconstitutional because its "no arbitration provision" conflicts with the Federal Arbitration Act ("FAA") and is therefore preempted.  However, Plaintiffs misread the application of this provision.  SB 2289 does not prohibit arbitration provisions in franchise agreements, rather it prohibits manufacturers from requiring or forcing dealers to enter into ancillary agreements requiring the dealer to arbitrate matters or waive rights. Such a provision does not run afoul of the FAA and is therefore not preempted.

A state law can be preempted by federal statute in three distinct ways.  A federal statute can expressly preempt state regulation with an explicit statement in its text.  *Home of Econ. v. Burlington N. Santa Fe R.R.*, 694 N.W.2d 840 (N.D. 2005) (quoting *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citations omitted).  A federal statute can also preempt state law by "occupying the field" so completely that there is no room for other regulation.  *Id.*  Or, a federal statute can preempt state law by conflicting with provisions of the state law.  *Id.*  The North Dakota Supreme Court has held that the FAA preempts state law where the state law conflicts with the accomplishment and execution of the purpose and objective of the FAA.  *Superpumper, Inc. v. Nerland Oil, Inc.*, 582 N.W.2d 647, 650 (N.D. 1998).  But, a state is not required to ignore its own procedural requirements in favor of the FAA, so long as the "state-enacted procedure does not defeat the rights granted by Congress."  *Id.*; *Thompson v. Lithia ND Acq. Corp. #1*, 896 N.W.2d 230, 234 (N.D. 2017).  That is exactly the case with SB 2289.

The FAA requires courts to enforce privately negotiated agreements to arbitrate in accordance with their terms.  *Volt Information Systems, Inc. v. Board of Trustees of Leland*

*Stanford Junior University*, 489 U.S. 468 (1989).  It does not require that parties arbitrate, absent an express agreement to do so, nor does it prevent them from excluding certain claims from the scope of their agreement to arbitrate.  *Id.*  And, general state law contract defenses like fraud, duress or unconscionability can invalidate arbitration agreements without conflicting with federal law.  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996).

The provisions of SB 2289 related to arbitration do not invalidate otherwise pre-existing contracts with arbitration provisions.  Nor does SB 2289 forbid manufacturers and dealers from voluntarily agreeing to arbitrate disputes.  However, it does prohibit manufacturers from requiring or forcing dealers "to enter into an agreement" requiring the dealer to agree to arbitration or waiver their rights to bring a cause of action against the manufacturer.  In this way, this provision does not apply to existing contracts with arbitration provisions and does not frustrate the purpose or defeat any rights granted under the FAA.  Rather, it serves to reinforce the common-law defense of duress or unconscionability and remind manufacturers that they cannot force or require dealers to enter into agreements to arbitrate.  Notably, this interpretation is also in concert with the jurisprudence imploring courts to interpret statutes to avoid constitutional conflicts, where possible.  *State ex rel. Peterson v. Olson*, 307 N.W.2d 528, 535 (N.D. 1981) (citations omitted).[4]

### c.  SB 2289 Does Not Conflict With or Frustrate the Purpose of the Lanham Act.

Plaintiffs' claim that 2289 is unconstitutional because it is preempted by the Lanham Act. However, courts are instructed to attempt to harmonize federal and state laws, rather than find the latter preempted and unconstitutional, if possible.  *See, e.g. Anderson v. Babb*, 632 F.2d 300, 308 (4th Cir. 1980).

---

[4] In the event the Court disagrees with NDIDA's arguments regarding FAA preemption, this provision of the law is severable from the remainder of SB 2289.  *See* N.D.C.C. §01-02-20; *Tooz v. State*, 38 N.W.2d 599, 609-10 (N.D. 1949)

Plaintiffs argue that the Legislature expressly preempted state regulation of trademarks with the Lanham Act. *See* 15 U.S.C. § 1121(b). However, such a reading of the Lanham Act has been categorically rejected by courts throughout the country. *International Franchise Association, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (citing *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 857 (3d Cir. 1975)); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 n. 3 (1st Cir. 1980). Additionally, the Lanham Act has never been found to "wholly occupy the field" of trademark regulation. *Mariniello*, 511 F.2d at 858; *Viacom, Inc. v. Ingram Enterprises, Inc.*, 141 F.3d 886, 890 (8th Cir. 1998).

Plaintiffs finally claim that certain provisions in SB 2289 conflict with the Lanham Act. <u>See</u> Docket No. 1, ¶ 207-208. Each provision will be examined more closely below. Keeping in mind that when courts are confronted with a claim of conflict preemption, "the specific purpose of the federal act must be ascertained in order to assess any potential erosion of the federal plan by operation of state law." *Mariniello*, 511 F.2d at 858.

The Lanham Act grants an exclusive right to a mark used to identify products, their origin, or their sponsor. *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir. 1979). The Lanham Act protects owners of registered trademarks from uses "likely to cause confusion, or to cause mistake or to deceive." 15 U.S.C. § 1114(1). The Lanham Act also gives the trademark holder the "right to control the quality of the goods manufactured and sold under its trademark." *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991). Many courts cite the Senate Report that accompanied the passing of the Lanham Act to clarify the Legislature's intent and the Lanham Act's purpose. *See, e.g., International Franchise Association*, 803 F.3d at 409. It states that:

> The purpose underlying any trademark statute is twofold. One is to protect the public so it may be confident that…it will get the product which it asks for and

> wants to get.  Secondly, where the owner of a trademark has spent energy, time,
> and money in presenting to the public the product, he is protected in his investment
> from its misappropriation by pirates or cheats.

S.Rep. No. 79-1333, at 1274.  Stated differently, the Lanham Act aims to prevent deception and

consumer confusion of the public based on the use of trademarks and prevent others from misusing

trademarks that are not theirs.  *Mariniello*, 511 F.2d at 858.  Therefore, as long as the state

regulation does not allow deception, invite customer confusion, degrade the quality and uniformity

of the trademarked goods or invite misappropriation, it does not conflict with, nor is it preempted

by the Lanham Act.

In determining whether there is a likelihood of confusion, the Eighth Circuit applies a six-

factor test, with none of the factor being dispositive by itself.  The six factors are: 1) the strength

of the owner's mark; 2) the similarity between the owner's mark and the alleged infringer's mark;

3) the degree to which the products compete with each other; 4) the alleged infringer's intent to

"pass off" its good as those of the trademark owner; 5) incidents of actual confusion; and 6) the

type of product, its cost, and conditions of purchase.  *Sensient Techs. Corp. v. SensoryEffects*

*Flavor Co.*, 613 F.3d 754, 763 (8th Cir. 2010).

Generally, Plaintiffs do not and cannot argue that quality and uniformity of their

trademarked products is compromised by SB 2289.  There is nothing in SB 2289 that allows a

dealer to misappropriate Plaintiffs' trademarks, alter the quality or uniformity of the goods to

which Plaintiffs' trademarks have been applied or invite consumer confusion as to trademarked

goods.  Plaintiffs argue that six provisions of SB 2289 conflict with the Lanham Act.  However,

this is simply inaccurate as are Plaintiffs self-titled descriptions of the provisions.

SB 2289 prohibits a manufacturer from dictating exactly how its products are displayed at

each dealer's showroom, including whether competing products can be placed side-by-side in its

showroom.  SB 2289 also prohibits a manufacturer from requiring that a dealer exclusively sell its

products.  But, such prohibitions clearly do not conflict with or frustrate the Lanham Act's purpose.
The placement of products side-by-side should not confuse a customer, especially since the
original trademarks are unaltered.  Plaintiffs purport that these provisions would allow dealers "the
freedom to mix and match one Manufacturer's products under another Manufacturer's
trademarks."  However, that is a tortured reading of SB 2289.  While it is true that "John Deere"
dealer could also sell "Kubota" products under SB 2289, nothing in SB 2289 allows a dealer to
take a "John Deere" tractor and stamp it with "Kubota" trademarks and market it is a "Kubota."
Despite products with different trademarks being sold under one roof, the dealers could not alter
the trademark branding on the products.  A "John Deere" tractor would retain the same quality and
uniformity as when it left the factory, whether it is displayed next to another "John Deere" tractor
or rather a similar, but distinctly-different trademarked "Kubota" tractor.

Similarly, the Plaintiffs' claim that SB 2289 impairs their ability to control or enforce
performance or appearance standards on the dealers.  SB 2289 does limit manufacturers' ability to
control performance and appearance standards that are peripheral to the quality and uniformity of
the goods themselves, but does nothing to affect the quality and uniformity of the trademarked
goods themselves.  Plaintiffs' complain that they cannot enforce same "signage, color, lighting
and cleanliness standards" on the dealers and that they cannot require them to provide specific
staff, inventory levels, etc.  Plaintiffs fail to show how these limits degrade their trademarks,
confuse consumers, comprise the quality and uniformity of their goods and services or invite
misappropriation.

Additionally, Plaintiffs complain of their inability to enforce minimum inventory or order
requirements on dealers and that SB 2289 forces them to transfer licenses to their trademarks
without any ability to control the license themselves.  Yet again, such strictures do not frustrate

the purpose or conflict with the Lanham Act.  And, this Forced Trademark License Provision requires that the transferee meet the manufacturer's reasonable standards of qualification relating to financial wherewithal and business experience, so the manufacturers are not without options to control or restrict the transfer.  N.D. Cent. Code § 51-07-02.2 (effective Aug. 1, 2017).

In *Storer Cable Commun. v. City of Montgomery, Ala.*, 806 F. Supp. 1518, 1541 (M.D. Ala. 1992), cable programmers made claims similar to Plaintiffs.  A local ordinance forced them to license their programming and the included-trademarks to more than one cable company in the region.  *Id.*  The cable programmers complained that the ordinance violated the Lanham Act by not giving them control over their trademarks.  *Id.*  The Court rejected this claim noting that nothing about requiring the programmers to license their programming infringed upon their ability to control the quality and uniformity of the programming or their trademarks.  *Id.*  Further, there was no likelihood of confusion based on the ordinance.  *Id.*  This Court should adopt similar reasoning with respect Plaintiffs' claims in this matter.

## CONCLUSION

To obtain a preliminary injunction, Plaintiffs have the burden to show a likelihood of success on the merits of their claims and they have failed to carry this burden.  SB 2289 does not substantially impair existing contracts because, among other bases, its additional regulations were foreseeable.  And, plain language interpretations of SB 2289 show that its provisions are not preempted by either the Federal Arbitration Act or the Lanham Act.  Thus, SB 2289 is constitutional and Plaintiffs are not entitled to a preliminary injunction.

Dated this 10th day of October, 2017.

/s/  *Jason T. Allen*
**BASS SOX MERCER**
Jason T. Allen, *pro hac vice*
jallen@dealerlawyer.com
2822 Remington Green Circle
Tallahassee, Florida 32308
T: 850.878.6404

and

**WOLD JOHNSON, P.C.**
Benjamin Thomas (ID #04713)
BThomas@woldlaw.com
400 Gate City Building
P.O. Box 1680
Fargo, N.D. 58107-1680
T: (701) 235-5515
*Attorneys for NDIDA*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of October, 2017, a true and correct copy of the foregoing has been furnished electronically transmitted through the CM.ECF system to:

- Benjamin E. Thomas    bthomas@woldlaw.com, jastrup@woldlaw.com
- Benjamin R. Dryden    bdryden@foley.com
- Connor A. Sabatino    csabatino@foley.com
- Jarren Ginsburg    jginsburg@foley.com
- Joseph P. Bialke    jbialke@nd.gov, ckvislen@nd.gov, mecastillo@nd.gov
- Katherine Susan Barrett Wiik    KBarrettWiik@RobinsKaplan.com, jgerboth@robinskaplan.com
- Lauren Champaign    lchampaign@foley.com
- Matthew A. Sagsveen    masagsve@nd.gov
- Michael J. Lockerby    mlockerby@foley.com
- Nathan James Svihovec    njsvihovec@nd.gov
- Roberta F. Howell    rhowell@foley.com
- Timothy Q. Purdon    tpurdon@robinskaplan.com, AHoellein@RobinsKaplan.com

/s/  *Jason T. Allen*
Jason T. Allen