## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| ASSOCIATION OF EQUIPMENT MANUFACTURERS, AGCO CORPORATION, CNH INDUSTRIAL AMERICA LLC, DEERE & COMPANY, and KUBOTA TRACTOR CORPORATION, <br>    Plaintiffs, <br>v. <br>THE HON. DOUG BURGUM, Governor of the State of North Dakota, in his Official Capacity, and <br>THE HON. WAYNE STENEHJEM, Attorney General of the State of North Dakota, in his Official Capacity, <br>    Defendants, <br>and <br>NORTH DAKOTA IMPLEMENT DEALERS ASSOCIATION, <br>    Intervenor. | Case No. 1:17-cv-00151-DLH-CSM |

## THE MANUFACTURERS' REPLY TO NDIDA'S OPPOSITION TO THE MANUFACTURERS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.    ARGUMENT .................................................................................................... 1

    A.    To the Extent That They Apply at the Preliminary Injunction Stage, the Federal Rules of Evidence Have Been Satisfied in This Case ................................ 1

    B.    Under *Janklow*, S.B. 2289's Impairment of the Manufacturers' Existing Dealership Agreements Was Not Foreseeable As a Matter of Law. ...................... 1

    C.    Leveling The Playing Field is Neither a Significant Nor a Legitimate Public Purpose for Impairing the Manufacturers' Existing Dealership Agreements. ............................................................................................. 3

    D.    S.B. 2289 Does Not Create a Generally Applicable Contract-Law Defense That Survives Express Preemption Under the Federal Arbitration Act. ................. 4

    E.    S.B. 2289 is Preempted By the Lanham Act Because it Impairs the Manufacturers' Right to Control the Use of their Marks by Licensees. ................. 4

The Manufacturers, by counsel, respectfully state as follows in reply to the Opposition (Dkt. # 46) filed by the North Dakota Implement Dealers Association ("NDIDA").

## I. ARGUMENT

### A. To the Extent That They Apply at the Preliminary Injunction Stage, the Federal Rules of Evidence Have Been Satisfied in This Case.

As a threshold matter, NDIDA complains that the Manufacturers have not submitted the voluminous dealer agreements referenced in their Fed. R. Evid. 1006 Summary of Manufacturers' Existing Dealership Agreements Impaired By Senate Bill 2289 (Dkt. # 1-8) "for review and evaluation." (Dkt. # 46 at p. 5 of 21). Even if the Federal Rules of Evidence applied to preliminary injunction hearings,[1] the Manufacturers have since moved to file the Existing Dealership Agreements under seal, resolving any potential evidentiary concern.

### B. Under *Janklow*, S.B. 2289's Impairment of the Manufacturers' Existing Dealership Agreements Was Not Foreseeable As a Matter of Law.

In *Janklow*, the Eighth Circuit considered—and rejected—the premise of NDIDA's Opposition, *i.e.*, that S.B. 2289's impairment of Existing Dealership Agreements was "foreseeable" in light of North Dakota's preexisting regulation of farm equipment-dealer relationships. (Dkt. # 46 at p. 9 of 21). In fact, the preexisting South Dakota law at issue in *Janklow* was more restrictive than the preexisting North Dakota farm equipment dealer statute. Before enactment of the South Dakota statute challenged in *Janklow*, South Dakota law made it a ***crime*** for a farm equipment manufacturer "'to coerce or attempt to coerce' a dealer to take certain actions, or for a manufacturer to cancel a dealership agreement 'unfairly, without due regard to the equities of the dealer and without just provocation.'" *Equip. Mfrs. Inst. v. Janklow*,

---

[1] *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits").

1

300 F.3d 842, 858 (8th Cir. 2002).  The Eighth Circuit *rejected* the argument that this preexisting criminal law made South Dakota's new dealership statute foreseeable, holding that it "was not sufficiently pervasive so as to destroy all reasonable contractual expectations by the manufacturers."  *Id.* at 859.  Here, too, the Manufacturers—many of which were the plaintiffs in *Janklow* or their successors[2]—could not have reasonably foreseen that North Dakota would make such sweeping changes to its farm equipment dealership statute, especially on a retroactive basis.[3]  It was simply not foreseeable that the State of North Dakota would try to do what the Eighth Circuit had so clearly forbidden.

Unable to distinguish *Janklow*, NDIDA's Opposition asserts that S.B. 2289 is "almost identical to the regulatory scheme already in place in North Dakota for motor vehicle dealers and tractor-trailer or truck dealers and their manufacturers."  (Dkt. # 46 at p. 11 of 21).  Even if this were true, prior laws are relevant for purposes of "foreseeability" only if they regulated the same "industry" as S.B. 2289.  *See Janklow*, 300 F.3d at 858 n.16 (identifying "agricultural machinery" as the relevant industry for analyzing the foreseeability of South Dakota's equipment dealership law) (citing *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)); *McDonald's*, 822 F. Supp. at 606 n.7 ("industry" for foreseeability purposes means businesses "that produce or supply technically substitutable goods").

---

[2] *See* Dkt. # 10 at p. 2 of 21 n.1.
[3] S.B. 2289 struck from the statute the verbiage in N.D.C.C. § 51-26-06 limiting its application to "new farm machinery sold after July 31, 2001," including the express statement that it did "not invalidate, impair, or otherwise infringe upon the specific requirements of any contract . . . entered before August 1, 2001."  (Dkt. # 1-3 at p. 5 of 5).  S.B. 2289 also added the phrase "[otwithstanding the terms of any contract" to N.D.C.C. § 51-07-01.2.  (*Id.* at p. 1 of 5).  Prior laws that "were only prospective in nature" do not render new, retroactive laws foreseeable.  *McDonald's Corp. v. Nelson*, 822 F. Supp. 597, 607 (S.D. Iowa 1993), *aff'd sub nom. Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383 (8th Cir. 1994).

2

### C. Leveling The Playing Field is Neither a Significant Nor a Legitimate Public Purpose for Impairing the Manufacturers' Existing Dealership Agreements.

Unable to distinguish controlling Eighth Circuit precedents decided under the Contracts Clause, NDIDA's Opposition claims that protecting dealers from allegedly abusive manufacturer practices qualifies as a "significant and legitimate public purpose." (Dkt. # 46 at p. 12 of 21) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox, Co.*, 439 U.S. 96 (1978)). This argument fails because *New Motor Vehicle Board* involved a challenge under the Due Process Clause, not under the Contracts Clause.[4] The distinction is dispositive. Under the Contracts Clause, "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Janklow*, 300 F.3d at 861. In *McDonald's*, the district court found— and the Eighth Circuit agreed—that the Iowa statute was "not based on a significant and legitimate public purpose" because its primary purposes "were the equalization of bargaining power, the promotion of fair dealing, and the protection of franchisees from fraudulent and abusive practices." 822 F. Supp. at 608-09. NDIDA identifies the goals of S.B. 2289 as "protect[ing] farm implement dealers from abusive and oppressive actions," "promoting fair dealing and protecting small business," and "protection of dealers and the public generally from abusive and oppressive manufacturer practices." (Dkt. # 46 at p. 12-13 of 21). These supposed legislative purposes are different ways of saying the same thing: leveling the playing field to impair private contracts after the fact for the benefit of NDIDA's membership.

---

[4] Similarly, NDIDA's repeated citations to *Deere & Co. v. State*, 130 A.3d 1197 (N.H. 2015) are unpersuasive. That decision is predominantly based on precedents under the Due Process, Equal Protection, and Commerce Clauses—not the Contracts Clause. *See* 130 A.2d at 1209. The New Hampshire Supreme Court therefore put the burden on the ***challengers*** to prove that the state law at issue was improper. *See* 130 A.3d at 1213. Under the Contracts Clause, however, the burden of proving a significant and legitimate public purpose falls on the law's ***defenders***—in this case, the State and NDIDA. *See, e.g.*, *Janklow*, 300 F.3d at 859.

3

D.   **S.B. 2289 Does Not Create a Generally Applicable Contract-Law Defense That Survives Express Preemption Under the Federal Arbitration Act.**

There is similarly no merit to NDIDA's argument that S.B. 2289's No Arbitration Provision is not preempted by the FAA because it does not "forbid manufacturers and dealers from voluntarily agreeing to arbitrate disputes." (Dkt. # 46 at p. 16 of 21). The FAA makes arbitration agreements "valid, irrevocable, and enforceable" regardless of whether the parties that have agreed to them later volunteer to submit their disputes to arbitration. *See* 9 U.S.C. § 2. Indeed, the purpose of the FAA is "to ensure that private arbitration agreements are enforced according to their terms." *Torres v. Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015) (citation and alteration omitted).

NDIDA also claims that S.B. 2289 merely "reinforce[s] the common-law defense of duress or unconscionability." (Dkt. # 46 at p. 16 of 21). However, S.B. 2289 "does not apply to contracts generally. Rather, it applies specifically to [dealership] agreements. Thus . . . [it] 'is not a generally applicable contract defense.'" *Cahill v. Alternative Wines, Inc.*, No. 12-CV-110-LRR, 2013 U.S. Dist. LEXIS 14588, at *14 (N.D. Iowa Feb. 4, 2013) (quoting *KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 51 (1st Cir. 1999)).

E.   **S.B. 2289 is Preempted By the Lanham Act Because it Impairs the Manufacturers' Right to Control the Use of their Marks by Licensees.**

While disputing that S.B. 2289 is preempted by the Lanham Act, NDIDA concedes that S.B. 2289 would be preempted if it permitted dealers to tamper with the trademarks affixed to farm equipment by the Manufacturers. (Dkt. # 46 at p. 19 of 21). That is not the only type of "interference by State . . . legislation," however, that Section 45 of the Lanham prohibits. 15 U.S.C. § 1127. Section 45 of the Lanham Act and the case law applying it are clear that—when a Manufacturer licenses its trademarks for the operation of a farm equipment dealership in North Dakota—the Manufacturer has the ***right*** to control the quality and uniformity of the goods and

4

services provided under its licensed trademarks.  In fact, Section 45 actually imposes upon the Manufacturers the ***duty*** to do so.  *See* Dkt. # 10 at pp. 15-16 of 21.[5]  This duty serves the important purpose of protecting consumers, in North Dakota and elsewhere, across the United States who rely on national brands as signals of value, quality, and consistency.  *See generally Susser v. Carvel Corp.*, 206 F. Supp. 636, 640 (S.D.N.Y 1962), *aff'd*, 332 F.2d 505 (2d Cir. 1964) ("It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores[6] for the product.").[7]

If S.B. 2289 applied to McDonald's, the iconic hamburger chain would lose the ability to require its North Dakota franchisees to actually stock and sell any of McDonald's signature items like the Big Mac® or Happy Meal.®  Instead, McDonald's franchised restaurants across North Dakota could use the franchisor's trademarks to attract customers but instead sell, for example, the Burger King Whopper,® the Taco Bell Crunchwrap Supreme,® the Starbucks Frappuccino,® or unbranded menu items.  By allowing North Dakota dealers to use the Manufacturers' trademarks to attract customers and then substitute other manufacturers' products, S.B. 2289 enables trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §

---

[5] The Manufacturers maintain their control over licensed trademarks by imposing contractual standards governing, among other things, the appearance of dealerships, displays of the Manufacturers' products, requirements for sales and service training, minimum inventory requirements for new equipment and spare parts, "best efforts" obligations, and required separation from competing products (or outright prohibitions on the sale of competing products). *See, e.g.*, Dkt. # 11 ¶¶ 8-10; Dkt. # 12 ¶¶ 16-19, 21-24; Dkt. # 13 ¶¶ 7-14; Dkt. # 13-1; Dkt. # 13-2; Dkt. # 14 ¶¶ 7-10, 14-15.

[6] Although a farm equipment dealership may not be a "franchise" as that term is commonly understood, the relationship is similar in that it includes a trademark license.

[7] The benefits to dealers from a trademark license are not limited to "the right to use a trademark" but also include association "with a network of stores whose very uniformity and predictability attracts customers," "the right to become a part of a system whose business methods virtually guarantee [its] success," and "pervasive franchisor supervision" so that "nothing is left to chance." *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir. 1980).

1125(a); and—in the case of "famous" trademarks—trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Indeed, the Second Circuit has found trademark infringement where a Carvel ice cream franchisee sold products under the Carvel trademark using so much as a single unauthorized ingredient or a single unauthorized paper cup. *Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668 (2d Cir. 1968). Like the Carvel trademark at issue in *Winter*, the Manufacturers' trademarks cover not just their products but also dealerships. Like the Second Circuit in *Winter*, the Eighth Circuit[8] and other courts[9] have recognized that the violation of a trademark *license* is just as actionable as trademark infringement as unlicensed use of a trademark itself.[10]

In *Branstad*, the Eighth Circuit upheld the district court's finding in *McDonald's* that the Iowa statute interfered with franchisors' ability to "maintain[] adequate control over the quality of services provided under their licensed trademarks." 822 F. Supp. at 606. S.B. 2289's regulation of trademark licenses is far more extensive. It takes direct aim at Manufacturers'

---

[8] *See, e.g., Thelen Oil Co. v. Fina Oil & Chem. Co.*, 962 F.2d 821, 822 (8th Cir. 1992) (sale of non-Fina gasoline from Fina-branded service stations and pumps actionable under the Lanham Act)*; Masters v. UHS of Del., Inc.*, 631 F.3d 464, 470–71 (8th Cir. 2011).

[9] *See also Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir. 2004); *E.G.L. Gem Lab Ltd., v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 293 (S.D.N.Y. 2000); *Bunn-O-Matic Corp. v. Bunn Coffee Serv.*, 88 F. Supp. 2d 914, 923 (C.D. Ill. 2000); *Hard Rock Cafe Int'l (USA) Inc. v. Morton*, No. 97 Civ. 9483 (RPP), 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999). *See generally* J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 18:41 (4th ed.).

[10] Because S.B. 2289 deprives Manufacturers of their right to control the quality and uniformity of dealerships licensed to use their trademarks, it is easily distinguishable from the statutes and ordinances at issue in cases in which courts have found no conflict with the Lanham Act. *See, e.g., Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 410 (9th Cir. 2015) (minimum wage requirement "does not interfere with a franchise's ability to maintain quality"); *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp. 1518, 1541-42 (M.D. Ala. 1992) (television networks "have not hinted at how customer confusion will result from their products being carried to viewers by other cable operators"); *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975) (New Jersey's "good cause" requirement for termination permitted franchisors to enforce quality control standards).

6

ability to change the required appearance of the dealerships operated under their licensed trademarks. The federal courts have long upheld this right. Yet S.B. 2289—had it previously been on the books and applied to franchisors generally—would have allowed North Dakota courts to simply decree that it was "unreasonable"[11] for McDonald's to require changes like the following to the appearance of its franchised restaurants:

  

While conceding that "S.B. 2289 does limit manufacturers' ability to control performance and appearance standards," NDIDA's Opposition argues that such standards "are peripheral to the quality and uniformity of the goods themselves." (Dkt. # 46 at p. 19 of 21). This Argument ignores the fact that North Dakota farm equipment dealers are licensed to use the Manufacturers' trademarks not only for the sale of products but also for the provision of *services* like retailing and repair. *See, e.g.*, Dkt. # 13 ¶¶ 7-8. Under the Lanham Act, the Manufacturers are thus entitled and indeed obligated to ensure that dealers licensed to use their trademarks actually have the training, inventory, and signage necessary to provide the same high-quality retailing and repair services for customers as if the Manufacturers operated the dealerships themselves. The whole point of branding is to present an attractive corporate image upon which customers can rely. As John Deere's Senior Vice President for Sales & Marketing stated in his affidavit, "Without the ability to enforce these requirements, John Deere would rather not license its trademarks to dealers at all." (Dkt. # 13 ¶ 8). By impairing the Manufacturers' rights to control the use of their trademarks by licensees, S.B. 2289 irreconcilably conflicts with the Lanham Act.

---

[11] *See* N.D. Cent. Code § 51-07-01.2(1)(h) (effective Aug. 1, 2017).

4834-1507-6945.5

Dated: October 17, 2017

Respectfully submitted,

ASSOCIATION OF EQUIPMENT MANUFACTURERS,
AGCO CORPORATION,
CNH INDUSTRIAL AMERICA LLC,
DEERE & COMPANY, and
KUBOTA TRACTOR CORPORATION

By:    s/ Timothy Q. Purdon

Timothy Q. Purdon (ND Bar #05392)
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, North Dakota 58503
(701) 255-3000

Katherine S. Barrett Wiik
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
(612) 349-8500

Counsel

Michael J. Lockerby (*pro hac vice*)
Benjamin R. Dryden (*pro hac vice*)
Lauren A. Champaign (*pro hac vice*)
Jarren N. Ginsburg (*pro hac vice*)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, NW, Sixth Floor
Washington, D.C. 20007
(202) 672-5300

Connor A. Sabatino (*pro hac vice*)
FOLEY & LARDNER LLP
Verex Plaza
150 East Gilman Street
Madison, Wisconsin 53703
(608) 258-4273

*Counsel for Plaintiffs, Association of Equipment Manufacturers, AGCO Corporation,
CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation*

8

4834-1507-6945.5