IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | |
|---|---|
| Association of Equipment Manufacturers, AGCO Corporation, CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation<br><br>Plaintiffs,<br><br>vs.<br><br>The Honorable Doug Burgum, Governor of the State of North Dakota, in his Official Capacity, and The Honorable Wayne Stenehjem, Attorney General of the State of North Dakota, in his Official Capacity<br><br>Defendants,<br><br>and<br><br>North Dakota Implement Dealers Association<br><br>Intervenor. | Case No. 1:17-cv-00151 |

**AMICUS CURIAE BRIEF OF EQUIPMENT DEALERS ASSOCIATION, FAR WEST EQUIPMENT DEALERS ASSOCIATION, IOWA-NEBRASKA EQUIPMENT DEALERS ASSOCIATION, MIDWEST-SOUTHEASTERN EQUIPMENT DEALERS ASSOCIATION, MN-SD EQUIPMENT DEALERS ASSOCIATION, MONTANA EQUIPMENT DEALERS ASSOCIATION, NORTHEAST EQUIPMENT DEALERS ASSOCIATION, UNITED EQUIPMENT DEALERS ASSOCIATION, AND WESTERN EQUIPMENT DEALERS ASSOCIATION**

Equipment Dealers Association ("EDA"), Far West Equipment Dealers Association, Iowa-Nebraska Equipment Dealers Association, Midwest-SouthEastern Equipment Dealers Association, MN-SD Equipment Dealers Association, Montana Equipment Dealers Association,

Northeast Equipment Dealers Association, United Equipment Dealers Association, Western Equipment Dealers Association (collectively "Dealer Associations"), for their Amicus Curiae Brief in Support of Intervenor North Dakota Implement Dealers Association and in Opposition to Plaintiffs' Motion for Preliminary Injunction, state as follows.

## I.   PRELIMINARY STATEMENT

Pursuant to Local Rule 7.1(G)(1), Dealer Associations state that all parties have consented to the filing of the *amicus curiae* brief.

## II.   STATEMENT OF INTEREST

The Equipment Dealers Association ("EDA") is a national trade association based in Missouri. EDA represents and promotes the legal and business interests of its farm equipment dealer members across the country. Some of EDA's members are also members of the North Dakota Implement Dealers Association ("NDIDA"). EDA and NDIDA, however, have separate memberships and each association is governed independently. The other Dealer Associations are independent trade associations representing, among other things, the legal and business interests of farm equipment dealers within their specific regions ("collectively Regional Associations"). While some members of NDIDA are members of other Regional Associations, the Regional Associations maintain independent memberships and independent governance. Likewise, the Regional Associations maintain independent memberships and independent governance from EDA. Like NDIDA in North Dakota, EDA and the Regional Associations engage in lobbying efforts with legislative bodies within their jurisdictions.

The Dealers Associations seek to participate in this action solely for the purpose of assisting the court in reviewing and determining the Lanham Act portions of plaintiff's claims. The Dealer Associations are not aware of any instance where farm equipment manufacturers

have asserted Lanham Act preemption as a basis to avoid the requirements of state statutes regulating the relationships between farm equipment manufacturers and dealers. Because other state laws contain provisions similar to the North Dakota Statute, N.D. Cent. Code §§51–07–01 *et seq.*, the Dealers Associations have a strong interest in the resolution of this case.

The vast majority of states have enacted legislation that regulates the relationships between farm equipment manufacturers and dealers. Indeed, almost every state from Alabama to Wyoming imposes restrictions on farm equipment manufacturers even though the relationship includes the use of manufacturers' trademarks. *See, e.g.*, Ala. Code §§ 8-21A-1 *et seq*.; Wyo. Stat. Ann. §§ 40-20-101 *et seq*. These statutes peacefully co-exist with the Lanham Act and have for many years. Dealer Associations believe that the Lanham Act has no impact on resolution of this case.

## III. <u>INTRODUCTION</u>

Plaintiffs seek to invoke the Lanham Act as a means to avoid complying with state law statutory provisions that prohibit farm equipment manufacturers from engaging in unreasonable, arbitrary or unfair business practices. Neither the purpose nor the scope of the Lanham Act is sufficiently broad to provide the immunity Plaintiffs seek. At least as to the portion of Plaintiffs' Motion for Preliminary Injunction that invokes the Lanham Act, Plaintiffs' Motion should be denied. Nothing in Senate Bill 2289 ("SB 2289") conflicts with the Lanham Act.

SB 2289 is perfectly consistent with the business method chosen by Manufacturers. The essence of the relationship is the sale of goods by the manufacturers to dealers. As the contracts make clear, the Manufacturers have decided to sell their products through ***independent*** dealers. Dealers are not like fast food restaurants that pay a franchise fee and on-going trademark royalties in exchange for a comprehensive business model. Rather, dealers are independent

businesses that purchase products from manufacturers to resell to farmers and other consumers. In fact, the contracts consistently show the essence of the agreement is the sale of equipment by manufacturers to dealers:

- The Kubota dealer agreement states, "The relationship between [Kubota] and Dealer is and shall be that of ***seller and buyer***." The agreement then disclaims other relationships including the franchisor/franchisee relationship.
- The Deere & Company dealer agreement provides, "Dealer acknowledges that it is an ***independent retail merchant which purchases Goods for resale for the principal benefit of Dealer***. Dealer further acknowledges and agrees that it is an independent contractor." The agreement further states that Dealer "is ***free to operate its business in accordance with its independent business judgment***, provided that such operation is in accordance with" the agreement. The Deere agreement also states that the dealer did not pay a franchise fee.
- CNH Industrial America dealer agreements contain the following language, "The Parties are ***independent*** businesses and neither has any fiduciary obligation to the other, and ***Dealer is an independent retailer which purchases Products for resale for Dealer's principal benefit***." The agreement then disclaims other relationships and specifically states that a dealer is not a franchisee.

(Emphasis added). The dealer agreements go to great lengths avoid the franchisor/franchisee relationship. SB 2289 recognizes the purchasers' (dealers) right to control what products to purchase, how to display the products for resale to consumers and what additional product lines to sell within the dealers' markets.

The Lanham Act, on the other hand, is intended to give the owner of a trademark the

1199998v1

right to control the quality of the goods associated with that mark. The other primary purpose of the Lanham Act is to protect an owner's investments from misappropriation by pirates and cheats. Because none of the provisions of SB 2289 conflicts with Manufacturers' ability to control the quality of the products that carry their trademarks and SB 2289 provides no protection for pirates and cheats, the Lanham Act is not implicated here.

## IV. <u>STANDARD OF REVIEW</u>

Whether a preliminary injunction should be issued involves four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Vonage Holdings Corp. v. Nebraska Pub. Serv. Comm'n,* 564 F.3d 900, 904 (8th Cir. 2009) (citing *Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). Plaintiffs' Motion, to the extent it is based on Lanham Act preemption, fails the third *Dataphase* factor.

Because the manufacturer-dealer relationship is regulated by almost every state in the country, Plaintiffs have a heavy burden to show that Congress clearly intended to preempt SB 2289. See *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995) ("[W]here federal law is said to bar state action in fields of traditional state regulation, we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'")(Citation omitted)(Quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Here, the Court is faced with a field of traditional state regulation, farm equipment dealer contracts, and Plaintiffs cannot show that Congress's "clear and manifest purpose" was that the Lanham Act bars the regulation set forth in SB 2289. There is no probability Plaintiffs

will succeed on the merits of their Lanham Act claims.

## V. ARGUMENTS AND AUTHORITIES

The purpose of Congress is the ultimate touchstone in every pre-emption case. *Wyeth v. Levine,* 555 U.S. 555, 565 (2009). When determining the interplay of the federal and state statutes at issue, courts are obliged to attempt to harmonize those statutes if reasonably possible. *See Anderson v. Babb*, 632 F.2d 300, 308 (4th Cir.1980)(a court should avoid, if possible, a construction of a statute that results in its constitutional invalidation). There is a rebuttable presumption that Congress, by enacting a federal statute, did not intend to preempt state law. *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010).

Congress may evince an intent to preempt state law in three ways. First, federal law may preempt state law by expressly declaring Congress' intent to do so ("express preemption"). *Chamber of Commerce of United States of America v. Whiting,* 563 U.S. 582, 592 (2011). Second, Congress can "occupy the field by regulating so pervasively that there is no room left for the states to supplement federal law" ("field preemption"). *Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230. And third, a state law is preempted "to the extent it actually conflicts with federal law" ("conflict preemption"). *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (internal quotation marks and citations omitted).

The Lanham Act does not expressly preempt all state law that impacts trademarks. *Mariniello v. Shell Oil Co.,* 511 F.2d 853, 857 (3d Cir. 1975). Courts have also made it clear that

Act does not occupy the entire field. *Attrezzi, LLC v. Maytag Corp.,* 436 F.3d 32, 41 (1st Cir. 2006); *International Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015). SB 2289 can only be preempted if it conflicts with the Lanham Act, *see generally Freightliner Corp. v. Myrick*, 514 U.S. 280, 286–87 (1995) (local laws can be preempted expressly, when Congress occupies the field, or when state law conflicts with or frustrates the purpose of statute).

Plaintiffs do not cite a specific provision of the Lanham Act that conflicts with SB 2289 apart from the general purpose statement in the Act that it is designed to "protect registered marks used in such commerce from interference by State, or territorial legislation." 15 U.S.C. § 1127. The value of the "purpose" language is limited, however, because there is no operative language in that section. A number of courts have cited language in the Senate Report accompanying the statute in assessing whether measures affecting, but not directly regulating, trademarks are preempted:

> The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that ... it will get the product which it asks for and wants to get. Secondly, where the owner of a trademark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.
> S.Rep. No. 79–1333, at 1274.

For instance, the Third Circuit cited this provision in approving a rule barring franchisors from terminating a franchise without cause, rejecting the argument that it was preempted by the Lanham Act. *Mariniello*, 511 F.2d at 858.

Plaintiffs claim that SB 2289 is preempted either through express preemption or conflict preemption. In doing so, Plaintiffs fail to account for the extremely limited reach of the express preemption provision. Further, the provisions challenged by Plaintiffs do not conflict with the Lanham Act in such a way as to warrant preemption. The law is clear; the inclusion of a trademark license in a dealer agreement does not function as a trump card to avoid state

regulations on the manufacturer-dealer relationship.

**A. The Lanham Act Does Not Expressly Preempt SB 2289.**

The Lanham Act includes a specific preemption provision which restricts states' ability to regulate trademarks. 15 U.S.C. § 1121(b). The preemption is, however, limited in scope:

> No State or other jurisdiction of the United States or any political subdivision or any agency thereof may require ***alteration of a registered mark***, or require that ***additional trademarks***, service marks, trade names, or corporate names that may be associated with or incorporated into the registered mark be displayed in the mark in a manner differing from the display of such additional trademarks, service marks, trade names, or corporate names contemplated by the registered mark as exhibited in the certificate of registration issued by the United States Patent and Trademark Office.

(Emphasis added). The statute is not so broad as to invalidate all state laws that might impact a trademark.

Courts recognize the limited nature of the Lanham Act's express preemption provision. Indeed, courts acknowledge that some state regulation of trademarks is permissible. In fact, courts have approved completely prohibiting the use of a trademark. *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1300 (9th Cir. 1998). The Lanham Act only precludes state actions that "require a change in a registered mark." *Id*.; See also, *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 15 (2nd Cir. 1999)("we think the more plausible interpretation of § 1121 (b) reads its use of the term 'alteration' 'to describe state-mandated changes in the mark itself, which are, of necessity, reflected in every subsequent display of that mark within the relevant jurisdiction.'" (Citation omitted)).

Plaintiffs have not identified any provision contained in SB 2289 which requires the alteration of any of their trademarks. To the contrary, no such provisions exist. The Lanham Act's express preemption provision, 15 U.S.C. § 1121 (b), is inapplicable to this case.

**B. The Lanham Act Does Not Impliedly Pre-empt SB 2289**

SB 2289 does not require the alteration of any trademark. Therefore, Plaintiffs must establish that the specific provisions of the law actually conflict with the purpose of the Lanham Act. The conflict cannot be imaginary and must relate directly to the product that carries the trademark. Unless Plaintiffs can show that the challenged provisions of SB 2289 concern the actual products sold by Manufacturers to the dealers, there is no conflict preemption.

The relationships between farm equipment manufacturers and dealers clearly contemplate that the use of manufacturers' trademarks is to identify the products sold, not to identify the dealership. As shown by Exhibit F to Plaintiffs' Complaint, all of the dealerships have their own names which identify the name of the business selling the equipment. While each franchised retail location bears the franchisor's trademark without regard to the name of the actual owner, dealerships put their ***own names*** on signs and buildings.

A case from the Third Circuit and three from the Fourth Circuit provide significant guidance for the Court's analysis in this case. The leading case in this area is the Third Circuit's 1975 decision in *Mariniello*. There, the court decided that a state rule that required good cause for termination of a service-station franchise despite an "at will" contractual term was not preempted by the Lanham Act. 511 F.2d at 858-59. The mere inclusion of a trademark license did not operate to invalidate all state efforts to regulate the contract:

> The interpretation and enforcement of contracts is traditionally within the province of state courts. Invalidation of contract clauses held repugnant to state public policy is a proper exercise of the state judicial function. Under the facts of this case, ***once the state court has declared a clause invalid as violating the public policy of the state, a federal court may not enforce such a term solely because a contract entails the licensing of a federally protected trademark.*** Thus, Shell could not insert in its dealer agreement or lease a clause otherwise unenforceable under state law—such as a disclaimer of warranty, a forfeiture, or a usurious interest rate—and then assert a right to enforce such provision based on its status as a registered trademark owner. And this is so even though the freedom of a trademark holder to dictate the terms of its licensing arrangement would thereby be curtailed to some degree.

*Id.* at 858. (Emphasis added). Under Mariniello, state contract law is permitted to curtail the freedom of a trademark holder to dictate the terms of a licensing arrangement.

*Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104 (4th Cir.1991), is a trademark infringement case that is germane to the preemption analysis because it articulates the rights of a trademark owner to regulate the quality control of the products bearing its mark. In *Shell Oil,* a wholesaler of bulk oil (who was not authorized[1] to sell Shell oil) bought Shell-brand oil from an authorized distributor and then resold it under the Shell trademark. *Shell Oil,* 928 F.2d at 106. The wholesaler argued it was entitled to do so because the Lanham Act does not prohibit the sale of genuine goods bearing genuine marks. *Id.* at 107. The Fourth Circuit disagreed, emphasizing that a trademarked good is only "genuine" if it is manufactured and distributed under quality controls established by that good's manufacturer. The court noted that the existence of quality controls on the part of the resaler were immaterial. "[I]n order to maintain the genuineness of the bulk oil, the quality standards must be controlled by Shell." *Id.*

In *Mobil Oil Corp. v. Virginia Gasoline Marketers and Automotive Repair Ass'n, Inc*., 34 F.3d 220 (4th Cir. 1994), the Fourth Circuit was confronted with a direct claim of Lanham Act preemption because Mobil challenged Virginia laws regulating contractual matters such as the maximum number of stations a retailer could operate, sales quotas for those stations, and minimum hours of operation. The court acknowledged that "[t]he Lanham Act gives a mark owner the right to control the quality of goods associated with his mark," *id.* at 226, but held that the regulations at issue did not run afoul of the Lanham Act. *Id.* at 226–27. Most importantly, the challenged restrictions in *Mobil Oil* were entirely unrelated to the manufacture or preparation

---

1 Like *Qualitex Co. v. Jacobson Products Co., Inc*., 514 U.S. 159 (1995) and *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630 (8th Cir. 2006) cited by Plaintiffs, *Shell Oil* is a "pirates and cheats" case that does not specifically address preemption.

of the actual trademarked product, Mobil-branded gasoline. *Id.*

Finally, *Am. Petroleum Inst. v. Cooper*, 718 F.3d 347 (4th Cir. 2013) applies the teachings of *Shell Oil* and *Mobil Oil* in a Lanham Act preemption case. The Fourth Circuit considered a challenge to North Carolina's Ethanol Blending Statute. Specifically, the issue was whether a statute allowing a retailer to mix gasoline and ethanol at the retailer's facility ("splash blending") conflicted with the Lanham Act because the Blending Statute inhibits suppliers' ability to preserve and verify the quality of their trademarked goods. *Id.* at 352. The Court summarized the law:

> Read together, *Mobil Oil* and *Shell Oil* stand for the proposition that, under the Lanham Act, the mark holder has a right to maintain the quality of the goods bearing its mark, and when a state statute does not significantly interfere with that right, there is no preemption.

The *Cooper* court remanded the case for a determination of the effect of splash blending on the trademarked product. *Id.* at 362-63.

There is nothing in SB 2289 that inhibits the Plaintiff Manufacturers' ability to control the quality of the goods bearing their mark. As recognized by *Cooper*, "there is no preemption." As discussed below, none of the specific provisions of SB 2289 cited by Plaintiffs are subject to preemption by the Lanham Act.

Minimum Inventory

Prior to the enactment of SB 2289, manufacturers were prohibited from requiring dealers to accept equipment that was not voluntarily ordered. SB 2289 added language to prevent manufacturers from a back-door violation of the preexisting provisions through minimum stocking requirements. The Lanham Act does not preempt this provision.

The position of Plaintiffs herein was rejected by the Fourth Circuit in the *Mobil Oil* case. 34 F.3d at 226. The Fourth Circuit specifically found that the "no quotas" provision does not

prevent Mobil from maintaining the quality of its products and services.

> The fact that a franchisee may not sell as much product as Mobil would desire does not adversely affect Mobil's trademark image, particularly when the product that is sold is supplied by Mobil, and the franchisee is in compliance with the other terms of the agreement.

*Id* at 227. Like Mobil Oil, the Manufacturer Plaintiffs will continue to supply products with their trademark. This will not prevent the manufactures "from maintaining the quality of [their] products." See *Id.* at 226. The Lanham Act does not preempt N.D. Cent. Code §51-07-01.2.1.a.

<u>Separation of Product Lines and Separation of Facilities</u>

Plaintiffs join these two provisions together in their Memorandum in Support and claim that "these provisions would violate the Manufacturers' well-settled federal trademark rights," Plaintiffs' Memorandum in Support at 14, but Plaintiffs fail to identify what those "well-settled" rights are. The provisions at issue, N.D. Cent. Code §§51-07-01.2.1.d&e, do not conflict with the purposes of the Lanham Act. To establish a conflict, Plaintiffs must show some impairment to the Manufacturers' ability to control the quality of their trademarked goods.

To prevail on their preemption argument, Plaintiffs must establish that these provisions restrict control over the actual product rather than other ancillary contractual provisions. In fact, Plaintiffs' position was rejected by the *Mobil Oil* Court.

> Mobil contends that the "no maximum stations," "no quotas," and "no minimum hours" provisions of the Virginia Act are inconsistent with its right of quality control, because they prevent Mobil's effective regulation of the quality of goods and services sold in Mobil gas stations. We disagree.

34 F.3d at 226. The location of Manufacturers' products at a dealer's facility is the type of ancillary provision that is not subject to Lanham Act preemption.

The essence of a trademark is its relationship with the goods produced by the trademark holder. Indeed, the "classic function of a trademark is to point out distinctively the origin of the

goods to which it is attached." *Application of Bose Corp*., 546 F.2d 893, 897 (1976). Thus, the *Mariniello* and *Mobil Oil* court recognized that there is no conflict preemption where the mark holder is able to control the quality of the products while the *Shell Oil* and *Cooper* courts found the Lanham Act does apply in scenarios where the mark holder loses the ability to control the quality of the products.

Nothing in these two provisions allow anyone other than the manufacturer to control the quality of the goods with their trademarks. The statute does not authorize dealers to remove trademarks from one piece of equipment and affix it to another or to use a deceptively-similar mark on equipment not provided by the trademark holder. There is no question as to the origin of equipment displayed. Likewise, there is no suggestion that dealers displaying licensed trademarks from manufacturers qualify as "pirates and cheats." SB 2289's effort to prevent manufacturers from requiring a dealer to abandon an existing relationship[2] with another manufacturer does not conflict with the purpose of the Lanham Act.

<u>Renovation Requirements</u>

SB 2289 added a provision that limits Manufacturers' imposition of renovation or remodeling requirements. N.D. Cent. Code §51-07-01.2.1.h. This provision, on its face, applies to the ***dealer's*** facilities. It merely prohibits Manufacturers from imposing ***unreasonable*** renovation or remodeling requirements. The statute does not prohibit the use of appearance[3] standards. Nothing in that section interferes with the Manufacturers' right to control the quality of their products and nothing allows the misappropriation of Manufacturer's investments by

---

[2] As shown by Exhibit F to Plaintiffs' Complaint, Plaintiffs current contracts do not prohibit dealers from carrying multiple equipment lines. The "Existing Dealership Agreements" list shows Plaintiffs have overlapping dealers among themselves.

[3] Plaintiffs' claim that this provisions prevents Manufacturers "from enforcing . . .cleanliness standards", see Plaintiffs' Memorandum in Support at 16, is confounding. This provision only applies to manufacturer demands that dealers remodel, renovate, recondition, alter or change the location of a dealer facility.

pirates and cheats. *See Mariniello,* 511 F.2d at 857. This provision does not conflict with the purpose of the Lanham Act.

Performance Standards

The *Mobil Oil* case also shows that the Lanham Act does not preempt N.D. Cent. Code §51-07-01.2.1.k. In *Mobil Oil,* the state statute limited the ability of the trademark holder to impose operational requirements on service station operators. 34 F.3d at 226. Mobil Oil argued that the state's "no minimum hours" provision that prevented mandatory hours of operation was preempted by the Lanham Act and the court rejected Mobil Oil's position. *Id.* If a state can prohibit operational requirements like minimum hours, a state can certainly require a trademark holder to avoid using "unreasonable, arbitrary, or unfair" performance[4] standards.

Dealership Transfer

The *Mariniello* court rejected the notion asserted by Plaintiffs that the mere fact that a dealer agreement includes a federally protected trademark gives the manufactures *carte blanche* authority to enforce provisions that are contrary to state law. *Mariniello,* 511 F.2d at 858. In fact, *Mariniello* specifically upheld state-law limitations on a trademark holder's ability to determine who could be a licensee. *Id*. Shell, the trademark holder, sought to terminate its dealer and the existence of a trademark license in the dealer agreement was insufficient to overcome state law which required Shell to establish good cause for termination. *Id.*

Given the *Mariniello's* holding that state law can limit a trademark holder's right to choose a licensee, the dealer transfer provisions of SB 2289 are also outside the bounds of Lanham Act preemption. The dealer transfer section affirmatively prohibits a dealer from transferring assigning or selling a dealer agreement. N.D. Cent. Code §51-07-02.2.1. A dealer

[4] Plaintiffs' claim that this provisions prevents Manufacturers "from enforcing routine requirements", see Plaintiffs' Memorandum in Support at 16, is flawed unless the routine requirements are unreasonable or arbitrary.

must submit proposed transferees and manufacturers are allowed to consider the transferee using "reasonable and uniformly applied standards of qualifications" set by the manufacturers themselves. N.D. Cent. Code §51-07-02.2. This allows the manufacturers to perform the "extensive review of the potential dealers" contemplated by *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842, 855 (8th Cir. 2002). Consistent with *Mariniello,* procedures for dealer agreement transfers, even ones that curtail a manufacturer's freedom to choose a licensee, are not preempted by the Lanham Act.

Plaintiffs cannot meet their heavy burden to show that Congress's "clear and manifest purpose" of the Lanham Act was to preempt state regulation of farm equipment dealer contracts. The Manufacturer Plaintiffs continue to have the right to maintain the quality of products bearing their marks. SB 2289 is not impliedly preempted by the Lanham Act.

## VI. CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied to the extent the Motion is based upon Lanham Act preemption.

Dated this 17th day of October, 2017.

/s/ *Douglas W. Gigler*
Douglas W. Gigler, ND ID#04984
NILLES LAW FIRM
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, ND 58108-2626
T/N: 701-237-5544
F/N: 701-280-0762
dgigler@nilleslaw.com

**OF COUNSEL**

**SEIGFREID BINGHAM, P.C.**
DAVID E. SHAY MO#37677
LANCE J. FORMWALT MO#49108
2323 Grand Boulevard, Suite 1000
Kansas City, MO 64108
T/N: 816-421-4460
F/N: 816-474-3447
dshay@sb-kc.com
lformwalt@sb-kc.com

**ATTORNEYS FOR *AMICUS CURIAE* DEALER ASSOCIATIONS**

**CERTIFICATE OF SERVICE**

It is hereby certified that on the 17th day of October, 2017 a copy of the foregoing was filed electronically and was served on all parties of interest receiving electronic notices in the above-captioned proceedings through the Court's CM/ECF System, including:

/s/ *Douglas W. Gigler*
*Counsel for Amicus Curiae*
*Dealer Associations*