Deere Ex 2

# JOHN DEERE AGRICULTURAL DEALER AGREEMENT

## RDO Agriculture Equipment Co. dba RDO Equipment Co. Bismarck, North Dakota



JOHN DEERE

DEERE EXHIBIT
2

# John Deere Agricultural Dealer Agreement

Dealer identified below hereby applies to Deere & Company ("Company") for appointment as a dealer for the area of responsibility designated in Exhibit 1. Dealer agrees that the relationship between Dealer and Company will be governed by the Terms of Appointment set forth in this Agreement. When it executes this Agreement, Company accepts Dealer's application and also agrees to be bound by the Terms of Appointment. This Agreement shall be effective upon execution by Company and shall as of that date supersede any prior John Deere Dealer Agreements between the parties hereto (including without limitation any prior John Deere Agricultural Dealer Agreement between Dealer and Company).

**Dealer (Firm Name):** **RDO Agriculture Equipment Co.**
**dba RDO Equipment Co.**
**Address:** **2000 Industrial Drive**
**Bismarck, North Dakota  58502**

_____ **Corporation**        **By:** _Csti Qlut_
_____ **Limited Liability Company**           Signature
_____ **Partnership**
       _____ **General**     _Christi Offutt_
       _____ **Limited**          Print
_____ **Proprietorship**
_____ **Other**            **Title:** _CEO_
                              (Authorized Officer, Owner or Partner)

                           **Date:** _5/20/16_

**Signatures of Other**
**Partners, Owners, or** _____
**Shareholders:**
                          _____

                          _____

**Accepted:**
**Deere & Company**   **By:** _John Walk_

                      **Title:** _Territory Sales Manager_

                      **Date:** _5/23/16_

# Defined Terms

For purposes of this Agreement, the following terms shall be defined as follows:

| | |
|---|---|
| **Agreement** | This Agreement |
| **Company** | Deere & Company |
| **Competitive Parts** | Parts marketed by Company for the repair and service of competitive agricultural equipment, and commercial and consumer equipment. |
| **Conditions of Sale** | Company's published Dealer Conditions of Sale. |
| **Customer Satisfaction** | The extent to which Dealer fulfills the needs and expectations of customers in Dealer's AOR.  Company will specify the method used to measure Customer Satisfaction. |
| **Dealer** | Dealer identified in this Agreement. |
| **Dealer's AOR** | The area of responsibility assigned to Dealer under this Agreement. |
| **Dispute** | Any dispute, controversy, or claim between Dealer and Company or Deere Credit Services, Inc., whether based on contract, tort, statute, or other legal theory. |
| **Equity** | Dealer's equity to assets percentage, determined by Company based upon the most recent fiscal year-end financial statements designated by Company and calculated at the end of the fiscal year covered by such financial statements. |
| **Financial Information System** | Company's Financial Information System (or successor system). |
| **Goods** | Agricultural machines and equipment checked on Exhibit 2, JDM items, licensed products, and allied agricultural machines, which are classified by Company as its Agricultural line, and attachments and service and repair parts for such equipment.  Additionally those products indicated by a check mark in Exhibit 2 manufactured and/or distributed as part of Company's Turf & Utility Equipment Platform and attachments and parts for such products. |
| **John Deere Affiliate(s)** | Deere & Company, its divisions and its subsidiaries whether direct or indirect. |
| **John Deere Warranty(ies)** | The John Deere warranties (including, in some cases, extended warranties) applicable to the sale and, in some cases, to the lease or rental of various types of Goods. |

| | |
|---|---|
| **JDM** | John Deere Merchandise, as listed in the JDM price list. |
| **John Deere Network** | The network of computers, communications equipment, computer networking equipment, computer software, application software, and data used by Company for the purpose of gathering and communicating information and conducting business. |
| **Key Persons** | Individual proprietor(s), partner(s), guarantor(s) and shareholder(s) (owning 25% or more), of Dealer.  Additionally, the person or persons serving as general manager(s) of Dealer and whom Company regards and has designated as its key contact in business matters with Dealer. |
| **Manual** | Company's published Warranty Administration Manual (or successor document). |
| **Market Share** | The market penetration achieved for Goods, or a subset thereof, in Dealer's AOR during a specified time period, as calculated by Company. |
| **Minimum Equity Level** | The minimum equity to assets percentage level specified by Company from time to time. |
| **Parts** | Service parts, repair parts, JDM, and accessories available from Company for whole Goods including service parts, repair parts, JDM, and accessories sold by Company for Goods. |
| **Performance Standard(s)** | A level of performance specified by Company from time to time with respect to Market Share, product and customer support and Equity, as well as other standards specified by Company from time to time for dealers generally. |
| **Service** | The sale of service labor for installation of parts, preventative maintenance and repairs to insure machine performance and Customer Satisfaction. |
| **Terms Schedule(s)** | Company's published U.S. Dealer Terms Schedule(s). |
| **Trademarks** | Trademarks owned by Company. |

# Terms of Appointment

**Preamble**

This Agreement serves as the foundation for a mutually beneficial business relationship between Company and Dealer.  It is agreed that Customer Satisfaction, achieved through the sale of quality products backed by excellent product support is key to our mutual success.  Company relies on Dealer to aggressively promote the sale, lease, and rental of Goods in Dealer's AOR and to provide excellent product support to meet and exceed customer needs and expectations.  The relationship between Company and Dealer will thrive in an environment of mutual respect, cooperation, and a commitment to continuous improvement in our business practices and processes.

Dealer and Company agree as follows:

**I.     Provisions of Appointment**

During the period of Dealer's appointment as a Dealer, the following provisions shall apply:

**A.     Dealer's AOR**

In authorizing Dealer to distribute Goods, Company is relying on Dealer to effectively market Goods against competing products in Dealer's AOR and to enhance the reputation Company and its dealer organization have developed over many years.  Dealer's AOR may be enlarged or reduced, upon not less than 180 days written notice by Company.  Achieving a high degree of Customer Satisfaction in Dealer's AOR requires that Dealer concentrate its efforts in Dealer's AOR.

1.     Dealer is assigned Dealer's AOR as set forth in Exhibit 1, for the purpose of marketing, servicing, and supporting Goods.  Dealer's AOR is not an exclusive territory.  Company and others authorized by Company may market, service, and support Goods in Dealer's AOR.  Without limiting the foregoing, Company may sell, loan, lease, or rent Goods, to any person or entity, including without limitation:

a)     federal, state, and local governments;

b)     accounts classified by Company as national accounts;

c)     purchasers for export;

d)     educational institutions;

e)     competitors of Company;

      f)      equipment manufacturers; and

      g)      employees of Company.

2.      Company shall have no obligation to offer its marketing programs or other Company support for activities of Dealer outside Dealer's AOR.

**B.**      *Locations; Other Product Lines*

The authorized Dealer locations specified in Exhibit 3(a) are necessary to ensure (1) aggressive sales, leasing, and rental coverage of Dealer's AOR, (2) superior product support, and (3) meeting and exceeding customer expectations. Locations may need to be added, relocated, or discontinued in the future to meet changing market needs.

1.      Dealer will maintain dealership operations at each location listed in Exhibit 3(a) for the purposes specified in Exhibit 3. Dealer will not open any new Dealer location, relocate or discontinue a Dealer location, or change the purposes of a Dealer location without obtaining Company's prior written approval. Dealer will not, either directly or indirectly, establish, maintain, or operate at any other location a place of business of any kind where (or from which) any Goods new or used are displayed, sold, leased, rented, or serviced.

2.      One of the purposes of Dealer's obligations under this Agreement is to assure that the best efforts and adequate resources are being committed to the sale of Goods and to the performance of this Agreement. If Dealer undertakes to carry another major competitive line of equipment or engage in another major business activity, either of which involves an important commitment of effort and resources, Dealer agrees to make such separation of the personnel, facilities, capital and other resources devoted to that business as is satisfactory to Company.

3.      If Dealer represents a competitive line(s) of equipment that is not a major line of equipment, Dealer shall commit retail display space including inside and outside areas for Goods equal to or greater than such space that it is used to display competitive line(s).

**C.**      *Dealer's Promotional Efforts, Performance Standards and Business Plan*

The reputation and mutual success of Company and John Deere dealers depend to a large degree upon how effectively each dealer manages its operations.

1.      Dealer will actively and aggressively promote the sale, lease, and rental of whole Goods and agrees to achieve sales objectives and market penetration within Dealer's AOR satisfactory to Company. Dealer's compliance with this commitment will be evaluated based on performance in Dealer's AOR and not on performance outside Dealer's AOR.

Dealer will maintain:

a)      highly qualified management and sales personnel;

b)      sales training and personnel development programs, including sending appropriate Dealer personnel to Company training programs;

c)      inventories of whole Goods and related attachments available for demonstration, sale, lease, and rental based on Company guidelines; and

d)      sales facilities that in each case are sufficient to achieve the Performance Standard objectives acceptable to Company.

2.      Dealer will actively and aggressively promote the sale of Parts and Service.  Dealer's compliance with this commitment will be evaluated based on performance in Dealer's AOR and not on performance outside Dealer's AOR.

Dealer will maintain:

a)      highly qualified parts and service personnel;

b)      personnel development programs, including participation in appropriate Company training for marketing, sales, service and management;

c)      inventories of Parts, including Competitive Parts;

d)      state of the art diagnostic equipment, service equipment, field service vehicles and tools; and

e)      parts and service facilities that in each case are sufficient to achieve the Performance Standards set by Company.

3.      As requested by Company, Dealer will submit and secure Company's approval of a business plan based on a full calendar or fiscal year (or more years if requested).  The business plan will contain:

a)      an objective for each Performance Standard;

b)      action plans designed to achieve the Performance Standard objectives specified in the plan, within a reasonable period of time; and

c)      such other elements as Company may request of John Deere dealers generally.

D.     Preparation of Goods, Warranty, and Post-Delivery Services

1.     The Manual and/or bulletins issued from time to time by Company designate John Deere Warranties.  In making sales, leases, and rentals of new and used whole Goods, Dealer will follow instructions contained in the Manual and Company's bulletins and will complete with true and accurate information the retail purchase orders, delivery receipts, lease agreements, warranty registrations and other forms specified therein. Dealer will be solely responsible for any warranties given by Dealer that exceed the applicable John Deere Warranty, if any, and for any liability cases where Dealer has failed to use the forms prescribed by Company in the manner specified by Company.

2.     To ensure the proper operation of Goods, Dealer will properly assemble and prepare all Goods sold, leased, or rented by Dealer and will perform such inspections, adjustments, and service prior to delivery to users as set forth in pre-delivery instructions provided by Company. Dealer will instruct users in the proper use, safe operation and maintenance of Goods and will furnish each user with the appropriate operator's manual(s) furnished by Company. Dealer will also perform the post-delivery inspections and adjustments as prescribed for Goods by Company.

3.     Dealer is authorized to and will perform prompt and effective warranty service on Goods in Dealer's AOR for which Company becomes obligated pursuant to a John Deere Warranty, including without limitation Goods not sold, leased, or rented by Dealer, if presented with proper evidence that the Goods are entitled to warranty service under a John Deere Warranty.

4.     Dealer will perform non-warranty service on Goods in Dealer's AOR, including without limitation Goods not sold, leased, or rented by Dealer.

5.     Dealer will perform product improvement programs that Company may from time to time require for Goods sold by Dealer or located in Dealer's AOR, including without limitation Goods not sold, leased, or rented by Dealer. Dealer will complete such programs as expeditiously as possible and, in any event, within the time frame specified by Company.

6.     Dealer will perform warranty service and product improvement programs in the manner and for the compensation specified in the Manual in effect at the time the service or program is performed. Dealer will submit to Company all warranty and product improvement program claims in accordance with the Manual.

E.    Sales to Re-sellers

Company relies on Dealer to promote the sale, lease and rental of Goods in Dealer's AOR to end-users.  Dealer will not sell Goods to or through any person or entity that re-sells or intends to re-sell or facilitates the re-sale of such Goods, provided, however, that this Section 1.E. shall not prevent Dealer from:

1.    selling Parts or Competitive Parts to a person or entity in Dealer's AOR that uses such Parts in providing repair or maintenance services in Dealer's AOR for products owned by others;

2.    selling used Goods to a person or entity that is engaged in the business of selling used equipment;

3.    selling Goods to another John Deere dealer authorized to sell similar equipment; or

4.    selling Goods to a person or entity that is primarily engaged in the business of renting equipment to end users, this exception shall be subject to Company approval.

F.    Company's Acceptance of Orders

Company will accept orders placed by Dealer for Goods in Company's then-current product line, provided that Company contemplates the Goods will be shipped during the period of Dealer's appointment as an authorized Dealer. Company shall have no liability for delay, failure, or refusal to accept Dealer's orders or to ship Goods to Dealer if the delay, failure, or refusal results from:

1.    capacity constraints, demand in excess of available supply, labor strikes or lockouts;

2.    a default under a security agreement between Dealer and Company;

3.    termination of Dealer's appointment;

4.    any cause beyond Company's control; or

5.    Company's determination, that:

a)    Dealer's financial condition does not justify the extension of additional credit or the addition of inventory;

b)    Dealer's inventory of Goods is excessive or with additional shipments would become excessive, or shipment would result in larger Dealer inventories than Company is willing to finance;

c)     Dealer has consistently failed to perform its obligations under this Agreement;

d)     limitations in Dealer's market potential, marketing capabilities, or product support capabilities for the particular Goods involved or Dealer has failed to fulfill ordering requirements established by Company for such products; or

e)     shipment would result in larger dealer inventories than warranted based on expected market demand.

All orders, sales, and shipments will be governed by the Conditions of Sale and applicable Terms Schedule in effect at the time the order is placed.

G.     Availability of Company Programs

1.     Company will make available to Dealer finance plans, lease plans, floor plans, and parts return programs (and other similar financing or inventory management plans or programs) comparable to such plans and programs that Company makes available to dealers generally. Such plans and programs may contain conditions for eligibility and are subject to credit approval. Such plans and programs also may have varying terms depending on certain dealer financial or performance criteria or market conditions.

2.     Company may make available to any authorized dealer marketing programs that Company deems necessary to compete in the area of responsibility assigned to that dealer without obligating Company to make similar programs available to any other dealer or to dealers generally.

H.     Changes in Dealer Ownership, Business Structure or Key Persons

Any change in the ownership, management, or business structure of Dealer could have serious negative consequences for Dealer and Company. Company considers the Key Persons to be particularly vital to Dealer and to a successful working relationship between Company and Dealer.

1.     Dealer agrees to give prior written notice to Company and consult with Company regarding changes in Key Persons and to provide a plan of action acceptable to Company regarding the replacement of the Key Person(s). Dealer further agrees to give prior written notice, consult with and explain to Company's satisfaction that any change in ownership, the business structure or Key Person(s) will not materially affect the business relationship or the financial security position between Company and Dealer.

2.     Dealer will execute such agreements or other documents as Company may deem necessary to preserve Company's rights under this Agreement or any other agreement between Dealer and Company in light of a change or proposed change in Dealer's ownership, management, or business structure.

3.     If Dealer wishes to sell its business or substantially all of the assets of its business (excluding Dealer's appointment and this Agreement, which are not transferable by Dealer), Dealer will notify Company before the beginning of any discussions or negotiations pertaining to the proposed sale. After giving such notice, Dealer may enter into negotiations to sell its business or assets (excluding Dealer's appointment and this Agreement) to a third party. Company retains at all times the right to decide, in its sole discretion, whether to appoint any person or entity as a dealer for Dealer's AOR, for any portion thereof, or for any other area.

    For purposes of this Agreement, a change in business structure shall include, without limitation, a change in the legal form of Dealer (e.g. from partnership to corporation); a change in the legal form of any Key Person or of any entity that holds, directly or indirectly, any ownership interest in Dealer; a merger or consolidation involving Dealer; the creation of a subsidiary, partnership, or other legal entity by Dealer; and any other change that may affect any right or obligation under this Agreement or any other agreement between Dealer and Company.

I.     **Financial Statements**

1.     Dealer will submit to Company annual financial statements for Dealer and for affiliated Dealer entities that Company may designate, within ninety (90) days of established fiscal year end(s). Such financial statements shall have been prepared in accordance with generally accepted accounting principles. Such financial statements shall be audited by an independent certificated public accountant, if requested by Company. Dealer also will submit electronically to Company financial statements, prepared in accordance with the Financial Information System, for each calendar month prior to Company's cutoff date for the following month. Dealer also will provide such other financial data of Dealer or personal financial information of Dealer guarantor(s), as Company may from time to time request.

2.     Company will determine the particular entity or combination of entities whose financial statements Company will use to determine Dealer's Equity for purposes of Section I.J. Additionally, Company's determination may be amended if Dealer, the designated entity(ies), or an affiliated entity undergoes a change in ownership or business structure prior to the end of that fiscal year.

J.  **Equity**

    1.  Dealer will maintain its Equity at a level sufficient to achieve Dealer's commitments under this Agreement, which shall be not less than the minimum equity level as established by Company for Dealer.

## II.  Termination of Dealer's Appointment

A.  Termination by Mutual Consent

Dealer's appointment may be terminated by the mutual consent of Dealer and Company, evidenced by a writing signed by Dealer and Company, with the effective date of such termination to be as mutually agreed upon in writing.

B.  Termination by Dealer

Dealer may terminate its appointment for any reason upon at least one hundred and eighty (180) days prior written notice to Company.

C.  Termination by Company

    1.  Company may terminate Dealer's appointment or a location shown on Exhibit 3(a), upon at least one hundred and eighty (180) days prior written notice to Dealer, in the event:

        a)  Company believes that Dealer is not fulfilling the requirements of Dealer's appointment despite the opportunity to correct or take appropriate action toward correcting deficiencies in Dealer's operations, which have been called to Dealer's attention by Company.

        b)  Dealer fails to comply with any material provision of this Agreement.

            Company may exercise its termination right under this Section II.C.1. with respect to all or any portion of Dealer's AOR, as Company may determine in its sole discretion.

            Company may exercise its termination right under this Section II.C.1. without regard to the performance of other dealers or to the circumstances under which Company has terminated or refrained from terminating the appointment of other dealers.

    2.  Company may terminate Dealer's appointment, effective immediately, by giving written notice of termination to Dealer at any time after the happening of any of the following:

a)      the death, incapacity, removal, withdrawal or dissolution of any Key Person;

b)      a default under any security agreement between Dealer and Company;

c)      any noncompliance with Section I.B.,  Section I.I.1., or Section I.J.1.;

d)      Dealer defrauds anyone, including without limitation Company, or misrepresents any material fact in any communication with or submission to Company;

e)      the cancellation, discontinuance, or revocation of a guaranty or letter of credit applicable to Dealer indebtedness, or a failure to modify the amount of such a guaranty or letter of credit when and as requested by Company or Deere Credit Services, Inc.;

f)      Dealer substantially closes dealership business or a location;

g)      Dealer intentionally fails to comply with any applicable federal, state, or local law, regulation, or ordinance relating to the operation of dealership;

h)      Dealer attempts to assign its rights or obligations under this Agreement; or

i)      Termination (or notice of termination) of any John Deere Dealer Agreement that Dealer, or an affiliate company, has with a John Deere Affiliate.

## III.    Effect of Termination of Appointment

Termination of Dealer's appointment hereunder means that the obligations and duties of the parties under Section I. no longer apply, and Company may decline to fill accepted orders placed before such termination.  Orders from Dealer that Company contemplates will be shipped after the effective date of termination may be accepted in Company's sole discretion.  Such orders will be subject to the Conditions of Sale in effect at the time the order is placed or to such other conditions that Company may prescribe.  Submission or acceptance of orders and shipment or acceptance of Goods does not have the effect of renewing or reinstating the obligations of Section I. and shall not be construed as an extension or renewal of Dealer's appointment or as a rescission of any notice of termination.  If Dealer's appointment is terminated, neither Dealer, nor Company shall be entitled to any compensation or reimbursement for loss of prospective profits, anticipated sales, or other losses occasioned by the termination, except as provided in this Agreement.

## IV.   Repurchase of Goods on Termination

Upon termination of Dealer's appointment, Company will buy and Dealer will sell      (or, with respect to JDM products, may sell subject to Section IV.C.), free and clear of all liens and encumbrances, the following Goods, provided they were originally purchased by Dealer from Company (or from another authorized dealer with the written approval of Company) and are listed in Company's published price list in effect on the effective date of termination of Dealer's appointment, according to the following terms:

A.   All unsold current whole Goods and attachments in Dealer's possession that are new, unused, complete, and in good condition.  The prices to be paid for such items will be the invoice prices (but not more than current dealer prices) plus freight from the factory to Dealer's location, less any discounts from invoice price that have been allowed, and less any reduction in value that may be required due to deterioration, demonstration or usage.

B.   All unsold Parts in Company's parts price list as date of termination in Dealer's possession that are new, unused, complete, in good condition, and re-salable as new without repackaging or reconditioning.  The prices to be paid for such items will be Company's then-current wholesale price, as listed in the John Deere Parts Price List in effect on the effective date of termination, less a discount of:

   1.   15% on items listed as returnable under Company's then-current parts return policy; and

   2.   50% on all other items, excluding licensed products.

C.   Such unsold current JDM products in Dealer's possession that Dealer may elect to sell to Company and that are new, unused, complete, in good condition, and re-salable as new without repackaging or reconditioning.  Company shall have no obligation to repurchase such products unless Dealer furnishes Company with a list of the products that it wishes to sell to Company within thirty days after the effective date of the termination of Dealer's appointment. The price to be paid for such products will be the then-current wholesale price, as listed in the JDM Price List in effect on the effective date of termination, less a discount of:

   1.   50% on products identified by an asterisk in the JDM Price List;

   2.   15% on items listed as returnable under Company's then-current parts return policy; and

   3.   25% on all other JDM products, excluding licensed products.

At the written request of Company, Dealer will, at Dealer's expense, list, tag, pack, load, and transport all repurchased Goods to the nearest location regularly maintained by Company for the storage of such Goods (or to such closer location as may be designated by Company) or pay for the cost of transportation to such location. The risk of loss shall be on Dealer until the vehicle transporting such

Goods reaches the designated destination. Should Dealer fail to fulfill the above obligation within sixty (60) days after Company has requested that it do so, Company or its designee may enter Dealer's premises, perform these duties, and charge Dealer's account for any expenses incurred in so doing.

Company shall be relieved of its obligations under this Section IV. if a default occurs or has occurred under any security agreement between Dealer and Company, and Company elects to exercise its rights under such security agreement to take possession of the Goods.

Company shall be relieved of its obligations under this Section IV. if Dealer has defrauded Company or if Dealer misrepresents a material fact pertaining to the repurchase of Goods in any communication with or submission to Company.

## V.     Death of Dealer:  Cooperation with Survivors

If Dealer's appointment is canceled because of the death of a Key Person, it is agreed:

A.     That in order to facilitate orderly settlement of the estate of the deceased and allow the heir and/or surviving associates (partners or shareholders) of the deceased who have or will obtain a controlling interest in dealership to rearrange their affairs and determine whether they wish to liquidate or to continue to operate the dealership, Company will, for a period of at least one hundred and eighty (180) days after such death, be willing to make shipments of orders previously received and accept new orders from Dealer, or Dealer's estate and/or surviving partners, as the case may be.   Company's obligations under this Section to accept orders and make shipment shall be subject to the provisions of Section I.F. and Company's Terms Schedules and Conditions of Sale then in effect.

Such obligations are also subject to Company's being satisfied that the person executing any new order is legally authorized to do so and that, with regard to the new order or the shipment, Dealer or Dealer's estate and/or surviving partners are legally bound by these Terms of Appointment, the Terms Scheudle, the Conditions of Sale, and any security agreement between Dealer and Company.

B.     That if such heirs and/or surviving associates wish to continue operating dealership, Company will cooperate with them in their effort to arrange to do so, and will offer to execute a new Dealer Agreement with Dealer or the heirs (or Dealer's estate, if appropriate due to anticipated length of administration) and/or the surviving partners if it believes them to be capable of carrying out the obligations thereunder, and if Company believes that the Dealer's AOR affords sufficient sales potential to continue to support an authorized dealer.  Company will inform the heirs and/or surviving associates in writing as promptly as possible as to whether or not Company elects to offer a new Dealer Agreement to them, and if Company so elects, the major conditions, including credit or

financial conditions, if any, under which Company would deem them capable of carrying out the obligations of Dealer Agreement.  Any written commitment by Company to Dealer which identifies the person(s) who will be acceptable to Company to operate the dealership will be honored by Company, provided the conditions set forth herein and any other major conditions specified by Company are met.

C.     That Company shall have discharged its obligations under Subsections A and B and may discontinue shipments to Dealer, Dealer's estate, or surviving partners, as the case may be, under any of the following conditions:

    1.     Company informs Dealer or the heirs and/or surviving partners of the deceased in writing (by notification sent to Dealer, Dealer's estate, the heirs, or one of the surviving partners, as is appropriate in the circumstances) that it will not execute a new Dealer Agreement and one hundred and eighty (180) days shall have elapsed since such death.

    2.     Company receives written notification that Dealer or the heirs and/or surviving partners of the deceased do not wish to enter into a new Dealer Agreement.

    3.     The heirs and/or surviving associates of the deceased cannot agree on appropriate arrangements for carrying on the business.

    4.     Any of the events enumerated in Sections II.C.2 (b) and (e) has occurred or shall occur.

## VI.     Information Technology

A.     During the period of Dealer's appointment, Dealer will, at Dealer's expense:

    1.     install and maintain or utilize a hosting service provider that provides, a computerized business system that is compatible with, and can communicate with, the John Deere Network;

    2.     maintain on-site or through a hosting service provider the hardware and software that will supply electronically to Company (a) monthly trial balance information in accordance with the Financial Information System; (b) product delivery and warranty claim information in accordance with the Service Information System; and (c) such other information as Company may from time to time request Dealer to submit electronically;

    3.     conform to any modifications made to the John Deere Network (provided Company gives Dealer at least sixty (60) days prior notice of the modification);

4.   input into the John Deere Network, in accordance with Company's instructions, such information as Deere may from time to time request, and furnish such computer files and reports as Company may from time to time request;

5.   pay costs associated with communicating on the John Deere Network; and

6.   provide and maintain required hardware, infrastructure and software capable of using technical information delivered by Company in an electronic format. Technical information includes but is not limited to, parts catalogs, manuals and software required to perform updates to product on-board networks and controllers.

B.   Dealer will keep confidential any information contained in the John Deere Network and not use such information for purposes unrelated to Dealer's dealership appointment hereunder.

C.   Company shall not be liable for any losses incurred by Dealer in connection with Dealer's computerized business system or the John Deere Network.

## VII.   Amendment of Agreement

This Agreement cannot be altered or amended, or any of its provisions waived, on behalf of Company except in a writing signed by a duly authorized officer of Company. Dealer and Company recognize that this Agreement does not have an expiration date. Because market and business practices and conditions are likely to change with the passage of time and such changes or other circumstances could necessitate a change in this Agreement, Company may amend these Terms of Appointment at any time, without the consent of Dealer, if the same amendment is made to the Terms of Appointment of all other dealers whose dealer agreements are in the form of this Agreement and may be amended in this manner pursuant to applicable law. Any such amendment shall be made by issuance of a dealer bulletin or other written notice to dealers and shall be effective on the date specified in the bulletin or other written notice, which date shall be at least ninety (90) days following the date of such bulletin or other written notice.

## VIII.   Use of Trademarks, Names and Signs

A.   Company grants Dealer the non-exclusive right to use the Trademarks (including without limitation the JOHN DEERE trademark, and the trademark comprising the leaping deer design with JOHN DEERE), during the period of Dealer's appointment, in connection with the advertising and sale of Goods bearing one or more of the Trademarks, and in connection with the providing of services by Dealer relating to the sale or servicing of Goods identified and authorized under this Agreement. Such use of the Trademarks shall be in a manner and form approved by Company. Dealer agrees not to use any of the Trademarks as part of Dealer's corporate or business name and to cease all use of the Trademarks if

Dealer ceases to be a dealer, including without limitation the removal from Dealer's premises and vehicles of all signs and distinctive identification that might associate Dealer with Company. Dealer also agrees not to sell or distribute any goods bearing any of the Trademarks, unless the goods originated from Company, entities affiliated with Company, or licensees authorized to use the Trademarks on the goods. Dealer also agrees not to use the Trademarks to promote goods not originating from Company, entities affiliated with Company, or their licensees.

B.   Any Dealership signage or architectural features bearing Company trademarks or trademark elements must be acquired through or approved by Company.

## IX.   Assignment

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Company and, to the extent the terms hereof bind or benefit Deere Credit Services, Inc. their respective successors and assigns.  Dealer's rights and obligations under this Agreement may not be assigned or transferred.  Any attempt by Dealer to assign its rights or obligations under this Agreement shall be null and void.

## X.   Changes in or Discontinuance of Goods

A.   Company may, at any time and without notice, make changes in or discontinue any Goods without incurring any liability.

B.   This Agreement extends only to Goods.  Company reserves the right to offer any other products to selected authorized dealers or others under existing or separate new agreements.  As new products, other than those designated by Company as direct successors of Goods, are developed, acquired, or marketed by Company, they may or may not be added to the Goods covered under this Agreement.

## XI.   Dealer Guaranty

To the extent requested by Company, Key Persons, affiliates, and other partners in, or owners of ten per cent (10%) or more of, Dealer have executed or concurrently herewith will execute in favor of Company one or more guaranties of Dealer's indebtedness to Company. Dealer will obtain, and Key Persons, and other partners in, or owners of, Dealer will execute such additional guaranties and amendments and additions to guaranties as Company may from time to time request.

For purposes of this Section XI. and Section XII., Company shall include Deere Credit Services, Inc. in addition to Company.

**XII.   Security in Goods**

Dealer has executed or concurrently herewith will execute in favor of Company one or more security agreements covering Dealer's inventory of Goods and certain other items of collateral more fully described in such security agreements (hereinafter collectively referred to as the "Collateral").   Dealer agrees to execute such additional security agreements and financing statements, and amendments and additions thereto or to existing instruments, as Company may from time to time request, in order that Company may have at all times a properly perfected first priority security interest or lien on the Collateral securing Dealer's indebtedness to Company.

**XIII.   Relationship of the Parties**

A.   Dealer acknowledges that it is an independent retail merchant which purchases Goods for resale for the principal benefit of Dealer.  Dealer further acknowledges and agrees that it is an independent contractor.   In performing service work Dealer assumes full responsibility for such work. Dealer also acknowledges and agrees that it is not an employee, agent, representative, franchisee, partner, or joint venture of or with Company, has not paid and will not pay a franchise fee to Company, and is free to operate its business in accordance with its independent business judgment, provided that such operation is in accordance with this Agreement and any other agreement between Dealer and Company. Dealer has no authority to bind Company by representations, statements, agreements, conduct, or in any manner whatsoever. Company shall not be liable for any debts, accounts, obligations, or other liabilities of Dealer, its agents, employees, or representatives. It is expressly recognized that no fiduciary relationship exists between the parties.

B.   Except as provided in Sections IX., XVII., and XVIII. this Agreement is not enforceable by any third party and is not intended to benefit, or convey any rights to, anyone other than Dealer and Company.

C.   Dealer obtains no rights by virtue of this Agreement or its dealership appointment to acquire additional dealerships or to obtain additional dealership appointments or AOR assignments from Company.

**XIV.   Use of Price Lists, Catalogs and Manuals**

The Manual and any bulletins, price lists, catalogs, and service manual pages furnished to Dealer by Company, either printed material or electronic version, must be kept in good condition and returned to Company upon termination of Dealer's appointment. Dealer will not disclose, directly or indirectly, the contents of such Manual, bulletins, price lists, catalogs, and service manual pages or electronic communications to a person or entity that is a competitor of Company or a John Deere dealer.

**XV.     Advertising Material; Mailing Lists**

During the period of Dealer's appointment:

A.     Company will furnish to Dealer, in quantities deemed appropriate by Company for Dealer's AOR, promotional materials and printed advertising matter that Company prepares for use by other authorized dealers in connection with the sale, lease, rental, or servicing of Goods and that Company deems appropriate for Dealer's AOR; and

B.     Dealer will (i) maintain, and keep current a list in a format designated by Company of the names and addresses of all purchasers and prospective purchasers of Goods in Dealer's AOR and (ii) promptly notify Company of all changes to the list.   This mailing list shall be the property of Company and Dealer authorizes Company to mail The Furrow or other Company marketing information to those on the mailing list.  Company will furnish such publications with no charge to Dealer but Dealer agrees to reimburse Company for postage costs.  Company shall advise Dealer in advance of any other use it may make of such list during Dealer's period of appointment.  Company shall have no liability to Dealer for any use it makes of such mailing list.

**XVI.   No Waiver**

The failure of Company to take any action or require full and strict compliance with any provision of this Agreement or any provision of any agreement with other dealers shall not affect Company's right to take any action or require full and strict compliance at any time prior or subsequent thereto and shall not constitute a waiver of a breach of the provision or nullify the effectiveness of such provision.

**XVII.  Resolution of Disputes**

Although Dealer and Company are entering into this Agreement in a spirit of cooperation and mutual respect, it is possible that Disputes may arise.  Dealer, (including without limitation guarantors of Dealer), Company and Deere Credit Services, Inc., agree that any Dispute shall be finally resolved by binding arbitration pursuant to the terms set forth in Exhibit 4.   The duty to arbitrate shall extend to any officer, employee, shareholder, principal, agent, partner, trustee (in bankruptcy or otherwise), or subsidiary of Dealer as to any Dispute that is subject to this Section XVII.

**XVIII. Limitation on Damages; Jury Waiver; Time to Initiate Proceedings**

A.     No party to a Dispute shall be entitled to an award of multiple, punitive, or exemplary damages, or any damages excluded by, or in excess of any damage limitation expressed in, this Agreement.

B.   Dealer (including without limitation guarantors of Dealer) and Company hereby knowingly, voluntarily, and intentionally waive any right he, she, or it may have to a trial by jury in respect of any litigation pertaining to any Dispute, and each agrees not to request a jury in any such litigation.

C.   No party to a Dispute may commence litigation or arbitration proceedings with respect to such Dispute more than two years after that party's cause of action accrues.

## XIX.   Compliance with Applicable Laws.

Dealer (which for purposes of this Section shall include all of its employees, agents and affiliates) agrees that it will not bribe, attempt to bribe, or accept bribes from, any government officials or employees, public international organizations, politicians, political parties, private individuals or entities. Dealer acknowledges and agrees that it is familiar with and will abide by the anti-bribery laws in the countries in which it does business (which may include, among others, laws promulgated under the Organization for Economic Cooperation and Development's Convention on Combating Bribery of Foreign Public Officials, the UN Convention Against Corruption, and the U.S. Foreign Corrupt Practices Act ("FCPA"). Dealer also agrees it will not take any action that would cause Company to be in violation of the FCPA or other anti-bribery laws.

Dealer acknowledges and agrees that Company and Goods are subject to export control laws, rules and regulations of the United States of America (U.S.) and other countries in which Company and/or John Deere Affiliates are located or its products are manufactured, including but not limited to the U.S. Export Administration Regulations; the laws, regulations and orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), including the OFAC List of Specially Designated Nationals and Blocked Persons; the EU Dual-Use Regulation; EU laws, regulations and orders designating parties or entities as restricted; and similar laws and regulations of other applicable jurisdictions (the "Export Control Regulations").   Dealer agrees that it: a) will abide by U.S. and other applicable Export Control Regulations regarding the export and re-export of any Goods or services under this Agreement; b) shall not sell, rent, or lease Goods or provide services to individuals or organizations which are prohibited from receiving exports or re-exports, or otherwise contrary to applicable Export Control Regulations; and c) shall not engage in any transaction for the sale, rental, or lease of Goods or provision of services to or in U.S. embargoed countries. Dealer further agrees that it shall not be a default of this Agreement if Company or John Deere Affiliates is/are precluded by applicable Export Control Regulations, from: (i) selling or shipping Goods; (ii) providing services; or (iii) otherwise fulfilling its obligations under this Agreement or other agreements.

Dealer agrees that its books, records, and accounts shall accurately reflect any and all payments by and transactions of Dealer.  Company shall have the right to periodically audit Dealer's books and records.

If Dealer becomes aware of any violations of the provisions in this Section, Dealer shall immediately notify Company and cooperate with any investigations or other actions by Company relating to such violation.  Further, notwithstanding anything in this Agreement to the contrary, Company shall not be required to make any payments to Dealer regarding any transaction that has been linked to any violation or infringement of this Section by Dealer and/or by any Key Person

## XX.   Notices

In addition to other available means of giving notice, notices required or permitted under this Agreement (including without limitation notices in connection with any arbitration under Section XVII) may be delivered by personal delivery or by certified U.S. mail, or other reputable overnight delivery service, or facsimile to the address of any authorized location listed in Exhibit 3(a). Notices given by personal delivery shall be deemed given when delivered. Notices given by certified U.S. mail, reputable overnight delivery service, or facsimile shall be deemed given when sent.

## XXI.   Severability

Any provision of this Agreement or portion thereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remainder of the provision or the remaining provisions of this Agreement and without affecting the validity or enforceability of such provision in any other jurisdiction. Any provision herein found to be prohibited or unenforceable in a jurisdiction shall, by agreement of the parties hereto, be replaced for such jurisdiction by a provision that ensures that the economic and/or business objectives of the prohibited or unenforceable provision are preserved insofar as it is possible to do so under the applicable law in such jurisdiction.

## XXII.   Payments on Termination

If Dealer's appointment hereunder is terminated, all indebtedness of Dealer to Company, which does not become due prior to the effective date of the termination will be due and payable as of the effective date of the termination. Company may pay any sums owing to Dealer on termination (including without limitation any sums owing to Dealer for repurchased Goods) or by giving Dealer credit to be applied to any indebtedness then owed by Dealer to Company, regardless of whether such indebtedness is then due and payable.

**XXIII. Survival**

The termination of Dealer's appointment shall not affect any rights or obligations that have accrued hereunder as of the effective date of such termination. Such termination also shall not affect any rights or obligations, except those expressly limited to the period of Dealer's appointment, under Sections III., IV., V., VI.B., VI.C., VII., VIII., IX., X., XI., XII., XIII., XIV., XV., XVI., XVII., XVIII., XX., XXI., XXII., and XXIII. which rights and obligations, except those expressly limited to the period of Dealer's appointment, shall survive termination of Dealer's appointment.

**XXIV.  Entire Agreement**

This Agreement is and shall be deemed to be the complete and final expression of the agreement between the parties as to the subject matters contained herein. This Agreement supersedes all previous dealer agreements and representations between the parties. It is acknowledged and agreed by Dealer and Company that no promise or representation not contained herein (including without limitation Exhibit 5) was an inducement to either party or was relied on by either party in entering into this Agreement. Any prior or contemporaneous promises, agreements, or representations, whether oral, written, or created through custom, usage, or course of dealing, except for those listed on Exhibit 5, are also superseded by this Agreement. Dealer understands that, except as provided in Exhibit 5, no agent or employee of Company has authority to vary or add to the provisions of this Agreement, or to make any representation altering or going beyond the terms of this Agreement.

# Exhibit 1

## Dealer's AOR

Dealer's Area of Responsibility for agricultural equipment shall be as set forth below:

**Bismarck, North Dakota - main store**

| State | County | Large AG | Small AG | Tractors <120 EHP |
|-------|--------|----------|----------|-------------------|
| ND | Burleigh | 100% | 100% | 100% |
| ND | Dunn | 10% | 10% | 10% |
| ND | Mclean | 55% | 55% | 55% |
| ND | Mercer | 100% | 100% | 100% |
| ND | Morton | 70% | 70% | 70% |
| ND | Oliver | 100% | 100% | 100% |
| ND | Sheridan | 25% | 25% | 25% |
| ND | Sioux | 35% | 35% | 35% |

_Csti Offut_
Dealer Signature

Christi Offutt
Print Name

CEO
Title (Authorized Officer, Owner, or Partner)

5/20/16
Date

_Arw Weck_
Company Signature

Andrew Week
Printed Name

5/23/16
Date

Exhibits/1

# Exhibit 2

## A. Agricultural Equipment

Dealer is authorized to order and sell the equipment checked below*:

| | | | | |
|---|---|---|---|---|
| **X** | **(A1) Commercial AG** (includes equipment in A2, A3, A4, & A5) | **X** | **(A6) Sprayers and High Capacity Nutrient Application Equipment** (Requires Exhibit 7) |
| ☐ | **(A2) 6 Family Tractors** | ☐ | **(A7) Commercial Scrapers** (Requires Exhibit 8) |
| ☐ | **(A3) 5 Family Tractors** | ☐ | **(A8) Commercial Scraper Tractors** (Requires Exhibit 8) |
| ☐ | **(A4) Pull-type Hay & Forage** | ☐ | **(A9) Self-Propelled Forage Harvesters** (requires Exhibit 6) |
| ☐ | **(A5) Cutters & Loaders** | | |

## B. Turf & Utility Equipment

Dealer is authorized to order and sell the equipment checked below*:

**X** (LW) **Lawn and Garden Products**

**X** (LV) **Commercial Mowing Products**
(includes Compact Utility and 5 Family Tractors)

☐ (LC) **Commercial Vehicles**

\* Specific definitions of product categories are published in the T Pages of the Agricultural and Turf Incentive Manual and may be amended at any time.

Products checked on this Exhibit may be added or deleted from time to time as agreed to by Company and Dealer.

Company may cease manufacturing and distributing any product category in its sole discretion.

_Cste Offut_
Dealer Signature

_Christie Offutt_
Print Name

_CEO_
Title (Authorized Officer, Owner, or Partner)

_5/20/16_
Date

_Andrew Week_
Company Signature

_Andrew Week_
Printed Name

_5/23/16_
Date

Exhibits/2

# Exhibit 3

## Sales and Service Centers and Other Authorized Locations

### 1.  Building

Dealer owns or leases or will arrange to own or lease, if this Agreement is approved by Company, buildings located at the locations provided under Exhibit 3(a). If Dealer is not already occupying such building(s), it will, once this Agreement is approved, arrange to enter into occupancy and be ready to commence business from the building(s), on or before the effective date of this Agreement.

### 2.  Sales and Service Center Appointment

When Dealer occupies and is ready to commence business from the building(s) at the locations described in Exhibit 3(a), Company will recognize such locations as Authorized John Deere Agricultural Sales and Service Centers with authority to store, sell and service Goods. Any prior Sales and Service Center Agreement for such location(s) is superseded hereby as of the date this Agreement is executed by Company.  If Dealer's appointment as an Authorized Dealer is terminated, then the authorization of the location(s) in Exhibit 3(a) as Sales and Service Center(s) shall automatically terminate concurrently therewith.  In any other case:

(a) Company may terminate the authorization of any Sales and Service Center location upon one hundred and eighty (180) days written notice to Dealer, and

(b) Dealer may not discontinue operation of any Sales and Service Center location unless Dealer has requested and received written permission from Company and has provided at least ninety (90) days written notice to Company.

### 3.  Name

The business of all Sales and Service Center locations will be conducted as a d/b/a or under the firm, trading or corporate name which Dealer uses in its authorized dealership, and this name shall be displayed in a form or manner approved by Company.  If a Sales and Service Center authorization is terminated, Dealer will not use the words "Deere", "John Deere" or "John Deere Sales and Service Center" in connection with any business conducted by Dealer from such location.

### 4. Relation to Authorized Dealership

The primary function of a Sales and Service Center is to enable Dealer to more effectively serve its AOR.

Company's published Conditions of Sale in effect when Dealer's orders are placed shall govern all purchases from Company for a Sales and Service Center.  Sales and Service Center locations shall be part of the authorized dealership and be governed by the terms of this Agreement.   Any Security Agreement or Chattel Mortgage between Dealer and Company applies to all Goods (as defined therein) located at Sales and Service Center locations as well as to Goods located at Dealer's principal location or elsewhere.

# Exhibit 3(a)

## Authorized Location(s)

**AG/Turf & Utility Combination Dealer**
**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
2000 Industrial Drive
Bismarck, North Dakota  58502

**AG/Turf & Utility Sales and Service Centers**
**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
5625 Highway 200 West
Hazen, North Dakota  58545

**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
1101 County Road 22
Washburn, North Dakota   58577


**See Exhibit 6 regarding dealerships below**

**AG/Turf & Utility Combination Dealer**
**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
4935 6th Avenue SE
Aberdeen, South Dakota  57401

**AG/Turf & Utility Sales and Service Centers**
**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
17440 Hwy 281 South
Redfield, South Dakota   57469

**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
901 West Highway 12
Webster, South Dakota   57274

**AG/Turf & Utility Combination Dealer**
**RDO Agriculture Equipment Co.**
**dba  RDO Equipment Co.**
1540 Deadwood Avenue
Rapid City, South Dakota  57702

_Csti Ofut_
Dealer Signature

_Christi Offutt_
Print Name

_CEO_
Title (Authorized Officer, Owner, or Partner)

_5/20/16_
Date

_AW W6_
Company Signature

_Audrew Week_
Printed Name

_5/23/16_
Date

Exhibits/3a

## Exhibit 4

## Dispute Resolution

1.  If the parties to a Dispute agree within thirty days from the submission of the notice of arbitration, the Dispute will be submitted to non-binding mediation.

2.  If the parties to a Dispute do not agree to mediation of the Dispute, or if mediation does not resolve the Dispute, the Dispute shall be finally resolved by binding arbitration in accordance with the arbitration rules of the American Arbitration Association, as amended by this Exhibit.  The party seeking arbitration shall submit a written notice of arbitration to the other party and to the American Arbitration Association.  The arbitration shall be held at such location as required by applicable law or, if no location is required by applicable law, such other city as the parties to the Dispute may agree in writing, in the event parties do not agree on a location then the arbitration shall be held in the state capital of the state in which the Dealer is located, if the Dealer has locations in more than one state then the arbitration shall be held in the most populous state capital.  The arbitration shall be held before a panel of three arbitrators however, if the amount of damages claimed in the arbitration is less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) then the arbitration shall be held before one arbitrator.  If the relief sought by the party initiating the arbitration is equitable in nature, such as but not limited to injunctive relief, the arbitration shall be held before a panel of three arbitrators.  Each arbitrator shall be affiliated with the American Arbitration Association and be part of the pool of arbitrators selected by the American Arbitration Association as available to arbitrate Disputes.  Each arbitrator in the pool shall:

    a)  be a current or former practicing attorney or former judge;

    b)  have at least ten years' experience in litigation, arbitration, and/or mediation of commercial disputes;

    c)  have prior experience as an arbitrator of at least three manufacturer/dealer or franchisor/franchisee disputes.

    The arbitration panel shall consist of three arbitrators. A decision and award joined by at least two members of the arbitration panel shall constitute the award and shall be binding on the parties. The arbitration panel shall provide written reasons for their decision and award, which shall be final and binding and may be entered by any court having jurisdiction thereof.

3.  Except as provided herein, any action or decision joined by two arbitrators from the arbitration panel shall constitute the action of the arbitration panel. The arbitration panel may consider and grant dispositive motions, including without limitation motions to dismiss or for summary judgment. In order to prevent irreparable harm, the arbitration panel may consider and grant requests for temporary or permanent injunctive relief or other equitable relief.

4. Each party shall bear its costs associated with the arbitration, including its attorneys' fees, and the parties shall share equally the fees and expenses of the American Arbitration Association and the arbitrators, provided, however, that if court proceedings to stay litigation, compel arbitration, or enforce the award are necessary, the party who unsuccessfully opposes such proceedings shall pay all associated costs, expenses, and attorneys' fees that are reasonably incurred by the other party. Determination of the reasonableness of such costs and expenses shall be submitted to a separate arbitration proceeding.

5. The Chairperson of the arbitration panel shall decide all matters relating to discovery as well as all procedural or non-dispositive matters that shall come before the arbitration panel. Subject to privileges recognized under applicable law (for example, but not limited to, attorney-client privilege), the Chairperson shall require such discovery as is necessary for the parties to be adequately prepared for the arbitration. Discovery may include the exchange of documents, depositions, interrogatories, and the exchange of exhibits, expert reports, and witness lists.

6. The parties, witnesses, and arbitrators shall not disclose the contents or results of the arbitration without the prior written consent of all parties to the Dispute, except to the extent necessary to enforce the award or as necessary for financial and tax reporting purposes.

7. Notwithstanding anything to the contrary in this Exhibit 4 or Section XVIII., in the event of an alleged violation of a party's intellectual property rights, that party may seek temporary injunctive relief from any court of competent jurisdiction pending appointment of the arbitration panel. The party requesting such relief shall also promptly file a notice of arbitration and a request that the arbitration panel provide temporary relief. Such actions shall not constitute a waiver of the party's rights or a breach of the party's obligations under this Exhibit 4 and Section XVIII. Any temporary injunctive relief entered by a court shall continue in effect only until the arbitration panel has issued a decision on temporary relief.

8. Notwithstanding anything to the contrary in this Exhibit 4 or Section XVIII., Company and Deere Credit, Inc. may seek judicial remedies, such as (but not limited to) attachment, replevin, and garnishment, deemed necessary by Company or Deere Credit Services, Inc. in its sole discretion for the enforcement of Company's or Deere Credit Services, Inc.'s rights regarding any security for indebtedness of Dealer, and such action by Company or Deere Credit Services, Inc. shall not constitute a waiver of Company's or Deere Credit Services, Inc.'s rights or a breach of Company's or Deere Credit Services, Inc.'s obligations under this Exhibit 4 and Section XVIII.

# Exhibit 5

## Promises and Representations

Dealer and Company agree that the following are the only promises, agreements, or representations, oral, written, or created through custom, usage, or course of dealing, not contained elsewhere in this Agreement and that were an inducement to or relied upon by any party hereto in entering into this Agreement or that were made prior to or contemporaneous with this Agreement and are not superseded by this Agreement:

1. If after the date (the Acceptance Date) on which Company executes Dealer Agreement to which this Exhibit 5 is appended (the Agreement), Company revises its U.S. John Deere Agricultural Dealer Agreement form and uses the form as revised for the appointment of new U.S. authorized dealers generally (or in re-contracting with existing U.S. Dealers generally), Company will make and Dealer will accept, the same revision to the Agreement so long as the revision in question is not inconsistent with any other agreement which Company may hereafter enter into with Dealer but not with authorized dealers generally.

2. Dealer shall provide as applicable:

   • Dealer owns and operates John Deere Dealer locations in South Dakota with its Principal office located in Fargo, North Dakota. Dealer and Company agree that their relationship, including but not limited to this Agreement, and the South Dakota locations shall be construed in accordance with the substantive laws of the State of North Dakota without regard to North Dakota's conflict of law rules.

3. Dealer shall request and obtain written approval from Company prior to discussing (directly or indirectly) with any dealer a possible purchase of a dealership that would add to Dealer's AOR or constitute a new area of responsibility for Dealer. Company, in its sole discretion, shall have the right to reject such a request, to disapprove additions to Dealer's AOR, and to refuse assignment of a new area of responsibility to Dealer.

_____
Dealer Signature

Christi Offutt
Print Name

CEO
Title (Authorized Officer, Owner, or Partner)

5/20/16
Date

_____
Company Signature

Andrew Week
Printed Name

5/23/16
Date

Exhibits/5.

**Exhibit 7**

# Application Support Dealer
# (ASD) Agreement
### RDO Agriculture Equipment Co.
### dba RDO Equipment Co.
### Bismarck, North Dakota

The following Application Support Dealer (ASD) Agreement (ASD Agreement) defines the working relationship agreed upon by the Dealer and Company.  If Dealer fails to meet the stated requirements or violates this ASD Agreement or the John Deere Agricultural Dealer Agreement (Agreement), the Company reserves the right to terminate this ASD Agreement.

This ASD Agreement authorizes Dealer to sell sprayers and high capacity nutrient application equipment, attachments, parts and services to Ag producers, Ag Service Providers (ASPs) and Commercial Applicators.  Dealer is authorized to use eligible CBD discounts and programs only for ASPs and Commercial Applicators that are not considered exclusive for CAD's use.

1. Commercial Applicators are defined as customers who:

   a.   Buy application chemicals wholesale and apply for customers;
   b.   Sell chemicals retail and provide application services for customers;
   c.   Have unique business entity for chemical application;
   d.   Possess a commercial applicator license; and
   e.   Possess commercial applicator insurance.

2. ASD Requirements

   Dealer shall meet the following requirements:

   a.  Develop and maintain an Ag AOR marketing plan to serve producers within the ASD's Ag AOR with the full line of John Deere application equipment, attachments, parts and services.  Dealer's plan should include demonstration objectives, sales and market share goals, used equipment remarketing, commercial customer identification, attachments, parts and service sales, precision ag and customer support initiatives.  Dealer shall submit the plan to a responsible field team representative for approval if requested.

   b.  Focus sales and marketing efforts on all John Deere application equipment and application parts and attachments.

   c.  Maintain a list of targeted ASPs and Commercial Applicators that reside in their Ag AOR.

   d.  Achieve and maintain all applicable program and product eligibility requirements as determined and communicated by Company from time to time.

Exhibit/7

e.  Develop and offer John Deere Precision Ag solutions in collaboration with customer's third party enablers.

f.  Meet the following personnel commitments:

1.  Adequate number of full-time application sales professionals consistent with market potential;

2.  Adequate number of dedicated application service specialists, consistent with market potential;

3.  Adequate number of trained application focused parts professionals, consistent with market potential; and

4.  On-Staff Certified Crop Advisor/Agronomist working with producers and ASPs to ensure dealership is proficient in Customer Third Party Enablement & Agronomic Implementation.

g.  Product & Customer Support requirements

1.  Dealer shall develop and implement application product support plan. Dealer shall submit the plan to responsible Territory Customer Support Manager for approval if requested;

2.  Dealer shall maintain sufficient stock of parts inventory to achieve a "first pass fill" rate of 80% or more for application equipment sold;

3.  Dealer shall ensure 100% completion of expired mandatory and safety PIPs for application equipment sold to producers and Commercial Applicators;

4.  Dealer shall provide mobile and technology enabled remote service capabilities (w/Service ADVISOR™);

5.  Dealer's customer support plan shall include providing customers with access to loaner equipment;

6.  Dealer shall be authorized to establish a unique shop labor rate for application products. Company agrees to pay warranty to the Dealer at the published application shop labor rate; and

7.  Dealer shall be responsible for providing or ensuring product support is provided for all producers, ASPs and commercial applicators that ASD sells to. ASD should coordinate as needed with CAD and other ASDs to meet customer service requirements.

h.  Complete Goods requirements

1.  Dealer shall maintain a demonstration fleet consistent with Ag AOR's market potential and approved by Dealer's responsible Division Sales Manager; and

2.  Dealer shall conduct an annual application clinic for their customer that provides machine optimization and safety information.

**Exhibit/7**

3. Company reserves the right to audit the ASD for fulfillment of all requirements.
   - In the event of failure to meet the requirements set-forth in this ASD Agreement, Company reserves the right to withhold access to discounts, incentive programs and payments until the failure is corrected.
   - If Dealer repeatedly fails to meet the ASD Agreement requirements, Company reserves the right to terminate this ASD Agreement.

4. If after the date on which Company executes the Agreement to which this Exhibit 7 is appended, Company revises its Agreement form and uses the revised form for the appointment of new U.S. authorized dealers generally (or in re-contracting with existing U.S. dealers generally), Company will make and Dealer will accept, the same revision to the Agreement so long as the revision in question is not inconsistent with any other agreement which Company may hereafter enter into with Dealer but not with authorized dealers generally.


_____
Dealer Signature

Christi Offutt
Print Name

CEO
Title (Authorized Officer, Owner, or Partner)

5/20/16
Date


_____
Company Signature

Andrew Week
Printed Name

5/23/16
Date


Exhibit/7