IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Association of Equipment Manufacturers, AGCO Corporation, CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation | ) ) ) ) ) ) | Case No. 1:17-cv-151 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| The Hon. Doug Burgman, Governor Of the State of North Dakota, in his Official Capacity, and The Hon. Wayne Stenehjem, Attorney General of the State of North Dakota, in his Official Capacity | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| North Dakota Implement Dealers Association | ) ) ) ) | |
| <u>Movant for Intervention.</u> | ) | |

### DECLARATION OF MATTHEW LARSGAARD

I, Matthew Larsgaard, declare under the penalty of perjury as follows:

1. I am the President and CEO of the North Dakota Implement Dealers Association ("NDIDA"). I have held that role since July 1, 2010.
2. NDIDA has 115 farm equipment dealer members. Dealer members include both major line and shortline farm equipment dealers.
3. NDIDA members employ approximately 3,600 North Dakota residents.
4. NDIDA's purpose is to promote the general welfare of its dealer members by providing a timely source of industry information, representing dealer interests in government regulation and legislation, enhancing dealer and employee education, and supporting equitable dealer and manufacturer relations.
5. NDIDA and its members supported SB 2289 and presented testimony in support of the bill.

```
AO386-B
DEFENDANT'S
EXHIBIT

CASE NO. 1:17-cv-151

EXHIBIT NO. 4
```

6. Numerous other North Dakota agricultural and ranching organizations formally supported SB 2289, including the North Dakota Farm Bureau, the North Dakota Farmers Union, the North Dakota Agricultural Association, the North Dakota Stockmen's Association, and the North Dakota Grain Growers Association. These organizations represent most of North Dakota's Ag sectors including farmers, ranchers, chemical applicators and distributors, co-operatives, fertilizer applicators and distributors, agronomists, seed distributors, and other agribusinesses.
7. Some farm equipment manufacturers (other than Plaintiffs) also supported the bill in its entirety or certain provisions within the bill.
8. SB 2289 benefits North Dakota consumers, the overall North Dakota economy and addresses certain oppressive manufacturer practices that have harmed North Dakota businesses.
9. Legislators heard testimony in support of the bill from North Dakota farmers, the North Dakota Farm Bureau, the North Dakota Farmers Union, the North Dakota Agricultural Association, existing farm equipment dealers, and a former farm equipment dealer that had his dealership terminated based upon a sales performance measurement. The testimony clearly spelled out how SB 2289 benefits the North Dakota economy as a whole and protects against oppressive practices that occurred within North Dakota.
10. The North Dakota Legislature was diligent and thorough in their review of SB 2289. There were exactly five public hearings that were held over the course of five separate days. In total, there was approximately 6 ½ cumulative hours of testimony and debate that was received from both the proponents and opponents of SB 2289. Between both the House and Senate Committee hearings, legislators presented numerous questions to both the proponents and opponents of SB 2289. I was present at every committee hearing in which SB 2289 was discussed. The testimony clearly demonstrated the need for the bill and the Legislative findings clearly evidence the broad benefits of the legislation to the public interest and the need to address oppressive and abusive manufacturer practices. The bill passed the Senate 46-0 and passed the House 86-5.
11. For example, the Senate Agriculture Committee heard testimony from a farm equipment dealer about the need to address the reimbursement amounts that farm equipment manufacturers pay farm equipment dealers. A farm equipment dealer is obligated to perform warranty service (parts and labor) on a piece of equipment that is under warranty regardless of whether the dealer sold the equipment. The dealer does not control the frequency of the repairs, and the manufacturer does not allow the dealer to charge the customer for the repair. Instead, the manufacturer reimburses the dealer for the warranty service provided. However, the reimbursement amounts are dictated by the manufacturer and often represent a substantially lower rate than the dealer charges customers for similar, non-warranty service. The net result is similar to an unfunded mandate. As a result, the manufacturers require the dealer to subsidize the warranty service, and the cost for doing so is typically passed on to the non-warranty customer as a matter of necessity. This creates inequity among North Dakota consumers and essentially discriminates against those who cannot afford the manufacturers' new equipment. The practice can also result in higher costs and lower quality service. Warranty reimbursement at retail

removes the manufacturer imposed subsidy and gives the dealer the ability to provide additional, higher quality, and more equitable services to all consumers.

12. A dealer, Marc Taylor, presented the following written testimony to the House Agriculture Committee about the issue: "Compounding the warranty compensation issue is the requirement by manufacturers that "Dealer shall provide Warranty Service for any Product, regardless of whether the Dealer sold that specific Product." So, when the dealer is, by contract, required to repair equipment the dealership did not sell, we have not figured out how to recover our expenses…we end up losing money." 3/9/17

13. During the Senate Agriculture Committee hearing Pete Hanebutt, ND Farm Bureau, testified "We are very supportive of this bill. We have worked with Mr. Larsgaard [NDIDA] along the way with this bill and we are obviously very happy to support the dealers that are the backbone of many small communities in North Dakota." 2/3/17 1:19:04

14. Donna Henderson, a farmer from rural North Dakota, testified to the Senate Agriculture Committee about the benefits of SB 2289 to North Dakota farmers and the economy. Ms. Henderson testified that their local dealership was terminated because "they were not selling enough new equipment." She further stated "They had the best repair shop, they would go out to the field promptly, many evenings, many Sundays, many weekends, they were out helping the farmer especially harvest time and seeding to get him going…" She further stated "I am fearful for the little dealership that we have that is 30 miles from us…that is our service when we have trouble with our tractor. We are not buying new, we are repairing the old stuff, they come out real quick and get us going, that means a lot when you are harvesting and seeding, you can't wait." She concluded with "If you can pass this bill, it really will help rural America." 2/3/17 1:23:40

15. Richard Schlosser, ND Farmers Union, presented the following written testimony to the Senate Agriculture Committee "SB 2289 establishes protections for equipment dealers that ultimately ensures farmers continue to receive a level of service that they need in order to be successful. Equipment orders mandated by manufacturers only serves to consolidate [close] dealerships in the state, resulting in more miles and longer travel time between producers and the parts and equipment they need." 2/3/17

16. During the House Agriculture Committee hearing, Representative Dwight Keifert explained to his fellow committee members the need to maintain a healthy dealer network to keep Agriculture producers functioning properly, which benefits the state's economy. He stated "[o]ne thing, being a farmer on the committee, to help the committee understand how important these dealers are to us, is that there was a time when a hammer would fix a lot of things on the farm and it is not that way anymore. Things are so automated that the last time the guy [dealer] came out to my farm to fix my combine, he sat in the chair with a laptop, pushed some buttons on the console, didn't change any parts, and that's all it needed. We are not capable of doing that anymore, we are so dependent on these guys [dealers] to come out and if we can't get up and running again it could cost us thousands of dollars a day." 3/9/17 51:46

17. SB 2289 also addresses abusive equipment manufacturer practices that have occurred in North Dakota. For example, in the last five years, at least two of the three major farm

equipment manufacturers have terminated or placed immense pressure on dealers by threatening to terminate dealerships based upon the dealers' inability to meet the manufacturers' unreasonably imposed market share obligations. Termination not only harms the dealer and its employees, but it can leave the North Dakota residents without representation in that territory. In one specific termination case, the farmers, ranchers, and other citizens are now forced to travel an additional 44 miles to the next nearest dealership to obtain warranty service. This can be extremely challenging for farmers and ranchers during the critical harvest season as the timely harvest of crops is critical to the economic sustainability of North Dakota's farm families and rural communities.

18. Travis Zablotney, a former manager for a major manufacturer and also a terminated dealer who owned Magic City Implement, testified to the House Agriculture Committee: "If you look at the map that you have you will notice that in the central part of the state there is no longer a dealership by the name of Magic City Implement. I would be the dealer that I believe Matthew was referring to when he talked about being terminated for market share...[for] what I considered a very unreasonable standard." He further stated "A couple of years ago, they had been putting the pressure on us for quite some time using the standard of market share to terminate us." He further stated "Over time, as you have all witnessed, there are fewer and fewer dealer owners, not to mention locations...and that has been their [manufacturers'] agenda for a long, long time.....[it] increases their leverage on the owners." He further stated "What happens in these situations [dealer agreement terminations] is the farmer absolutely loses...there is just no question." 3/9/17 37:14

19. Mr. Zablotney also explained to legislators a scenario where it was impossible to meet market share goals forced upon them by the manufacturer. He further stated "Many of the other protections....in this bill...are things that are necessary to keep the manufacturer from placing undue hardship and pressure on a dealership because if they can't get you out, and they want you out, for reasons of market share they will find other ways whether its through discounts....forcing you to take on product that you didn't want... ." Travis goes on to explain the manufacturers would maintain onerous market share expectations even for products that wouldn't sell due to the product not being relevant to their market or the product was inferior to a competing product. 3/9/17 44:05

20. Other examples of abusive manufacturer policies in North Dakota include requiring dealers to sign contracts that would force dealers to purchase a certain level of inventory regardless of whether the market supports carrying that inventory. The manufacturers may misjudge market demand, produce too much of a certain amount of equipment, and then force the dealers to purchase it through contract requirements. The equipment is extremely expensive and has significant carrying costs. For example, one new tractor can retail for as much as $659,979.

21. The decision to purchase equipment may not be made by the dealers or by the marketplace, but instead can be forced upon dealers by the manufacturers through contract language. For example, the CaseIH contract states the "Dealer shall order....and prominently display, at all Dealer Locations....new equipment.....at the level deemed necessary by Case IH to meet dealer's equipment sales obligations... ." Case IH, through

its contract, has afforded itself the ability to force dealers to purchase any amount of equipment that the manufacturer arbitrarily determines to send them. These abusive policies harm not only the dealer, but the North Dakota economy as a whole as it can severely cripple a key component of the vital agricultural sector.

22. In many cases, a main line manufacturer may not produce a particular line of product that has demand in a given region or they may have a significantly inferior product relative to their competitors. As such, in an effort to fulfill farmers' needs, dealers often must establish relationships with other manufacturers in an attempt to fill product gaps and fulfill farmers' expectations. Dealers may expend a substantial amount of time, treasure, and talent in an effort to develop a market for any given non-main line product. Under North Dakota law, it is currently illegal for a manufacturer to prohibit a dealer from purchasing farm equipment that was made by another manufacturer. However, we are seeing some manufacturers include provisions in their contracts that would require dealers to separate both their personnel and facilities in such a manner "as is satisfactory to the manufacturer." Dealers need the ability to choose, display, and offer for sale the products and equipment that North Dakota farmers and ranchers demand.

23. Pre-SB 2289 ND state law *(57-07-01.1)* prohibits a manufacturer from terminating a dealership contract except for "good cause." Good cause is defined as the "failure by the retailer to substantially comply with those essential and reasonable requirements imposed by the contract ... ." In today's economy, most dealers operate multiple stores in an effort to try to turn a profit. Typically, multiple stores or branch locations are operated under one dealership contract. We have seen another new contract provision that would allow the manufacturer to terminate a branch location, with limited exceptions, "for ANY breach by the dealer" of the contract. This provision is particularly troubling because it appears to allow the manufacturer to change the intent of North Dakota's termination for "good cause" statute, which apply to contracts, not single locations. Thus, a manufacturer could terminate a branch location and not be in violation of the law. In our rural state, the loss of a branch location would be harmful to not only the dealer but, the farmers that count on that location for prompt service; especially during harvest. SB 2289 helps to alleviate this potentially devastating policy.

24. Additionally, some manufacturers utilize their extreme advantage in bargaining power and force dealers to sign new contracts that have terribly onerous provisions and that have a high probability of harming dealers. These "contracts of adhesion" are not negotiable, they are a take-it or leave-it arrangement under which the dealer has no choice but to sign the agreement or be terminated.

25. A dealer, Marc Taylor, presented the following testimony to the Senate Ag Committee about such provisions: "Several contracts have a clause that states if a dealer has not "executed," which means signed and returned, [a new contract] within a time specified in the governing contact, usually 90 days, it is "good cause" for termination." He further testified "Recently, some manufacturers have presented new contracts, some with little regard for the disastrous effect the contract can have on a dealer. Because dealers have resisted signing the new contract, those manufacturers have published programs that state the dealer has until a given date to sign the contract or lose certain incentives, such as

volume bonuses. Some years, in fact I would say a lot of years, the volume bonus is the difference between being profitable and unprofitable." 2/03/17 36:12, 35:21

26. The testimony regarding the legitimate benefits of SB 2289 was not limited to the farmers and dealers that testified in support. Numerous Legislators directly addressed those same issues in committee hearings. During the Senate Agriculture Committee hearing and following more than 1 ½ hours of testimony from both the proponents of SB 2289 and the [AEM] plaintiff's lobbyist, the Assistant Senate Majority Leader, and Agriculture Committee member, Jerry Klein concluded that the manufacturers have engaged in unfair business practices and/or established unfair business policies and that the State needed to protect its interests and enhance the dealer protections as they existed at that time. Senator Klein stated "There is good cause, it seems to me, that we update the [dealer] laws that we currently have." Later in the debate, he further stated "When I hear some of the discussion here, there are folks who feel they have been wronged and I sense that they have been." He later stated "What I am suggesting is we are looking for a reasonable solution to what I hear is a grievance out there." 2/9/17 1:35:20, 1:48:44, 1:49:23

27. Representative Skroch, during the House Agriculture Committee hearing, stated to one of the manufacturers' lobbyists "The dealers have designed this bill to address issues that have been unresolved and if there had been an answer to those contract concerns we wouldn't be here...." 3/9/17 1:17:18

28. Representative Kiefert, during the House Agriculture Committee hearing, stated to one of the manufacturers' lobbyists "We are getting emails faster than we can delete them from dealers asking us to do something, they are in trouble. They are saying they can't afford to stock the equipment, they are getting burned on the warranty work, and they are crying out for help for us to do something. The question is, what is John Deere offering to do for them when things have gone South now so they don't have to stock all of this new equipment that they do not have a prayer to sell?" 3/9/17 1:19:40

29. Manufacturer personnel, including a representative of John Deere, readily admitted that the issues presented to the Legislature represented a "heavy handed" approach and were "shocking". During the House Agriculture Committee hearing, Representative Headland heard testimony about dealers being presented with take it or leave contracts that put their business at risk and contained onerous terms. Representative Headland put the question to Tom Iles of John Deere: "Tom, I had asked Levi [AEM Lobbyist] a question about the contracts having mutual agreement and some of the commentary that we had heard prior to that where there seems to be a heavy-handed approach by the manufacturer indicating...you're going to sign the contract by such a date or we're going to hold back your volume [sales] bonuses...can you just address that portion for me?" Tom Iles, John Deere, responded "I had heard that this morning too, and <u>to me that came across as really...pretty heavy-handed, in regard to that manufacturer, and basically, that's almost a shotgun approach......that was kind of shocking to me</u> this morning, but I don't believe a company like John Deere would do that. I would hope that they wouldn't." 3/9/17(2) 35:46

30. SB 2289 builds on existing protections for North Dakota farm equipment dealers and also adds other protections that other states have enacted; most of which have been in place

for years for North Dakota motor vehicle dealerships to benefit North Dakota's economy, in particular the farming, ranching, shortline farm equipment manufacturing, and the farm equipment retail businesses and also addresses oppressive equipment manufacturer practices and policies.

Executed on this 10th day of October, 2017.

*Matthew C. Larsgaard*
Matthew Larsgaard

STATE OF NORTH DAKOTA/COUNTY OF CASS

Subscribed and sworn to before me, the undersigned officer, this 10th day of October, 2017.

*Susan Olerud Boreen*
Notary Public

> SUSAN OLERUD BOREEN
> Notary Public
> State of North Dakota
> My Commission Expires Aug. 8, 2019