# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

ASSOCIATION OF EQUIPMENT
MANUFACTURERS,
AGCO CORPORATION,
CNH INDUSTRIAL AMERICA LLC,
DEERE & COMPANY and
KUBOTA TRACTOR CORPORATION,
     Plaintiffs,        Case No. 1:17-cv-00151-CSM
v.
THE HON. DOUG BURGUM, Governor
of the State of North Dakota,
in his Official Capacity,
-and-
THE HON. WAYNE STENEHJEM,
Attorney General of the State
of North Dakota, in his Official
Capacity,

     Defendants,

-and-

NORTH DAKOTA IMPLEMENT
DEALERS
ASSOCIATION,

     Intervenor.
-------------------------------------------------------

AUDIOVISUAL DEPOSITION OF
MATTHEW LARSGAARD
TAKEN ON BEHALF OF PLAINTIFFS
March 8, 2018
* * *

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF NORTH DAKOTA
 3
    ASSOCIATION OF EQUIPMENT
 4  MANUFACTURERS,
    AGCO CORPORATION,
 5  CNH INDUSTRIAL AMERICA LLC,
    DEERE & COMPANY, and
 6  KUBOTA TRACTOR CORPORATION,
 7       Plaintiffs,         Case No. 1:17-cv-00151-CSM
 8  v.
 9  THE HON. DOUG BURGUM, Governor
    of the State of North Dakota,
10  in his Official Capacity,
11  -and-
12  THE HON. WAYNE STENEHJEM,
    Attorney General of the State
13  of North Dakota, in his Official
    Capacity,
14
         Defendants,
15
    -and-
16
    NORTH DAKOTA IMPLEMENT
17  DEALERS
    ASSOCIATION,
18
         Intervenor.
19  ------------------------------------------------------
20       DEPOSITION OF MATTHEW LARSGAARD, produced,
21  sworn and examined on March 8, 2018, commencing at
22  9:44 a.m. and concluding at 4:27 p.m., at Doug
23  Ketcham & Associates, 51 Broadway, Suite 130,
24  Fargo, North Dakota 58102, before Shawn Weber,
25  Court Reporter and Notary Public.
```

2

```
 1                        APPEARANCES

 2

 3   ON BEHALF OF PLAINTIFFS

 4        Timothy Q. Purdon

 5        ROBINS KAPLAN LLP

 6        1207 West Divide Avenue, Suite 200

 7        Bismarck, ND 58503

 8        612.349.8767

 9        tpurdon@robinskaplan.com

10

11   ON BEHALF OF DEFENDANTS

12        Matthew A. Sagsveen (Via Telephone)

13        James E. Nicolai (Via Telephone)

14        OFFICE OF THE ATTORNEY GENERAL

15        500 North Ninth Street

16        Bismarck, ND 58501-4509

17        701.328.3640

18        msagsve@nd.gov

19        jnicolai@nd.gov

20

21

22                           *   *   *

23

24

25
```

3

```
 1                   APPEARANCES (CONTINUING)

 2

 3   ON BEHALF OF INTERVENOR

 4        Jason T. Allen

 5        BASS SOX MERCER

 6        2822 Remington Green Circle

 7        Tallahassee, FL 32308

 8        850.878.6404

 9        jallen@dealerlawyer.com

10

11

12                              *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                  INDEX OF EXAMINATIONS

 2

 3   By Mr. Purdon                             8

 4   By Mr. Allen                            298

 5                      * * *

 6

 7                 INDEX OF EXHIBITS

 8          (Larsgaard Exhibits 1 - 16 Marked)

 9      #           DESCRIPTION            MARKED

10   Exhibit 1     NDIDA Staff                 22

11   Exhibit 2     ADAND Staff                 37

12   Exhibit 3     ASI Business Solutions Staff    41

13   Exhibit 4     2017 Senate Agriculture SB 2289   72

14   Exhibit 5     EDA 000912 - 000915         84

15   Exhibit 6     EDA 000922 - 000923         91

16   Exhibit 7     LJF000731 - 000733         109

17   Exhibit 8     NDIDA-PAC Campaign Finance  129

18   Exhibit 9     Exhibit D - SB 2289        142

19   Exhibit 10    EDA 000948 - 000960        151

20   Exhibit 11    EDA 000034 - 000039        176

21   Exhibit 12    Exhibit D - SB 2289        178

22   Exhibit 13    EDA 000342                 200

23   Exhibit 14    Responses to First Requests 225

24   Exhibit 15    NDIDA0001 - 0009           232

25   Exhibit 16    Rule 26 Initial Disclosures 246
```

5

```
 1                    FARGO, NORTH DAKOTA

 2                       9:44 A.M

 3                        * * *

 4           THE VIDEOGRAPHER:  We are going on the

 5      record.

 6           The time is 9:44 a.m.  The date is

 7      March 8, 2018.

 8           This is the videotaped deposition of

 9      Matthew Larsgaard in the matter of

10      Association of Equipment Manufacturers,

11      et al. versus the Hon. Doug Bergum and the

12      Hon. Wayne Stenehjem in the U.S. District

13      Court for the District of North Dakota,

14      Case Number 1:17-cv-00151-CSM.

15           This deposition is being held at the

16      offices of Doug Ketcham & Associates

17      located at 51 Broadway, Suite 130, Fargo,

18      North Dakota.

19           My name is Nolan Wileman from

20      Sound Deposition Services with offices

21      located at 400 Ocean Gate Plaza, Suite 400,

22      Long Beach, California.  The court reporter

23      is Shawn Weber.

24           Counsel, would you please introduce

25      yourselves and who you represent?
```

6

1          MR. PURDON:  This is Tim Purdon,

2     Robins & Kap -- Robins Kaplan, representing

3     the plaintiffs in this matter.

4          MR. ALLEN:  Jason Allen, Bass Sox

5     Mercer, on behalf of the defendant

6     intervenor.

7          MR. PURDON:  Matt?

8          MR. SAGSVEEN:  Matt Sagsveen on behalf

9     of State of North Dakota and the

10     aforementioned defendants.

11          THE VIDEOGRAPHER:  Would the court

12     reporter please swear in the witness?

13                    * * *

14          MATTHEW LARSGAARD, having been first

15     duly sworn and responding "yes," was

16     examined and testified as follows:

17          MR. PURDON:  Good morning,

18     Mr. Larsgaard.  Thank you for being here

19     today.

20          As you know, my name is Tim Purdon.  I

21     represent the -- the tractor manufacturers

22     and AEM in this matter, and we're going to

23     jump into your deposition here this

24     morning.

25

7

1           The law firm that you're talking about, had

2   they represented you before they got involved in the

3   2289 issue?

4       A.   What do you mean "represented me"?

5       Q.   Provided you -- provided NDIDA legal

6   representation.

7       A.   I don't know that they did.

8       Q.   Okay.  How did you get in contact -- I'm not

9   asking what anybody said.  I'm not asking what a

10  lawyer said to you, but how did you get in contact

11  with that law firm -- why did you decide -- scratch

12  that question, ask it this way.

13          You contacted a law firm to assist you.  How

14  did you pick that law firm?

15          MR. ALLEN:  I'm going to object.  This

16          -- and I appreciate you qualifying it with

17          this is tricky.  This is getting very, very

18          close to the edge, and it's also -- you

19          probably saw in the discovery responses

20          that certain responses were objected to

21          under the privilege, too, and specifically

22          the first amendment privilege which allows

23          an association to deliberate and strategize

24          about proposed legislation.

25          So to the extent that this would impede

51

```
 1          on any internal discussions regarding
 2          SB2289, I'm going to ask you not to answer.
 3     BY MR. PURDON:
 4          Q.   That's -- okay.  But -- but if his brother
 5     told him, you should call this lawyer, I don't think
 6     that's privileged under either of the privileges.
 7               So my question is, to the extent not
 8     privileged, how did you choose the lawyer that you
 9     went to, to discuss the drafting of 2289?
10               MR. ALLEN:  And I would just instruct
11          you the same thing.  To the extent that the
12          association's decision was made through
13          discussion, internal discussion about
14          proposed legislation, I'm going to instruct
15          you not to answer.
16               So if you can answer, feel free.
17          Otherwise ...
18               THE DEPONENT:  So having been in the
19          industry since 2006, you become aware of
20          law firms that work in different areas, law
21          firms that have assisted dealers, maybe
22          assisted manufacturers, and so you have a
23          general idea of who's in the industry.
24     BY MR. PURDON:
25          Q.   So based on your knowledge of the industry
```

52

1          THE DEPONENT:  Yeah, so we just covered

2      that like minutes ago, right?  So, yeah,

3      communicated the issues to the law firm

4      after we had identified what some of those

5      dealer concerns were.

6  BY MR. PURDON:

7      Q.   Were there any writings memorizing your

8  concerns?

9      A.   I just don't remember right now how the

10  initial communications were initiated.

11      Q.   Right.  So that's a different question.

12      A.   Okay.

13      Q.   Was there any document that you drafted

14  before you talked to a lawyer that had your first

15  stab at what 2289, what would become 2289?

16          MR. ALLEN:  And again, please note my

17      previous objections to the extent that that

18      document was prepared by the association

19      with respect to proposed legislation, I'm

20      going to instruct you not to answer.  To

21      the extent you can answer, please feel free

22      to try to do so.

23          THE DEPONENT:  Okay.

24          MR. ALLEN:  If such a document exists

25      that he's asking about.

54

```
 1            THE DEPONENT:  I cannot think of -- I
 2        cannot think of any specific document that
 3        I would have sent to the law firm.
 4   BY MR. PURDON:
 5        Q.   Okay.  So I'm going to ask you some
 6   questions, and the answer to all these might be no,
 7   but I'm going to try to jog your memory, because you
 8   seem to be sort of "I can't really remember."  So
 9   maybe this will help.
10        A.   Sure.
11        Q.   Do you recall taking the old dealer statute,
12   printing it off and maybe sitting down with a pencil
13   and changing things?  Did you ever do anything like
14   that, you ever do you anything like that?
15        A.   I am in the dealer statutes from time to
16   time throughout the year, and so as dealers present
17   concerns to me, I review the statutes and visit with
18   them about the statute.  And if it's ever unclear or
19   if there's ever a question that needs an attorney to
20   answer it, since I'm not an attorney, then we engage
21   counsel accordingly.
22        Q.   Can you tell me the name of the law firm you
23   asked to assist you in drafting 2289?
24        A.   I can.
25        Q.   Will you?
```

55

```
 1    their concerns were, they would have shared that

 2    information with you.

 3        A.    Yes, sir.

 4        Q.    And you may have a copy of that?

 5        A.    I may, yeah.  Yeah, I may.

 6        Q.    Okay.  Setting -- and I'm going to talk

 7    before you engaged Mr. Allen's law firm to help with

 8    you 2289, had you discussed proposed language with

 9    anyone who was not an attorney before you -- before

10    that?

11            MR. ALLEN:  Same objection as it

12        relates to internal association

13        communications.  I'm going to instruct you

14        not to answer that.  Otherwise, feel free

15        to answer the question, though.

16            THE DEPONENT:  You know, I talk to a

17        lot of different individuals.  I mean,

18        that's what I do.

19    BY MR. PURDON:

20        Q.    Right.

21        A.    So I can't think of any specific -- could

22    you say the question one more time?

23        Q.    I'm asking about specific language.  Did you

24    show anybody language, did you say hey, get me what

25    you -- send me an e-mail of what you want in the
```

61

1    bill.  I'm talking about any specific discussions of

2    specific language not with a lawyer and prior to

3    engaging Mr. Allen's law firm?

4        A.   You know, as I consider -- I can't remember

5    any specific discussions.

6        Q.   Was specific language ever discussed at any

7    NDIDA board meetings before you retained Mr. Allen?

8            MR. ALLEN:  Same objection.  I'm going

9        to instruct you not to answer on the basis

10       of the first amendment privilege.

11           MR. PURDON:  Well, Jason, let me posit

12       this.  I'd like to establish that there

13       were discussions.  Because if there

14       weren't, then it's a different world,

15       right?

16           MR. ALLEN:  Okay.

17           MR. PURDON:  I'd like to establish

18       there were discussions.  And I think my

19       question was a yes or no one and then I

20       understand what you're saying.

21           MR. ALLEN:  So you're seeking to

22       establish whether discussions occurred, not

23       the substance of the discussions?

24           MR. PURDON:  Exactly.

25           MR. ALLEN:  Okay.

62

```
 1        A.    Yep, so he was the president.

 2        Q.    Yeah.

 3        A.    So did he call me to discuss the details of

 4   the bill after it was introduced?

 5        Q.    Yep.

 6        A.    I don't think Rick did, no.

 7        Q.    Did -- did anybody from EDA call you to

 8   discuss the bill after it was introduced?

 9        A.    I don't remember any specific discussions.

10   Yeah, I don't remember any specific discussions.

11        Q.    Did you -- did you tell your members in --

12   prior to the introduction of the bill, the drafting

13   of the bill in 2017?

14        A.    Uh-huh.

15        Q.    Prior to that point in time did you tell any

16   the members of NDIDA that you were drafting that

17   legislation?

18             MR. ALLEN:  I'm going to instruct you

19        not to answer pursuant to the first

20        amendment privilege as it relates to

21        discussions with your members regarding the

22        introduction of legislation.  To the extent

23        you can provide an answer as to perhaps

24        whether your members were aware, I don't

25        know if that satisfies your question, but
```

76

```
 1          otherwise I'm going to instruct you not to

 2          answer.

 3    BY MR. PURDON:

 4        Q.   Right.  So my question was yes or no, did

 5    you communicate, I want to establish if there were

 6    communications.

 7             So did you communicate to your members

 8    before the bill dropped that there was -- that you

 9    were drafting legislation?  Yes or no question.

10        A.   The members would have voted for

11    legislation.

12        Q.   The members of board or the members of the

13    whole NDIDA?

14        A.   The members would have known, the members of

15    NDIDA.

16        Q.   So -- so you took a vote of your membership

17    on whether or not to introduce legislation?

18        A.   The communication -- let me rephrase that.

19    The communication, I don't remember exactly what that

20    communication would have been, but we would have

21    communicated with membership to identify their

22    concerns, what the issues were.  Also thinking back

23    to that article as well that we'd sent out.  Could

24    you -- tell you what, could you rephrase the question

25    again, Tim?
```

77

1      Q.   You said the members would have voted.  I

2   guess I don't understand what you would mean when you

3   say "voted."  I'm assuming the board of directors

4   voted to authorize this action?

5      A.   The membership did.  The membership voted to

6   authorize legislation.

7      Q.   How did you conduct this election?

8      A.   Through e-mail.

9      Q.   So how many -- is this universe of 55 to 60

10  voters then that you identified as your membership?

11     A.   It would be just -- so yeah, exactly the 55

12  yeah, exactly, the 55 dealers, the 110 rooftops,

13  that's where it gets broken up, but ...

14     Q.   Did they vote by rooftop or by member?

15     A.   Each store is a member so it would be by

16  rooftop.

17     Q.   So there would be115, 110, 115 votes?

18     A.   Typically.

19     Q.   Typically, do you often poll the membership

20  and have them vote on issues this common?

21     A.   No, it's not.

22     Q.   Okay.

23     A.   Yeah.

24     Q.   Did the board ask you or empower you or

25  order you to -- to have this election before you

78

1    could move forward?

2            MR. ALLEN:  I'm going to instruct you

3        not to answer that based on the first

4        amendment privilege.

5    BY MR. PURDON:

6        Q.   So you e-mailed -- sent out an e-mail asking

7    for a yes or no vote, is that how this worked?

8        A.   I'd have to try to remember what's exactly

9    within that e-mail, Tim, but it was -- it was an

10   e-mail that was specific to concerns that were

11   addressed in the legislation and identifying whether

12   or not the concerns that ended up in the bill were

13   indeed industry-wide or I guess North Dakota wide,

14   industry-wide concerns that dealers would want

15   addressed.

16       Q.   Did this election take place -- can you tell

17   me when, ballpark, this election took place?

18       A.   Summer or Fall of '16.

19       Q.   After you'd engaged the law firm?

20       A.   Yes.

21       Q.   Did you send around a draft of the bill?

22       A.   No.

23       Q.   Did you send around an e-mail explaining

24   what was potentially going to be in the bill?

25       A.   I believe the e-mail contained identified --

                                                        79

1          MR. ALLEN:  He's asking you yes or no

2      questions.  He's not asking you substance.

3      To the extent you want to provide him

4      substance, I'm going to instruct you not to

5      answer.

6          THE DEPONENT:  Okay.  Could you restate

7      the question?

8  BY MR. PURDON:

9      Q.   Did the e-mail that you sent around have a

10  description of what was likely to be in the bill?

11      A.   I don't remember what exactly was in that

12  e-mail.

13      Q.   Did everybody -- so they just voted by

14  sending a reply e-mail?

15      A.   Correct.

16      Q.   What was the vote total?

17      A.   I don't remember.

18      Q.   Was it a landslide, or was it close?

19      A.   It was majority.

20      Q.   Right.  But majority can be 50.1 percent.

21      A.   I don't remember what the vote total was.

22      Q.   There were members who voted against it?

23      A.   No, there were not.

24      Q.   Oh, I see what you're saying.  So how many

25  votes were cast?

80

```
 1   purge e-mails?
 2           MR. ALLEN:  I'm just going to instruct
 3        you not to answer.
 4           MR. PURDON:  That's fair.
 5   BY MR. PURDON:
 6       Q.   Besides the election of -- this election --
 7   no, we'll move off that.
 8           Did any NDIDA members express concern over
 9   the drafting of 2289?
10       A.   None.
11       Q.   Did any NDIDA members object to you
12   introducing Senate Bill 2289?
13       A.   None.
14       Q.   Did any individuals condition their support
15   of 2289 on the exclusion or inclusion of any certain
16   terms?
17           MR. ALLEN:  I'm just going to instruct
18        you not to answer to the extent it gets
19        into substance of communications with your
20        members.
21   BY MR. PURDON:
22       Q.   But I'm just asking for a yes or no
23   question.
24           MR. ALLEN:  But your yes or no question
25        contains the inform -- specific
```

82

```
 1        information.  That's the problem.  It's not

 2        just yes or no, did you communicate with

 3        your members.  It's yes or no, did you

 4        communicate with your members about

 5        specific items.

 6            MR. PURDON:  All right.  I don't know

 7        that you're right about that.  I'll note an

 8        exception, but we'll -- we're not going to

 9        solve it here today between you and I.

10   BY MR. PURDON:

11        Q.   Have you ever heard Senate bill 2289

12   referred to as "Farm Equipment Dealer Bill of

13   Rights"?

14        A.   Yes.

15        Q.   Have you ever used that term?

16        A.   I may have.

17        Q.   What does that mean to you?

18        A.   What it means to me is that it's -- it's a

19   bill that is intended to create a level of equity

20   with respect to the relations of the manufacturers

21   and the public interest of North Dakota.

22        Q.   And the rights that you're talking about

23   here, where do these rights come from?

24        A.   Rights granted by the legislature of

25   North Dakota.
```

83

```
 1      Q.   Yes.  Right, besides your --

 2      A.   I was the only one that represented NDIDA

 3  besides dealers that testified.

 4      Q.   I'm talking about registered lobbyists,

 5  people being paid for their time.

 6      A.   No, no.  Just me.

 7      Q.   Just you?

 8      A.   Yep.

 9      Q.   Did you direct or assist any of your members

10  in lobbying any members of the committee or

11  committees or State legislators in connection with

12  2289?

13           MR. ALLEN:  I'm going to object, and

14        I'm going to instruct you not to answer

15        pursuant to the first amendment privilege

16        to the extent you had communications,

17        internal communications with your members

18        regarding lobbying decisions and things of

19        that nature.

20  BY MR. PURDON:

21      Q.   So let me establish whether or not any such

22  communications took place.  Did you ever send e-mails

23  to your members?  I don't know want to know what the

24  e-mails said at this point subject to his objection.

25  Let me ask it this way, were there communications to
```

140

1      Q.   Consent to jurisdiction.  I'm sorry, page

2    950.  I'm sorry, I changed pages on you.

3      A.   950.  Okay.  So what's your conclusion --

4    what's your statement?

5      Q.   So the -- the -- the dealers who were being

6    offered the new Case New Holland contract, if they'd

7    have filed a lawsuit, they could have -- they could

8    have filed in North Dakota, correct?  There was no

9    arbitration provision in the new -- in the -- under

10   old law, right?

11           MR. ALLEN:  I'd just note my continued

12      objection.

13           THE DEPONENT:  I don't know the answer

14      to that, Tim.

15   BY MR. PURDON:

16      Q.   Okay.

17      A.   You know, when I put this together, I mean,

18   that was more than two years ago, and you know, I do

19   research on different issues.  You educate yourself

20   and then time moves on and you don't remember all the

21   details to ...

22      Q.   Was there an advantage, do you think,

23   strategically of -- of NDIDA deciding to seek new

24   legislation through 2289 as opposed to challenging

25   the onerous, the provisions you've described as

169

```
 1    onerous in the new Case IH contract in a lawsuit?

 2          MR. ALLEN:  Object to the line of

 3          questioning to the extent it seeks

 4          legislative strategy, discussions with --

 5          internal discussions with their members and

 6          calls for a legal conclusion.  So I'm going

 7          to instruct you not to answer to the extent

 8          you had discussions with your members about

 9          the legislation itself, then to the extent

10          whether or not if there's an advantage

11          calls for a legal conclusion.  So you can

12          answer if you can.

13    BY MR. PURDON:

14    Q.   So my question is not -- and let me --

15    I'll -- I'll narrow my question.

16          Do you see -- I don't want to know about any

17    discussions or anything that you had with anybody,

18    but do you think that back in February of 2016 as you

19    were thinking about what to do next, you got this

20    issue, you don't like this contract from Case New

21    Holland, your members don't like it, EDA is done with

22    their negotiation, did you feel under pressure to do

23    something to protect your members at that point?

24    A.   I don't remember what my feelings were at

25    that point in time.
```

170

```
 1      don't have anything further.

 2          MR. PURDON:  I don't either.  We'll go

 3      off the record.

 4          Do you want to talk to him about

 5      reading and signing?

 6          MR. ALLEN:  Yep.  We'll read and sign.

 7          THE REPORTER:  Noted.  Thank you.

 8          THE VIDEOGRAPHER:  We're going off the

 9      record.  The time is 4:27 p.m.

10          (Deposition concluded at 4:27 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

299

1              NOTARY REPORTER'S CERTIFICATE

2    STATE OF NORTH DAKOTA

3    COUNTY OF CASS

4              I, Shawn D. Weber, a Notary Public within

5    and for the County of Cass and State of North Dakota

6    do hereby certify:  That the afore-named witness was

7    by me sworn to testify the truth, the whole truth,

8    and nothing but the truth.

9              That the foregoing 300 pages contain an

10   accurate transcription of my shorthand notes then and

11   there taken.

12             I further certify that I am neither related

13   to any of the parties or counsel, nor interested in

14   this matter directly or indirectly.

15             WITNESS my hand and seal this 23rd day of

16   March, 2018.

17

18

19                  Shawn D. Weber

20                  Notary Public

21                  Fargo, North Dakota

22   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES

23   NOT APPLY TO THE REPRODUCTION OF THE SAME BY ANY

24   MEANS, UNLESS UNDER THE DIRECT CONTROL AND/OR

25   DIRECTION OF THE CERTIFYING COURT REPORTER.

                                                        300