**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Association of Equipment | ) | |
| Manufacturers, | ) | |
| AGCO Corporation, | ) | **Case No. 1:17-cv-151** |
| CNH Industrial America LLC, | ) | |
| Deere & Company, and | ) | |
| Kubota Tractor Corporation | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The Hon. Doug Burgman, Governor | ) | |
| Of the State of North Dakota, in his | ) | |
| Official Capacity, and | ) | |
| The Hon. Wayne Stenehjem, Attorney | ) | |
| General of the State of North Dakota, | ) | |
| in his Official Capacity | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| North Dakota Implement Dealers | ) | |
| Association | ) | |
| | ) | |
| Intervenor | ) | |

**INTERVENOR, NORTH DAKOTA IMPLEMENT DEALERS ASSOCIATION'S,
RESPONSE IN OPPOSITION TO MOTION TO LEAVE AND MOTION TO COMPEL**

Intervenor, North Dakota Implement Dealers Association ("NDIDA"), respectfully submits this response in opposition to the Plaintiffs' Motion for Leave and Motion to Compel production of documents and deposition ("Motion"). Plaintiffs Motion for Leave should be denied, because Plaintiffs have not, and cannot, establish that they diligently sought to confer on the alleged discovery disputes prior to the close of the fact discovery period, much less file their Motion by that agreed upon deadline. Moreover, the information Plaintiffs seek is protected from

1

disclosure by the First Amendment privilege and is not relevant to Plaintiffs' Contracts Clause claim. Thus, Plaintiffs' Motion should be denied.

### Background

On July 24, 2017, Plaintiffs filed an eleven-count, 63-page Complaint that attacked SB 2289, a bill passed by the North Dakota Legislature in 2017. Plaintiffs alleged, *inter alia*, that SB 2289 violates the Contracts Clause of the United States Constitution (Count Six). The crux of that claim is that SB 2289 interferes with existing contracts and is not supported by a legitimate public purpose. The information that Plaintiffs seek to compel by way of its Motion purportedly relates to its Contracts Clause claim and the North Dakota Legislature's purpose. *See* Mem. Support of Mot. 11, ECF No. 86.

Plaintiffs served their written discovery requests on January 19, 2018. Document Request No. 4 sought "[a]ll documents relating to the drafting, preparation, enactment, or passage of Senate Bill 2289." The Plaintiffs defined Senate Bill 2289, for purposes of their discovery requests, as the bill that passed and was attached as Exhibit A to their Complaint. SB 2289 was introduced on January 19, 2017 and signed by the Governor on March 16, 2017.

The Defendant (State) and NDIDA jointly responded to the Plaintiffs' written discovery requests on February 23, 2018. With respect to Document Request No. 4, the parties objected and responded that there were no responsive documents other than those documents that are publicly available.

Thereafter, on March 8, 2018, Plaintiffs deposed NDIDA's Matthew Larsgaard. During the course of the deposition, Plaintiffs' counsel asked a number of questions regarding NDIDA's involvement in the legislative process and its legislative/lobbying strategies prior to the

introduction of SB 2289.[1]   True and correct copies of Mr. Larsgaard's deposition transcript

excerpts are attached hereto as **Exhibit A**.

Prior to those deposition questions, Plaintiffs had not expressly requested internal NDIDA

communications and there was no understanding that Plaintiffs sought information beyond the

legislative history with respect to the Legislature's purpose of SB 2289.[2]   Indeed, prior to the

deposition, Plaintiffs made no attempt to confer with NDIDA (or the State) to state what it sought

and/or determine whether any internal communications existed, whether they would be produced,

etc.[3]

Nonetheless, NDIDA asserted the First Amendment privilege during the Larsgaard

deposition with respect to questions that requested information (and related documents) about SB

2289 legislative and/or lobbying strategies that were purely internal (*i.e.*, not shared outside of

NDIDA).[4]   Otherwise, the witness answered all questions over the course of the all-day deposition.

---

[1] *See* Larsgaard Dep. 54:13-15 ("Was there any document that you drafted before you talked to a lawyer that had your first stab at what 2289, what would become 2289?"); *See* Larsgaard Dep. 61:8-10 ("[H]ad you discussed proposed language with anyone who was not an attorney before you – before that?"); *See* Larsgaard Dep. 62:6-7 ("Was specific language ever discussed at any NDIDA board meetings before you retained Mr. Allen?"); *See* Larsgaard Dep. 76:15-17 ("Prior to that point in time did you tell any the members of NDIDA that you were drafting that legislation?").

[2] This is evidenced by Plaintiffs specifically requesting internal communications in addition to the identical request as No. 4 from the Equipment Dealers Association by way of a Rule 45 subpoena served on January 24, 2018.   For example, Plaintiffs requested "[a]ll documents relating to the drafting, preparation, enactment, or passage of Senate Bill 2289" as well several other requests that specifically requested "all communications with or from EDA." Similarly, document request no. 6 to NDIDA requested "all communications with or from NDIDA members relating to any opinions, grievances, or perceived problems with any Existing Dealership Agreements." Clearly, the Plaintiffs knew how to make the request for such information (i.e. internal communications), but did not do so.   Thus, prior to the March 8 Larsgaard deposition, NDIDA was not aware that Plaintiffs sought internal communications, which was due to the nature of Plaintiffs' request as compared to others they had propounded, Plaintiffs' own supplied definition of SB 2289, and Plaintiffs failure to confer with NDIDA regarding the requests/responses prior to the deposition. Plaintiffs' failure to confer continued after the deposition as well.

[3] NDIDA counsel noted on the record during the deposition that Plaintiffs had not made any effort to confer with NDIDA about its written discovery responses. *See* Larsgaard Dep. 229:19-25 ("I'd just also note for the record that counsel has had our responses and the State's responses for several weeks.  We haven't received any effort to confer as to the basis for the denial.").

[4] *See* Larsgaard Dep. 52:10-16 ("To the extent that the association's decision was made through discussion, internal discussion about proposed legislation, I'm going to instruct you not to answer.  So if you can answer, feel free"); *See* Larsgaard Dep. 54:16-22 ("And again, please note my previous objections to the extent that the document was prepared by the association with respect to proposed legislation, I'm going to instruct you not to answer.  To the extent you can answer, please feel free to try to do so."); *See* Larsgaard Dep. 61:11-16 ("Same objection as it relates to

Indeed, Plaintiffs had ample opportunity to question the witness about NDIDA's participation in the legislative process, the legislative history, NDIDA's attendance at committee hearings, NDIDA's communications with legislators, the harms NDIDA believed that SB 2289 addressed, the benefits of SB 2289 and every other aspect that was identified in NDIDA's initial disclosures. And, NDIDA answered those questions.[5]

Notwithstanding that much of that information is extremely tangential, at best, to the Contracts Clause inquiry into the Legislature's purpose, Plaintiffs did not stop there and instead, demanded to know about NDIDA's internal deliberations regarding SB 2289, such as bill drafts and internal discussions regarding lobbying the bill.  And, Plaintiffs have brought this Motion to obtain that purely internal information, which was not even shared with the Legislature during SB 2289's consideration.

As set forth above, NDIDA asserted the First Amendment privilege only as it related to purely internal discussions regarding SB 2289 and lobbying strategies.[6]  However, Plaintiffs' counsel did not seek to clarify the First Amendment privilege with NDIDA during the deposition, ask NDIDA to recede from its position, or otherwise confer with NDIDA on its assertion of privilege.  Thereafter, the parties continued to conduct discovery, and conducted eight more depositions during the discovery period.  Counsel for Plaintiffs and NDIDA were present at each

---

internal association communications.  I'm going to instruct you not to answer that. Otherwise, feel free to answer the question, though.").

[5] *See* Larsgaard Dep. 64:21-23 ("Who was the first person you approached to sponsor?  A. Senator Kelly Armstrong."); *See* Larsgaard Dep. 70:18-22 ("So which sponsors did you get, did you recruit to be sponsors besides Senator Armstrong?"  A: "Senator Armstrong made the decision who ultimately made the decision who he wanted to have as co-sponsors on that bill."); *See* Larsgaard Dep. 139:22-23  ("Besides yourself, did anyone else lobby on behalf of NDIDA for 2289?"); *See* Larsgaard Dep. 142-145 (Plaintiffs asked questions regarding discussions with specific legislators about the bill); *See* Larsgaard Dep. 149-150 (Plaintiffs asked questions regarding purpose of the bill); Larsgaard Dep. 214-218 (Plaintiffs asked questions regarding amendments to the bill); *See* Larsgaard Dep. 221 (Plaintiffs asked questions regarding Matthew's testimony on the bill).

[6] *See* Larsgaard Dep. 54:16-22 ("[P]lease note my previous objections to the extent that the document was prepared by the association with respect to proposed legislation, I'm going to instruct you not to answer.  To the extent you can answer, please feel free to do so.").

deposition and were available to discuss any discovery issues, including NDIDA's assertion of the First Amendment privilege.[7]  Yet, Plaintiffs never once mentioned the issue.

Plaintiffs' counsel did not address the First Amendment privilege with NDIDA until after the close of fact discovery and the deadline to file discovery motions.  Indeed, the conferral certification on Plaintiffs' Motion for Leave confirms that the first conferral efforts took place on April 9, 2018, which was after the discovery motion filing deadline.[8]

Notwithstanding Plaintiffs' silence on the issue, and in light of Plaintiffs' aggressive questioning during the deposition, NDIDA proactively searched for additional documents that would reflect internal communications regarding SB 2289, amended its discovery responses to reflect such, and produced a privilege log.  NDIDA's good faith efforts directly refute Plaintiffs tale of an eleventh-hour trap sprung by NDIDA.  As explained above, it was not until the deposition of Mr. Larsgaard that Plaintiffs sought internal communications with Request No. 4.  Plaintiffs resort to such a tale is a direct result of Plaintiffs need to take the focus off of its dilatory behavior, and specifically, its complete and utter failure to confer on any discovery issue (whether related to document production or deposition) until well after the agreed-upon deadline for doing such.

Simply put, NDIDA asserted the First Amendment privilege on March 8 when it became clear that Plaintiffs demanded purely internal discussions regarding NDIDA's legislative strategy, and Plaintiff took no action until April 9.  In contrast, NDIDA continued to operate in good faith and provided additional information and a privilege log without any request from Plaintiffs.

---

[7] Five of the depositions were conducted in-person, and three depositions were conducted remotely via video.  Thus, counsel for Plaintiffs was present in the same room with counsel for Defendants for five separate depositions following the Larsgaard deposition/assertion of privilege and there was never any discussion of this alleged issue.  Moreover, Plaintiffs' Motion lists six different counsel (in four different offices) that are admitted to practice in this matter, any of which could have sent an email, made a phone call, or drafted a letter on the issue.

[8] This Court's Scheduling Order, ECF No. 62, provides that "[t]he parties shall have until March 30, 2018 to complete fact discovery and to file discovery motions."

Plaintiffs' failure to even confer on the issue, much less file a motion, during the agreed upon discovery period is fatal to this Motion.

<u>**Applying the First Amendment Privilege**</u>

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  The First Amendment privilege protects against the compelled disclosure of organizational/associational political activity and has been recognized and enforced by the Supreme Court for sixty years.  *NAACP v. Alabama*, 357 U.S. 449 (1958).  The Supreme Court "has recognized the vital relationship between freedom to associate and privacy in one's associations."  *Id.* at 462. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association."  *Id.* "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association."  *McCutcheon v. Federal Electric Comm'n*, 134 S.Ct. 1434, 1448 (2014). "The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation."  *AFL–CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003).[9]  "Disclosures of political affiliations and activities that have a 'deterrent effect on the exercise of First Amendment rights' are therefore subject to this same 'exacting scrutiny.'"  *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160-61 (9th Cir. 2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 64-65 (1976)).

The First Amendment privilege applies to all organizations, not just dissident groups.  *See Pleasant v. Lowell*, 876.F.2d 787, 795 (10th Cir. 1989) (First Amendment protection extended to

---

[9] "Although the First Amendment does not normally restrict the actions of purely private individuals, the amendment may be applicable in the context of discovery orders, even if all of the litigants are private entities," because a trial court's order compelling discovery "[p]rovide[s] the requisite governmental action that invokes the First Amendment scrutiny."  *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987).

"advocacy concerning the lawful modification or elimination of the federal tax system").[10]   The First Amendment privilege also protects against the production of all association political activity, not just membership lists. *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) ("Membership lists are not the only information afforded First Amendment protection. In blocking the government's discovery request of political action groups, this court recently stated, it is crucial to remember that we are considering the essence of First Amendment freedoms—the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest."); *see also Degregory v. Att'y Gen. of N.H.*, 383 U.S. 825, 828 (1966) (applying the First Amendment privilege to discussions at political party meetings); *Dole v. Service Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459 (9th Cir. 1991) (First Amendment privilege prevented disclosure of union members' discussions at a union meeting).

Several cases establish that NDIDA's purely internal communications regarding SB 2289 and/or lobbying strategies are privileged.[11]   Recently, in *Sierra Club v. Union Elec. Co.*, No. 4L14-cv-00408-AGF, 2015 WL 9583394 (E.D. Mo. Dec. 31, 2015), a court denied several motions to compel based upon the application of the First Amendment privilege and affirmed a finding that the requested information was irrelevant.  *Id.* at *3.  In *Sierra Club*, the court summarized the First Amendment privilege tests from the Ninth and Tenth Circuits.  *Id.*  And, while the tests differ

---

[10] "[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958).  Further, the First Amendment privilege is also not set aside simply because an association is a party to a lawsuit and the information is requested in the suit.  *See Grandbouche v. Clancy*, 825 F.2d 1463, 1467 (10th Cir. 1987) (noting that "this argument is intuitively appealing", but rejecting the argument and stating that parties should "not be unduly deterred from instituting lawsuits by the fear of exposure of their private associational affiliations and activities").

[11] While the Supreme Court and numerous federal appellate courts have dealt with the First Amendment privilege extensively, there is little authority from the Eighth Circuit.  However, several district courts within the Eighth Circuit have analyzed the issue and affirmed the application of the First Amendment privilege to protect against compelled discovery of association activities.

slightly, both iterations apply the First Amendment privilege to internal association communications and lobbying discussions. *Id.*[12] The *Sierra Club* also stated that "the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation – a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Id.* (quoting *Perry*, 591 F.3d at 1160)).

In *Heartland Surgical Specialty Hospital, LLC v. Midwest Div., Inc.,* Case No. 05-2164-MLW-DWB, 2007 WL 852521 (D. Kan. Mar. 16, 2007), another district court denied a motion to compel seeking internal association communications regarding legislative and lobbying efforts on the basis of the First Amendment privilege. There, the plaintiff sought documents related to the Kansas Hospital Association's (KHA) lobbying efforts, meeting minutes, agendas, and draft legislative bills.[13]  *Id.* at *2.  The court found that KHA's advocacy relating to Kansas statutes concerning hospitals was the type of "political or economic association" protected from compelled disclosure by the First Amendment privilege. *Id.* at *3.  And, forcing production of KHA's internal evaluations of possible legislation and legislative strategy is exactly the type of action that "would have a 'chilling effect' on [KHA] and its members."  *Id.* at *4. (citing *Austl./E. USA Shipping Conf. v. United States,* 537 F. Supp. 807, 810-11 (D.C. Cir. 1982) (concluding that "[a] factual showing of actual chilling is not a necessity for a decision forbidding disclosure" and it is for the court to evaluate the likelihood of a chilling effect under the circumstances)).  Thus, the court found that KHA had met its prima facie burden of showing a chilling effect and the First Amendment privilege applied preventing disclosure.[14]  *Id.*

---

[12] In order to enjoy the protection of the First Amendment Privilege, the plaintiffs submitted declarations from their members discussing the negative impact compelled disclosure of their internal deliberations would have on their associational rights and their decision to participate in such political activities or discussions in the future. *Id.*

[13] The information sought was almost identical to the information that Plaintiffs seek in the current matter.

[14] The court in *Alliance of Auto. Mfrs., Inc. v. Jones*, 2013 WL 4838764 (N.D. Fla.), also refused to permit discovery (and granted a protective order) into a state association's lobbying efforts and communications regarding the legislative process. Id. at *1. There, a national manufacturer trade association (like Plaintiffs here) brought a

Finally, in *Johnson v. Mead Johnson & Co., LLC*, Civil No. 11-225 (JNE/LIB), 2012 WL 12894473 (D. Minn. May 21, 2012), the court recognized the existence of the First Amendment privilege. *Id.* at *3. Specifically, the court noted with approval the privilege's existence, but that it did not apply to the facts before the court. *Id.* at *3 (citing with approval, *NAACP v. Alabama,* 357 U.S. 449 (1958); *Heartland Surgical,* 2007 WL 852521 at *3; *Pleasant*, 876 F.2d 787; *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470 (10th Cir. 2011); and *Perry*, 591 F.3d at 1160).[15]

## Legal Argument

### I.   NDIDA's Internal Communications are Privileged and Not Discoverable

The First Amendment privilege clearly applies to the NDIDA's internal communications regarding SB 2289. NDIDA properly asserted the privilege during deposition and in response to Plaintiffs document requests. Accordingly, Plaintiffs' Motion to Compel should be denied.

It is undisputed that the First Amendment privilege applies to confidential association communications relating to political activity, such as lobbying efforts. *See McCutcheon*, 134 S.Ct. at 1448 ("[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association."); *AFL–CIO*, 333 F.3d at 175; *Perry*, 591 F.3d at 1160.

---

contracts clause challenge to legislation passed in Florida and sought discovery from the dealer association regarding the association's legislative efforts. The Court squarely rejected such discovery under the First Amendment privilege and rejected its relevance to the constitutional claim. "Legislative history is the primary source for determining legislative intent". Id. at *5. The court held that the discovery requests "improperly infringes upon the First Amendment rights of FADA and its members and is not relevant to the ultimate decision at issue here." *Id.* The "[s]ubject matters [sought for deposition] are not relevant to the constitutionality questions which are ultimately before this Court as explained above." And, "Alliance has not pointed to any case which permitted discovery into a proponent of legislation's understanding or interpretation of the proposed legislation, the proponent's communications concerning 'supporting, opposing, lobbying for or otherwise seeking passage of the' legislation, the extent of the proponent's involvement in the legislative process, support for political candidates, or campaign contributions. Such information is not relevant." *Id.*

[15] Ultimately, the court found the First Amendment privilege did not apply to documents at issue, but notably, those documents were not directly related to legislative activities or lobbying efforts of the association. *Id.* at *4.

Several courts have found that internal communications regarding lobbying strategy and/or political activity are prima facie protected from disclosure, *see Wyoming v. U.S. Dep't of Agric.*, 239 F. Supp. 2d 1219, 1237 (D. Wyo. 2002); *Heartland Surgical*, 2007 WL 852521 at *5, while others recognize such when the party demonstrates that the production would have a chilling effect on their associational activity, *see In re Motor Fuel*, 641 F.3d at 488; *Perry*, 591 F.3d at 1159-1161.

Here, NDIDA satisfies either standard.  First, the information that Plaintiffs seek is purely internal association communications regarding lobbying strategies. The *Heartland Surgical* court held that compelled production of such communications would have a *per se* "chilling effect." 2007 WL 852521 at *3-4.  Thus, Plaintiffs must show the information sought is highly relevant to their Contracts Clause claim, which they cannot.  *E.g.*, *Perry*, 591 F.3d at 1161.

And, even if not afforded the *prima facie* protection, NDIDA is submitting declarations from its President/CEO and its board members that establish a chilling of associational activities would occur if disclosure of the information were compelled.  *E.g.*, *Grandbouche v. Clancy*, 825 F.2d 1463 (10th Cir. 1987).  For example, NDIDA's President and CEO declarations state "[i]f confidential and solely internal discussions from legislative meetings with NDIDA members is released, I will not engage in full and completely frank discussions with the NDIDA members regarding their legislative interests for the following reasons [detailed reasons]."  Larsgaard Decl. ¶ 8. Similarly, NDIDA's Board members' declarations state that NDIDA's meetings are confidential, and "[t]he confidentiality of the discussions is vital in order to have full and frank discussions. . . . If that information is released, I will no longer participate in the association's meetings to discuss whether to engage in the political process." *See* Hanson Decl. ¶ 10; Joyce Decl. ¶ 10.  True and correct copies of the declarations are attached hereto as **Composite Exhibit B**.

Courts have consistently held that disclosures that would "stifle full and frank discussions within and among the trade associations . . . would satisfy appellants prima facie burden." *In Re Motor Fuel*, 641 F.3d at 490.[16]   Accordingly, Plaintiffs' Motion should be denied.

## II.   NDIDA's Internal Communications are Not Relevant to Plaintiffs' Contract Clause Claim

Plaintiffs are entitled to discovery only as to relevant information, and when the First Amendment privilege applies (as it does here), Plaintiffs must establish "that the information sought is highly relevant to the claims or defenses in the litigation – a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Perry*, 591 F.3d at 1161. The internal communications (that are not part of the official legislative history) are not relevant, much less highly relevant to Plaintiffs' Contract Clause claim.  Accordingly, Plaintiffs' Motion should be denied.

Here, Plaintiffs seek NDIDA's confidential internal information solely for their Contracts Clause claim.[17]  Indeed, that is the only claim that requires any evaluation of the Legislature's purpose in passing SB 2289.  However, when seeking to ascertain legislative purpose, the only information that is to be reviewed is the official legislative record that evidences what a legislature considered prior to passing the challenged legislation.  *E.g.*, *United States v. Monsanto*, 491 U.S. 600, 610 (1989); *North Dakota v. Brossart*, 565 N.W.2d 752, 756-57 (N.D. 1997); *Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646-48 (8th Cir. 1987).  Information that was not shared with the Legislature, such as NDIDA's purely internal communications, is wholly irrelevant to the

---

[16] Declarations of association members and staff are consistently the type of evidence Court's rely upon to uphold the invocation of the First Amendment privilege.  *See Perry*, 591 F.3d at 1163-1164 (finding the submitted "declaration creates a reasonable inference that disclosure would have practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression."); *Dole*, 950 F.2d at 1459-61 (holding that the union satisfied its prima facie burden by submitting the declarations of two members who said they would no longer participate in union membership meetings if the disclosure of the minutes of the meetings were permitted).

[17] *See* Pls.' Mot. 11-12, ECF No. 85.

Court's inquiry of the Legislature purpose as that information is not contained within the official legislative history. *Id.*; *see also In Re Racing Services,* 779 F.3d 498, 505-06 (8th Cir. 2015); *Hug v. City of Omaha*, 749 N.W.2d 884, 889 (Neb. 2008) (when ascertaining legislative intent a court should consult the legislative history, which has more probative value than postenactment views) (citing *Black's Law Dictionary* 919 (8th ed. 2004); *Kaplan v. Chertoff*, 481 F. Supp. 2d 370, 385 n. 15 (E.D. Pa. 2007) (explaining how statements not presented prior to the passage of a bill are irrelevant and can even serve to advance individual interests rather than that of the legislature as a whole). Notably, the Courts have consistently rejected such efforts even when those efforts have sought information from the Legislators that passed the challenged legislation, much less from a trade association and its lobbyist.

The Supreme Court has eschewed the reliance on lobbyist views of legislation that were not presented in the legislative process. In *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005), the Court noted the inherent problem in relying on unofficial legislative sources, as they "may give unrepresentative committee members – or, worse yet, unelected staffers and lobbyists – both the power and incentive to . . . secure results they were unable to achieve through the statutory text." "The intent of a lobbyist – no matter how public spirited he may have been – should not be attributed to the Congress without positive evidence that elected legislators were aware of and shared the lobbyist's intent." *Kosak v. United States,* 465 U.S. 848, 863 (1984 (Stevens, J. dissenting)

The Eighth Circuit has also consistently limited the use of information not found in the official legislative record when determining legislative intent. *See Express Scripts Inc. v. Wenzel*, 262 F.3d 829 (8th Cir. 2001) (rejecting the use of an affidavit from a Legislator to establish intent because it was post enactment and rejecting affidavit of association lobbyist because he was not a

legislator; finding that statements not issued by a legislative body are not evidence of legislative intent); *In re Racing Services*, 779 F.3d at 505-506 (court held that it was "wary" of divining legislative intent from lobbyist who was not a member of the legislature and did not vote on the bill).

Similarly, other federal appellate courts have rejected the use of information outside of the official legislative record when determining intent. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 987 (Fed. Cir. 1995) ("While a court may seek from the public record to ascertain the collective intent of Congress when it interprets a statute, the subjective intent of any particular person involved in the legislative process is not determinative. Thus the members of Congress, or staffpersons who draft legislation, are not deposed or called on to testify in actions involving statutory interpretation."); *Alliance of Auto. Mfr. v. Gwadosky*, 430 F.3d 30, 39 (1st Cir. 2005) ("[T]he correspondence of a single lobbyist has little (if any) probative value in demonstrating the objectives of the legislative body as a whole. This is particularly so when, as in this case, far stronger statements of intent can be gleaned from official legislative sources."); *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1048 (D.C. Cir. 1997) (holding that letters from lobbyists prior to the passage of legislation are unofficial and "carry little or no weight" in determining legislative intent); *Kaplan v. Chertoff*, 481 F. Supp. 2d 370, 385 n. 15 (E.D. Penn. 2007) ("[T]he Court cannot allow members of Congress, their staff, or just any individual claiming interest in the legislative drafting process to opine on Congress' intent in passing a particular statute. The Court will only look to the traditional sources of legislative intent, which include the language of the statute itself and other statements made on the public record prior to the passage of the statute.").

In *Phelps-Roper v. Heineman*, No. 4:09CV3268, 2014 WL 562843 (D. Neb. Feb. 11, 2014), the court quashed a subpoena issued to a Nebraska legislator and the Clerk of the Nebraska

Legislature, which sought a deposition and information regarding the passage of a bill that was not found within the official legislative history.  The Court held that information that was not contained within the official legislative history was not relevant to determining legislative intent.  *Id.*  The court stated: "Plaintiff's request seemingly includes information from advocates, lobbyists and interested citizens. The Court finds that other than the official legislative history, the discovery sought is irrelevant to the issues involved in this litigation. As stated above, the analysis of legislative intent must be limited to the official legislative history, which does not include the opinions of a legislative clerk or outside advocates and lobbyists."  *Id.* at *2. (emphasis added). Here, the analysis is identical.  Plaintiffs seek to go far beyond the official legislative record, purportedly to establish the Legislature's purpose in passing SB 2289.  However, that information is not relevant.[18]

Plaintiffs' prior filings in this matter (both with this Court and the Eighth Circuit in the pending interlocutory appeal) also directly refute Plaintiffs' position in this Motion.  For example, in its response in opposition to the State and NDIDA's Motion Stay, Plaintiffs represented to this Court that the purpose of the statute was already fixed and additional discovery was not warranted. Opposition Mot. Stay 10-11, ECF No. 74 ("No amount of discovery, however, can change the underlying purpose of Senate Bill 2289 as articulated by its backers as the time [citing the bill

---

[18] Plaintiffs do not address the mountain of caselaw that limits the review to the official legislative record, and instead, point to a district court decision regarding a Dormant Commerce Clause case.  However, that is not the claim that Plaintiff is moving under here.  Plaintiff's claim, which this information must relate to, is the Contract's Clause.  And, the inquiry is whether the Legislature had a legitimate purpose in passing the bill.  In contrast, in a Dormant Commerce Clause claim (and the case cited by Plaintiffs) the question can be one of whether there was a discriminatory intent to pass a law that specifically favors in-state interests over out-of-state competitors.  But, Plaintiffs did not plead "discriminatory intent" in their Dormant Commerce Clause claim, so such an investigation into intent is irrelevant for the purposes of this matter.  Accordingly, Plaintiffs reliance on *Tesla Motors, Inc. v. Johnson,* Case No. 1:16-cv-1158 (W.D. Mich. Dec. 11, 2017) is wholly misplaced.

videos for SB 2289].").  Yet, Plaintiffs now state that they desperately need additional discovery to establish the Legislative intent.

Plaintiffs also recently represented to the Eighth Circuit that comments from lobbyists regarding legislation "are inherently unreliable sources of legislative intent and should not be afforded the weight to an actual report of a legislative committee."  Pls.' Br. 13-14.  There, Plaintiffs seek to downplay the official legislative record that the State and NDIDA filed with the District Court in the injunction proceedings, and in so doing, Plaintiffs direct the Eighth Circuit to disregard lobbyist statements found in the official record.  Yet, here, Plaintiffs tell this Court that the internal association communications (i.e. advocate statements) that were not presented to the Legislature or contained in the official record are vital to this case.  That is an untenable position.

Plaintiffs' attempt to take the Court's focus away from the general and heightened relevance standards and quote NDIDA's intervention motion as a basis for support.[19]  Plaintiffs' efforts are red-herrings.  Plaintiffs have had the opportunity to seek discovery on every matter listed in NDIDA's initial disclosures.  Moreover, Plaintiffs have had the opportunity to question NDIDA (through deposition, interrogatory and document request) about NDIDA's participation in the legislative process, NDIDA's communications with members of the Legislature, NDIDA's testimony on SB 2289, NDIDA's views as to the purpose of the bill, and other related information.  So, Plaintiffs have had ample opportunity to address the items NDIDA listed.  However, those are not what Plaintiffs seek.  Quite the contrary, Plaintiffs want to take the focus off what occurred during the Legislature's consideration of SB 2289, and instead, obtain purely internal, irrelevant

---

[19] Plaintiffs cite NDIDA's Motion to Intervene, ECF No. 32, which states that "NDIDA has first-hand knowledge of the purpose of the bill and other evidence.  This knowledge and other evidence is critical to showing that the bill does not violate . . . the Constitution."  Pls.' Mem. 3, ECF No. 83.

information that was not presented to the Legislature and had no bearing on the Legislature's passage of SB 2289.

III.   **Plaintiffs Motion was not Timely, and Plaintiffs Failed to Establish the Requisite Diligence**

Plaintiffs' Motion should be denied, because it was filed well beyond the deadline to file discovery motions.[20]  Indeed, Plaintiffs did not initiate this Court's mandated two-step conferral process until after the deadline to file discovery motions.  Plaintiffs' delay was entirely its own making, and Plaintiffs have not established its diligence in attempting to meet this Court's deadlines.  Accordingly, Plaintiffs' Motion to Compel and Motion for Leave should be denied.

The fact discovery deadline and deadline to file discovery motions was March 30, 2018.  Scheduling Order ¶ 3, ECF No. 62.  Defendants (State and Intervenor) served their responses to Plaintiffs' discovery first set of discovery requests on February 23, 2018.  The deposition of NDIDA President and CEO Matthew Larsgaard occurred on March 8, 2018.  The First Amendment privilege was raised during the March 8 deposition with respect to the testimony and related documents.  Thus, Plaintiffs were on notice on March 8 that NDIDA asserted the First Amendment privilege with respect to the information Plaintiffs now seek.

Plaintiffs made no effort to confer with NDIDA during the deposition regarding NDIDA's assertion of the First Amendment privilege.  In the following weeks, the parties continued to conduct fact discovery and a series of depositions occurred.  Counsel for Plaintiffs and NDIDA were present, in the same room, at five of the depositions that occurred after the March 8, 2018 Larsgaard deposition.  Plaintiffs did not address NDIDA's assertion of the First Amendment privilege during the subsequent depositions when the parties and their counsel were in the same room for hours on end.  Notwithstanding that, Plaintiffs have an army of lawyers on the case, not

---

[20] Plaintiffs filed a separate Motion for Leave to file this Motion.  NDIDA also addresses the Motion for Leave herein.

one raised a single discovery issue prior to the close of fact discovery/deadline for filing discovery motions whether by way of telephone call, email, or letter.

Local Rule 37.1 requires a two-step conferral process before a discovery motion is filed. The Local Rule also requires a certification of conferral efforts.  Plaintiffs' Motion reveals its lack of diligence.  In the "certificate of conference," Plaintiffs' counsel states that the first conferral occurred on April 9, 2018, which is outside of the discovery cut-off date.  "Normally, a motion to compel should be filed in advance of the deadline for completion of discovery." *Weatherford US LP v. Innis*, Civil No. 4:09-cv-061, 2011 WL 2174045 at *3 (D.N.D. June 2, 2011). The simple question to which Plaintiff cannot provide an adequate answer is why did it wait over a month to confer with NDIDA regarding the First Amendment privilege?

Plaintiffs have not shown the required diligence to establish good cause to conduct discovery outside of the agreed upon discovery period.  The most important consideration in whether good cause has been demonstrated to extend a deadline imposed by a scheduling order is whether the movant has diligently conducted its activities up to this point.  *E.g.*, *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716-17 (8th Cir. 2008) ("The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements.").  Plaintiffs knew of NDIDA's raising the First Privilege since March 8.  And yet, waited until after the close of discovery to raise an issue with it.  Ostensibly, they blame this on NDIDA's "eleventh-hour" surprise, but that neglects the assertion of the privilege over a month earlier.[21]

---

[21] Plaintiffs also seek to take the blame off themselves by pointing to the number of depositions that occurred following March 8.  However, those depositions were agreed to by Plaintiffs, and Plaintiffs had many more attorneys available to address the alleged discovery dispute during that time than were at the depositions.  Indeed, only two of six of the Plaintiffs listed counsel attended the depositions.

Plaintiffs repeated insistence that its delay was due to an eleventh-hour surprise from NDIDA is understandable (as that is the only excuse that it can posit), but it is not credible.[22]  As set forth above, NDIDA asserted the First Amendment privilege on March 8, which was the first time that Plaintiffs had explicitly requested purely internal NDIDA communications regarding legislative and/or lobbying strategy.  The deposition transcript is clear that the privilege was asserted both with respect to the deposition questions and any documents that the questions may implicate.  *See* Larsgaard Dep. 54:13-22.

In contrast, NDIDA, now fully understanding how broadly Plaintiffs interpreted the scope of Request No. 4 to be, conducted additional searches for potentially responsive documents.  And, thereafter, it produced additional documents in response to Request No. 4 and a privilege log identifying those documents implicated by Plaintiffs line of questioning during deposition.  As part of this exercise, NDIDA also made explicit what it has been arguing all along.  While it may have provided input and helped in early iterations of what would eventually become SB 2289, it was the North Dakota Legislature that drafted SB 2289.  Prior to that document being submitted by its sponsors for publishing and consideration, there was no SB 2289.  Thus, as Plaintiffs' defined SB 2289, there were no documents related to SB2289 until it was labelled as such and published by the North Dakota Legislature.[23]  This is not some monumental "unilateral" time limitation as Plaintiffs suggest, rather it simply makes explicit, what was otherwise implicit in Plaintiffs' own definition.  And, in any event, it cannot be overstated that NDIDA produced the

---

[22] Just recently, in opposing any amendment to the case schedule, Plaintiffs stated "Defendants should be held to the schedule for *fact discovery*, expert discovery, dispositive motions, and – if necessary – trial to which they agreed in November."  *See* Opposition Mot. Stay 17, ECF No. 74 (emphasis added).  Plaintiffs have not explained why that does not now apply to their actions.

[23] Plaintiffs' fixation on NDIDA's statement in its Motion to Intervene that NDIDA was involved in the drafting of SB 2289 is misplaced, since Plaintiffs had ample opportunity to question NDIDA about its involvement with the drafting of SB 2289, the bill sponsors, and the amendments to SB 2289 during the legislative process. However, Plaintiffs do not care about this. Instead, Plaintiffs want internal communications that were not part of the legislative process.

additional documents and privilege log on its own accord and without any conferral efforts by Plaintiffs.

Yet, Plaintiffs have claimed that the amended responses and privilege log caught them unaware and somehow justified their complete inaction.  That is simply not credible based upon what occurred during the deposition.  Plaintiffs have failed to explain why they failed to act following the deposition, despite asking for another deposition, and instead, pinned their inaction entirely on NDIDA's unsolicited actions.  The amended responses, production and privilege log all clearly relate to the deposition questioning and in no way caught Plaintiffs off guard.

Plaintiffs Motion should be denied as untimely.  This Court has permitted a party to file a motion to compel beyond the deadline to do so, but only when there was ample evidence that the filing party was diligent and conducted the required conferrals in advance of the discovery motion filing deadline.  *Weatherford*, 2011 WL 2174045 at *3 ("The record is clear that Weatherford's counsel had attempted over the course of several months prior to the expiration of the time permitted for discovery to work out a resolution of the discovery disputes and advised defendants' counsel that a motion to compel would be requested if an agreement could not be reached."  And, "the record before the court is that Weatherford has been diligent in its discovery efforts.").  Here, that is not the case.  Conferral efforts, much less the motion filing, did not occur until after the discovery period despite the parties and counsel being present in the same locations repeatedly and having ample opportunity to raise any issues.

## Conclusion

Plaintiffs Motion should be denied as the information sought is privileged and irrelevant to Plaintiffs' Contract Clause claim.   Additionally, Plaintiffs Motion is untimely and it has not established the good cause necessary to conduct discovery beyond the deadlines Plaintiffs agreed upon.

Dated this 11th day of May, 2018.

/s/ *Jason T. Allen*
**BASS SOX MERCER**
Jason T. Allen, *pro hac vice*
jallen@dealerlawyer.com
W. Kirby Bissell, *pro hac vice*
kbissell@dealerlawyer.com
2822 Remington Green Circle
Tallahassee, Florida 32308
T: 850.878.6404

and

**WOLD JOHNSON, P.C.**
Benjamin Thomas (ID #04713)
BThomas@woldlaw.com
400 Gate City Building
P.O. Box 1680
Fargo, N.D. 58107-1680
T: (701) 235-5515
*Attorneys for NDIDA*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of May, 2018, a true and correct copy of the foregoing has been furnished electronically transmitted through the CM.ECF system to:

- Benjamin E. Thomas  bthomas@woldlaw.com, jastrup@woldlaw.com
- Benjamin R. Dryden  bdryden@foley.com
- Connor A. Sabatino  csabatino@foley.com
- Jarren Ginsburg  jginsburg@foley.com
- Joseph P. Bialke  jbialke@nd.gov, ckvislen@nd.gov, mecastillo@nd.gov
- Katherine Susan Barrett Wiik  KBarrettWiik@RobinsKaplan.com, jgerboth@robinskaplan.com
- Lauren Champaign  lchampaign@foley.com
- Matthew A. Sagsveen  masagsve@nd.gov
- Michael J. Lockerby  mlockerby@foley.com
- Nathan James Svihovec  njsvihovec@nd.gov
- Roberta F. Howell  rhowell@foley.com
- Timothy Q. Purdon  tpurdon@robinskaplan.com, AHoellein@RobinsKaplan.com

/s/ *Jason T. Allen*
Jason T. Allen, *pro hac vice*