IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


ASSOCIATION OF EQUIPMENT
MANUFACTURERS,
AGCO CORPORATION,
CNH INDUSTRIAL AMERICA LLC,
DEERE & COMPANY and
KUBOTA TRACTOR CORPORATION,
  Plaintiffs,   Case No. 1:17-cv-00151-CSM
v.
THE HON. DOUG BURGUM, Governor
of the State of North Dakota,
in his Official Capacity,
-and-
THE HON. WAYNE STENEHJEM,
Attorney General of the State
of North Dakota, in his Official
Capacity,

  Defendants,

-and-

NORTH DAKOTA IMPLEMENT
DEALERS
ASSOCIATION,

  Intervenor.
-------------------------------------------------------


AUDIOVISUAL DEPOSITION OF
MATTHEW LARSGAARD
TAKEN ON BEHALF OF PLAINTIFFS
March 8, 2018
* * *

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF NORTH DAKOTA
 3
    ASSOCIATION OF EQUIPMENT
 4  MANUFACTURERS,
    AGCO CORPORATION,
 5  CNH INDUSTRIAL AMERICA LLC,
    DEERE & COMPANY, and
 6  KUBOTA TRACTOR CORPORATION,
 7       Plaintiffs,         Case No. 1:17-cv-00151-CSM
 8  v.
 9  THE HON. DOUG BURGUM, Governor
    of the State of North Dakota,
10  in his Official Capacity,
11  -and-
12  THE HON. WAYNE STENEHJEM,
    Attorney General of the State
13  of North Dakota, in his Official
    Capacity,
14
         Defendants,
15
    -and-
16
    NORTH DAKOTA IMPLEMENT
17  DEALERS
    ASSOCIATION,
18
         Intervenor.
19  ------------------------------------------------------
20       DEPOSITION OF MATTHEW LARSGAARD, produced,
21  sworn and examined on March 8, 2018, commencing at
22  9:44 a.m. and concluding at 4:27 p.m., at Doug
23  Ketcham & Associates, 51 Broadway, Suite 130,
24  Fargo, North Dakota 58102, before Shawn Weber,
25  Court Reporter and Notary Public.
```

2

1          on any internal discussions regarding

2          SB2289, I'm going to ask you not to answer.

3     BY MR. PURDON:

4          Q.   That's -- okay.  But -- but if his brother

5     told him, you should call this lawyer, I don't think

6     that's privileged under either of the privileges.

7               So my question is, to the extent not

8     privileged, how did you choose the lawyer that you

9     went to, to discuss the drafting of 2289?

10               MR. ALLEN:  And I would just instruct

11          you the same thing.  To the extent that the

12          association's decision was made through

13          discussion, internal discussion about

14          proposed legislation, I'm going to instruct

15          you not to answer.

16               So if you can answer, feel free.

17          Otherwise ...

18               THE DEPONENT:  So having been in the

19          industry since 2006, you become aware of

20          law firms that work in different areas, law

21          firms that have assisted dealers, maybe

22          assisted manufacturers, and so you have a

23          general idea of who's in the industry.

24     BY MR. PURDON:

25          Q.   So based on your knowledge of the industry

52

```
 1              THE DEPONENT:  Yeah, so we just covered
 2         that like minutes ago, right?  So, yeah,
 3         communicated the issues to the law firm
 4         after we had identified what some of those
 5         dealer concerns were.
 6    BY MR. PURDON:
 7         Q.   Were there any writings memorizing your
 8    concerns?
 9         A.   I just don't remember right now how the
10    initial communications were initiated.
11         Q.   Right.  So that's a different question.
12         A.   Okay.
13         Q.   Was there any document that you drafted
14    before you talked to a lawyer that had your first
15    stab at what 2289, what would become 2289?
16              MR. ALLEN:  And again, please note my
17         previous objections to the extent that that
18         document was prepared by the association
19         with respect to proposed legislation, I'm
20         going to instruct you not to answer.  To
21         the extent you can answer, please feel free
22         to try to do so.
23              THE DEPONENT:  Okay.
24              MR. ALLEN:  If such a document exists
25         that he's asking about.
```

54

```
 1    their concerns were, they would have shared that

 2    information with you.

 3         A.   Yes, sir.

 4         Q.   And you may have a copy of that?

 5         A.   I may, yeah.  Yeah, I may.

 6         Q.   Okay.  Setting -- and I'm going to talk

 7    before you engaged Mr. Allen's law firm to help with

 8    you 2289, had you discussed proposed language with

 9    anyone who was not an attorney before you -- before

10    that?

11              MR. ALLEN:  Same objection as it

12         relates to internal association

13         communications.  I'm going to instruct you

14         not to answer that.  Otherwise, feel free

15         to answer the question, though.

16              THE DEPONENT:  You know, I talk to a

17         lot of different individuals.  I mean,

18         that's what I do.

19    BY MR. PURDON:

20         Q.   Right.

21         A.   So I can't think of any specific -- could

22    you say the question one more time?

23         Q.   I'm asking about specific language.  Did you

24    show anybody language, did you say hey, get me what

25    you -- send me an e-mail of what you want in the
```

61

1   bill.  I'm talking about any specific discussions of

2   specific language not with a lawyer and prior to

3   engaging Mr. Allen's law firm?

4       A.   You know, as I consider -- I can't remember

5   any specific discussions.

6       Q.   Was specific language ever discussed at any

7   NDIDA board meetings before you retained Mr. Allen?

8            MR. ALLEN:  Same objection.  I'm going

9        to instruct you not to answer on the basis

10       of the first amendment privilege.

11           MR. PURDON:  Well, Jason, let me posit

12       this.  I'd like to establish that there

13       were discussions.  Because if there

14       weren't, then it's a different world,

15       right?

16           MR. ALLEN:  Okay.

17           MR. PURDON:  I'd like to establish

18       there were discussions.  And I think my

19       question was a yes or no one and then I

20       understand what you're saying.

21           MR. ALLEN:  So you're seeking to

22       establish whether discussions occurred, not

23       the substance of the discussions?

24           MR. PURDON:  Exactly.

25           MR. ALLEN:  Okay.

62

1      Q.   And he scrubbed it through alleged counsel?

2      A.   Yes.

3      Q.   And then that became the final draft?

4      A.   Correct.

5      Q.   That you then shared with the other sponsors

6  and that they had to sign off on?

7      A.   That is correct.  But Senator Armstrong,

8  obviously, is involved in that with visiting with the

9  other sponsors, of course, yeah.

10     Q.   Sure.  So you identified Senator Armstrong,

11 as I don't know what words you want to use, your

12 primary sponsor or your initial sponsor?

13     A.   We asked -- we asked Senator Armstrong if

14 he'd be the prime sponsor of this bill, yep.

15     Q.   So he helped you get some of these other

16 sponsors as well?

17     A.   Yes, yeah.

18     Q.   So which sponsors did you get, did you

19 recruit to be sponsors besides Senator Armstrong?

20     A.   Senator Armstrong made the decision who

21 ultimately made the decision who he wanted to have as

22 co-sponsors on that bill.

23     Q.   Okay.

24     A.   That's their discretion, a primary sponsor,

25 they introduce their bill, and they select who they

70

```
 1        A.   Yep, so he was the president.

 2        Q.   Yeah.

 3        A.   So did he call me to discuss the details of

 4   the bill after it was introduced?

 5        Q.   Yep.

 6        A.   I don't think Rick did, no.

 7        Q.   Did -- did anybody from EDA call you to

 8   discuss the bill after it was introduced?

 9        A.   I don't remember any specific discussions.

10   Yeah, I don't remember any specific discussions.

11        Q.   Did you -- did you tell your members in --

12   prior to the introduction of the bill, the drafting

13   of the bill in 2017?

14        A.   Uh-huh.

15        Q.   Prior to that point in time did you tell any

16   the members of NDIDA that you were drafting that

17   legislation?

18             MR. ALLEN:  I'm going to instruct you

19        not to answer pursuant to the first

20        amendment privilege as it relates to

21        discussions with your members regarding the

22        introduction of legislation.  To the extent

23        you can provide an answer as to perhaps

24        whether your members were aware, I don't

25        know if that satisfies your question, but
```

76

1    year or are you helping in amendments every year, how

2    typical is the -- the situation you just described

3    with Mr. Keiser, how typical is that, per -- once per

4    session, twice per session, can you give me some

5    ballpark?

6        A.   You know, in any given session, let's say in

7    any given biennium, let's go that route, session

8    biennium, a legislator may reach out to us regarding

9    what is our position on a given issue.

10       Q.   Right.

11            My question, though, was about drafting

12   legislation.

13       A.   Okay.

14       Q.   Do you typically get involved in looking at

15   language in helping draft or assisting in amendments,

16   how typical is that?

17       A.   It's not often.  There we go.

18       Q.   Do you ever get involved assisting in

19   campaigns?  Does NDIDA ever get involved in assisting

20   in campaigns, aside from donating money?

21       A.   Not other than PAC, no.

22       Q.   Besides yourself, did anyone else lobby on

23   behalf of NDIDA for 2289?

24       A.   Oh, yes.  Well, you said on behalf of N --

25   NDIDA.

```
1              MR. PURDON:  Thanks, guys.

2              THE DEPONENT:  Thanks, Tim.

3              MR. PURDON:  We'll go off the record.

4              THE VIDEOGRAPHER:  We're going off the

5         record.  The time is 12:31 p.m.

6              (Recess.)

7              THE VIDEOGRAPHER:  The time is

8         1:15 p.m.  We're going back on the record.

9              MR. PURDON:  What are we on there?

10              THE REPORTER:  Number 9.

11              MR. PURDON:  9?  All right.

12              (Larsgaard Exhibit No. 9 marked for

13         identification.)

14    BY MR. PURDON:

15         Q.   Matthew, you're familiar with representative

16    Cindy Schreiber Beck, correct?

17         A.   I know who she is, yes.

18         Q.   And she serves down in the Wahpeton area, do

19    I have that right?

20         A.   I believe she does.

21         Q.   And you -- did you meet with her before

22    Senate Bill 2289 was introduced?

23         A.   I don't believe I did.

24         Q.   Did you discuss Senate Bill 2289 with her

25    after it was introduced?
```

142

1      A.   Yes, she sits on the -- yes.

2      Q.   She sits on one of the committees?

3      A.   Yeah.

4      Q.   Which one?

5      A.   House Ag.

6      Q.   House Ag.

7      A.   Yep.

8      Q.   You are -- did you ever meet one-on-one with

9  her to discuss the bill?

10     A.   I've met one-on-one with most legislators

11 when I'm lobbying a bill, so actually most of the

12 legislators in the House and Senate I met with

13 one-on-one.

14     Q.   Do you recall anything specific about with

15 your meeting with Cindy Schreiber Beck?

16     A.   Nothing that I didn't discuss with everybody

17 else.

18     Q.   Right.  So you're familiar with what's been

19 marked as Exhibit 9 which is an article from the

20 Wahpeton Daily News in which Ms. Schreiber Beck talks

21 about Senate Bill 229, and this was before the bill

22 was passed, correct?

23     A.   March 3rd, well, do you have the dates the

24 bill was passed, Tim?

25     Q.   Well, I've got your press release we'll get

143

1    to.  It's dated ...

2        A.   It looks like this is March 3rd.  This

3    article is March 3rd.

4        Q.   It was passed late March it looks like,

5    March 16, signed by Governor Bergum March 16.  Does

6    that sound right?

7        A.   It sounds right.

8        Q.   So this would have been a little bit before

9    that?

10       A.   Before the governor signed, yeah.

11       Q.   Yeah.  So, you know, in this article,

12   obviously, you -- we talked about this before, you

13   note in describing the bill in the newspaper says "If

14   there's a building and it says 'John Deere' on it,

15   now they (could) sell anything out of that

16   particularly -- that particular building, Schreiber

17   Beck continued."  Do you see that language in the ...

18       A.   I see the language you just -- yes.

19       Q.   Yes.  And just for the record, you just

20   circled the language on the exhibit which is fine.

21       A.   Oh, I'm not supposed to mark it?

22       Q.   It's fine.  If you want to, you can.  I just

23   need to make sure that it doesn't -- isn't that I

24   circled it, that you've circled it, it's fine.  No

25   worries.

144

1      A.   Okay.

2      Q.   Did you explain the bill in those terms to

3  her?

4      A.   No, I didn't.  And -- and the reason why I

5  didn't is because the law prior to Senate Bill 2289

6  states that a manufacturer may not prohibit a dealer

7  from purchasing machinery or equipment that's

8  manufactured by another manufacturer.  So, for

9  example, if a dealership, an independent business

10  happens to have that John Deere sign outside of the

11  dealership prior to Senate Bill 2289, they can buy

12  equipment from Case, from Brant, from whoever else,

13  new equipment, put it on their lot and display it for

14  sale.  So I don't know what her intent of this

15  statement was, but I certainly would not have told

16  her this, because I don't -- again, as I just

17  described, dealers are independent businesses that

18  carry multiple brands of multiple products.

19      Q.   Right.  You would agree with me, though,

20  that a customer would expect that a building that had

21  a John Deere sign on it would actually have

22  John Deere products inside, you'd agree that that's a

23  valid customer expectation?

24         MR. ALLEN:  Object to the form.

25      Foundation.

145

1    that.

2           So what happens is over time, Tim, these

3    dealers are investing hundreds of thousands, millions

4    of dollars of their own money in growing the

5    business.  And they're spending their money to create

6    brand equity in the John Deere brand which they don't

7    own.  The Case IH, they're spending their money to do

8    that.  And with that in mind, the issue is, with all

9    of the time, effort and talent that they have put

10   into growing the business into creating customer

11   awareness about a particular manufacturers' equipment

12   brand, et cetera, there's a lot of value that the

13   dealers place in growing that brand equity and to

14   walk away from a contract, for example, if a dealer

15   said you know what, Case IH, this contract you have

16   is absolutely terrible, I don't want to sign it and

17   Case IH says, "Fine, we're pulling the contract, you

18   are no longer a Case IH dealership, that dealer is

19   now in a terrible position, because Case IH ...

20      Q.   So they don't have -- the dealer doesn't

21   have as much power in that negotiation as the

22   manufacturer, that's what you're saying?

23      A.   That's exactly what I'm saying.  They have

24   really no power to negotiate, because these large

25   global companies have so much, really all of the

149

1   negotiating power.

2       Q.   So -- so the intent of the statute here was

3   to -- was to balance out that negotiating power?

4       A.   The -- the intent of the statute is to

5   create a more equitable relationship between

6   manufacturers and ag, you know, farmers, communities,

7   small towns, dealerships, yep, the ag community.

8       Q.   Well, I don't understand the inequity

9   between say Case IH and a farming community.  They're

10  not -- they're not in a contract together.

11      A.   Uh-huh.

12      Q.   The contract is between the dealer and the

13  manufacturer, correct?

14      A.   That is correct, yeah.

15      Q.   And so -- okay.  Got it.

16      A.   But they exist in the same environment, and

17  they are -- their livelihood depends on each other.

18  So the farmers absolutely depend on Ag community,

19  small towns depend on dealers and the relationships

20  manufacturers have with dealers for their survival.

21      Q.   And so this legislation was intended to

22  bring more balance to that power disparity.  I think

23  that's what you're saying?

24      A.   Yeah.  So the -- the legislation was

25  intended to create a more equitable environment

1    or.

2        Q.    Right.

3        A.    Or legislation.

4        Q.    Okay.  So the -- 2289 was edited or excuse

5    me, edit -- was amended as it made its way through

6    the legislature, correct?

7        A.    It was amended in the Senate.

8        Q.    Yeah.  And you were -- I mean, you were part

9    of that process, your input went into that amendment

10   process, is that fair to say?

11       A.    It's fair to say that, yes.

12       Q.    And was that through acting through Senator

13   Jerry Klein?

14       A.    Senator Klein developed -- okay.  So Bobcat,

15   wanted a -- they came to the Senate Ag hearing.

16   Bobcat asked to have the bill amended to define what

17   farm equipment was.  And Senator Klein approached the

18   lobbyists from Bobcat who asked for the definition of

19   farm equipment and approached me and sat us down

20   together and said, "Gentlemen, Bobcat wants an

21   amendment, here's some language."  They looked at the

22   language that legislative counsel had developed, and

23   at the end of the day, Bobcat was sat -- comfortable

24   with the language and we were comfortable with the

25   language.

214

1      Q.   Right.  So you and I talked about that at

2  the -- at the hearing, and I think we were a little

3  bit ships passing in the night.  I understand the --

4  the Bobcat part of it, but Jerry Klein at one of the

5  hearings, said that I ran the amendment past

6  Mr. Larsgaard, and that -- that was -- he was talking

7  about in conjunction with that Bobcat process, right?

8      A.   I don't know what he meant by that, but I

9  can tell you that representatives from Bobcat, their

10  lobbyists and Jerry Klein and I, we all met, and

11  Jerry Klein, again, no other manufacturers were there

12  to testify other than a local contract lobbyist that

13  AEM had hired.  Other than that, the amendment to

14  just define what farm equipment was, and let's make

15  no mistake, was just an amendment to define what is

16  farm equipment.  Bobcat was comfortable with the

17  language, we were comfortable with it, and that's the

18  extent of it.

19      Q.   Without the amendment, Bobcat was

20  considering opposing the bill, correct?

21      A.   Bobcat, I believe -- I believe the history

22  shows that Bobcat opposed it, because I think they

23  were -- they didn't understand the legislation.

24      Q.   But they -- they were concerned that they

25  were going to be subject to this as farm equipment

215

1   manufacturers?

2       A.   I believe that they thought that they were

3   going to be affected by the bill, but I never did

4   understand their position, Tim, because -- and here's

5   why.  We never changed or added any new sections.  I

6   mean it was farm equipment in the past.  We just

7   expanded, it was already in place.  We enhanced what

8   was already in place.  They thought they were being

9   pulled into something --

10      Q.   Well, so --

11      A.   And I never did understand their position on

12  that.

13      Q.   So Bobcat's lawyers were concerned that this

14  bill might have a negative impact on them and they

15  were opposed to it, is that --

16          MR. ALLEN:  Object to the form and

17       foundation.

18          THE DEPONENT:  So Bobcat thought that

19       they were being pulled into this

20       legislation and you know what, they

21       weren't.  So I don't understand -- I don't

22       understand how Bobcat came to that

23       conclusion.

24  BY MR. PURDON:

25      Q.   Yeah.  I understand that.

216

```
 1              What I'm saying to you is, you're trying to
 2   get this bill passed, right, this is your top
 3   priority for the 2017 legislative session, right?
 4      A.   It was a -- it was a good bill, a major
 5   bill, yeah.
 6      Q.   It was the top priority of NDIDA and
 7   yourself in that session, wasn't it?
 8      A.   It was a top priority.
 9      Q.   And it was a no holds barred game time,
10   right, this is -- this is really important to your
11   members?
12      A.   The bill is important to our members, yep.
13      Q.   Right.  And you didn't want Bobcat to be
14   opposed to this, because that could be bad for the
15   bill's passage, right?
16      A.   Well, I didn't want any manufacturers to
17   oppose the bill.
18      Q.   But I'm asking about Bobcat.
19      A.   Okay.
20      Q.   Right?  Because they're in North Dakota, and
21   they have a bigger presence in North Dakota than some
22   of the other manufacturers, right?
23      A.   What do you mean by "a bigger presence"?
24      Q.   Well, yeah, I mean --
25      A.   As far as the sale volume?
```

217

```
 1      Q.   Yeah.

 2      A.   I think John Deere has a bigger presence

 3 than Bobcat.  I mean, they've got --

 4      Q.   So I don't know if we're passing here or

 5 what, but it was important for you to get this bill

 6 passed to not have Bobcat opposed to it, is that a

 7 true statement?

 8      A.   I don't want any manufacturers to oppose the

 9 bill.

10      Q.   That's not --

11      A.   And it's a top priority -- it was a priority

12 for us to pass the bill.

13      Q.   Okay.  So did -- whether or not Bobcat

14 needed these changes, there were some changes made to

15 the bill that were at the request of Bobcat; is that

16 fair?

17      A.   Bobcat made a request to have the bill

18 amended.

19      Q.   And then a meeting took place with you,

20 Jerry Klein and Bobcat's representatives to make

21 those changes or to agree on those changes?

22      A.   That is correct.

23      Q.   So Jerry Klein was the one who sort of

24 brought the sides together and got that worked out?

25      A.   Correct.
```

218

```
 1       A.   Yes.  Maybe a former farmer.

 2       Q.   So, on page 31 of Exhibit 4, which is the

 3  legislative history, let me see it I can find exactly

 4  what I'm looking for here.

 5            MR. ALLEN:  Which page, Tim?

 6            MR. PURDON:  I think 31.

 7            MR. ALLEN:  Okay.

 8  BY MR. PURDON:

 9       Q.   But maybe I'm wrong.

10            So this is the testimony from the -- if you

11  go back to 29, Matt -- Matthew, from February --

12  excuse me, the March 9th, House Ag Committee,

13  correct?

14       A.   Yes.

15       Q.   And you testified on behalf of the bill

16  there?

17       A.   Correct.

18       Q.   And on page 31, vice -- Matt --

19  Wayne Trottier is the vice chairman of that

20  committee, correct?

21       A.   Yes.

22       Q.   And he says here, we are discussing -- this

23  is after you've done in testimony and some other

24  folks, too, "We are discussing dealers -- dealers and

25  manufacturers.  It boils down to -- to the farmers.
```

221

 1    maybe, Tim.  I'd have to review the legislative

 2    history, because there is data.  There's some

 3    analytics within some of the testimony that's in

 4    here, so possibly.

 5        Q.   So that is --

 6        A.   The answer I have is possibly.

 7        Q.   Okay.  The information you're referring to,

 8    just so I'm clear on that page, is part of the

 9    testimony of -- who is this -- Mark Taylor from the

10    -- who was a past president of NDIDA?

11        A.   Yes, sir.

12        Q.   In the bill itself, though, that was passed,

13    there were no findings of fact set forth by the state

14    legislature, correct?

15        A.   Well, what's a finding of fact?

16        Q.   Well, sometimes legislation has findings of

17    fact, and then they pass the legislation.

18        A.   I'm not familiar with that.

19            MR. ALLEN:  I'd just also note for the

20         record that counsel has had our responses

21         and State's responses for several weeks.

22         We haven't received any effort to confer as

23         to the basis for the denial.  So to the

24         extent there is a question, as that's

25         always the preferred course of action.

229