| | | |
|---|---|---|
| Association of Equipment Manufacturers, | ) | |
| AGCO Corporation, CNH Industrial | ) | |
| America LLC, Deere & Company, and | ) | |
| Kubota Tractor Corporation, | ) | |
| | ) | **AMENDED AND CORRECTED** |
| Plaintiffs, | ) | **SUPPLEMENTAL ORDER** |
| | ) | **RE ORDER COMPELLING** |
| vs. | ) | **DISCOVERY AND ORDER RE** |
| | ) | **MOTION FOR ATTORNEY FEES** |
| The Hon. Doug Burgum, Governor | ) | |
| of the State of North Dakota, in his | ) | |
| official capacity, and | ) | |
| | ) | |
| The Hon. Wayne Stenehjem, Attorney | ) | |
| General of the State of North Dakota, | ) | |
| in his official capacity, | ) | Case No. 1:17-cv-151 |
| | ) | |
| Defendants, | ) | |
| | ) | |
| North Dakota Implement Dealers | ) | |
| Association, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

I.     **BACKGROUND**

A.     **This case generally**

Plaintiffs AGCO Corporation, CNH Industrial America, Deere & Company, and Kubota Tractor Corporation are manufacturers of farm equipment. Plaintiff Association of Equipment Manufacturers is a not-for-profit trade association that represents and promotes the legal and business interests of its 900-plus members, including the plaintiff manufacturers in this case.

Defendant Doug Burgum is the Governor of the State of North Dakota and defendant Wayne Stenehjem its Attorney General (collectively the "State"). Intervenor-defendant North

Dakota Implement Dealers Association ("NDIDA") is a trade association for approximately 115 franchised North Dakota farm equipment dealers.

In this action, plaintiffs have sought to enjoin the enforcement of amendments enacted by the North Dakota Legislature in 2017 to N.D.C.C. chapters 51-07 and 51-26[1] by 2017 N.D. Sess. Laws Ch. 354 (Senate Bill 2289) entitled "AN ACT to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair." Plaintiffs contend the enacted amendments (hereinafter "SB 2289") violate: (1) the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10; (2) the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq.; (3) the federal trademark statute, 15 U.S.C. § 1051 et seq. (the Lanham Act); (4) the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3; and (5) interstate price regulation provisions found at 15 U.S.C. § 13 et seq. (the Robinson-Patman Act).

On December 14, 2017, District Judge (then Chief Judge) Hovland preliminarily enjoined enforcement of SB 2289 on the grounds it likely violates the Contract Clause of the Constitution and that certain of its provisions are expressly prohibited and preempted by the Federal Arbitration Act. Ass'n of Equip. Mfrs., No. 1:17-cv-151, 2017 WL 8791104, at *11 (D.N.D. Dec. 17, 2017) ("Ass'n of Equip. Mfrs."). Defendants appealed the order, limiting their appeal to the court's conclusions with respect to the Contract Clause.

---

[1] N.D.C.C. ch. 51-07 contains provisions that, among other things, regulate the relationships between manufacturers and dealers of automobiles, trucks, lawn and garden equipment, and farm equipment—some to a greater degree than others. Ch. 51-26 governs farm equipment warranties and handling of warranty repair work.

On August 2, 2019, the Eighth Circuit affirmed the grant of the preliminary injunction, stating in summary the following:

> For these reasons, the State has not carried its burden of showing a significant and legitimate public purpose underlying Senate Bill 2289. The district court thus did not err in concluding that the manufacturers were likely to succeed on the merits of their Contract Clause claim. The State does not challenge the scope of the preliminary injunction, so the question whether it should be limited to retroactive applications of SB 2289, or to certain provisions of the law, is not presented at this juncture. The motions to supplement the record are denied. The district court's order granting a preliminary injunction is affirmed.

Ass'n of Equip. Mfrs. v. Burgum, 932 F.3d 727, 734 (8th Cir. 2019). On September 19, 2019, the Eighth Circuit denied defendants' petition for rehearing and rehearing en banc. Id. at 727.

## B. Plaintiffs' document requests and motion to compel

During the course of discovery, plaintiffs served defendants with document requests pursuant to Fed R. Civ. P. 34. The predicate instructions to the requests stated that plaintiffs were seeking responsive documents from January 1, 2015, through the date of the trial. They also defined SB 2289 by its official name, *i.e.*, "AN ACT to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair."

The State and NDIDA filed a joint response to plaintiffs' document requests,[2] stating initially with respect to  Document Request No. 4:

> **Document Request No. 4:** All documents relating to the drafting, preparation, enactment, or passage of Senate Bill 2289.
>
> **Response: Objection**. The State has no documents responsive to this request other than which is already publicly-available. NDIDA objects to this Request because it implicates documents that are covered under attorney-client privilege. Further, NDIDA objects to

---

[2] NDIDA is represented by the same firm that was retained to draft what was introduced as SB 2289.

this Request because it also implicates documents protected from disclosure as attorney workproduct. Otherwise, NDIDA has no other documents responsive to this Request. NDIDA will produce an appropriate privilege log.

On March 23, 2018, one week prior to the expiration of the March 30, 2018 deadline for completing discovery and after plaintiffs had deposed NDIDA's President and CEO, defendants served an amended response to Document Request No. 4 as follows:

**Amended Response: Objection.** The State has no documents responsive to this request other than which is already publicly-available. NDIDA objects to this Request because it implicates documents that are covered under attorney-client privilege. Further, NDIDA objects to this Request because it also implicates documents protected from disclosure as attorney workproduct. NDIDA also objects because this request implicates documents protected from disclosure under it and its members' First Amendment Privilege to engage in political activities as free speech and to not have such activities or speech chilled or otherwise used against them. Finally, the State and NDIDA interprets the above request to only reference those documents relating to the above that post-date the introduction of SB 2289. Further, the North Dakota Legislature, not NDIDA, drafts and prepares legislation, including SB 2289. Without waiving those objections above, NDIDA states that at the time of its initial response, investigation for potentially-responsive documents was ongoing and none had been found. As the investigation has continued, responsive documents have been discovered and those non-privileged, responsive documents will be provided. Otherwise, NDIDA will produce an appropriate privilege log.

Several days later, defendants' counsel identified responsive documents postdating the introduction of SB 2289 that were claimed to have been discovered after the initial response. Some of the documents were turned over to plaintiffs. A greater number were withheld on First Amendment privilege grounds. Also, for the first time, a privilege log of withheld documents was served on March 26, 2018. Notably, the privilege log referenced only documents that postdated the introduction of SB 2289 and claimed the First Amendment privilege. No documents were listed as being withheld based on claims of attorney-client or work-product privileges—even documents generated after the introduction of SB 2289 and notwithstanding the continued reference to these privileges in the amended response to Document Request No. 4.

Plaintiffs subsequently filed a motion to compel discovery seeking an order compelling NDIDA to:

1.    fully respond to plaintiffs' Document Request No. 4, including production of documents predating the introduction of SB 2289;  and

2.    require its President and CEO to sit for a supplemental deposition to cover the topics that were objected to during his deposition on First Amendment associational privilege grounds.

NDIDA opposed the motion.

### C.    The order granting the motion to compel

On July 2, 2019, the undersigned issued an order granting in part the motion to compel discovery.  Ass'n of Equip. Mfrs., 2019 WL 2871093 (D.N.D. July 2, 2019).  At the outset, the undersigned rejected NDIDA's argument that plaintiffs' motion was untimely given the lateness and suspect timing of NDIDA's revised disclosures.[3]  The undersigned also rejected NDIDA's contention that Document Request No. 4 did not extend to documents related to the drafting of SB 2289 prior to its formal introduction.  The State's and NDIDA's last-minute "rewriting" of Document Request No. 4 was deemed unreasonable given the clear language of the Request and the fact NDIDA had represented in its motion to intervene as a reason why intervention should be permitted:

> *NDIDA also helped draft this bill [SB 2289]*, which means NDIDA has firsthand knowledge of the purpose of the bill and other evidence. This knowledge and evidence is critical to showing that the bill does not violate the Lanham Act, the Robinson-Patman Act, or the Constitution.

---

[3]  To be fair, for all of plaintiffs' chest-thumping about untimely disclosures, they were even later in producing their own privilege log, not serving it until afer the deadline for completing discovery.

Turning to NDIDA's more meritorious arguments, the undersigned agreed that some of what was being withheld was likely First Amendment privileged. However, the court expressed doubts that it all would be and concluded that an *in camera* inspection of the documents was prudent under the circumstances.

Finally, NDIDA argued that the withheld information and documents were irrelevant. With respect to documents related to the drafting of SB 2289, the undersigned concluded some that were nonprivileged might be relevant and that NDIDA was estopped from claiming lack of relevancy upon what it had asserted in its motion to intervene. While not specifically addressed in the order, what the undersigned believed might be of some relevance was NDIDA's final draft of the legislative language that it provided to the sponsors it had lined up to introduce its draft bill. By comparing that document to what was formally introduced as SB 2289, one could determine the exact extent to which NDIDA was the "drafter" of SB 2289. In granting the motion to compel, the undersigned assumed that at least the draft of what NDIDA provided to its legislative sponsors would be produced given that any claim of privilege would be specious for reasons discussed later.

The undersigned further concluded that what also might be of some relevance given NDIDA's role in drafting SB 2289 (again putting aside the question of weight and any applicable privileges) would be any statements that NDIDA had made about SB 2289's purpose. In concluding that information reflecting NDIDA's role as drafter of SB 2289 and possibly statements about its purpose may be of some relevance, the undersigned relied upon: (1) United States Supreme Court precedent in which the Court had looked to material outside of the text of a challenged law and its legislative history in First Amendment Free Exercise and Fourteenth

Amendment Equal Protection cases when legislative purpose was an issue; (2) prior cases in which the Eighth Circuit had considered material outside of the text of a challenged statute and its legislative history (or functional equivalent) in considering legislative purpose in both dormant Commerce Clause and Contract Clause cases; and (3) the fact that Judge Hovland had in one instance relied upon material outside of the legislative record in considering the purpose of SB 2289 in his order granting the preliminary injunction, *i.e.*, a press release issued by the NDIDA after its passage.

As a result of what was decided, NDIDA was ordered to produce documents relating to the drafting, preparation, enactment, and passage of SB 2289, including those that predate the introduction of SB 2289, but excluding any documents for which there was a legitimate claim of privilege. With respect to the latter, the undersigned ordered NDIDA to: (1) prepare an updated privileged log listing all document being withheld based upon any claim of privilege; and (2) file with the court under seal all documents being withheld based upon a claim of privilege pursuant to the First Amendment.

As for that part of the motion to compel seeking a supplemental deposition of NDIDA's President and CEO, the undersigned concluded that certain lines of questioning by plaintiffs in the deposition that was taken were simply attempts to "muck around" in the internal affairs of NDIDA, likely First Amendment privileged, and, in any event, irrelevant.[4] Nonetheless, the undersigned concluded that plaintiffs should have some opportunity to depose NDIDA's President and CEO with respect to any withheld documents that were ordered produced along with any lines of inquiry that the court deemed not to be First Amendment privileged.

---

[4] In addition to numerous questions about NDIDA's internal affairs, there were other lines of inquiry that were similarly irrelevant, *e.g.*, why NDIDA and its members had not first attempted to negotiate with plaintiffs before seeking a legislative solution.

Consequently, the undersigned ordered a supplemental deposition following the production of the documents ordered produced and the undersigned's resolution of the First Amendment privileged issues.

**D.** **NDIDA's motions for a stay and for reconsideration, plaintiffs' motion for fees and costs, and the filing of documents for court review and a revised privilege log**

NDIDA filed motions for a stay of the order compelling discovery pending the Eighth Circuit's decision on the motion for preliminary injunction and for reconsideration, which the undersigned denied on July 18, 2019. While those motions were pending, plaintiffs filed its motion for attorney fees and costs, claiming $55,566—a breathtakingly huge number.

On July 17, 2019, NDIDA served an amended privilege log identifying the documents that it was withholding based on a claim of First Amendment privilege. The amended privilege log also identified for the first time documents being withheld based on a claim of attorney-client and/or work-product privileges, both before and after SB 2289's filing. On the same date, NDIDA forwarded to the court copies of the documents being withheld based only on a claim of First Amendment privilege for *in camera* inspection. Documents claimed to be privileged based upon claims of both First Amendment privilege and attorney-client or work-product privileges were not included.

**E.** **The Eighth Circuit's decision rendering irrelevant the withheld documents and information—at least as to the Contract Clause claim**

The extent to which legislative history and material outside of the official legislative record should be considered, if at all, in addressing whether SB 2289 had been passed for an improper purpose in violation of the Contract Clause was front and center in the appeal of Judge Hovland's order granting the preliminary injunction. The State and NDIDA argued the

legislative record was relevant and demonstrated that SB 2289 was passed in part to address economic problems of farmers and rural farm communities that went beyond the narrow interests of the equipment dealers who are the immediate, if not primary, beneficiaries of SB 2289. The State and NDIDA also argued, however, that material outside of what they characterized to be the "official" legislative record was immaterial, including, NDIDA's role in drafting SB 2289. Ass'n of Equip. Manufacturers v. Burgum, No. 18-1115, 2018 WL 2234314, at **5–16 (Appellant-Intervenor's Reply Brief, May 18, 2018).

Plaintiffs in their briefing on appeal also relied upon the legislative record to support their argument that SB 2289 was passed for an illegitimate purpose—except when it arguably did not. However, contrary to the State and NDIDA, plaintiffs contended that highly probative as to SB 2289's purpose were: (1) the fact that SB 2289 been drafted by NDIDA; (2) certain statements attributed to NDIDA made outside of the legislative record that purportedly demonstrated SB 2289's illegitimate purpose; and (3) NDIDA's extensive lobbying efforts. Ass'n of Equip. Manufacturers v. Burgum, No. 18-1115, 2018 WL 2017937, at **26–45 (Appellees' Response Brief, April 26, 2018).

In deciding the State had not carried its burden of showing a significant and legitimate public purpose underlying SB 2289, the Eighth Circuit panel in a 2–1 decision refused to consider its legislative history and looked only to its text. In relevant part, the panel majority stated:

> The State's primary argument is that even if SB 2289 substantially impairs the manufacturers' contractual rights, the legislation reasonably advances a significant and legitimate public purpose, so the impairment is constitutional. In Equipment Manufacturers Institute, South Dakota conceded that the purpose of a similar law was "to level the playing field between manufacturers and dealers," 300 F.3d at 860, and this court concluded that the conceded purpose did not qualify as a "significant and legitimate

public interest." Id. at 861. North Dakota makes no such concession and asserts that this law furthers a significant public interest in serving farmers and rural communities. But the mere assertion of a conceivable public purpose is insufficient to justify a substantial impairment of contractual rights. *Virtually all legislation enacted by multi-member bodies will be motivated by multiple purposes in the minds of individual legislators, but those subjective intentions are not controlling.* Whether the law passes constitutional muster requires a more discerning inquiry into the Act's structure and design.

\* \* \* \*

In evaluating the present North Dakota law governing contracts between manufacturers and dealers, the State "bears the burden of proof in showing a significant and legitimate public purpose underlying the Act." Id. at 859. The state legislature declined to follow the examples of the legislatures in Blaisdell and Keystone Bituminous, which included well-supported findings or purposes within their duly enacted laws, *so any significant and legitimate public purpose must be discerned from the design and operation of the legislation itself. Statements in the legislative history of individual legislators, lobbyists, or advocates that the law would benefit farmers and rural communities are insufficient. Special-interest groups cannot establish that legislation serves a broad societal interest simply by ensuring that the record contains testimony or floor statements about a law's conceivable public benefits.*

Ass'n of Equip. Mfrs. v. Burgum, 932 F.3d 727, 731–33 (8th Cir. 2019) (italics added).

Likewise, consistent with its focus on the text alone, the panel majority did not mention and apparently did not rely upon (1) the fact that the NDIDA was the principal drafter of SB 2289, or (2) any statements made by NDIDA about the purpose of SB 2289—whether made outside of the legislative record or as a part of it.  Id. at 730–34.  This, coupled with what the panel majority had to say about statements of "lobbyists" and "special interest groups," albeit with a different focus, supports the conclusion that the panel implicitly deemed the evidence irrelevant.[5]

---

[5] The dissenting member of the three-judge panel disagreed with the majority's conclusion that material beyond the text of SB 2289 was irrelevant in considering SB 2289's purpose.  Ass'n of Equip. Mfrs. v. Burgum, 932 F.3d at 736.

**F.**     **NDIDA's renewed request for reconsideration in light of the Eighth Circuit's decision and plaintiffs' response in opposition**

Following the Eighth Circuit's decision, NDIDA again urged reconsideration of the order granting the motion to compel, arguing that the documents and information being sought by plaintiffs are now clearly irrelevant in light of the Eighth Circuit's decision.  In response, plaintiffs conceded the panel's decision appears to make irrelevant what they were seeking in the motion to compel with respect to its Contract Clause claim.  However, they argued the panel's decision might not be the final word because the State and NDIDA had petitioned for a rehearing and en banc review, arguing, in part that the panel had erred in confining its analysis to SB 2289's text.  Also, plaintiffs argued that the withheld documents and information remain relevant to their other claims.

**G.**     **What is now before the court**

Before the court now is what further action, if any, should be taken with respect to the motion to compel in light of the Eighth Circuit's decision.  There is also plaintiffs' motion for attorney fees and costs.

**II.**     **THE MOTION TO COMPEL**

**A.**     **Introduction**

The undersigned agrees the landscape changed with what the Eighth Circuit stated about the lack of relevancy of anything beyond the text of SB 2289 in evaluating its purpose.  For reasons that will be discussed first, the undersigned concludes that the prudent thing to do now is to declare the prior order compelling discovery moot.  However, because of the likelihood of an appeal, the undersigned will make alternative rulings on the withheld information and documents, putting aside what appears to be the clear import of the Eighth Circuit's decision.

**B.** **The Eighth Circuit's statements about what is relevant in evaluating SB 2289's purpose moots the order granting the motion to compel**

As noted above, plaintiffs conceded that the Eighth Circuit's panel decision made irrelevant for purposes of the Contract Clause claim what they are seeking in the motion to compel, but noted that the State and NDIDA had moved for a rehearing and for en banc review. That motion for rehearing and for en banc review has since been denied.

Plaintiffs argue, however, that the withheld documents and information are relevant to its other claims. But, with respect to the federal statutory claims, plaintiffs offer no explanation for why other than the assertion of relevancy made by NDIDA in its motion to intervene, which the undersigned concludes is not by itself sufficient to justify further costs and expenses with respect to this matter.[6] This leaves only the dormant Commerce Clause claim.

Plaintiffs argue that statutory purpose is a relevant consideration in their dormant Commerce Clause claim and point to past Eighth Circuit cases that have considered matters beyond the text of the challenged statute and its legislative history or its functional equivalent. See South Dakota Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 593-96 (8th Cir. 2003) (considering a wide range of evidence with respect to the issue of purpose arising out of a dormant Commerce Clause challenge to a state constitutional amendment passed by referendum that prohibited corporations owning farm land); SDDS, Inc. v. State of S.D., 47 F.3d 263, 270 (8th Cir. 1995) (considering "protectionist propaganda" to voters on a state referendum being

_____

[6] With respect to the Robinson-Patman Act claim, NDIDA's draft may have used the term "like" in the price discrimination provision and SB 2289, as formally introduced, used the term "similar." Plaintiffs have not attempted to argue that NDIDA's draft is material to understanding SB 2289's meaning in light of this possible change. But, even if that argument had been made, the Eighth Circuit would likely conclude that attempting to draw any conclusions about SB 2289's meaning based on this change would be a search for "fools gold," given what it has had to say about the significance of legislative history.

challenged on dormant Commerce Clause grounds as a reason to diminish the weight of the result of the referendum); cf. Alliance of Auto Manufacturers v. Gwadosky, 430 F.3d 30, 39 (1st Cir. 2005) ("Where, as here, a party presents circumstantial evidence of an allegedly discriminatory purpose in support of a dormant Commerce Clause argument, it is that party's responsibility to show the relationship between the proffered evidence and the challenged statute. See E. Ky. Res. v. Fiscal Court, 127 F.3d 532, 543 (6th Cir.1997). While statements by a law's private-sector proponents sometimes can shed light on its purpose, see, e.g., S.D. Farm Bureau v. Hazeltine, 340 F.3d 583, 594-95 (8th Cir. 2003), the correspondence of a single lobbyist has little (if any) probative value in demonstrating the objectives of the legislative body as a whole.").

NDIDA disagrees. It argues that the purpose of SB 2289 would only be relevant, if at all, if the species of plaintiffs' dormant Commerce Clause claim is that SB 2289 is discriminatory, either facially or in effect, with respect to interstate commerce or out-of-state interests. As NDIDA has correctly observed, the Eighth Circuit cases cited above are "discrimination" cases and the dormant Commerce Clause claim made by plaintiffs is not one of discrimination but rather that SB 2289 creates an "undue burden" upon interstate commerce. For an "undue burden" dormant Commerce Clause claim, NDIDA argues SB 2289's purpose is irrelevant.

The undersigned is not so sure. The seminal case for the "undue burden" species of a dormant Commerce Clause claim is the Supreme Court's decision in Pike v. Bruce Church, 397 U.S. 137 (1970) ("Pike"); see, e.g., Southern Union Co. v. Missouri Pub. Serv. Comm'n, 289 F.3d 505, 507–09 (8th Cir. 2002); Cotto Wax Co. v. Williams, 46 F.3d 790, 793–95 (8th Cir. 1995) ("Cotto Wax"). In a Pike type of case, a balancing test is employed to determine whether

the Commerce Clause is violated.  "Under the balancing test, a state statute violates the Commerce Clause only if the burdens it imposes on interstate commerce are 'clearly excessive in relation to the putative local benefits.'" Cotto Wax, 46 F.3d at 793 (quoting Pike, 397 U.S. at 142).

In arguing that SB 2289's purpose is irrelevant in a Pike case, NDIDA cites only to Bens Oehriens and Sons and Daughters, Inc. v. Hennepin County, 115 F.3d 1372 (8th Cir. 1997), which, upon close analysis, does not appear to say that.  Further, plaintiffs ignore what the Supreme Court had to say in Pike itself.  In Pike, the Supreme Court clearly appears to have considered the challenged law's purpose.  In relevant part, the Court stated:

> At the core of the Arizona Fruit and Vegetable Standardization Act are the requirements that fruits and vegetables shipped from Arizona meet certain standards of wholesomeness and quality, and that they be packed in standard containers in such a way that the outer layer or exposed portion of the pack does not 'materially misrepresent' the quality of the lot as a whole.  The impetus for the Act was the fear that some growers were shipping inferior or deceptively packaged produce, with the result that the reputation of Arizona growers generally was being tarnished and their financial return concomitantly reduced.  It was to prevent this that the Act was passed in 1929.  The State has stipulated that its primary purpose is to promote and preserve the reputation of Arizona growers by prohibiting deceptive packaging.
>
> We are not, then, dealing here with 'state legislation in the field of safety where the propriety of local regulation has long been recognized,' or with an Act designed to protect consumers in Arizona from contaminated or unfit goods. Its purpose and design are simply to protect and enhance the reputation of growers within the State. These are surely legitimate state interest. Sligh v. Kirkwood, 237 U.S. 52, 61, 35 S.Ct. 501, 503, 59 L.Ed. 835. * * * *

Pike, 397 U.S. at 142–43 (footnotes omitted).  Finally, it is difficult to treat NDIDA's argument seriously when it and the State's briefs addressing the merits of plaintiffs' undue burden Commerce Clause claim are littered with references to SB 2289's purpose.  The following is but one example:

Manufacturers' dormant Commerce Clause claim again fails as a matter of law because they have failed to allege any facts showing cognizable burdens under the dormant Commerce Clause. Absent such material facts, their claim fails and there is nothing left to balance under the <u>Pike</u> standard. However, even if there exists some small recognizable burden, their claims fail because SB 2289 was enacted pursuant to North Dakota's police power, and evenhandedly effectuates multiple broad symbiotic significant and legitimate public purposes, with only incidental and speculative effects on interstate commerce.

(Doc. No. 119, p. 24).

That being said, what is at issue now is what evidence is relevant to ascertaining SB 2289's purpose. While NDIDA and the State have claimed that NDIDA's role in drafting and promoting SB 2289 is irrelevant, they have not been consistent on that issue. Aside from NDIDA's claim of relevancy in its motion to intervene, NDIDA and the State recently contended that the legislative testimony of NDIDA's President and CEO is relevant for ascertaining SB 2289's purpose, despite his being a lobbyist witness.[7] (Doc. No. 154, pp. 15–16 & n. 2, 19, 29 & n. 15). In support, defendants in a footnote cited two cases and added parenthetical comments as to their significance as follows:

> <u>See</u> <u>generally</u> <u>Group Life & Health Ins. Co. v. Royal Drug Co.</u>, 440 U.S. 205, 221 (1979) (Court found the view of the National Association of Insurance Companies [NAIC] significant "because the Act was based in large part on the NAIC bill."); * * * * <u>Kohring v. Ballard</u>, 325 P.3d 717, 725–27 (Or. 2014) ("In some cases, . . . it is appropriate to give greater weight to [non-legislator] legislative history, as when nonlegislators were the drafters of and principal proponents of a bill, and it is clear that the legislature relied on their explanation.").

(Doc. No. 154, pp. 15–16 & n. 2, 19, 29 & n. 15). Clearly, defendants are suggesting here that NDIDA's role as drafter renders relevant the testimony of NDIDA's President and CEO with

---

[7] Granted, this was in a brief addressing plaintiffs' Contract Clause claim, defendants have argued as already that SB 2289's purpose as well as  the legislative history (which includes Larsgaard's testimony) remain relevant to plaintiffs' dormant Commerce Clause claim.

respect to SB 2289's purpose. And, if that is correct, it then begs the question of what exactly was NDIDA's role as drafter.

Notwithstanding all of this, however, the undersigned believes the Eighth Circuit would conclude that the role of NDIDA as the primary drafter of SB 2289 as well as what NDIDA has said about its purpose are simply too tenuous to be relevant regardless of the claim being pursued. The undersigned reaches this conclusion based upon what the Eighth Circuit panel said about ascertaining legislative purpose generally and what it said about its ability to discern SB 2289's purpose in this instance from its text alone.[8] In view of this and the information that plaintiffs already possess as discussed in more detail below, the undersigned concludes that the prudent thing to do now to avoid the parties having to incur further costs and expenses for little or no practical gain (as well as for the court not to have to grapple with difficult First Amendment issues if there is an appeal) is simply to declare the prior order compelling discovery moot.

### C.    The undersigned's alternative rulings

Because the undersigned's conclusion of mootness may be appealed, alternative rulings will be made with respect to what remains to be decided. These rulings will assume the Eighth

---

[8] In so concluding, the undersigned acknowledges the matter is not without doubt—at least for part of the withheld documents. The panel decision did not mention NDIDA's role in drafting SB 2289, one way or the other, and there may remain an argument that it is marginally relevant (even with respect to the Contract Clause claim) if for no other reason than for purposes of context. Further, as to the dormant Commerce Clause claim, there remains: (1) what the Supreme Court had to say in Pike and what other courts have said about the purpose of the challenged legislation in that type of case; (2) the fact the Supreme Court and other courts have considered it noteworthy in other cases (albeit ones not involving the Commerce Clause) that the legislation at issue was drafted initially by a third party, as discussed in the foregoing excerpt from one of defendants' briefs; and (3) the instances (some of which are noted in the undersigned's prior order) in which the Supreme Court and other courts have considered the background of challenged legislation, including statements made outside of the legislative history as to the challenged law's purpose, albeit for other kinds of constitutional challenges. Finally, in "undue burden" Commerce Clause cases, those defending the challenged law do not appear to be confined to its text in arguing either the existence or weight of the putative local benefits. See, e.g., Bens Oehriens and Sons and Daughters, Inc. v. Hennepin County, 115 F.3d 1372 (8th Cir. 1997); Cotto Wax, 46 F.3d at 794–95; see also Allstate Ins. Co. v. Abbott, 495 F.3d 151, 164 (5th Cir. 2007) (considering evidence that was presented to the state legislature).

Circuit's decision has not rendered irrelevant *all* of what plaintiffs have sought by the motion to compel. First, however, it is necessary to consider what information plaintiffs already possess with respect to (1) NDIDA's role in the drafting of and lobbying for SB 2289, and (2) what it has said about SB 2289's purpose. Also, it is necessary to consider the applicability and scope of the First Amendment privilege claimed by NDIDA and its members.

### 1.	The information that plaintiffs already possess

Starting first with the evidence that plaintiffs have as to NDIDA's role in drafting SB 2289, plaintiffs are in possession of the following:

- NDIDA's representations in its motion to intervene. In addition, to the passage quoted earlier, NDIDA also stated:  "Most recently, NDIDA helped draft Senate Bill 2289 and was a major supporter of its passage." (Doc. No. 32-1, p. 2).  Then, later it again repeated:  "NDIDA also promoted and helped draft this legislation." (Id. 6).

- At least two documents in which NDIDA took credit for having "introduced" SB 2289.  One being a press release issued following the passage of SB 2289 and the other NDIDA's final report to it members on the 2017 Legislative Session that somehow found its way into the public domain.  Both of these documents were exhibits to plaintiffs' complaint.  (Doc. Nos. 1-4 & 1-5).

- The more detailed information that plaintiffs elicited from Matthew Larsgaard (NDIDA's President and CEO) during his deposition. Larsgaard testified that NDIDA hired a law firm (the same firm that is now jointly representing NDIDA and the State in this action) to draft proposed legislation. He testified NDIDA provided its draft to one or more legislators that it had lined up to be sponsors and

that NDIDA's draft found its way to the State's Legislative Council whose attorneys prepared the formal draft that was introduced as SB 2289. Finally, he testified the only substantive change he could recall from NDIDA's draft to what was first introduced as SB 2289 was substitution of the word "similar" for the word "like" in the provision prohibiting price discrimination in the sale of farm equipment. (Doc. No. 89-1, dep. pp. 48–74). Given Larsgaard's position and detailed knowledge of SB 2289, it is likely that, if there had been other substantive changes, he would have recalled them. That being said, the information that plaintiffs have demonstrating that NDIDA was the principal drafter of the language of what ultimately was first introduced as SB 2289 is somewhat fuzzy. Further, if it came down to technicalities, defendants might attempt to assert evidentiary objections to oral testimony as to the contents of NDIDA's final draft.

• As for changes to SB 2289 after it was formally introduced, NDIDA has the "official" legislative record as well as Larsgaard's testimony on that subject. It appears only a few changes were made.

With respect to NDIDA's role in securing the passage of SB 2289, plaintiffs have the legislative history and the documents referenced above. Also, plaintiffs' attorneys questioned Larsgaard at length about what NDIDA did to secure SB 2289's enactment and established that NDIDA: (1) lined up sponsors for the proposed legislation it drafted; (2) sought and organized support from ag-related organizations; (3) arranged for and coordinated testimony and other legislative support; and (4) engaged in other lobbying activities, including personal contacts with individual legislators. (Doc. No. 89-1, dep. pp. 59–229). This testimony alone, but particularly

when coupled with the legislative history and other record information, clearly establishes that NDIDA was the principal moving force behind its passage—if that should ever be a relevant consideration.

Finally, plaintiffs argue that highly probative of SB 2289 having been enacted for a constitutionally impermissible purpose is NDIDA's purported acknowledgment, as the apparent principal drafter of SB 2289, that its purpose is to level the playing field between manufacturers and dealers.  Plaintiffs argue that the additional purposes touted by NDIDA and the State before the Legislature and in this action are mere eyewash.  In advancing this narrative, plaintiffs rely in particular upon Equipment Manufacturers Institute v. Janklow, 300 F.3d 842 (8th Cir. 2002) wherein the Eighth Circuit held that a similar South Dakota law violated the Contract Clause based upon the State of South Dakota's acknowledgment that the purpose of the law was to "level the playing field between manufacturers and dealers" and the lack of evidence of an overriding "significant and legitimate public purpose" for the law.  Id. at 860–62.  For purposes of being able to advance their argument with respect to the dormant Commerce Clause claim, plaintiffs already have evidence of NDIDA's statements about the purpose of SB 2289 in terms of its providing protection for farm equipment dealers and "leveling the playing field" or comparable language.  Specifically, this includes:

- The press release issued by the NDIDA following the passage of SB 2289, which Chief Judge Hovland relied in part upon in his order granting the preliminary injunction and which was attached to the complaint.  (Doc. No. 1-4).

- The legislative testimony of Larsgaard, NDIDA's final report to its members re the 2017 legislative session, and certain lobbying pieces that either explicitly or implicitly, state the same thing.  (Doc. Nos. 1-5; 113-1).

• Finally, and not to overlook the obvious, there is SB 2289 itself. Its provisions are limited to providing protection for equipment dealers and it is obvious from both the scope and substance of its provisions that its *immediate* purpose is to "level the playing field," so to speak, between farm equipment manufacturers and dealers. In fact, the State and the NDIDA in their briefing on appeal and in the cross-motions for summary judgment have not seriously contended otherwise. Rather, their argument is that providing protection to dealers and leveling the playing field results in additional societal benefits they claim are sufficient to sustain its constitutionality.

That plaintiffs have substantial information and appear not to have been handicapped in the presentation of their case is confirmed by their briefing to this court and on appeal. Particularly illustrative is the following passage from plaintiffs' Eighth Circuit's appeal brief:

Senate Bill 2289 was drafted by the North Dakota Implement Dealers Association ("NDIDA"), a trade association whose membership consists of 120 farm equipment dealers in North Dakota. (J.A.677-78). NDIDA's stated purpose "is to promote the general welfare of its dealer members by . . . [among other things] representing dealer interests in government regulation and legislation . . . and supporting equitable dealer and manufacturer relations." (J.A.150). In various public statements, NDIDA claimed to have "introduced" Senate Bill 2289, called it the "Farm Equipment Dealer Bill of Rights," and characterized it as a "major farm equipment dealer protection bill"--"one [of] the most comprehensive and impactful pieces of legislation that the NDIDA has ever introduced in our 117 year history." (J.A.83, 86).

After lobbying the North Dakota legislature to consider Senate Bill 2289, NDIDA brought current and former NDIDA executives, current and former dealers, and members of other interest groups to testify in support of the bill before the North Dakota Senate and House Agricultural Committees. (J.A.87). These advocates testified, and the committees agreed, that Senate Bill 2289 was designed to protect local dealers. (J.A.739, 768-69, 774, 781, 788, 813, 814, 830). Both committees ultimately approved Senate Bill 2289 with very few changes from the legislation that NDIDA had originally drafted. (J.A.685-87, 746-49, 755-56).

Once Senate Bill 2289 reached the Senate floor, the only legislator to speak about it was Assistant Majority Leader Jerry Klein, one of its co-sponsors. Senator Klein told the Senate that "[w]e need to do what we can to help protect . . . our farm equipment dealers.

. . . [T]he hope is that we will give the same level playing field to our implement dealers as we did to our auto dealers." (J.A.952, 871-72). About forty-five seconds later, the Senate unanimously approved the legislation. Senator Klein's reference to "our auto dealers" pertained to legislation that the Assembly had passed several years earlier at the behest of the Automobile Dealers Association of North Dakota, an automotive dealer advocacy group that happens to have the same employees and leadership as NDIDA. (J.A.660-61).

Ass'n of Equip. Mfrs., 2018 WL 2017937, at **9–10.

## 2.     NDIDA's claim of First Amendment privilege

The undersigned acknowledged in the prior order that NDIDA and its members likely have a First Amendment privilege with respect to some of the withheld documents and information, citing several Supreme Court and lower federal circuit court cases, including one from the Eighth Circuit. That discussion will not be repeated. In addition, since the supplemental briefing that the undersigned allowed on the claim of First Amendment privilege, the Eighth Circuit, sitting en banc, decided a case involving an as-applied First Amendment challenge to Missouri's laws governing lobbyists. Calzone v. Summers, __ F.3d __, 2019 WL 5667584, at **5,7 (8th Cir. Nov. 1, 2019) ("Calzone"). While not directly on point, what the Eighth Circuit had to say about First Amendment rights in the legislative context supports providing protection to NDIDA and its members in this case.[9]

---

[9]  The as-applied First Amendment challenge to Missouri's laws governing lobbyists challenge was brought by Calzone, a person who frequently interacted with the Missouri Legislature—nominally in the name of a nonprofit corporation that essentially was his alter ego. Calzone claimed that Missouri's lobbyist requirements chilled his First Amend rights and did not survive scrutiny as applied to him because he neither accepted money for his activities nor spent money on legislators or legislative staff. In agreeing with Calzone , the Eighth Circuit stated, in part, the following:

> Now that we have concluded that Calzone's entire as-applied challenge is before us, the question is straightforward: can Missouri require Calzone to pay a fee and publicly disclose his political activities, even though he neither spends nor receives any money in connection with his advocacy? We conclude that the answer is no.

> Everyone agrees on one point: Calzone is engaged in First Amendment activity. See FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 426, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (noting the First Amendment right "to lobby ... officials to enact favorable legislation"). After all, "interactive communication concerning political change" is at the "core" of the First Amendment, Meyer v. Grant, 486 U.S. 414, 422, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), and the right "to petition for a redress

(continued...)

With respect to the rulings that follow, the undersigned concludes NDIDA has made a sufficient threshold showing (which need not be great) for invoking a First Amendment claim of privilege by the affidavits it has filed—at least for part of what is within the scope of Document Request No. 4 as well as for most of the objected-to questions in the Larsgaard deposition that are at issue here.   See, e.g., Perry v. Schwarzenegger, 591 F.3d 1147, 1163 (9th Cir. 2010) (threshold showing can be met by filing affidavits attesting to the chilling effects of disclosure of the information at issue); Alliance of Automobile Manufacturers, Inc. v. Jones, No. 4:08-cv-555, 2013 WL 4838764, at *4 (N.D. Fla. Sept. 11, 2013) (same) ("Alliance of Auto Mfrs."); Flynn v. Square one Distribution, Inc., No. 6:16-mc-25, 2016 WL 2997673, at *3 (M.D. Fla. May 25, 2016) ("Flynn") (The "burden [of the proponent of the privilege] is light, given the crucial place speech and associational rights occupy under our constitution.") (internal quotations and citing

---

⁹(...continued)
of grievances [is] among the most precious of ... liberties," United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967).

Missouri calls this activity "lobbying." Regardless of the label, Calzone does not lose his First Amendment rights just because he speaks through an organization that shares his perspective. See, e.g., Superior Court Trial Lawyers Ass'n, 493 U.S. at 426, 110 S.Ct. 768; United Mine Workers, 389 U.S. at 221–22, 88 S.Ct. 353. To the contrary, both he and Missouri First still have the right to make their views known.

* * * *

These concerns, however, are not "sufficiently important" to justify the burdens placed on Calzone's speech. See Swanson, 692 F.3d at 876. As the Supreme Court has recognized, speakers ordinarily have the right to keep their identities private. McIntyre, 514 U.S. at 341–43, 348–49, 353–57, 115 S.Ct. 1511. In fact, the right to remain nameless is "an aspect of the freedom of speech protected by the First Amendment" and a component of "a respected tradition of anonymity in the advocacy of political causes." Id. at 342–43, 115 S.Ct. 1511. This principle applies with particular force here because "core political speech" is at issue. Id. at 346–47, 115 S.Ct. 1511; see also Superior Court Trial Lawyers Ass'n, 493 U.S. at 426, 110 S.Ct. 768. So Missouri's "simple interest in providing voters with additional relevant information does not justify a state requirement that [Calzone] make statements or disclosures [he] would otherwise omit." McIntyre, 514 U.S. at 348, 115 S.Ct. 1511. Nor does legislative curiosity justify upfront disclosure of information that legislators can presumably find out on their own.
Calzone, 2019 WL 5667584, at **5,7 (8th Cir. Nov. 1, 2019).

authority omitted). While the affidavits are to a certain extent conclusory and formulaic, just enough is claimed to satisfy the threshold, particularly when considered in the context of the relative power held by the manufacturers in terms of being able to terminate or not renew a dealer and to a lesser extent the recent demands made by manufacturers in renewing dealer contracts. The undersigned concludes that the professed fears of intimidation and reprisal on the part of at least some of NDIDA's members are genuine and that disclosure of the privileged information would result in a chilling of First Amendment rights. See Alliance of Auto Mfrs., 2013 WL 4838764, at *4.

With NDIDA having made its threshold showing for at least some of what is being sought, the burden shifts to plaintiffs to show a compelling need for the information to overcome the privilege. See, e.g., Savola v. Webster, 644 F.2d 743, 747 (8th Cir. 1981); United States v. Citizens State Bank, 612 F.2d 1091, 1094 (8th Cir. 1980); Flynn, 2016 WL 2997673, at *2 (The "burden [of the proponent of the privilege] is light, given the crucial place speech and associational rights occupy under our constitution.") (internal quotations and citing authority omitted); Sierra Club v. Union Electric Co., No. 4:14-cv-00408, 2015 WL 9583394, at *3 (E.D. Mo. Dec. 31, 2015); Alliance of Auto Mfrs., 2013 WL 4838764, at *4. In making this showing, plaintiffs must demonstrate more than simply that the information is relevant. See id.

The First Amendment privilege issues in this case are difficult not only because of the sparsity of cases addressing the privilege's scope and applicability in cases involving lobbying by associations, but also because of the uniqueness of this case. First, NDIDA in this instance not only drafted and lobbied for the proposed legislation, it voluntarily intervened as a party defendant to defend its lawfulness. Then, in seeking to intervene, it claimed that its role in drafting SB 2289 provided it with insight that would assist the court in determining SB 2289's

purpose and ultimate legality and later, in at least one instance, claimed that remarks of its President and CEO were relevant to these issues because of its role as drafter. Second, there are difficult waiver issues for which the case law is also sparse in terms of when and under what circumstances the privilege can be waived. Plaintiffs argue that NDIDA waived the privilege, all or in part, with respect to its role in drafting SB 2289 by the representations it made in the motion to intervene and other documents that are publically available. Plaintiffs also argue the same is true for any documents in which NDIDA made a statement about SB 2289's purpose given what NDIDA has publically said about that subject, including Larsgaard's testimony before the state legislature and the press release that was issued following its passage. Finally, some of the withheld documents are of the same character that plaintiffs already possess. And, does the fact that comparable documents are already in the "wild," so to speak, amount to a waiver? Does it make a difference if the documents inadvertently leaked out and were not deliberately and purposefully disclosed? Is the lack of any statement in the documents that the information is confidential and should not be publically disseminated relevant to the issue of wavier? The parties and the court can spend hours and pages grappling with the First Amendment privilege issues in this case and not substantially advance the ball in terms of the merits.

### 3.    Rulings on the documents filed under seal

The undersigned concludes as a general matter that communications and discussions that are internal to NDIDA and are about (1) problems with manufacturers and their contracts, (2) what relief should be sought from the state legislature, (3) reasons for retention of outside counsel with respect to legislative solutions, and (4) lobbying strategy and tactics, all lie at the core of and are protected from disclosure in this instance by the First Amendment. Further,

plaintiffs have no compelling need for the information given the lack of any relevancy to the issues in this case, even putting aside the Eighth Circuit panel's narrow determination of what is relevant. See, e.g., Alliance of Auto Mfrs., 2013 WL 4838764, at **1–5; cf. Flynn, 2016 WL 2997673, at **1, 3-4 (holding that discovery of comparable information was of marginal, if any, relevancy, and not proportional to the needs of the case as required by Fed. R. Civ. P. 26(b)).   In holding that demands by auto manufacturers for comparable internal communications and other documents of a dealer association were privileged, the court in Alliance of Auto Mfrs. stated in conclusion following:

> Alliance has not pointed to any case which permitted discovery into a proponent of legislation's understanding or interpretation of the proposed legislation, the proponent's communications concerning "supporting, opposing, lobbying for or otherwise seeking passage of the" legislation, the extent of the proponent's involvement in the legislative process, support for political candidates, or campaign contributions. Such information is not relevant. While the Supreme Court permits courts to probe beyond assertions of legislative purpose in determining the "actual purpose," the Court has not permitted probing into the political affairs of citizens, lobbyists, or other proponents of legislation. Participants in the legislative process should have input into laws which govern areas of concern, but the responsibility for statutory language enacted by Florida's Legislature rests with the Legislature. It is primarily from the Legislature that discovery is obtained to inquire into a statute's purpose and intent.

2013 WL 4838764, at *5.

Plaintiffs cite to In re Motor Fuel Temperature Sales Practices Litigation, 707 F. Supp. 2d 1145 (D. Kan. 2010) ("In re Motor Fuel") as support for their entitlement to broad discovery with respect to NDIDA's role in drafting and lobbying for SB 2289 passage, including the ability to obtain internal association communications that touch upon these subjects in part because only commercial interests are at stake.   The problems with relying upon this case, however, are several.   First, the primary conclusion of the district court in In re Motor Fuel was that the party invoking the privilege had not presented enough to make out a prima facie case for invocation of the First Amendment privilege for the documents at issue.   Notably, there were no affidavits or

other comparable evidence demonstrating a chilling effect on First Amendment rights.  Id. at 1164–65, 1168.  Second, the substantive issues in In re Motor Fuel were different and arguably made the internal communications more relevant for purposes of determining the need for the information.  Id. at 1147, 1161.  Third, the analysis of the court in Alliance of Auto Mfrs., supra, is more persuasive than that of the district court in In re Motor Fuel.  Finally, the district court's decision in In re Motor Fuel was appealed.  And, while the Tenth Circuit agreed that the sparse record before the district court was not enough to make the requisite prima facie showing for invoking First Amendment rights, there is nothing in the opinion which suggest that a prima facie showing would not have been possible had appropriate evidentiary evidence been submitted.  Further, the Tenth Circuit discussed at length its views regarding the scope of the First Amendment Privilege and appears clearly to have concluded it extends to internal communications between trade association groups and their members regarding lobbying strategy and the implementation of legislation—even when only economic interests are at stake.  This is at odds with certain statements of the district court relied upon by plaintiffs here.  In re Motor Fuel Temperature Sales Practices Litigation,  641 F.3d 470, 481 (10th Cir. 2011).  After discussing the First Amendment right to associate and Supreme Court cases applying that right in various contexts, the Tenth Circuit stated:

> Although the First Amendment privilege has now been applied by various courts in varying contexts, no court has directly considered its application to a case like ours, where a court compels disclosure of trade groups' and their members' strategic pre-lobbying communications in a lawsuit between private parties. In NAACP v. Alabama, however, the Court made it clear that the First Amendment privilege applies "whether the beliefs sought to be advanced by association pertain to political, *economic*, religious, or cultural matters." 357 U.S. at 461, 78 S.Ct. 1163 (emphasis added). Moreover, in Grandbouche v. Clancy, we expressly held that the First Amendment privilege applies to discovery orders issued in litigation involving only private parties. 825 F.2d 1463, 1466 (10th Cir.1987). Thus, we conclude that the First Amendment privilege applies to the district court's discovery order, which requires trade groups and their members to disclose to a private party their communications regarding strategy for

26

lobbying against the implementation of ATC in the United States. Accordingly, we turn
now to the substance of the interlocutory appeal and mandamus petition.

Id. at 481 (footnotes omitted).

The other case that plaintiffs cite as authority for broad discovery into NDIDA's internal

affairs is Tesla Motors, Inc. v. Johnson, No. 1:16-cv-1158 (W.D. Mich. Dec. 11, 2017).  This

unpublished decision is "thin gruel" for plaintiffs' arguments in this case.  This is because the

court in Tesla Motors recognized that the privilege applied to internal trade association

communications and the documents it ordered to be produced were  for "attorneys eyes only"

because of that fact.  Further, it appears that the restricted production was only ordered because

of the particular circumstances of the case, including that one of the claims being asserted was

the contention that, if the challenged legislation was left to stand, the result would be an

unlawful monopoly.  More relevant here is the analysis of the court in Alliance of Auto Mfrs.,

supra.

With this predicate, what follows are the undersigned's rulings with respect to the

documents that have been filed under seal for *in camera* inspection.  The document numbers are

the ones used by NDIDA in its privilege log.

- Document Nos. 23–25, 57 make no mention of SB 2289 or any matters related to
  this case.  Hence, the documents are irrelevant and do not have be produced for
  this reason.  Also, the documents are First Amendment privileged.

- Document No. 1 is, in part, the text of the Final 2017 Legislative Report that
  plaintiffs already possess in final form and is attached to their complaint.  Hence,
  plaintiffs have no need for this part of the Document.  The remainder of

Document No. 1 involves matters irrelevant to this case and is also First Amendment protected. For these reasons, Document No. 1 need not be produced.

- Document Nos. 2–5, 14–15, and 18 are all communications or other documents that are facially internal to NDIDA and subject to First Amendment protection. The documents do include statements touching upon the purpose of SB 2289 and, if those statements are deemed relevant and discoverable, it appears the documents could be redacted to protect against other First Amendment concerns. That being said, the undersigned concludes none of the documents need be produced given that, in striking the required balance and putting aside that the Eighth Circuit would likely conclude the material is irrelevant in any event, plaintiffs do not have a compelling need for the statements given the information they already possess and the at best nominal relevancy of the documents.[10] Also, the undersigned would conclude that the First Amendment privilege as to these documents has not been waived. Finally, apart from the First Amendment privilege, the statements about purpose are cumulative to what plaintiffs already have. And, given (1) that fact, (2) the statements being of nominal relevance at best, and (3) the costs and expenses of the parties continuing to argue whether the documents are discoverable, the undersigned concludes that the documents need not be disclosed after balancing the proportionality factors set forth in Fed. R. Civ. P. 26(b). See Flynn, 2016 WL 2997673, at **1, 3–4.

---

[10] In fact, some of what is stated in the documents arguably supports defendants' claim of a broader purpose for SB 2289.

- Document Nos. 6–12, 19, 26–29, 32–33, 58, 60, 62–63 are all internal NDIDA documents that variously discuss or touch upon problems with existing manufacturer-dealer contracts, whether legislative relief should be sought in 2017, what the legislative relief should be, the hiring of outside counsel, drafts of suggested language, potential legal issues, lobbying strategy and efforts, and updates with respect to the legislative process. Unlike the previous set of documents, these do not appear to contain any explicit statements about SB 2289's legislative purpose. The undersigned concludes that all of these documents are First Amendment privileged because plaintiffs have not demonstrated a compelling need given (1) their lack of or marginal relevancy to the issues in this case, even putting aside the Eighth Circuit's decision, and (2) the information that plaintiffs already possess to support their argument of SB 2289's purported improper purpose. Apart from the First Amendment privilege, the undersigned concludes that the documents are not discoverable for the same reasons discussed above after considering the proportionality requirements of Fed. R. Civ. P. 26(b).

- Document No. 14 is an email with attached documents. The text of the email is not discoverable for the same reasons expressed in the preceding bullet point. The attachments are all documents that plaintiffs already have as made clear from the briefing in this case and the deposition of Larsgaard. For these reasons, Document No. 14 need not be produced.

- Document No. 16 appears to be an incomplete draft of remarks for a particular legislator that includes statements touching upon NDIDA's role with respect to

the introduction of SB 2289 as well as statements touching upon the purpose of the existing law providing protection to equipment dealers prior to SB 2289.  It is not clear why NDIDA is in possession of this document.  One possibility is that it is a partially-completed draft of testimony that NDIDA prepared for the legislator.  If that is the case, the undersigned would conclude that the document is First Amendment privileged given that defendants have not demonstrated a compelling need for its disclosure for the same reasons expressed above.  Further, apart from its substance, the undersigned concludes that the document is of minimal relevance to the issues in this case if plaintiffs' purpose is to argue that NDIDA "ghost wrote" one or more legislator statements thereby in their view tainting the end product as well as the legislative record that NDIDA and the State rely upon.  That special interest groups engage in this type of activity is well-known generally and is one reason why legislative history, if it is going to be relied upon, must be viewed with healthy skepticism.  But, to the extent it may have been done in this case, is not something this court would try to sort out, even absent what the Eighth Circuit most recently has said, for the obvious reason that it would significantly broaden the scope of inquiry for little gain at that end of the day.  Finally, to the extent that NDIDA has the document because the legislator provided it to NDIDA, the undersigned would not order Document No. 16 to be produced given its nominal relevance, even absent the Eighth Circuit's decision. In short, Document No. 16 need not be produced.

- Document No. 17 is a legislative statement by a particular legislator.  It is not clear whether it is a draft or simply a copy of a written statement that is in the

legislative record.  If it is the latter, plaintiffs already have it.  If it is the former, then it need not be produced for the same reasons expressed with respect to Document No. 16.

- Document No. 21 purports to be testimony of an NDIDA member dealer.  If the document is simply a copy of the actual testimony given, then plaintiffs already have it.  If not, the undersigned believes it is First Amendment privileged and plaintiffs have not demonstrate a need for it sufficient to overcome the privilege given its marginal relevancy and the information plaintiffs already possess.

- Document No. 22 is the same as Document No. 21 but it is not clear whether the identified author is an NDIDA member or simply an ally.  Nevertheless, the document need not be produced for the same reason as expressed with respect to Document No. 21.

For those keeping tally, this covers all of the documents that were produced for *in camera* review[11] with the net result being that the undersigned would not order any of these documents to be produced.

### 4. Documents that are claimed to be attorney-client or work-product privileged

When plaintiffs made their motion to compel, NDIDA's response to Document Request No. 4 suggested it was withholding documents for which it claimed an attorney-client and/or work-product privilege but produced a privilege log that identified only documents generated after the introduction of SB 2289 and that claimed only a First Amendment privilege.  In its order granting the motion to compel, the undersigned ordered NDIDA to prepare a revised

---

[11]  To be clear, only documents claiming just the First Amendment privilege were submitted for *in camera* review and this did not include all of the documents numbered 1–63 in NDIDA's revised privilege log.

privilege log listing all documents for which a claim of privilege was being made and that included documents responsive to Document Request No. 4 whether generated before or after the introduction of SB 2289. The undersigned further ordered that the documents withheld based on a claim of First Amendment privilege be submitted for *in camera* review since that appeared to be where the principal dispute was and the undersigned was not interested in reviewing a large volume of documents withheld based on another claim of privilege if there was no contest over them.

Plaintiffs in their further briefing argue that the court needs to consider all of the documents for which a claim of privilege has been made. NDIDA disagrees, arguing that the documents for which a claim of attorney-client or work-product privileges are beyond the scope of plaintiffs' motion. NDIDA also argues that plaintiffs were always aware that an attorney-client and work-product privileges were being claimed and that it is untimely now to attempt seek production of these documents.

The problem with NDIDA's "shell-game" arguments, however, is the fact that it never identified what documents were being withheld based upon attorney-client and work-product privileges in its initial privilege log that it served just prior to the expiration of the discovery deadline and only identified the documents claimed to be privileged on these grounds after the court ordered it to do so. That being said, there likely are a number of documents for which a claim of attorney-client privilege would be appropriate. These would include: (1) communications between NDIDA and counsel about legal issues relating to existing relations between manufacturers and dealers; (2) communications relating to the preparation and drafting of SB 2289, including initial drafts but obviously not the document reflecting the final draft as discussed in a moment; and (3) internal NDIDA communications with members with respect to

advice provided by counsel with respect to (1) and (2). Further, even absent the Eighth Circuit's decision, these documents would also likely be lacking in relevance and not worth considering whether privileged or not. For these reasons, the undersigned is not interested in reviewing more documents without a targeted motion that takes into consideration the revised privileged log.

5. **Documents responsive to Document Request No. 4 for which no claim of privilege has been made**

It is unclear whether NDIDA has turned over any documents in response to the order granting the motion to compel. The parties in their subsequent briefing have not referenced the production of any documents and the undersigned presumes none have been produced given NDIDA's request for reconsideration in light of the Eighth Circuit's decision.

The one document the undersigned presumes NDIDA is still withholding pending a final order is NDIDA's final draft of SB 2289 that it provided to its legislative sponsors. This is because (1) it defies belief that neither NDIDA nor its attorneys retained a copy, and (2) NDIDA has not claimed its final draft is privileged in that it was neither produced for *in camera* inspection nor otherwise identified and listed as privileged in the revised privilege log. Further, there is good reason why NDIDA has not claimed its final draft is privileged. Any claim that NDIDA's final draft is First Amendment privileged would be specious given what NDIDA has publically represented with respect to it role in drafting SB 2289 as well as the fact that it made no attempt to object when Larsgaard was questioned during his deposition about the draft NDIDA submitted to its sponsors and the contents of that draft. Likewise, even a second-year law student would understand that a claim of attorney-client or work-product privilege would be specious and lacking in good faith given that the document was not held in confidence (*i.e.*, it

was given to one or more legislators) and also that there can be no claim of protected work product since it was not prepared in anticipation of litigation.

If it were not for the Eighth Circuit's decision and the likelihood it would deem all of what has been withheld irrelevant with respect to SB 2289's obvious purposes, the undersigned would require that NDIDA's final draft of SB 2289 as presented to its legislative sponsors be turned over. Granted, NDIDA does have the testimony of Larsgaard (assuming it is admissible) from which an inference can be drawn that NDIDA was the drafter of virtually all of what was finally passed as SB 2289—at least substantively—as well as other more general evidence of NDIDA stating it was involved in the drafting and introduction of SB 2289. However, both NDIDA and the State have continued to obfuscate with respect to the *extent* of NDIDA's role in the drafting of SB 2289 and comparing the final draft of what NDIDA submitted to its sponsors to what was formally introduced as SB 2289 provides a definitive and simple answer.

The other documents that NDIDA may be holding pending a final order are any cover letters, memorandums, or the like that may have accompanied NDIDA's final draft of SB 2289 as it was presented to one or more of the legislative sponsors. It might very well be that there are none since NDIDA's transmittal of the final draft to its legislative sponsors may have been done in person or not under cover of a transmittal document. While there may have been some argument for a claim of First Amendment privilege with respect any transmittal documents, no transmittal documents were included in the documents submitted to the court for *in camera* review and none were otherwise identified in the revised privilege log. Consequently, any claim of privilege has now been waived, particularly given that NDIDA has had multiple opportunities to claim and preserve the privilege but has not done so. That being said, these documents are

likely to be of marginal relevance and cumulative, even if they contained statements that touched purposes of the proposed legislation, and not worth either side fighting over.

### 6. No supplemental Larsgaard deposition

After closer consideration of the information that plaintiffs already have, the undersigned would not now require Larsgaard to sit for a supplemental deposition given the foregoing rulings. The only document for which there might be some marginal relevance and for which there can be no claim of privilege is NDIDA's final draft of SB 2289. If ordered to be produced, this document would speak for itself and further inquiry would not meaningfully advance the ball in terms of resolution of this case.

## III.   PLAINTIFFS' MOTION FOR ATTORNEY FEES AND COSTS

The only argument that plaintiffs make for their motion for attorney fees is pursuant to Fed. R. Civ. 37(a)(5). Hence, consideration of plaintiffs' motion will be limited to that Rule.

Given the undersigned's conclusion that the order granting the motion to compel is now moot in light of the Eighth Circuit's decision, plaintiffs' motion for attorney fees and costs will be denied. See Fed. R. Civ. P. 37(a)(5) (ii), (iii) (award of fees not required when opposing party's nondisclosure was substantially justified or when circumstances make an award unjust). As for plaintiffs' suggestion that they are entitled to something for their earlier "win," circumstances changed and no one forced plaintiffs to file their motion to compel.[12]

---

[12] Even if was determined (1) that the document the undersigned stated in its alternative rulings would be subject to production and (2) that NDIDA's reasons for non-production were not justified, the fees and costs the undersigned would award, if any, would be a small fraction of the amount being claimed for several reasons. First, the amount claimed by plaintiffs is unreasonable, even if plaintiffs would have prevailed 100%. Second, plaintiffs would not have prevailed 100%. Finally, if plaintiffs had narrowed their original demands to just the NDIDA's final draft of SB 2289 along with any transmittal documents, there is some possibility the motion to compel could have been avoided by the mandatory telephone conference with the undersigned prior to filing of the motion to compel. In that instance, the demands would have more focused and a common sense resolution might very well have been possible.

Likewise, NDIDA will also not be awarded its fees and costs given that plaintiffs' motion to compel, at least for the most part, was substantially justified as well as the particular circumstances. With respect to the latter, NDIDA has only has itself to blame for the position it found itself in when plaintiffs initially filed their motion to compel by the claims of relevancy set forth in its motion to intervene as well as its less than forthright conduct as outlined in the court's prior order.

## IV.  ORDER

 Based on the foregoing, the undersigned **ORDERS** as follows:

1.  NDIDA's request for reconsideration in light of the Eighth Circuit's decision on the preliminary injunction (Doc. No. 144) is **GRANTED**. The undersigned's prior order compelling discovery (Doc. No. 130) is deemed **MOOT**. NDIDA will not be required to comply further in terms of producing documents and tendering Larsgaard for a supplemental deposition.

2.  Neither party will be awarded its fees and costs. Plaintiffs' motion for attorney fees and costs (Doc. No. 132) is specifically **DENIED**.

Dated this 17th day of December, 2019.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court