**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Association of Equipment Manufacturers, AGCO Corporation, CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **ORDER ON MOTIONS** |
| vs. | ) ) | |
| The Hon. Doug Burgum, Governor of the State of North Dakota, in his official capacity, and | ) ) ) ) | |
| The Hon. Wayne Stenehjem, Attorney General of the State of North Dakota, in his official capacity, | ) ) ) ) | Case No. 1:17-cv-151 |
| Defendants, | ) ) | |
| North Dakota Implement Dealers Association, | ) ) ) | |
| Intervenor-Defendant. | ) | |

Before the Court are six motions for summary judgment or partial summary judgment and a motion to strike. See Doc. Nos. 95, 107, 112, 115, 147, 150, and 152. Both the Plaintiffs and the Defendants have moved for summary judgment as to all issues. The motions have been fully briefed and are ripe for consideration. For the reasons set forth below, the partial motions for summary judgment (Doc Nos. 147, 150, and 152) and the Plaintiffs' motion for summary judgment (Doc. No. 112) are granted in part and denied in part; the State's partial motions for summary judgment (Doc. Nos. 95 and 107) are granted; and the State's motion to strike (Doc. No. 115) is denied.

1

I.      **BACKGROUND**

Plaintiff Association of Equipment Manufacturers ("AEM") is a not-for-profit corporation organized under the laws of Illinois, with a principal place of business in Milwaukee, Wisconsin.  AEM is a trade association that represents and promotes the legal and business interests of AEM's 900-plus members and of the equipment manufacturing industry in general.  Many of AEM's members enter into individualized contractual relationships with farm equipment dealers whom they have determined are qualified to market and service their machinery to consumers in specific markets.  The relationship between the manufacturers and dealers are governed by dealership agreements which establish the respective rights and duties of each party, and regulated by the North Dakota Farm Equipment Dealership Statute.

Plaintiff AGCO Corporation ("AGCO") is a corporation organized under the laws of Delaware, with a principal place of business in Duluth, Georgia.  AGCO is a manufacturer of farm equipment and farm implements, and its agreements with farm equipment dealers in North Dakota are subject to the North Dakota Farm Equipment Dealership Statute.   AGCO is a member of AEM.

Plaintiff CNH Industrial America ("CNH") is a corporation organized under the laws of Delaware, with a principal place of business in Burr Ridge, Illinois.  CNH is a manufacturer of farm equipment and farm implements, and its agreements with farm equipment dealers in North Dakota are subject to the North Dakota Farm Equipment Dealership Statute.  CNH is a member of AEM.

Plaintiff Deere & Company ("John Deere") is a corporation organized under the laws of Delaware, with a principal place of business in Moline, Illinois.  John Deere is a manufacturer of

farm equipment and farm implements, and its agreements with farm equipment dealers in North Dakota are subject to the North Dakota Farm Equipment Dealership Statute.  John Deere is a member of AEM.

Plaintiff Kubota Tractor Corporation ("Kubota") is a corporation organized under the laws of Delaware, with a principal place of business in Grapevine, Texas.  Kubota is a manufacturer of farm equipment and farm implements, and its agreements with farm equipment dealers in North Dakota are subject to the North Dakota Farm Equipment Dealership Statute. Kubota is a member of AEM.  The Plaintiffs will be referred to collectively as the "Manufacturers."

Defendant Doug Burgum is the Governor of the State of North Dakota.  Defendant Wayne Stenehjem is the Attorney General of the State of North Dakota.  Burgum and Stenehjem will be referred to collectively as the "State."

Defendant-Intervenor North Dakota Implement Dealers Association, ("NDIDA" or "Dealers") is a trade association for approximately 115 franchised North Dakota farm equipment dealers.  The NDIDA members are subject to the North Dakota Farm Equipment Dealership Statute.

Senate Bill 2289 ("SB 2289") is entitled "AN ACT to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair."  See Doc. No. 1-3.  The pre-existing provisions of the North Dakota Century Code that SB 2289 amends and reenacts are Sections 51-07-01.2, 51-07-02.2, and 51-26-06.

These statutory provisions will be referred to collectively as the "North Dakota Farm Equipment Dealership Statute."

Section 51-07-01.2, which is entitled "Prohibited acts under farm equipment dealership contract," prohibits manufacturers from imposing certain contractual obligations on farm implement dealers.  It provides as follows:

1.  Notwithstanding the terms of any contract, a manufacturer, wholesaler, or distributor of farm implements, machinery, or repair parts who enters into a contract with any person engaged in the business of selling and retailing farm implements and repair parts for farm implements may not:

    a.  Require or attempt to require a farm equipment dealer to accept delivery of farm equipment, parts, or accessories that the farm equipment dealer has not voluntarily ordered or require the farm equipment dealer to maintain or stock a level of equipment, parts, or accessories except as provided in subdivision b.

    b.  Condition or attempt to condition the sale of farm equipment, parts, or accessories on a requirement that the farm equipment dealer also purchase other goods or services, or purchase a minimum quantity of farm equipment as a condition of filling an order for farm equipment, except a farm equipment manufacturer may require the dealer to purchase all parts reasonably necessary to maintain the quality of operation in the field of any farm equipment used in the trade area and telecommunication necessary to communicate with the farm equipment manufacturer.

    c.  Require or attempt to require a farm equipment dealer into a refusal to purchase farm equipment manufactured by another farm equipment manufacturer.

    d.  Require a farm equipment dealer to separate the line-makes operating within the dealer's facility by requiring the separation of personnel, inventory, service areas, display space, or otherwise dictate the method, manner, number of units, or the location of farm equipment displays at the dealer's facility. This subdivision does not prevent a farm equipment dealer and manufacturer from agreeing to those terms if the agreement was supported by separate and valuable consideration. The issuance, reissuance, or extension

4

of a dealership contract alone is not separate and valuable consideration.

e.      Require a farm equipment dealer to either establish or maintain exclusive facilities, personnel, or display space or to abandon an existing relationship with another manufacturer in order to continue, renew, reinstate, or enter a dealer agreement or to participate in any program discount, credit, rebate, or sales incentive. This subdivision does not prevent a farm equipment dealer and manufacturer from agreeing to establish or maintain exclusive facilities for separate and valuable consideration. The issuance, reissuance, or extension of a dealership contract alone is not separate and valuable consideration.

f.      Discriminate in the prices charged for farm equipment of similar grade and quality sold by the farm equipment manufacturer to similarly situated farm equipment dealers. This subdivision does not prevent the use of differentials that make only due allowance for differences in the cost of manufacture, sale, or delivery or for the differing methods or quantities in which the farm equipment is sold or delivered by the farm equipment manufacturer. This subdivision does not diminish the manufacturer's, wholesaler's, or distributor's ability to provide volume discounts, bonuses, or special machine ordering programs commonly used in the industry.

g.      Attempt or threaten to terminate, cancel, fail to renew, or substantially change the competitive circumstances of the dealership contract for any reason other than failure of the farm equipment dealer to substantially comply with the material terms of the written contract between the parties or if the attempt or threat is based on the results of a circumstance beyond the farm equipment dealer's control, including a sustained drought or other natural disaster in the dealership market area or a labor dispute. A substantial change in the competitive circumstances includes the removal of authorization to operate at a location from where the dealer is currently operating or the unreasonable removal of a product line or segment.

h.      Require a farm equipment dealer to unreasonably remodel, renovate, or recondition the dealer's facilities, change the location of the facilities, or make unreasonable alterations to the dealership premises. A request for a dealer to remodel, renovate, or recondition the dealer's facilities, change the location of the

facilities, or make alterations to the dealership premises must be considered in light of current and reasonably foreseeable projections of economic conditions, financial expectations, and the dealer's market for the sale of farm equipment. A facility modification request is unreasonable if the request is within seven years of a farm equipment dealer's most recent facility remodel, renovation, or reconditioning.

i.      Unreasonably prevent or refuse to approve the relocation of a dealership to another site within the dealer's relevant market area. The dealer shall provide the manufacturer or distributor with notice of the proposed address and a reasonable site plan of the proposed location. The manufacturer or distributor shall approve or deny the request in writing within sixty days after receipt of the request. Failure to deny the request within sixty days is deemed an approval.

j.      Conduct a warranty or incentive audit or seek a chargeback on a warranty or incentive payment more than one year after the date of the warranty or incentive payment. A manufacturer may not charge back a dealer for an incentive or warranty payment unless the manufacturer can satisfy its burden of proof that the dealer's claim was false, fraudulent, or the dealer did not substantially comply with the reasonable written procedures of the manufacturer. The audit and chargeback provisions in this subdivision apply to all incentive and reimbursement programs that are subject to audit by a manufacturer. Before imposing a chargeback, a manufacturer shall identify each claim at issue and provide the dealer with written explanation for the proposed chargeback for each claim. The cumulative value of any chargeback, fees, penalties, or adverse action for an individual claim may not exceed the total direct compensation received by the dealer for the claim at issue. Thereafter, the manufacturer shall provide the dealer a reasonable time, no less than forty-five days, to present additional information regarding a claim at issue.

k.      Use an unreasonable, arbitrary, or unfair sales, service, or other performance standard in determining a farm equipment dealer's compliance with a contract or program. Before applying any sales, service, or other performance standard to a farm equipment dealer, a manufacturer shall communicate the performance standard in writing in a clear and concise manner, including a detailed explanation of the criteria, calculations, methodology, and data used to establish the standard.

6

l.     Require a farm equipment dealer in this state to enter an agreement
with the manufacturer or any other party which requires:

(1)     The law of another jurisdiction to apply to a dispute
between the dealer and manufacturer;

(2)     The dealer to bring an action against the manufacturer in a
venue outside of this state;

(3)     The dealer waive the right to have all of this state's
statutory and common law apply;

(4)     Reducing, modifying, or eliminating the dealer's right to
resolve a dispute in a state or federal court in this state; or

(5)     The dealer to agree to arbitration or waive their rights to
bring a cause of action against the manufacturer, unless
done in connection with a settlement agreement to resolve
a matter between a manufacturer and the dealer. The
settlement agreement must be entered voluntarily for
separate and valuable consideration. Renewal,
reinstatement, or continuation of a dealer agreement alone
is not separate and valuable consideration.

2.     As used in this section "farm equipment" and "farm implements" means
all vehicular implements and attachment units, designed and used
primarily for planting, cultivating, or harvesting farm products or used
primarily in connection with the production of agricultural produce or
products, livestock, or poultry on farms, and which are operated, drawn, or
propelled by motor or animal power.

N.D.C.C. § 51-07-01.2.  The Plaintiffs challenge all of Section 51-07-01.2 except subsection 51-

07-01.2(2).

Section 51-07-02.2, which is entitled "Dealership transfers," regulates and permits

dealership transfers while placing limits on denials of dealership transfers by manufacturers.  It

provides as follows:

1.     A dealer of automobiles or trucks, farm equipment, or parts for
automobiles, trucks, or farm equipment may not transfer, assign, or sell a

7

dealer agreement to another person unless the dealer first provides written notice to the manufacturer or distributor of the intended action. Within sixty days of receiving the notice, the manufacturer or distributor must approve or deny the action. If the manufacturer or distributor denies the action, the manufacturer or distributor shall provide material reasons for the denial to the dealer. If the manufacturer or distributor does not respond within the sixty-day period, the action is deemed approved.

2.      A denial by the manufacturer or distributor to accept a proposed transferee who meets the written, reasonable, and uniformly applied standards of qualifications of the manufacturer or distributor relating to the financial qualifications of the transferee and business experience of the transferee is presumed to be unreasonable. If an action is denied by the manufacturer or distributor, the dealer may file an action for determination of a violation of this subsection. The dealer may pursue the dealer's remedy under the contract or the remedy provided in this subsection. The manufacturer or distributor has the burden of proof regarding all issues raised in the action. The court shall approve the transfer unless the manufacturer or distributor can prove the proposed transferee does not meet the written, reasonable, and uniformly applied standards regarding financial qualifications and business experience.

3.      As used in this section, "farm equipment" has the same meaning as in section 51-07-01.2.

N.D.C.C. § 51-07-02.2.

Section 51-26-06, which is entitled "Application -- Dealers reimbursed for warranty repair," imposes requirements on manufacturers with respect to reimbursement to dealers for repairs covered by warranty.  It provides as follows:

1.      If warranty repair work or service is performed for a consumer by a farm equipment dealer under a manufacturer's express warranty, the manufacturer shall provide the dealer with reasonable and adequate compensation for diagnostic work, as well as repair service, parts, and labor, for warranty work compensation, a product improvement program, a maintenance plan, an extended warranty, a certified preowned warranty or a service contract, issued by the manufacturer or distributor or its common entity. In addition, a manufacturer shall provide reasonable and adequate time allowances for the diagnosis and performance of warranty work and service for the work performed and the time allowances may not be less than the average time spent by the dealer on similar work for

nonwarranty customers. The hourly labor rate and parts reimbursement rate paid by a manufacturer to the dealer under this subsection may not be less than the average rate charged by the dealer for similar service or sales to nonwarranty customers. A manufacturer or distributor may not pay its dealers an amount of money for warranty work, parts, or service that is less than the average rate charged by the dealer for similar service or sales to nonwarranty customers. The dealer may accept the manufacturer's or supplier's warranty labor reimbursement terms and conditions in lieu of the above.

2.      The compensation required under subsection 1 includes transportation services, including labor and equipment, necessary to transport equipment under warranty to perform the service and to return the equipment to the customer. If transporting the equipment to the dealership to perform the service is not mechanically or financially feasible, the compensation required under subsection 1 includes travel to and from the location of the equipment if the service or repairs are performed at the location of the equipment. Reimbursement for travel time required under this subsection may not exceed six hours.

3.      A manufacturer shall pay a dealer on a claim made by a dealer under this section within thirty days of the approval of the claim. The manufacturer shall either approve or disapprove a claim within thirty days after the claim is submitted to the manufacturer. The manufacturer may prescribe the manner in which and the forms on which the dealer must present the claim. A claim not specifically disapproved in writing within thirty days after the manufacturer receives the claim must be construed to be approved and the manufacturer shall pay the claim within thirty days.

4.      As used in this section, "farm equipment" has the same meaning as in section 51-07-01.2.

N.D.C.C. § 51-26-06.

SB 2289 was introduced in the North Dakota Senate on January 19, 2017, at the request of the North Dakota Implement Dealers Association. SB 2289 was passed by the North Dakota Legislature by a vote of 46-0 in the Senate and 86-5 in the House. It was signed into law by Governor Doug Burgum on March 16, 2017. SB 2289 was scheduled to go into effect August 1, 2017. The Plaintiffs commenced this declaratory judgment action on July 24, 2017, and filed a

motion for a preliminary injunction the next day.  The parties agreed SB 2289 would not be enforced until the Court ruled on the motion for a preliminary injunction.  <u>See</u> Doc. No. 30.

On December 14, 2017, the Court granted the Plaintiffs' motion for a preliminary injunction which enjoined enforcement of SB 2289.  <u>See</u> Doc. No. 70.  In its Order, the Court found the Plaintiffs were likely to succeed on their Contract Clause claim and their Federal Arbitration Act claim.  On August 2, 2019, the Eighth Circuit Court of Appeals affirmed the Court's grant of a preliminary injunction.  <u>Ass'n of Equip. Mfrs. v. Burgum</u>, 932 F.3d 727 (2019) (rehearing and rehearing *en banc* denied).

In their complaint, the Plaintiffs contend SB 2289 violates three federal statutes and two constitutional clauses.  The Plaintiffs claim that SB 2289 violates: (1) the Contracts Clause of the United States Constitution, U.S. Const. art. I, § 10; (2) the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq.; (3) the federal trademark statute, 15 U.S.C. § 1051 et seq. (the Lanham Act); (4) the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3; and (5) the interstate price regulation provisions found at 15 U.S.C. § 13 et seq. (the Robinson-Patman Act).  In addition the Plaintiffs allege a Takings Clause claim, U.S. Const. amend. V., in the alternative to their Lanham Act claim.  The offending provisions of SB 2289 are described by the Plaintiffs as follows:

1.      The "No Required Separation of Trademarks" provision.  N.D.C.C. § 51-07-01.2(1)(d).

2.      The "No Enforcement of Appearance Standards" provision.  N.D.C.C. § 51-07-01.2(1)(h).

3.      The "No Enforcement of Performance Standards" provisions.  N.D.C.C. §§ 51-07-01.2(1)(g) and 51-07-01.2(1)(k).

4.      The "No Minimum Inventory or Order Requirements" provisions.  N.D.C.C. §§ 51-07-01.2(1)(a) and 51-07-01.2(1)(b).

5.      The "No Exclusivity Requirements" provisions.  N.D.C.C. §§ 51-07-01.2(1)(c) and 51-07-01.2(1)(e).

6.      The "Forced Transfer of Trademark License" provision.  N.D.C.C. §§ 51-07-02.2.

7.      The "No Market Withdrawal" provision.  N.D.C.C. §§ 51-07-01.2(g)

8.      The "No Control Over Dealer Locations" provisions.   N.D.C.C. §§ 51-07-01.2(1)(i), 51-07-01.2(1)(g), and 51-07-01.2(1)(h).

9.      The "Enabling Warranty and Incentive Payment Fraud" provision.  N.D.C.C. § 51-07-01.2(1)(j).

10.     The "Retroactive Impairment of Existing Warranties" provision.  N.D.C.C. § 51-26-06.

11.     The "Retroactive Impairment of Existing Contracts" provision.  N.D.C.C. § 51-07-01.2(1).

12.     The "No Arbitration" provision.  N.D.C.C. §§ 51-07-01.2(1)(l).

13.     The "Interstate Price Regulation" provision.  N.D.C.C. § 51-07-01.2(1)(f).

See Doc. No. 1, p. 14.  The names given the offending provisions are not found in SB 2289 itself.  The State objects to the Manufacturers' description of the challenged provisions as an attempt to color their arguments.  The State has suggested the following instead:

1.      N.D.C.C. § 51-07-01.2(1) Retroactive Application to Existing Contracts

2.      N.D.C.C. § 51-07-01.2(1)(a) No Forced Inventory Stocking

3.      N.D.C.C. § 51-07-01.2(1)(b)  No Conditioned Equipment Inventory

4.      N.D.C.C. § 51-07-01.2(1)(c)  No Required Brand Exclusivity

5.      N.D.C.C. § 51-07-01.2(1)(d)  No Required Line-Make Separation

6.      N.D.C.C. § 51-07-01.2(1)(e)  No Required Facility Exclusivity

7.      N.D.C.C. § 51-07-01.2(1)(f)  Nondiscriminatory Pricing Provision

8.      N.D.C.C. § 51-07-01.2(1)(g)  No Termination Unless Substantial Noncompliance

9.      N.D.C.C. § 51-07-01.2(1)(h)  No Unreasonable Facility Renovations

10.     N.D.C.C. § 51-07-01.2(1)(i)  No Unreasonable Prevention of Relocation

11.     N.D.C.C. § 51-07-01.2(1)(j)  No Unjustified Warranty Chargebacks

12.     N.D.C.C. § 51-07-01.2(1)(k)  No Unreasonable Performance Standards

13.     N.D.C.C. § 51-07-01.2(1)(l)(2), (4), (5)  No Arbitration Provision

14.     N.D.C.C. § 51-07-02.2  No Transfer Denial If Transferee Meets Manufacturer Standards

15.     N.D.C.C. § 51-26-06  Reasonable and Adequate Warranty Repair Reimbursement

Insofar as is possible, the Court will attempt to address the issues presented without reference to the monikers attached to the disputed provisions by the parties.

The parties have moved for summary judgment as to all counts, six motions in all.  The motions have been fully briefed and are ripe for consideration.  The Court will address each count in turn, taking into consideration all of the arguments in the pending motions.


II.    **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id. The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1).  If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  Matsushita, 475 U.S. at 587.

III.   **MOTION TO STRIKE**

The State moves to strike the expert reports, rebuttals, and deposition transcripts of Professor Francine Lafontaine, (Doc. Nos. 99-2, 113-5, 113-6, and 113-7) and of Professor Eric Leininger, (Doc. Nos. 99-1, 113-8, and 113-9) filed by the Plaintiffs in support of their motion for summary judgment.  See Doc. No. 115.  The State contends these exhibits are irrelevant and

inadmissible to address the purely legal issues pending in the parties' respective summary judgment motions.  The Plaintiffs maintain the exhibits are relevant.

A careful review of the exhibits to which the State has objected reveals that while they are not very helpful, they are not entirely irrelevant either.  In this case, the Court is faced with cross-motions for summary judgment in a declaratory judgment action challenging the constitutionality of a state law.  In this context, the witnesses are competent to give their opinions as to the impact of SB 2289.  The Court would permit such testimony at trial.  However, the Court will not consider them in relation to the pure questions of law posed by the motions.  As such, the motion is denied.


IV.   **LEGAL DISCUSSION**

A.   **FEDERAL ARBITRATION ACT**

The Plaintiffs contend in counts one and two of their complaint that SB 2289's "No Arbitration" provision (N.D.C.C. § 51-07-01.2(*l*)(2), (4), and (5)) violates the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2.  Section 51-07-01.2(*l*)(2), (4), and (5) prohibits manufacturers from requiring a dealer to enter into an agreement in which the dealer agrees to arbitration, to bring any action against a manufacturer outside of North Dakota, or resolve any dispute in the State or federal courts in North Dakota.  In granting the Plaintiffs' motion for a preliminary injunction, the Court found the Plaintiffs were likely to succeed on their claim that Section 51-07-01.2(*l*)(2), (4), and (5) was preempted by the FAA.  See Doc. No. 70, p. 21.  The Defendants did not appeal this determination.

14

The FAA "declares a national policy favoring arbitration of claims that parties contract to settle in that matter.  That national policy . . . forecloses state legislative attempts to undercut the enforceability of arbitration agreements."  <u>Preston v. Ferrer</u>, 552 U.S. 346, 353 (2008) (alterations and citation omitted).  The purpose of the FAA is "to ensure that private arbitration agreements are enforced according to their terms."  <u>Torres v. Simpatico, Inc.</u>, 781 F.3d 963, 968 (8th Cir. 2015).  In response to the Plaintiffs' motion for summary judgment, the State concedes the provision is preempted by the FAA.  <u>See</u> Doc. No. 119, p. 45.  Given the agreement of the parties and the Court's earlier determination at the preliminary injunction stage, the Court again finds Section 51-07-01.2(*l*)(2), (4), and (5) is preempted by the FAA.  The parties dispute whether the provision can be severed from SB 2289.  The Court will address the issue of severability below.

### B.      CONTRACT CLAUSE

The Plaintiffs contend that SB 2289 violates the Contract Clause because it applies retroactively and thus substantially impairs existing contracts between farm implement manufacturers and farm implement dealers.  The Defendants contend the impairments imposed by SB 2289 are not substantial because they were foreseeable and the regulations serve a significant and legitimate public purpose.  The Court previously determined the Plaintiffs were likely to succeed on the merits of their Contract Clause claim and issued a preliminary injunction.  <u>See</u> Doc. No. 70.  The Eighth Circuit Court of Appeals affirmed that determination. <u>Ass'n of Equip. Mfrs. v. Burgum</u>, 932 F.3d 727 (8th Cir. 2019).  Having carefully reviewed the

Eighth Circuit's opinion, the briefs of the parties, and all the relevant case law, the Court remains convinced SB 2289 violates the Contract Clause.

The United States Constitution provides that "No State shall . . . pass any . . . law impairing the Obligation of Contracts." U.S. Const. art. I, § 10.   However, this bar is not absolute.   Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Ass'n, 110 F.3d 547, 551 (8th Cir. 1997).   The Eighth Circuit has articulated the test in Contract Clause challenges as follows:

> In determining whether a state law passes muster under the Contract Clause, the threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship.   If the answer is yes, then the court asks whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.   The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act.   If the State shows a significant public purpose and is not a contracting party, then courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

Burgum, 932 F.3d at 730. (internal citations and quotations omitted).

## 1.   SUBSTANTIAL IMPAIRMENT

It determining whether the impairment is substantial, the Court must primarily consider whether the parties could have reasonably foreseen that their contractual arrangement might be disrupted.   Id. at 730.   Impairment of existing agreements is not substantial if previous regulation made the law in question foreseeable.   Id. at 857.

In granting a preliminary injunction, the Court had no difficulty concluding SB 2289 substantially impaired the Manufacturers' contractual rights.   See Doc. No. 70, p. 16.   The Eighth Circuit agreed, holding "SB 2289 substantially impairs obligations of contract."   Id. at 731.   The Defendants have failed to demonstrate this conclusion was incorrect.

16

SB 2289 applies retroactively to existing contracts.  In 2002, the Eighth Circuit held a similar retroactive farm implement dealership law in South Dakota violated the Contract Clause. Equip. Mfrs. Inst. v. Janklow, 300 F.3d at 858-59.  In light of *Janklow*, the legislative impairments visited upon existing contracts by SB 2289 in 2017 was not foreseeable.  See Burgum, 932 F.3d at 731.


## 2.  SIGNIFICANT AND LEGITIMATE PUBLIC PURPOSE

Because a substantial impairment of pre-existing contractual rights exists as a result of the passage of SB 2289, the State must demonstrate a significant and legitimate public purpose underlying the law.  The State contends SB 2289 was enacted in order to protect North Dakota farmers, preserve rural communities, and sustain and bolster its agricultural industry and economy.

In affirming the Court's preliminary injunction, the Eighth Circuit offered considerable guidance as to how the State could and could not meet its burden to demonstrate a significant and legitimate public purpose underlying SB 2289.  The relevant passage provides as follows:

> In evaluating the present North Dakota law governing contracts between manufacturers and dealers, the State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act.  The state legislature declined to follow the examples of the legislatures in *Blaisdell* and *Keystone Bituminous*, which included well-supported findings or purposes within their duly enacted laws, so any significant and legitimate public purpose must be discerned from the design and operation of the legislation itself.  Statements in the legislative history of individual legislators, lobbyists, or advocates that the law would benefit farmers and rural communities are insufficient.  Special-interest groups cannot establish that legislation serves a broad societal interest simply by ensuring that the record contains testimony or floor statements about a law's conceivable public benefits.

Burgum, 932 F.3d at 733 (internal citations and quotations omitted).   The Eighth Circuit concluded SB 2289 "does not self-evidently further a significant and legitimate public purpose." Id.

The Eighth Circuit found the legislative record is insufficient to show a significant and legitimate public purpose.  Id.  It is undisputed the North Dakota Legislature failed to include any statement of purpose or findings of fact in SB 2289.  Thus, the State must make its showing based upon "the design and operation of the legislation itself."  Id.  It has failed to do so, offering little discussion of the design or operation of SB 2289.  SB 2289 focuses on the contractual relationship between farm implement dealers and manufacturers.  It makes no mention of farmers or rural communities.  Id.  "Special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts."  Janklow, 300 F.3d at 861.  Nothing in the record rebuts the Eighth Circuit's determination that "the design of this North Dakota legislation fails to provide the requisite guarantee."  Burgum, 932 F.3d at 734.  The Court finds the retroactive nature of SB 2289 does not further a significant and legitimate public purpose.

The only question which remains is the appropriate remedy and the scope of the Court's injunction which the Court will address below.  However, it is clear the retroactive nature of SB 2289 cannot be allowed to stand.


### C.   LANHAM ACT

The Plaintiff Manufacturers, who typically license farm implement dealers to use and display their trademarks, contend in counts three and four of their complaint that six provisions of SB 2289 deprive them of their rights under the Lanham Act, 15 U.S.C. § 1051 et seq. Specifically, the Manufacturers contend the No Required Separation of Trademarks (N.D.C.C. §

51-07-01.2.(1)(d)), No Exclusivity Requirements (N.D.C.C. §§ 51-07-01.2(1)(c) and (e)), No Enforcement of Performance Standards (N.D.C.C. § 51-07-01.2(1)(k) and (g)), No Enforcement of Appearance Standards (N.D.C.C. § 51-07-01.2(1)(h)), No Minimum Inventory or Order Requirements (N.D.C.C. § 51-07-01.2(1)(a) and (b)), and the Forced Trademark License Transfer Provisions (N.D.C.C. § 51-07-02.2) (collectively "Trademark Provisions") violate and conflict with their rights and duties as federally registered trademark owners under the Lanham Act and are preempted. The Manufacturers contend these provisions, none of which actually mention trademarks, will permit the North Dakota farm implement dealers to infringe on the Manufacturers' trademarks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); to engage in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); to dilute the Manufacturers' trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and to control their trademarks under Section 45 of the Lanham Act, 15 U.S.C. § 1127. The Defendants contend the Lanham Act does not give the Manufacturers the right to control how North Dakota farm implement dealers operate or prohibit state legislation which establishes public policy and regulates the contractual relationship between dealers and manufacturers. The Court finds the Manufacturers' construction of the Lanham Act would expand its scope beyond any reasonable interpretation, and SB 2289 does not significantly interfere with the Manufacturers' trademark rights.

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that interfere with, or are contrary to, federal law." Hillsborough Cty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (internal quotations omitted). This invalidation is accomplished by way of federal preemption, which "is invoked under the directive of the Supremacy Clause." Brown v. Hotel and Rest. Emps. and

Bartenders Int'l Union Local 54, 468 U.S. 491, 500 (1984); see also Kurns v. R.R. Friction Prods. Corp., 565 U.S. 625, 630 (2012) (stating preemption of state law occurs through the direct operation of the Supremacy Clause).

Under the Supremacy Clause, federal law may supersede, or preempt, state law in several different ways: (1) Congress may expressly state that federal law preempts state law (express preemption); (2) Congress' intent to preempt state law may be inferred from its comprehensive regulation of an area of law (field preemption); or (3) state law may actually conflict with the federal law (conflict preemption) – i.e., where compliance with both federal law and state law is impossible, or where the state law stands in the way of the accomplishment and execution of the purposes and objectives of Congress. Hillsborough, 471 U.S. at 713; see also Gunter v. Farmers Ins. Co., Inc., 736 F.3d 768, 771 (8th Cir. 2013). Congress may evince its intent to preempt state law either implicitly or explicitly. Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992). Federal regulations can have the same preemptive effect as federal law. Gunter, 736 F.3d at 771-72.

Congressional intent is at the base of all preemption analysis. Cipollone, 505 U.S. at 516. Courts must start their inquiry with the assumption that the historic police powers of the states were not meant to be superseded by federal law unless that was the "clear and manifest" intent of Congress. Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230 (1947); see also Cipollone, at 516. This assumption assures the "federal-state balance will not be disturbed unintentionally by Congress or unnecessarily by the courts." Jones, 430 U.S. at 525. "[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." Chamber of Commerce of the U.S. v. Whiting, 563 U.S. 582, 607 (2011) (quoting Gade, 505 U.S. at 110).

20

The Manufacturers contend all six of the Trademark Provisions (N.D.C.C. §§ 51-07-01.2(1)(a), (b), (c), (d), (e), (g), (h), (k) and N.D.C.C. § 51-07-02.2) are conflict preempted by Section 45 of the Lanham Act, 15 U.S.C. § 1127.  The Manufacturers also contend N.D.C.C. §§ 51-07-01.2(1)(c), (d), and (e) are expressly preempted by Section 39(b) of the Lanham Act, 15 U.S.C. § 1121(b).

The Manufacturers' express preemption argument clearly fails.  The case law establishes that the Lanham Act does not expressly preempt state law.  Int'l Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 409 (9th Cir. 2015) (stating "the Lanham Act does not expressly preempt state law"); Mariniello v. Shell Oil Co., 511 F.2d 853, 857 (3d Cir. 1975) (noting the lack of Congressional intent to comprehensively control all aspects of the trademark field); JCW Investments, Inc. v. Novelty, Inc., 482 F.3d 910, 919 (7th Cir. 2007) (finding "the Lanham Act has not been interpreted as a statute with broad preemptive reach"); Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 41 (1st Cir. 2006) (rejecting express preemption and field preemption argument in relation to the Lanham Act); KHC Enterprises LLC v. KC Hemp Co., LLC, No. 19-CV-2718 2020 WL 1904030, at *2 (D. Kan. Apr. 17, 2020) (noting multiple courts have concluded the Lanham Act does not expressly preempt state law).  The Manufacturers offer no case law to support their expansive reading of 15 U.S.C. § 1121, which prohibits requiring the alteration of a trademark, as an express preemption clause.  The Court finds the contention unpersuasive.

The Manufacturers' conflict preemption argument requires closer scrutiny.  The portion of 15 U.S.C. § 1127 that the Manufacturers rely upon in support of their conflict preemption argument provides as follows:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127.   The often-cited language in the Senate Report accompanying the statute clarifies Congressional motives:

> The purpose underlying any trade-mark statute is twofold.  One is to protect the public so it may be confident that ... it will get the product which it asks for and wants to get.  Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

S.Rep. No. 79–1333, at 1274.

The parties cite a multitude of cases in support of their arguments.  Most of those cases are patent infringement cases which are not directly on point and thus offer limited guidance in assessing whether SB 2289, which affects but does not directly regulate trademarks, is preempted.  The Court finds three cases where, as in this case, a trademark holder challenged a state or local law, to be particularly helpful is assessing whether SB 2289 conflicts with the Lanham Act.

In *Mariniello*, a gas station franchisee sued the franchisor after the franchisor terminated the dealer agreement pursuant to a clause in the franchise agreement which permitted at will termination upon the completion of the franchise term.  511 F.2d at 855-56.  The district court found New Jersey common law and the New Jersey Franchise Practices Act, which established a good cause standard for termination of a franchise agreement, conflicted with the Lanham Act and was preempted.  Id. at 856.  The Third Circuit reversed finding no conflict existed.  Id. at

22

858-59.   The Third Circuit rejected the idea that the mere existence of the Lanham Act prohibited all law making relating to trademarks.   Id. at 857.   The Third Circuit explained that the purpose of the Lanham Act was to allow the public to buy with confidence and protect the trademark holder from piracy.   Id. at 858.   The good cause for termination standard did not permit confusing or deceptive trademarks to operate or dilute the franchisor's trademark.   Id. Contract enforcement and the setting of public policy was noted to be a traditional state function and the Lanham Act did not permit the franchisor to insert terms in its contracts which violate public policy.   Id.

In *Mobil Oil Corp. v. Virginia Gasoline Marketers & Auto. Repair Ass'n, Inc.*, 34 F.3d 220, 222 (4th Cir. 1994), an oil company sued Virginia alleging amendments to the Virginia Petroleum Products Franchise Act which prevented the inclusion of certain terms in franchise agreements were preempted by the Lanham Act.   The amendments prohibited quotas, excessive hours of operation, unreasonable rents, and limitations on the number of gas stations a dealer could operate.   Id. at 223.   The Fourth Circuit rejected a Lanham Act preemption argument finding the protection of trademarks does not encompass a statute "which does not govern the appearance of, the ownership of, or the right to use franchisors' registered marks."   Id. at 226. The Fourth Circuit also rejected the oil company's quality control argument finding the amendments did not have a significant impact on the quality of its products.   Id. at 226.

In *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 398 (9th Cir. 2015), a franchise association sued Seattle over an ordinance which raised the minimum wage to $15 an hour within the city, setting two different time scales for small and large employers.   The franchises argued the law, which classified employers based upon the number of persons employed nationally rather than locally, was preempted by the Lanham Act because the

ordinance defined franchises in part based upon their shared use of a trademark. Id. at 410. The district court denied a motion for a preliminary injunction and the Ninth Circuit affirmed. Id. at 397. The Ninth Circuit explained that the ordinance did not directly affect trademarks because it did not interfere with product quality, compromise public confidence in trademarks, allow misappropriation or directly interfere with trademarks. Id. at 409-10. The court noted minimum wage laws are a traditional field of state regulation. Id. at 410.

These cases stand for the proposition that the Lanham Act preempts only those state laws which directly conflict with its provisions. Storer Cable Commc'ns v. City of Montgomery, Ala., 806 F. Supp. 1518, 1540 (M.D. Ala. 1992) (citing Mariniello, 511 F.2d at 858). Laws such as SB 2289 which affect, but do not directly regulate trademarks, are not preempted by the Lanham Act.

In this case, the Manufacturers of farm implements are challenging a State law which regulates their business relationship with farm implement dealers. SB 2289 does not speak directly to trademarks, but rather sets limits on the terms of farm implement dealership agreements, a relationship North Dakota has long regulated. See Mariniello, 511 F.2d at 858 (noting contract enforcement and interpretation were traditional areas of state regulation). The Lanham Act does not permit a trademark owner to insert a clause in a dealership agreement which violates public policy simply because the contract involves a trademarked good.

SB 2289 does not permit the alteration or misappropriation of trademarks. Nor does SB 2289 govern the appearance, right to use, or ownership of trademarks. See Mobile Oil, 34 F.3d at 226 (noting the protection of trademarks afforded by the Lanham Act does not preempt state laws which do not affect the appearance, ownership, or right to use trademarks). The Manufacturers remain in full control of their trademarks. In addition, SB 2289 has no impact on

the quality of the Manufacturers' goods as the manufacturing process remains within their full control.  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 304 (3d Cir. 1998) ("'quality control' is not a talisman the mere utterance of which entitles the trademark owner to judgment").

The suggestion by the Manufacturers that a farmer visiting a dealership displaying logos from more than one line of equipment manufacturers will be confused or deceived by a distinctive green John Deere tractor bearing John Deere trademarks sitting next to a distinctive red Case IH tractor bearing Case IH trademarks is unpersuasive.  Confusion does not ordinarily exist where a genuine article bearing a true mark is sold.  Enesco Corp. v. Price/Costco Inc., 146 F.3d 1083, 1085 (9th Cir. 1998); Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991).

The changes to the dealership transfer provision (N.D.C.C. § 51-07-02.2) are best described as stylistic.  See Doc. No. 1-3.  Both the old law and the new law simply require "written reasonable, and uniformly applied standards" for any denial and give the dealer the right to ask a court to make such a determination.  Such a standard cannot be said to conflict with Lanham Act protections.  See Mariniello, 511 F.2d at 858 (finding a good cause standard for termination of a franchise agreement did not dilute the trademark or conflict with the Lanham Act).

The Court is unpersuaded by the Manufacturers' expansive reading of the Lanham Act, a reading which is unsupported by any case law directly on point.  The Court finds the *Mariniello, Mobile Oil,* and *Int'l Franchise Ass'n* cases, all of which declined to give the Lanham Act the expansive reading suggested by the Manufacturers, to be persuasive.  Seeing no significant or direct conflict between SB 2289 and the Lanham Act, the Court finds SB 2289 is not preempted.

D.     **TAKINGS CLAUSE**

The Manufacturers contend, as an alternative to their Lanham Act claim, that the Trademark Provisions will cause economic harm to their trademark rights, frustrate their investment in their brands, and amount to a regulatory taking.  The Manufacturers also contend the Trademark Provisions might cause them to forfeit their trademark rights if they lose control of their trademarks resulting in a *per se* taking.   The State maintains trademarks are not recognized as protected property interests under the Fifth Amendment or compensable under Takings Clause.   Having determined that SB 2289 does not directly regulate or impact the Manufacturers trademarks, the Court has no difficulty rejecting the Manufacturers novel Takings Clause argument.

The Takings Clause of the United States Constitution provides that "nor shall private property be taken for public use, without just compensation."   U.S. Const. amend V.   The Takings Clause applies to the states through the Fourteenth Amendment.   Lingle v. Cevron U.S.A. Inc., 544 U.S. 528, 536 (2005).  Its purpose was to prevent the government "from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole."  Id. at 537 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)).  The classic taking which requires just compensation is the physical appropriation of real or personal private property by the government.  Id.; Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 277-78 (8th Cir. 1993).  Examples include the seizure of a coal mine and the occupation of a warehouse.  Id.  For much of our nations' history, the Takings Clause was thought only to embrace such physical takings and not to apply to the regulation of property. Lingle, 544 U.S. at 537.

However, in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) the United States Supreme Court recognized that the regulation of private property may be considered a taking if the regulation "goes too far."  The difficulty with regulatory takings is discerning how far is too far.  All government regulation involves the adjustment of rights for the public good. Lingle, 544 U.S. 538.  "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."  Id. (quoting Mahon, 260 U.S. at 413).  There is no set test for evaluating whether a regulatory taking has occurred.  Id.  Each inquiry involves the "case specific weighing of the competing public and private interests."  Armour and Co., 2 F.3d at 278.  The Supreme Court has identified three factors which are helpful in analyzing a regulatory taking: (1) the economic impact of the regulation on the property owner, (2) the extent to which the regulation has interfered with distinct investment-back expectations, and (3) the character of the government regulation. Lingle, 544 U.S. at 539.

The first question raised by the motions is whether a trademark is the type of private property protected by the Takings Clause.  The question is fairly debatable and far from settled. See Dustin Marlan, Trademark Takings: Trademarks As Constitutional Property Under the Fifth Amendment Takings Clause, 15 U. Pa. J. Const. L. 1581, 1583 (2013).  It seems likely the Supreme Court would recognize a trademark as private property protected by the Fifth Amendment as it has recognized other intangible property as so protected.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1004 (1984) (holding an intangible property interest in trade secrets is a right protected by the Taking Clause of the Fifth Amendment); Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 673 (1999) (noting "the Lanham Act may well contain provisions that protect constitutionally cognizable property interests" and

trademarks are property); but see In re Int'l Flavors & Fragrances, Inc., 183 F.3d 1361, 1366 (Fed. Cir. 1999) (noting "[t]he federal registration of a trademark does not create an exclusive property right in the mark").

Assuming for the sake of argument that trademarks are constitutionally protected property, the Manufacturers' Takings Clause claim is unsupported by a fair reading of SB 2289. The Manufacturers contend SB 2289 works a regulatory taking of their trademarks. They also make the unrealistic argument that SB 2289 works a *per se* regulatory taking.

The latter contention is easily dismissed. A regulation may work a categorical or *per se* regulatory taking when government causes a property owner to "suffer a permanent physical invasion of her property" or a regulation completely deprives a property owner of "*all* economically beneficial use of her property." Lingle, 544 U.S. at 538 (emphasis in original). However, SB 2289 deprives the Manufacturers of little, if any, use of their trademarks, much less "all economically beneficial use" of the property. Nor does SB 2289 permit anyone other than farm implement dealers with whom the Manufacturers have entered into dealership agreements to use their trademarks. The Manufacturers remain free to use their trademarks as they choose.

The regulatory burden imposed by SB 2289 cannot be described as severe. The burdens imposed are certainly not the functional equivalent of the direct appropriation of private property or the ouster of a property owner from their property. The State has not taken any trademarks for its own use or for the use of any third party. Nor has the State forbidden the Manufacturers from using their trademarks. The Manufacturers remain free to use them, their bundle of rights by and largely intact. SB 2289 makes no mention of trademarks. The regulation applies to all farm implement Manufacturers who are left on an even playing field with one another. SB 2289

is classic contract regulation which simply "adjusts the benefits and burdens of economic life to promote the common good." <u>Lingle</u>, 544 U.S. at 539.  The economic impacts are tangential, highly speculative, and anticipatory in the sense that the State has regulated the contractual relationship between farm implement dealers and Manufacturers for more than eighty years. Any other conclusion would come perilously close to prohibiting any government regulation of the commercial dealings of a trademark holder.  <u>See</u> <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1027–28 (1992) (stating "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless").  Suffice it to say, SB 2289 does not "go too far."  The Court finds as a matter of law that SB 2289 does not result in a regulatory taking of the Manufacturers' trademarks.

### E.  COMMERCE CLAUSE

In counts eight and nine of their complaint, the Manufacturers also contend four provisions of SB 2289 impose an undue burden on interstate commerce and thus violate the dormant Commerce Clause.  As described by the Manufacturers, these are the "No Minimum Inventory or Order Requirements" provisions, N.D.C.C. §§ 51-07-01.2(1)(a) and 51-07-01.2(1)(b); the "Forced Transfer of Trademark License" provision, N.D.C.C. §§ 51-07-02.2; the "No Market Withdrawal" provision, N.D.C.C. §§ 51-07-01.2(g); and the "Interstate Price Regulation" provision, N.D.C.C. § 51-07-01.2(1)(f).  The State maintains SB 2289 places little or no burden on interstate commerce.

The Commerce Clause grants to Congress the power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8.  The Commerce Clause has long been understood to

have a "negative or dormant implication." S. Union Co. v. Mo. Public Serv. Comm'n, 289 F.3d 503, 507 (8th Cir. 2002). The dormant Commerce Clause prohibits states from "enact[ing] laws that discriminate against or unduly burden interstate commerce." Hazeltine, 340 F.3d at 592. The purpose of the dormant Commerce Clause is to prevent states from promulgating protectionist policies which would inhibit free trade among the states. Id. The Commerce Clause "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." Hughes v. Okla., 441 U.S. 322, 325 (1979).

When a state law is challenged on dormant Commerce Clause grounds it is subject to a two-tiered analysis. Hazeltine, 340 F.3d at 593. The first tier analysis requires the court to determine whether the law discriminates against interstate commerce. Jones, 470 F.3d at 1267. "Discrimination in this context means the 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the later.'" Hazeltine, 340 F.3d at 593 (quoting Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994)). A law can discriminate in three ways: 1) it can discriminate on its face; 2) it can have a discriminatory purpose; or 3) it can have a discriminatory effect. Jones, 470 F.3d at 1267; Hazeltine, 340 F.3d at 593. If a state law is determined to be discriminatory, it is *per se* invalid unless the state can show, under rigorous scrutiny, that it has no other means to advance the legitimate state interest. Jones, 470 F.3d at 1270; Hazeltine, 340 F.3d at 593. If a law is found non-discriminatory under a first tier analysis, the second tier analysis, otherwise known as the *Pike* balancing test, provides the law will be found unconstitutional "if the burden it imposes on interstate commerce 'is

30

clearly excessive in relation to its putative local benefits.'" Hazeltine, 340 F.3d at 593 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).  Any court applying these rules must be mindful that the purpose of the Commerce Clause is to prevent economic discrimination, and the Supreme Court has eschewed the formalistic application of these rules in favor of a careful "case-by-case analysis of purposes and effects."  S.D. v. Wayfair, Inc., 138 S.Ct. 2080, 2094 (2018).

It is the second tier *Pike* balancing test which the Manufacturers rely upon to challenge SB 2289 in this case.  Although they make mention of the alleged extraterritorial effect of SB 2289 in their motion, they made no such claim in their complaint, and their extraterritorial argument circles back into their *Pike* balancing test analysis.  In any case, SB 2289 easily passes the first tier analysis as it does not differentiate in its treatment of in-state and out-of-state interests, and has no extraterritorial effect whatsoever as its effect is wholly within the State of North Dakota.  Thus, the Court will focus its analysis on an examination of SB 2289's burden on interstate commerce relative to its asserted putative benefits.

The State contends SB 2289 was intended to promote North Dakota's family farm based economy and rural communities which are harmed when farm implement dealerships close.  The State further contends its agricultural based economy benefits from a "stable, sizable, and sufficiently dispersed network of farm equipment dealerships competing with each other throughout the State" and which its farmers rely upon.  See Doc. No. 96, p. 51.  This may or may not be true.  SB 2289 does not contain a statement of purpose.  It is well-established that "North Dakota's principle industry is agriculture."  N.D. Farm Bureau, Inc. v. Stenehjem, 333 F. Supp. 3d 900, 924 (D.N.D. 2018) (citing Coal Harbor Stock Farm, Inc. v. Meier, 191 N.W.2d 583, 591 (N.D. 1971)).  Protecting farmers and rural communities is a significant and legitimate state

interest.  Equip. Mfrs. Inst. v. Janklow, 300 F.3d 842, 860 (8th Cir. 2002).  And the wisdom of SB 2289 is immaterial.  See generally N.D. State Bd. of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 165 (1973) (noting it is not the role of the courts to judge the wisdom of legislation).

In granting a preliminary injunction the Court found the purpose of SB 2289 was to level the playing field between dealers and manufacturers.  See Doc. No. 70.  While such a purpose may run afoul of the Contract Clause, the very purpose of the Commerce Clause was to put businesses on an even playing field.  Wayfair, 138 S. Ct. at 2094 (Commerce Clause); Equip. Mfrs. Inst. v. Janklow, 300 F.3d 842, 860 (8th Cir. 2002) (Contract Clause).  The Court remains convinced the purpose of SB 2289 was to equalize bargaining power between dealers and manufacturers and protect dealers from abuses by manufacturers.  For purposes of Commerce Clause analysis, this is a "legitimate local public interest." Pike, 397 U.S. at 142.

To analyze the burdens of SB 2289, the Court must first look at the actual language of the challenged provisions.   One problem with the Manufacturers dormant Commerce Clause argument is their expansive reading of SB 2289.  The four challenged provisions, which prohibit certain contract clauses especially advantageous to farm implement manufacturers, are not as onerous as the Manufacturers contend.  The burdens, as alleged by the Manufacturers, are not so much a burden on interstate commerce as they are on the Manufacturers own parochial commercial interests.  See Neb. Beef Producers Comm. v. Neb. Brand Comm., 287 F. Supp. 3d 740, 751 (D. Neb. 2018).

The first provision prohibits manufacturers from requiring dealers "to maintain or stock a level of equipment, parts, or accessories" or "purchase a minimum quantity of farm equipment as a condition of filling an order for farm equipment."  N.D.C.C. §§ 51-07-01.2(1)(a) and (b).

32

This provision keeps manufacturers from overburdening dealers with excess inventory.  It says nothing about a dealer being able to hold no inventory which is a totally illogical course of business for a dealership.  The second provision prohibits a manufacturer from terminating a dealership agreement or substantially changing the competitive circumstances of a dealership agreement with the change of circumstance to include "the removal of authorization to operate at a location from where the dealer is currently operating or the unreasonable removal of a product line or segment."  N.D.C.C. § 51-07-01.2(1)(g).  This provision does not impose an "exit toll" or prohibit the discontinuation of a product line.  Instead, it simply prohibits a manufacturer from unreasonably refusing to permit a dealer from selling a line of products currently in production.  The third challenged provision states a manufacturer may not "unreasonably prevent or refuse to approve the relocation of a dealership to another site within the dealer's relevant market area."  N.D.C.C. § 51-07-01.2(1)(i).  This provision simply prohibits the Manufacturer from having veto power over dealership locations.  The dealers also get a say and the location must stay within the relevant market area, not at a remote and far away location as the Manufacturers posit.  The fourth challenged provision, which is the subject of the Court's Robinson-Patman Act analysis, contains a stylistic change from the word "like" to the word "similar" in relation to prices charged for farm equipment.  N.D.C.C. § 51-07-01.2(1)(f).  The Court rejected this contention.  The reality of the burdens actually imposed by SB 2289 is far from the burdens imagined by the Manufacturers.  See Central GMC, Inc. v. General Motors Corp., 946 F.2d 327, 334 (1991) (noting statutes should be construed so as to avoid doubts about their constitutionality whenever possible).

No in-state interest is benefitted at the expense of an out-of-state interest by SB 2289. "[I]n the absence of actual or prospective competition between the supposedly favored and

disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." General Motors Corp. v. Tracy, 519 U.S. 278, 300 (1997). SB 2289 treats all farm implement manufacturers the same. SB 2289 has no impact on the Manufacturers' relationships with farm implement dealers in other states. There are no favored or disfavored manufacturers; both in-state and out-of-state manufacturers are treated the same by SB 2289. The burdens are equal. A recent case from the District of Nebraska stated the principle as follows:

> The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests. It is, accordingly, important to remember that the incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce. Legislation will not be invalidated under the *Pike* test unless it imposes discriminatory burdens on interstate commerce. Thus, a Commerce Clause challenge to a state regulation requires showing that the regulation has a disparate impact on interstate commerce — the fact that it may otherwise affect commerce is not sufficient. Where a regulation does not have this disparate effect on interstate commerce, then it has not imposed any incidental burdens on interstate commerce that are clearly excessive in relation to the putative local benefits.

Neb. Beef Producers Comm, 287 F. Supp. 3d at 752 (internal citations and quotations omitted).

Even handed regulations do not implicate the dormant Commerce Clause. Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty., 115 F.3d 1372, 1387 (8th Cir. 1997). As the Eighth Circuit explained:

> A Delaware corporation doing business in Minnesota could not argue that it is discriminated against by Minnesota laws that apply equally to all businesses operating in the state. South Dakota companies may chose not to locate operations in Minnesota because of comparatively high state taxes that apply to all businesses, but this is not discrimination under the Commerce Clause. Like any other local market regulation, Ordinance 12 may or may not encourage companies from doing business in the state. But while this may be a relevant concern in forming economic policies, it is simply not the proper inquiry for considering discrimination under the Commerce Clause.

Id. at 1386–87.  Dealers and manufacturers do not compete with one another, although the relationship may be a one-sided at times.  This is not a case where in-state manufacturers of farm equipment are favored over out-of-state manufacturers.

On balance, the Court finds the burdens imposed on interstate commerce by SB 2289 are incidental and slight and are not "clearly excessive in relation to its putative local benefits." Hazeltine, 340 F.3d at 593 (emphasis added).


### F.      ROBINSON-PATMAN ACT

In counts ten and eleven of their complaint, the Manufacturers contend N.D.C.C. § 51-07-01.2(1)(f) conflicts with and is preempted by the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13(a).  The RPA prohibits price discrimination for "commodities of like grade and quality" where the effect of such price discrimination is to injure competition in interstate commerce.  15 U.S.C. § 13(a).  Before its amendment by SB 2289, the North Dakota Farm Equipment Dealership Statute's prohibition on price discrimination prohibited only "[d]iscriminat[ion] in the prices charged for farm equipment of *like* grade and quality sold by the farm equipment manufacturer to similarly situated farm equipment dealers."  N.D.C.C. § 51-07-01.2(4) (before Aug. 1, 2017) (emphasis added).  As amended by SB 2289, the North Dakota Statute now prohibits discriminatory pricing for "farm equipment of *similar* grade and quality."  See N.D.C.C. § 51-07-01.2(1)(f) (emphasis added).  The Manufacturers contend this change from "like" to "similar" creates an inescapable conflict between Section 51-07-01.2(1)(f) and the RPA making it impossible to comply with both laws.  The argument is based upon a hypothetical situation where a court gives the two words different meanings and requires the Manufacturers price tractors of similar grade, but not like grade, the same.  See Doc. No. 1, ¶ 191.  The State

35

contends the substitution of the word "like" for the word "similar" was simply a stylistic change rather than a substantive one because the two words essentially have the same meaning.   The Court agrees.

SB 2289 does not define the term "similar."   The parties agree there is no legislative history to explain the change.   The Court sees no reason to seek out or create conflict where none need exist.   Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 130-31 (1978) (noting that "in this as in other areas of coincident federal and state regulation, the teaching of this Court's decisions enjoins seeking out conflicts between state and federal regulation where none clearly exists") (internal quotations omitted).   There is no evidence the change was intended to be anything other than stylistic.   The change, although perhaps ill-considered, does not materially alter the meaning of the law.   See RECALLND v. Jaeger, 792 N.W.2d 511, 515 (N.D. 2010) (noting only material changes to a law are presumed to indicate an intent to change the law).   The words "like" and "similar" are, when given their ordinary and commonly understood meaning, obvious synonyms.   The State has aptly demonstrated as much and the Manufacturers have failed to rebut the argument.   See Doc. No. 96, pp. 69-81.

The Manufacturers have cited no case law which would compel a finding that the words "like" and "similar" are not identical and the Court finds the possibility of a court doing so remote.   The reliance on Utah Foam Prod. Co. v. Upjohn Co., 154 F.3d 1212, 1218 (10th Cir. 1998) is misplaced.   In Utah Foam the Tenth Circuit upheld the district court's determination that two foam insulation products were not of "like grade and quality" because they had significant physical differences.   Id. at 1217-18.   The district court rejected the plaintiff's argument that the two products were very similar, which is the same as arguing they were of "like grade and quality."   Id.   The case actually supports the position of the State.

The Manufacturers hypothetical is implausible at best.  No reasonable Court would find a company's $50,000 high-end tractor to be "similar" to or "like" a $30,000 mid-tier model.  <u>See</u> <u>Exxon</u>, 437 U.S. at 131 (finding the existence of potential RPA conflicts too speculative to warrant preemption).  The lack of identical language in the RPA and Section 51-07-01.2(1)(f) does not mandate a finding of conflict.  The Court finds as a matter of law that no conflict exists between SB 2289 and the RPA.

### G.    <u>SEVERABILITY</u>

Having determined the N.D.C.C. § 51-07-01.2(*l*)(2), (4), and (5) are preempted by the Federal Arbitration Act, and the retroactive nature of SB 2289 violates the Contract Clause, the Court must address whether the entire law must be enjoined or whether severance of some portion of the law will suffice as a remedy.  The Plaintiffs contend SB 2289 should be struck down in its entirety.  The Defendants contend the offending language can simply be severed and the remainder of the law allowed to stand.  The Court agrees with the Defendants that severing the offending language is the most appropriate and reasonable remedy.

Severance is the preferred remedy under both North Dakota and federal law.  <u>See</u> <u>Ayotte</u> <u>v. Planned Parenthood of N. New England</u>, 546 U.S. 320, 328-29 (2006) (noting the United States Supreme Court's preference for enjoining only the unconstitutional language while leaving the remainder intact); <u>Tooz v. State</u>, 38 N.W.2d 285, 291 (N.D. 1949) (stating severance is preferred and "[i]t would be inconsistent with all just principles of constitutional law to adjudge these enactments void because they are associated in the same act, but not connected with or dependent on others which are unconstitutional"); <u>First Bank of Buffalo v. Conrad</u>, 350 N.W.2d 580, 584 (N.D. 1984) ("The declaration of part of a law as being unconstitutional does

not require a court to also declare the remainder void, unless all provisions are so connected and dependent upon each other that it cannot be presumed that the legislature would have enacted the valid sections without the unconstitutional sections."); Kessler v. Thompson, 75 N.W.2d 172, 189 (N.D. 1956) ("It is a fundamental principle that a statute may be constitutional in one part and unconstitutional in another part and that if the valid part is severable from the rest, the portion which is constitutional may stand while that which is unconstitutional is stricken out and rejected.").  North Dakota law also contains a general savings clause which reinforces the principle of preferring severance to voiding an entire enactment.  N.D.C.C. § 1-02-20 (providing that "[i]n the event that any clause, sentence, paragraph, chapter, or other part of any title, is adjudged by any court of competent or final jurisdiction to be invalid, such judgment does not affect, impair, nor invalidate any other clause, sentence, paragraph, chapter, section, or part of such title, but is confined in its operation to the clause, sentence, paragraph, section, or part thereof directly involved in the controversy in which such judgment has been rendered."); Montana-Dakota Utilities Co. v. Johanneson, 153 N.W.2d 414, 425 (N.D. 1967) (noting the applicability of Section 1-02-20 to the entire North Dakota Century Code).

In determining whether severance is permissible, the primary question involves the ascertainment of legislative intent.  Johanneson, 153 N.W.2d at 424.  Phrased another way, would the Legislative Assembly of North Dakota have enacted the law absent the offending provisions?

In this case, only two provisions of SB 2289 have been found invalid.  The vast majority of the bill has not been invalidated.  Thus, it is entirely feasible for the Court to adjudge only a certain "clause, sentence, paragraph, chapter, or other part of any title to be invalid" as contemplated by N.D.C.C. § 1-02-20.  The invalid provisions are not so critical to the bill such

that they cannot be severed.  The Court has no trouble concluding the North Dakota Legislature would have passed SB 2289 without the offending provisions had the bill been presented to them in such a fashion.  Thus, the Court concludes as a matter of law that the offending provisions may be severed and there is no need to strike down SB 2289 in its entirety.

## V.    CONCLUSION

Accordingly, the partial motions for summary judgment (Doc Nos. 147, 150, and 152) and the Plaintiffs' motion for summary judgment (Doc. No. 112) are **GRANTED in part and DENIED in part** as explained herein; the State's partial motions for summary judgment (Doc. Nos. 95 and 107) are **GRANTED**; and the motion to strike (Doc. No. 115) is **DENIED**.

The Court **ORDERS** and declares that the State is permanently enjoined from enforcing or seeking to enforce SB 2289 (N.D.C.C. §§ 51-07-01.2, 51-07-02.2, and 51-26-06) retroactively to farm implement dealership contracts which predate the effective date of SB 2289, August 1, 2017.  The Court further **ORDERS** and declares that the State is permanently enjoined from enforcing or seeking to enforce N.D.C.C. § 51-07-01.2(*l*)(2), (4), and (5) which prohibit arbitration.  The Eighth Circuit Court of Appeals has previously upheld these rulings.  The remaining challenged provisions of SB 2289 remain intact.

**IT IS SO ORDERED**.

Dated this 19th day of October, 2020.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court